UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 (Subchapter V) |
| | ) | |
| Golden Fleece Beverages, Inc., | ) | Case No. 21-12228 |
| | ) | Hon. David D. Cleary |
| Debtor. | ) | |

**DECLARATION OF CANDACE MACLEOD IN SUPPORT OF DEBTOR'S CHAPTER 11 PETITION & FIRST DAY RELIEF**

I, Candace MacLeod, declare under penalty of perjury, that:

1.      I am the President of Golden Fleece Beverages, Inc., the debtor and debtor in possession (the "***Debtor***" or "***GFB***") in the above-captioned chapter 11 case, proceeding under subchapter V of chapter 11 (the "***Case***"). I am over 18 years of age, and I am competent to testify. I am also commonly known by my married name "Candace Pappas."

2.      The Debtor filed a voluntary chapter 11 petition on October 27, 2021 (the "***Petition Date***"). (Dkt. 1). The Debtor continues to manage its financial affairs as debtor in possession. The Debtor elected for this Case to proceed under subchapter V of chapter 11 of the Bankruptcy Code,[1] as discussed in greater detail in this Declaration.

3.      The Debtor has requested certain relief in "first day" motions filed with the Court (the "***First Day Motions***") to minimize potential adverse effects of the bankruptcy filing and to maximize the value of its estate. I and I am authorized to submit this Declaration (the "***Declaration***") on behalf of the Debtor to assist the Court and parties in interest in understanding the circumstances that led to the commencement of the Case and in support of the Debtor's voluntary petition and First Day Motions.

4.      I have served as President of the Debtor since approximately July 7, 2021. Prior to that time, I served as the Debtor's Managing Partner, Retail. Except as otherwise indicated in this Declaration, all facts set forth here are based upon (a) representations by executives or

---

[1]    11 U.S.C. § 101 *et seq.*

employees of the Debtor to me; (b) my personal knowledge; (c) my review of relevant business records and documents of the Debtor, including the First Day Motions and their exhibits; and (d) my opinion based on my experience and knowledge. If called upon to testify, I would testify that the facts set forth in this Declaration are true and correct.

5.      To the best of my knowledge and after reasonable inquiry, the relief sought in the First Day Motions is necessary to avoid immediate and irreparable damage to the Debtor's business and will provide an orderly transition of the Debtor into this Case, and ultimately facilitate the Debtor's ability to reorganize, thus maximizing recoveries for all parties in interest. Further, I believe the relief sought in the First Day Motions is narrowly tailored and necessary to achieve the goals identified above, and accordingly, best serve the interests of the Debtor's estate.

### EXECUTIVE SUMMARY

6.      GFB has two business lines: selling consumer packaged goods to retailers ("*CPG*") and working with licensee-partners who operate cafés ("*Licensing*").

7.      GFB purchased assets used in its business in February 2020 out of a UCC Article 9 sale of the assets of Argo Tea, Inc. ("*Argo*"). Following the closing of the Article 9 sale, two Argo creditors elected to pursue collection litigation against Argo. Eventually, one of them, 550 St. Clair Retail Associates, LLC ("*Judgment Creditor*," or "*550 St. Clair*") managed to obtain a state court order freezing funds payable to GFB by two GFB customers even though GFB was not a defendant in the collection proceeding. In effect, 550 St. Clair obtained a *prelitigation attachment* of a GFB receivable based solely on 550 St. Clair's claims against Argo. GFB is not aware of any legal precedent that countenances this outcome.

8.      The disruption of 550 St. Clair's actions to GFB's cash flow and business operations has been severe. The potential additional disruption of the activities of certain other Argo creditors would exacerbate an already critical situation.

9.    GFB's goals (as elaborated in paragraph 36 of this Declaration) in filing this bankruptcy are to:

(i)  obviate the already-filed state court litigation filed against Argo (the "**2021 Citation Proceeding**") as to GFB;

(ii) forestall future state court litigation against GFB;

(iii) confirm a plan that resolves the disputes at issue in the 2021 Citation Proceeding; and

(iv) enable GFB to continue in business, thus preserving jobs and going concern value, and thus maximizing creditor recoveries while permitting GFB's shareholders to retain their equity.

### HISTORY LEADING UP TO THE 2021 CITATION PROCEEDING

10.    Argo began business in 2003. By 2015, Argo:

(i)  employed approximately 243 people;

(ii) owned and operated 23 cafes in three states;

(iii) licensed another 25 cafes in the United States and in 3 other countries; and

(iv) had Argo Tea brand bottled beverages being sold in more than 20,000 distribution points throughout the United States. Top customers included Walgreens (approx. 15% of CPG sales), 7-11, Circle K, Whole Foods, Wawa, etc.

11.    In 2015, Caribou Coffee Company, Inc. ("**Caribou**") loaned Argo and its eight subsidiaries $10 million ("**Argo Secured Debt**"). The Argo Secured Debt was secured by all of Argo's assets and those of Argo's eight subsidiaries.

12.    By 2019, Argo's business was in some distress:

(i)  it was in default of the credit agreement with Caribou under the Argo Secured Debt;

(ii) the principal amount of the Argo Secured Debt still stood at $10 million, and Argo owed additional amounts for accrued interest and fees; and

(iii) Argo's trade vendors and landlords were owed no less than $8 million.

13.     By December 2019, Argo had fewer than 115 employees, was operating only 13 retail locations, and had only 22 licensed locations.

14.     In addition, one of Argo's trade creditors, Haelssen & Lyon GMBH & Haelsson & Lyon North America Corp. ("*Old Judgment Creditor*") obtained a judgment in New York in the principal amount of $260,614.39, domesticated it in Illinois, and obtained a citation to discover assets against Argo, after which it issued third party citations to Argo's banks (collectively, the "*2019 Citation Proceeding*"). The 2019 Citation Proceeding caused further harm to Argo's operations for more than two months before it was dismissed due to the vacating of Old Judgment Creditor's underlying judgment. Attached **Appendix 1** contains a summary of the 2019 Citation Proceeding.

15.     As 2020 dawned, Argo was under severe financial distress not just due to the Caribou default and 2019 Citation Proceeding but numerous additional legal actions and threats related to unpaid obligations (including 550 St Clair, GGP-Oakbrook, State/Randolph, LLC, GGP-Natick, Chicago Department of Aviation, Reinhart Food Service, LLC, Novack & Macey, LLP, etc.). At this point, Argo lacked sufficient cash or other working capital to continue to produce goods for sale, crippling revenue, and had no ability to raise capital.

16.     GFB was formed on January 15, 2020, for the express purpose of purchasing Argo's secured debt held by Caribou. GFB raised $3.15 million in equity capital.

17.     GFB purchased the Argo Secured Debt immediately after its formation for $1.6 million. This amount was 84% less than the principal balance of the Argo Secured Debt.

18.     On February 14, 2020, GFB held a public auction of the collateral ("*Article 9 Auction*") As required by applicable law, notice of the sale was provided:

> (i) to known secured creditors and creditors with known judgment liens; and

> (ii) in the Chicago Tribune on February 5th, 9th, and 12th. Attached **Group Exhibit A** contains additional information regarding the notice and the sale itself.

19.    GFB was the only bidder at, and won, the Article 9 Auction with a credit bid of $9 million. Pursuant to its successful bid, GFB took title to substantially all the Argo debtors' assets.

### GFB's Operations

20.    GFB, following its purchase of Argo's assets through the Article 9 Auction, then proceeded to use the assets it acquired to invest in growing the new business.

21.    With the $1.55 million of capital remaining from its initial raise, GFB began to build operations, produce inventory, develop new formulas for its beverages, develop a new brand image, and market to customers.

22.    The overall business strategy focused on CPG, with a secondary focus on Licensing, while exiting the direct ownership and operation of cafés.

23.    Very shortly after the COVID pandemic began in March 2020, all retail operations were closed except a café location at NYU Medical Center in NYC.[2] All company owned café operations were transitioned to licensees, closed permanently, or sold.

24.    As of the Petition Date, GFB has only six employees and contracts out all manufacturing.

25.    The CPG side of GFB's business produces about 93% of its revenue, over 80% of which is earned by selling its products to Walgreens and Kwik Trip. As of the Petition Date, Walgreens owes GFB about $819,000 (the "*Walgreens Receivable*"), and Kwik Trip owes GFB about $29,000 (the "*Kwik Trip Receivable*").

### The 2021 Citation Proceeding

26.    550 St. Clair, a former landlord of an Argo affiliate, obtained a judgment against Argo and initiated the 2021 Citation Proceeding. In connection with that proceeding:

> (i) In May 2021, 550 St. Clair obtained a citation to discover assets against Walgreens ("*Walgreens Citation*"), enjoining Walgreens from transferring any assets of Argo to GFB.

---

[2]    Prior to March 2020, this location was company operated. As of March 1, 2020, however, the location transitioned to being licensee operated.

   (ii) In July 2021, 550 St. Clair obtained a citation to discover assets against Kwik Trip, Inc. ("***Kwik Trip Citation***," referred to collectively with the Walgreens Citation as the "***Customer Citations***"), enjoining Kwik Trip from transferring any assets of Argo to GFB.

27. Although Walgreens and Kwik Trip were GFB customers that owed money to GFB—not Argo—and although the Customer Citations did not explicitly prevent either customer from paying GFB, Walgreens and Kwik Trip took a conservative view of their respective Customer Citations. Walgreens and Kwik Trip, consequently, have refused to pay GFB any of the Walgreens Receivable or Kwik Trip Receivable.

28. In short, the effect of the Customer Citations has been to paralyze GFB's business. Attached **Appendix 2** summarizes and contains the key pleadings related to the Walgreens Citation.

29. The Walgreens Receivable is a simple account receivable. Walgreens has not alleged that the goods GFB sold to Walgreens were deficient in any way. There is no dispute that payment is owed.

30. The Kwik Trip Receivable is similarly a simple account receivable. Kwik Trip has not alleged that the goods GFB sold to Kwik Trip were deficient in any way. There is no dispute that payment is owed.

31. The Customer Citations that 550 St. Clair has obtained have effectively worked as a *prelitigation* attachment of GFB property. The only problem with this description is that the concept has no basis in law.

**MISTAKES REGARDING PPP LOAN PROCEEDS**

32. To facilitate the transition of assets from Argo to GFB, the two parties entered into a customary transition services agreement ("***TSA***") under which Argo retained certain of its employees after the Article 9 Auction and leased them to GFB, with the lease payments covering the salaries and benefits of the retained employees. This arrangement continued until July 21,

2021, when Argo's Chase bank accounts were frozen due to a citation issued against Chase Bank in connection with the 2021 Citation Proceeding.

33.     In my capacity as President of GFB, I have become aware that Argo applied for two PPP loans. Through my review of publicly available information,[3] I confirmed that the first PPP Loan was approved on April 15, 2020, in the amount of $859,412.00 (the "***First PPP Loan***"), and that the second PPP loan was approved on February 11, 2021, in the amount of $1,203,177.00 (the "***Second PPP Loan***").

34.     I further became aware that some of the proceeds of both the First PPP Loan and Second PPP Loan were used in a manner that benefited GFB and that renders at least some of those proceeds subject to having to be paid back. An internal inquiry regarding this situation is underway.

### GOAL OF THIS BANKRUPTCY CASE

35.     As of the Petition Date, GFB's business is essentially on death's door because:

(i)  it has no access to immediate working capital because of the Customer Citations; and

(ii) it has no practical ability to raise new capital of any kind because of the yet-to-be-filed litigation based on successor liability claims.

36.     GFB seeks to use this bankruptcy case to:

(i)  enable Walgreens to immediately release the Walgreens Receivable, under the protection of Bankruptcy Code § 542;

(ii) enable Kwik Trip to immediately release the Kwik Trip Receivable, under the protection of Bankruptcy Code § 542;

(iii) obviate the 2021 Citation Proceeding as to it, to proactively address Judgment Creditor's yet-to-be-brought successor liability claims;

(iv) similarly forestall any future state court litigation against GFB; and

(v)  confirm a plan that resolves the disputes at issue in the 2021 Citation Proceeding.

---

[3]   Information regarding PPP loan award amounts and dates of awards are available publicly through https://projects.propublica.org/coronavirus/bailouts/ (last visited October 17, 2021).

37.     GFB does not agree it would be held liable to creditors of Argo if successor liability litigation (or any other litigation) were to be filed against it.

38.     GFB, however, can neither afford to defend against such claims nor can it raise any new capital while the possibility of such litigation exists.

OVERVIEW OF THE DEBTOR'S CAPITAL STRUCTURE

**A.  The Debtor's Business & Capital Structure**

39.     As of the Petition Date, the Debtor's debts include approximately $1.56 million in noncontingent, liquidated unsecured debts owed to general unsecured creditors. The Debtor does not have any secured creditors.

40.     The Debtor does business with its trade vendors under the terms of various agreements, particularly with those of its key trade vendors supplying certain proprietary or specialized goods or services for the Debtor. For example, the bottles, labels, and formulas for the Debtor's bottled tea products sold through CPG channels are produced by various vendors, making up the Debtor's ultimate finished CPG products. The Debtor also has executory contract relationships with certain of its other vendors to maintain and operate its business in the ordinary course.

FIRST DAY MOTIONS & RELIEF

41.     Below is a brief discussion of the Debtor's First Day Motions and an explanation of why such motions are critical to the success of the Case. More detailed descriptions of the facts pertaining to the Debtor's operations and the bases for the requested relief in each motion can be found in each relevant First Day Motion.

42.     As described more fully below, the relief requested in the First Day Motions was carefully tailored by the Debtor, in consultation with its professionals, to ensure the Debtor's immediate operational needs are met, and that the Debtor suffers no immediate and irreparable harm. At all times the Debtor's management and professionals remained cognizant of the limitations imposed on debtors in possession and, in light of those limitations, the Debtor

narrowed the relief requested at the outset of this Case to those issues that require urgent relief to sustain the Debtor's operations.

### A. DIP Financing & Cash Collateral Motion

43.     To fund its operations in light of the Walgreens's refusal to release the Walgreens Receivable, the Debtor needs immediate access to and use of cash. By this emergency motion (the "***DIP Financing Motion***"), the Debtor seeks interim and final authority to borrow up to $500,000 from the Lenders (as defined in the DIP Financing Motion), with an initial guaranteed amount of $145,000 to fund its operations in this Case on interim and final bases as it seeks to reorganize its business under subchapter V.

44.     In brief, the key terms of the DIP Agreement, approval of which is sought by the Financing Motion is summarized as follows, and as described in more detail in the DIP Financing Motion:

| Material Terms | Summary of Material Terms |
| --- | --- |
| **Borrower**: | Golden Fleece Beverages, Inc. |
| **Lenders**: | G & K Investment Holdings, Vicinet, LLC, and GTeaVentures, LLC |
| **Agent:** | Gerald Muizelaar, administrative agent on behalf of the Lenders |
| **Budget**: | A Budget showing anticipated sources and uses of cash (including DIP Loan advances) is attached as Exhibit B to the Interim Order. |
| **Loan Limit** | $145,000 guaranteed if requested, up to $500,000 upon agreement of Lenders and Borrower |
| **Interest Rate**: | 0.86% per annum |
| **Duration of Use**: | The Loan shall mature and Debtor's ability to borrow further shall terminate 120 days following the Petition Date, absent written consent of the Lenders to extend the Loan and court approval of the extension.  In addition, the Debtor's right to borrow shall terminate upon (a) the occurrence of an Event of Default or the expiration of the cure period for certain Defaults (as provided in Section 14 of this Agreement) if the Default is not cured, (b) upon receipt by Debtor in full of the Walgreens Receivable[4], or (c) the effective date of a confirmed plan of reorganization in this case.  The first of these events to occur shall be the "Maturity Date."  In the event a portion of the Walgreens Receivable is received by Debtor but that amount is insufficient to repay Lenders in full, Debtor shall pay such proceeds to Lenders as partial repayment on the Obligations then outstanding. |

---

[4]     The Walgreens Receivable is approximately $819,000.

| | |
|---|---|
| **Events of Default**: | ***Payment***. Debtor fails to pay any Obligation to Lenders as and when due and payable; |
| | ***Representations and Warranties***. Any representation or warranty Debtor has made, or makes in the future proves to have been incorrect, incomplete, or misleading in any material respect on or as of the date it is made or deemed made, and Debtor does not cure such breach to Lenders' satisfaction within five (5) business days of receipt of written notice of such breach by Lenders; |
| | ***Breach of Term or Condition***. Debtor fails to perform or observe any other material term or condition of this Agreement with Lenders, and Debtor does not cure such breach to Lenders' satisfaction with five (5) business days of receipt of written notice of such breach by Lenders; |
| | ***Lenders' Rights***. Any of the Liens or other rights of Lenders in the Collateral at any time are not (or Debtor claims the right is not) a first (super) priority, valid, and perfected interest in the Collateral as set forth in the DIP Financing Orders or as otherwise provided herein with respect to any holder of a Prior Permitted Lien; |
| | ***Other Proceedings***. Debtor becomes involved in any proceeding that Lenders reasonably believes would result in a forfeiture of all or a substantial part of Debtor's assets, or in the entry of a material judgment against Debtor. |
| **506(c) Waiver**: | Upon entry of the Final Order, and except for the Carveout, the Obligations will be: i) Superpriority DIP Claims over all administrative expense claims and unsecured claims against Debtor now existing or hereinafter arising, including all administrative expense claims set forth in 11 U.S.C. Sections 105, 326, 328, 330, 331, 332, 333, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114, or any other provision of the Bankruptcy Code; and ii) secured pursuant to 11 U.S.C. Sections 364(c)(2) and (c)(3), and (with the exception of Prior Permitted Liens) Section 364(d)(1), and to the extent provided in the DIP Financing Orders will not be subject to any claims against the Collateral pursuant to 11 U.S.C. Section 506(c). |
| **Carveout:** | The prepetition tax liens (if any) of governmental units and the operational and case-related obligations identified in the Budget shall be senior to the liens and claims of the Lenders. |
| **Waiver/Modification of Automatic Stay**: | Ten (10) days following the delivery of a Notice of Event of Default, the automatic stay provisions of 11 U.S.C. Section 362 will be vacated and modified to the extent necessary to permit Lenders to exercise all rights and remedies set forth in any of the Loan Documents (the "Termination Date"). Upon the occurrence of the Termination Date, Lenders may also (in their sole and absolute discretion) take any of the following actions without further notice, and without further order from, or application to, the Bankruptcy Court: |
| | (a) Terminate Commitment. Terminate any obligation to make any further advances or financial accommodations to Borrower; |
| | (b) Collateral. Subject to the rights of any holder of a Prior Permitted Lien, enforce all rights against any Collateral in the possession of Lenders, including disposing of the Collateral solely for application towards the Obligations; and/or |
| | (c) Other Action. Take any other action, or enforce any other right or remedy, provided by any applicable Law, or the Loan Documents. |
| **Adequacy of Budget:** | The Debtor has reason to believe that the cash flow and borrowing projected in the Budget will be adequate to support operations during the DIP period (inclusive of professional fees and disbursements) considering all available assets, to pay all administrative expenses due or accruing during the period covered by the Budget. |

45.     The Debtor has run out of cash, making access to the DIP Loan essential for the Debtor to fund payroll immediately and to operate its business during this Case. I therefore believe that immediate authority to obtain the DIP Loan is necessary to prevent immediate and irreparable harm to the Debtor's estate, and that the relief sought in the DIP Financing Motion is necessary and in the best interests of the Debtor and its bankruptcy estate.

**B. Cash Management Motion**

46.     By this emergency motion (the "***Cash Management Motion***"), the Debtor seeks an order authorizing it to, in the ordinary course of business, (a) use its existing cash management system, certain prepetition bank accounts, and prepetition business forms (without reference to the Debtor's status as a debtor in possession); (b) direct the Debtor's banks and financial institutions to maintain, service, and administer the Debtor's bank accounts and to the extent funds are available, honor and process all related checks and electronic payment requests consistent with the relief requested therein; and (d) waive the Debtor's compliance with the guidelines set forth in Bankruptcy Code § 345(b).

47.     As described more fully in the Cash Management Motion, the Debtor operates its business under an established cash management system which it utilizes to collect, manage, and disburse funds used in the Debtor's operations in the ordinary course of business.

### *(i)    The Cash Management System*

48.     The Debtor operates its business in the ordinary course under an integrated, centralized cash management system (the "***Cash Management System***") comparable to the cash management systems used by similarly situated companies, to manage its cash in a cost-effective, efficient manner.

49.     The Cash Management System is administered by the Debtor to collect funds from various sources to fund operations and pay various operating and administrative expenses. The Debtor uses the Cash Management System in the ordinary course of business to collect,

transfer, and distribute funds generated from its operations and to facilitate cash monitoring, forecasting, and reporting.

### (ii)  The Debtor's Existing Bank Accounts & Business Forms

50.    The Debtor maintains four separate commercial bank accounts, held at JP Morgan Chase Bank, N.A. (the "**Bank**," or "**Chase**,") described as follows:

#### (a) Operating Account

The Cash Management System centers around the Debtor's account ending in -6529 (the "**Operating Account**"), which it uses as its main operating and disbursement account. The Operating Account is used to take in deposits from the Debtor's various depository accounts, and use those funds to pay the Debtor's operating expenses, using the monies deposited into the Operating Account to make all disbursements to meet the Debtor's ordinary course obligations, including payroll, vendor payments, expense reimbursements, processor fees, and bank fees, among others.

Postpetition, the Debtor anticipates that funds from the DIP Loan sought under the *Debtor's Emergency Motion for Interim and Final Orders Authorizing the Debtor to Incur Postpetition Debt*, filed concurrently with this Motion, will be disbursed to the Operating Account.

#### (b) Licensing Account

The Debtor uses a separate account ending in -6537 for purposes of receiving payments from its various licensing partners (the "**Licensing Account**") as part of the Cash Management System. The Licensing Account is used to track and account for receipts from the Debtor's various licensing partners. Funds held in the Licensing Account are periodically transferred to the Licensing Account to fund the Operating Account. Generally speaking, such transfers are made daily when the Debtor receives funds into the Licensing Account.

#### (c) CPG Account

The Debtor also uses a separate account ending in -6522 for purposes of receiving payments from customers on account of CPG sales (the "**CPG Account**") as part of the Cash Management System. The CPG Account is used to track and account for sales through the Debtor's consumer package goods customers. Funds held in the CPG Account are periodically transferred to the Operating Account to fund the Operating Account, generally speaking, such transfers are made daily when the Debtor receives funds into the CPG Account.

*(d) Holding Account*

The Debtor also maintains an account ending in -1879 with the Bank as part of the Cash Management System for the purpose of holding and accounting for funds transferred to the Debtor as capital infusions from equity holders (the "***Holding Account***"). Funds held in the Holding Account (to the extent any are held) are available to the Debtor t in the event that the Debtor does not hold enough funds in the Operating Account to pay its expenses in the ordinary course.

51.     The Debtor also regularly uses company-specific business and banking forms, including checks; letterhead; envelopes; invoices; purchase orders; guest receipts and other common forms in the day-to-day conduct of its affairs (collectively, the "***Business Forms***").

52.     The Cash Management System touches all aspects of the Debtor's business operations, and by its nature, is critical to the integrated management of the Debtor's financial affairs. The overwhelming majority of the Debtor's business transactions are conducted electronically, tied directly to the Bank Accounts. Additionally, the Cash Management System is integrated directly with the Debtor's accounting system to track and receive information regarding the Debtor's business, including tracking and accounting for receipts from specific sources, projecting future revenues and income, and managing employee, vendor, and customer payments and receipts. The Debtor needs to be able to continue operating its business in the ordinary course under the Cash Management System and should not be forced to disrupt its regular business activities at a time when restarting operations is so critical to the Debtor's ability to reorganize.

53.     In my opinion, requiring the Debtor to alter its Cash Management System would cause disruption in the Debtor's business and would impair the Debtor's efforts to maximize the value of its estate. Moreover, such actions would be expensive, unnecessary, and burdensome to the Debtor's estate, and disruptive to the Debtor's business operations, while simultaneously conferring no benefit to parties dealing with the Debtor.

54.     Consequently, I believe that maintaining the Debtor's existing Cash Management System, and other banking and business practices during this Case is necessary and in the best interests of the Debtor and its bankruptcy estate.

### C.  Employee Wages & Benefits Plans Motion

55.     By this emergency motion (the "***Employee Motion***"), the Debtor seeks interim and final orders order authorizing it to (a) satisfy all prepetition employee obligations; (b) continue administering employee benefits plans; and (c) direct all banks to honor prepetition checks or wire transfers with respect to payments authorized by the Employee Motion.

### *(i)   Employee Payroll*

56.     As of the Petition Date, The Debtor has a workforce consisting of six full time salaried and exempt employees (the "***Employees***") and have prepetition aggregate unpaid salary, commissions, and wages of approximately  $19,811.38, exclusive of commissions related to prepetition sales, and which are not yet due and payable to those Employees, described in further detail below.

57.     In the ordinary course of business, the Debtor incurs payroll obligations for its Employees. Such obligations generally consist of wages, commissions, and salaries ("***Employee Compensation***"). The Debtor's employees are paid salaries, commissions, and wages on a bi-weekly basis. Wednesday is payday for all employees, with payment being made two weeks in arrears. On average, the total amount of bi-weekly Employee Compensation is approximately $24,000.

58.     Employee Compensation is funded through ZenPayroll, Inc., dba Gusto ("***Gusto***"), a payroll service. To pay the Employee Compensation, the Debtor transmits payroll records to Gusto on the Mondays for payday later in the week. On those Mondays, Gusto debits the Debtor's bank accounts the amount referenced on the payroll records. On the regular payday, Gusto disburses the Employee Compensation to each Employee from the funds

advanced by the Debtor, paying the Employee in arrears for the past two weeks' work.

59.    The Debtor transmitted funds to Gusto to pay the Employee Compensation through October 15, 2021, and Gusto disbursed these funds to the Employees. Gusto has not yet been funded to pay Employee Compensation for services rendered through October 31, 2021. Gusto is not holding any additional funds from the Debtor for Employee Compensation as of the Petition Date.

60.    The Employees have not been paid outstanding Employee Compensation for the period of October 16, 2021, through the Petition Date.

61.    Additionally, certain of the Debtor's employees are entitled to commission on account of CPG sales. Two of the Employees receive sales commissions based on sales of the Debtor's CPG products. Commissions are paid to these Employees upon the Debtor receiving payment from a customer on account of the relevant Employee's sales. Both employees receive commission payments from all customer sales. Commission percentages are increased once the business reaches specific sales, and there is no cap on commission amount. As of the Petition Date, the total estimated commissions owed to Employees on account of prepetition sales— inclusive of sales relating to the Walgreens Receivable and the Kwik Trip Receivable—is approximately $214,81.57 that will become due and payable to the Employees following the Debtor's collection of roughly $859,000 in accounts receivable relating to these sales.

### (ii)  *Employment & Withholding Taxes*

62.    The Debtor routinely withholds from its Employees' payroll amounts they are required to remit to various federal, state, and local taxing authorities and other governmental agencies (the "**Employee Deductions**", referred to collectively with Employee Compensation as the "**Employee Obligations**"). Examples of Employee Deductions include: Social Security Taxes; federal, state, and local income taxes; wage garnishments; and other court-ordered deductions. These taxes and other deduction obligations are usually calculated based on statutorily-mandated percentages of earned wages. The Debtor has historically paid all

Employee Deductions, and by this motion, the Debtor seeks authority to continue doing so, and forward any outstanding prepetition Employee Deductions to the appropriate parties.

### (iii) *Employee Benefits & Expense Reimbursements*

63.      The Debtor offers its Employees certain benefits, including health insurance, dental and vision insurance, a 401(k), life insurance, disability insurance, accident insurance, flexible benefits, and paid time off (collectively, the "***Employee Benefits***"). The Debtor seeks to continue providing the Employee Benefits postpetition, and to honor all prepetition obligations related to the Employee Benefits.

64.      The Debtor also regularly reimburses Employees, as well as one non-Employee, Roy Yu (the Debtor's Operating Partner, who is also a small indirect shareholder of the Debtor) for business expenses advanced on the Debtor's behalf by these individuals (the "***Expenses***"). Categories of Expenses that the Debtor reimburses for include but are not limited to customary travel, lodging, and meal expenses.

65.      In addition, the Debtor reimburses Expenses for certain business expenses that these individuals advance from their personal credit cards on the Debtor's behalf, as a matter of expediency because the Debtor itself does not currently have a corporate credit card account, and in many cases no other method of payment is accepted by third parties on the timeframe needed by the Debtor. Such Expenses include advances made by individuals to pay for certain software platform subscriptions the Debtor uses to manage its business; freight charges for shipping through third parties; and overnight mailing services. Generally speaking, individual credit cards are only used for these Expenses when no other method is accepted in the necessary timeframe. The Debtor is working to migrate these expenses to its own accounts as it continues operations.

66.      Individuals seeking reimbursement for Expenses from the Debtor do so on a monthly basis by submitting reimbursement requests through Expensify, the Debtor's expense reimbursement tracking software platform.

67.     The Debtor has historically reimbursed the Employees and Mr. Yu for all Expenses in the ordinary course of its business, and by the Employee Motion, the Debtor seeks authority to continue doing so, and to reimburse Expenses sought by Employees, and only those prepetition Expenses sought by Mr. Yu. The total amount of Expenses incurred prepetition is approximately $20,000 and, if this aspect of the Employee Motion is approved, six people will be reimbursed.

68.     The benefit to the Debtor's estate of permitting it to honor its obligations to the Employees and other workers is far greater than the cost of denying this relief to the Debtor.

69.     I further believe that it is likely the Debtor's workforce will exit if the Debtor is not permitted to pay prepetition wages, continue administering employee benefits plans, and allow employees to use paid time off. The Debtor will not be able to operate without its workforce.

70.     Additionally, the Debtor could face additional unplanned liability if it is not permitted to comply with its obligations regarding prepetition payroll withholdings, workers' compensation, and other employer duties, which would deplete amounts available to pay creditors.

71.     I therefore believe that the relief sought in the Employee Motion is essential for the Debtor to be able to operate its business postpetition, and is necessary to prevent immediate and irreparable harm to the Debtor's estate. Without a workforce or the ability to continue honoring the Prepetition Employee Obligations, the Debtor will have no way to do business. I believe that the relief sought in the Employee Motion is necessary and in the best interests of the Debtor and its bankruptcy estate.

**D.  Tax Motion**

72.     By this motion (the "***Tax Motion***"), the Debtor seeks an order authorizing it to, among other things, pay certain tax obligations in the ordinary course of business, whether arising prepetition or postpetition.

2.      In the ordinary course of business, the Debtor pays certain taxes (collectively, the
"***Taxes***") to various taxing and other governmental authorities (the "***Taxing Authorities***").
The Taxes generally consist of sales taxes, income taxes, and unemployment taxes. As of the
Petition Date, the Debtor's records show it owes approximately $14,111.73 in outstanding Taxes.
Accordingly, the Debtor seeks authority to pay or fund any outstanding amounts.

73.      The Debtor is responsible for remitting franchise taxes (the "***Franchise Taxes***")
to the Delaware Division of Corporations and the Illinois Department of Revenue to maintain its
corporate status and ability to conduct its business in these states. The Debtor's records indicate
that, as of the Petition Date, the Debtor is current on its Franchise Taxes in Delaware, but owes
Franchise Taxes to the Illinois Department of Revenue subject to completion and filing of the
Debtor's 2020 Illinois state tax return.

74.      Certain of the Taxing Authorities require that the Debtor pay income or corporate
taxes on net income (*i.e.*, the difference between gross receipts, expenses, and additional write-
offs) ("***Income Taxes***"). Since the Debtor was formed in 2020, it has not yet filed its 2020
income tax returns, but the Debtor is required to pay, when due, Income Taxes on an annual
basis. The Debtor intends to file its 2020 returns for the Income Taxes within the next 7 days,
with 2020 Income Taxes to be paid by the end of 2021. The Debtor anticipates paying any
Income Taxes owed, but the amount of the Debtor's Income Taxes (if any) will not be known
until the returns are filed.

75.      The Debtor also routinely withholds from its employees' payroll the Employee
Deductions—amounts the Debtor are required to remit to various federal, state, and local taxing
authorities and other governmental agencies, which include: Social Security Taxes; federal,
state, and local income taxes; wage garnishments; and other court-ordered deductions. These
taxes and other deduction obligations are usually calculated based on statutorily-mandated
percentages of earned wages.

76.     With respect to Social Security Taxes, the Debtor has an outstanding amount owed to the Internal Revenue Service for approximately $12,987.74 on account of deferred deposits and payment of Social Security Taxes, as allowed for under the Coronavirus, Aid, Relief and Economic Security Act (CARES Act). The Debtor must pay half of this outstanding amount by the end of 2021.

77.     The Debtor is required to pay, when due, certain sales taxes for ecommerce sales made directly to consumers (the "***Sales Taxes***"). The Debtor collects sales tax from consumers through its ecommerce business and pays Sales Taxes to the Illinois Department of Revenue. The Sales Taxes are paid on a monthly basis in arrears. As of the Petition Date, the Debtor's outstanding amount of unpaid Sales Taxes is approximately $373.99.

78.     I believe that the relief sought in the Tax Motion is essential for the Debtor to be able to operate its business postpetition, is necessary to prevent immediate and irreparable harm to the Debtor's estate, and that the relief sought in the Tax Motion is necessary and in the best interests of the Debtor and its bankruptcy estate, as more fully set forth in the Tax Motion.

### E.     Insurance Motion

79.     By this motion (the "***Insurance Motion***"), the Debtor seeks an order authorizing it to, among other things, maintain its existing insurance policies and premium financing agreement on an uninterrupted basis in accordance with historical practice; and fund all premiums, deductibles, fees, and other obligations in respect thereof, whether relating to the prepetition or postpetition period

80.     In the ordinary course of its business, the Debtor maintains multiple insurance policies through various carriers (the "***Insurance Providers***") providing coverage for, among other things: health, dental, vision, and accident and life insurance coverage for employees; general liability, property, and umbrella coverage; director and officer liability; and cyber protection (collectively, the "***Insurance Policies***"). The following chart summarizes the Debtor's existing Insurance Policies and coverage:

| Coverage | Policy Provider | Policy Period |
|---|---|---|
| Health, Vision, Dental Insurance | United Health Group | 04/01/2021-04/01/2022 |
| Disability Insurance | Principal / Stumm Insurance | 08/01/2021-07/31/2022 |
| Accident & Life Insurance | Guardian | 04/01/2021-04/01/2022 |
| Workers Compensation | Liberty Mutual | 08/13/2021-08/13/2022 |
| General Liability, Property | Liberty Mutual | 02/17/2021-02/17/2022 |
| Umbrella | Liberty Mutual | 02/17/2021-02/17/2022 |
| Director & Officer | Nationwide Management Liability & Specialty | 08/13/2021-08/13/2022 |
| Cyber | Beazley | 09/01/2021-09/01/2022 |

81.     One of the Insurance Policies—the Debtor's director and officer liability Insurance Policy—is paid through a commercial premium finance agreement with First Insurance Funding, a division of Lake Forest Bank & Trust Company, N.A., a Wintrust Community Bank. Under the premium finance agreement effective as of September 17, 2021, the Debtor paid a $3,359.00 initial payment and has a monthly obligation to pay $1,062.59 over a 6-month term. The term of the Insurance Policy paid through the premium financing agreement began August 13, 2021, and such coverage is subject to renewal on August 13, 2022.

82.     All of the Insurance Policies are subject to periodic review and renewal by the Debtor in the ordinary course of its business. The Debtor may determine in the ordinary course of its business operations during this Case that certain coverage should be renewed, modified, terminated, or moved to another carrier.

83.     Further, it is imperative that the Debtor be able to maintain the Insurance Policies to be able to protect and preserve the value of the Debtor's estate in this Case. If any of the Insurance Policies do not remain in place, the Debtor's ability to operate in this Case will be disrupted even further than it already has been.

84.     I believe that the relief sought in the Insurance Motion is essential for the Debtor to be able to operate its business postpetition. Without insurance coverage under the Insurance Policies, the Debtor's estate is subjected to unnecessary and intolerable risk. I believe that the relief sought in the Insurance Motion is necessary to prevent immediate and irreparable harm to

the Debtor's estate, and that the relief sought in the Insurance Motion is necessary and in the best interests of the Debtor and its bankruptcy estate.

### F. Motion to Extend time to File Schedules & SOFA

85.     By this motion (the "***Schedules Motion***"), the Debtor seeks an order granting the Debtors an extension of 14 days (for a total of 28f days after the Petition Date) to file its schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases (collectively, the "***Schedules***"), and statement of financial affairs (collectively, the "***SOFA***"), among other things.

86.     The Debtor has begun compiling the information required to complete its Schedules and SOFA. Nevertheless, because of the limited time and resources available, the Debtor has not yet finished gathering such information.

87.     Given the numerous critical operational matters that the Debtor's accounting and legal personnel must address in the early days of this Case, and the volume of information that must be accessed, reviewed, prepared, and included in the Schedules and SOFA, the Debtor anticipates it will be unable to complete the Schedules and SOFA within the time required under Bankruptcy Rule 1007. Moreover, the Debtor submits that focusing the attention of key accounting and legal personnel on vital operational and restructuring matters during the critical first weeks after filing this Case, rather than on preparing the Schedules and SOFA, will facilitate the Debtors' smooth transition into chapter 11 and maximize the value of the Debtor's estate for the benefit of creditors and all parties in interest.

88.     Additionally, the Debtor must gain access to certain records of Argo which the Debtor does not have ready access to in connection with formulating a plan. The Debtor also has a limited staff capable of performing the required internal review of such financial records and affairs, including obtaining and reviewing those of Argo.

89.     I believe that the relief sought in the Schedules Motion is therefore essential for the Debtor to be able to operate its business postpetition.

**CONCLUSION**

90.     For the reasons stated here and in each of the First Day Motions, filed concurrently or in connection with the commencement of this Case, I request that each First Day Motion be granted in its entirety, together with any other, further relief the Court deems appropriate under the circumstances.

**[Signature Page Follows]**

I certify under penalty of perjury that, based upon my knowledge, information, and belief as set forth in this Declaration, the foregoing is true and correct.

Date: October 27, 2021                         /s/ Candace MacLeod

                                              Candace MacLeod, President
                                              Golden Fleece Beverages, Inc.

**Appendix 1**

---

**Summary of the 2019 Citation Proceeding**

1.  November 20, 2019: Old Judgment Creditor obtained a default judgment against Argo in New York, case number 651681/2019 (the "***New York Case***"), for $260,614.39, plus additional charges. *See* (Appx. 1 Ex. A).

2.  Old Judgment Creditor registered its New York judgment in the Circuit Court of Cook County on December 10, 2019, case 2019-L-050760. *See* (Appx. 1 Ex. B).

3.  On December 17, 2019, the court clerk issued Old Judgment Creditor's third party citation to discover assets against Metropolitan Capital Bank ("***Metropolitan***"), Argo's primary depository institution. *See* (Appx. 1 Ex. C).

4.  On December 18, 2019, the court clerk issued H&L's citation to discover assets against Argo. *See* (Appx. 1 Ex. D).

5.  Under Illinois law, the 2019 Citation Proceeding imposed a judgment lien upon all of Argo's personal property and prohibited Argo and any other person served with a citation from transferring any of Argo's property.

6.  On December 22, 2019, Argo filed an emergency motion for relief. *See* (Appx. 1 Ex. E).

7.  On December 24, 2019, the citation judge entered an order (*see* (Appx. 1 Ex. F)) that enabled Argo to continue operating. It provided, among other things, that:

    (a)  Argo was permitted to use its funds for certain ordinary business expenses and settlement/forbearance payments to specific creditors.

    (b)  Conditions were placed on Old Judgment Creditor from serving further citations to Argo's banks.

    (c)  Argo was required to make weekly reports to Old Judgment Creditor.

    (d)  The case was continued to January 15, 2020.

8.  On January 8, 2020, the court in the New York Case entered an order vacating Old Judgment Creditor's underlying default judgment. *See* (Appx. 1 Ex. G).

9.  On February 5, 2020, the court in the New York case, on re-argument, entered a second order vacating the underlying default judgment. *See* (Appx. 1 Ex. H).

10. On February 18, 2020, the Illinois citation court entered an order dismissing all pending citations, including those to Argo and Metropolitan Bank, and vacating and dismissing the Old Judgment Creditor's judgment registered in Illinois, in light of the New York judgment having been vacated. *See* (Appx. 1 Ex. I).

**Appendix 2**

## Summary of the 2021 Citation Proceeding

1.  The Walgreens Citation was issued May 7, 2021. *See* (Appx. 2 Ex. A).

2.  On July 13, 2021, GFB filed an emergency petition requesting leave to intervene in the Walgreens Citation case, release the freeze on its account at Walgreens, and dismiss the Walgreens Citation as to GFB. *See* (Appx. 2 Ex. B).

3.  A number of documents were then filed two days later, July 15, 2021:

    (a) Levenfeld Pearlstein, LLC filed its appearance on behalf of GFB. *See* (Appx. 2 Ex. C).

    (b) Judgment Creditor filed a response to GFB's petition to intervene. *See* (Appx. 2 Ex. D).

    (c) Judgment Creditor filed a petition seeking to enjoin Walgreens from transferring the proceeds of Argo-branded products until further order of the court. *See* (Appx. 2 Ex. E).

    (d) Judgment Creditor filed a motion seeking leave to file fraudulent transfer and successor liability claims against GFB and Arsen Avakian in the Walgreens Citation case. *See* (Appx. 2 Ex. F).

    (e) Novack and Macey LLP filed an emergency motion seeking an extension of time to file a petition to intervene in the Walgreens Citation case and postpone a ruling on GFB's motion, alleging rights a judgment creditor in two separate legal proceedings against Argo in Cook County, Illinois, cases 2020 CH 05306 and 2020 CH 06295. *See* (Appx. 2 Ex. G).

4.  On July 26, 2021, the Court entered an order (a) granting GFB leave to intervene but denying its request to release the freeze on its account at Walgreens and dismiss the citation; (b) granting Novack and Macey LLP to July 26, 2021 to file a Petition to Intervene; and (c) continuing other matters to August 3, 2021. *See* (Appx. 2 Ex. H).

5.  Also on July 26, 2021, Novack and Macey LLP filed its motion to intervene in the Walgreens Citation case, alleging rights a judgment creditor in two separate legal proceedings against Argo in Cook County, Illinois, cases 2020 CH 05306 and 2020 CH 06295. The motion stated Novack and Macey LLP's intention to follow suit with Judgment Creditor and file post-judgment claims against GFB alleging fraudulent transfer and successor liability. *See* (Appx. 2 Ex. I).

6.  On August 3, 2021, Levenfeld Pearlstein, LLC filed its appearance on behalf of third-party citation respondent Arsen Avakian. *See* (Appx. 2 Ex. J).

7.  Also on August 3, 2021, GFB filed a combined (a) response to Judgment Creditor' petition to enjoin and (b) motion requesting the court to reconsider its denial of GFB's July 13, 2021 emergency petition to unfreeze its account at Walgreens (See Appx. 2 Exs. B, E, and H). *See* (Appx. 2 Ex. K).

8.  On August 5, 2021, the court entered an order setting briefing schedules on multiple pending matters, continuing others, and setting a hearing for September 3, 2021. *See* (Appx. 2 Ex. L).

9.  On August 17, 2021, GFB filed its response to Judgment Creditor's motion (App. 2 Ex. F) for leave to maintain fraudulent transfer and successor liability actions against GFB and Arsen Avakian. *See* (Appx. 2 Ex. M).

10. On August 24, 2021, Judgment Creditor filed its response to GFB's motion to reconsider (Appx. 2 Ex. K). *See* (Appx. 2 Ex. N).

11. On August 27, 2021, Judgment Creditor filed its reply in support of its motion for leave to file fraudulent transfer and successor liability claims against GFB and Arsen Avakian (App. 2 Ex. F). *See* (Appx. 2 Ex. O).

12. On August 30, 2021, Judgment Creditor filed a motion to file additional claims against GFB, alleging newly discovered information. *See* (Appx. 2 Ex. P).

13. Also on August 30, 2021, GFB filed its reply in support of its motion to reconsider (App. 2 Ex. K). *See* (Appx. 2 Ex. Q).

14. On September 7 and 9, 2021, the Court entered orders continuing pending matters to September 9 and October 7, 2021, respectively. *See* (Appx. 2 Exs. R, S).

15. On September 30, 2021, Novack and Macey LLP filed a motion in its separate case against Argo (2020-CH-05306) for a rule to show cause against third-party citation respondent Arsen Avakian. *See* (Appx. 2 Ex. T).

16. On October 5, 2021, Levenfeld Pearlstein, LLC filed a motion to withdraw as counsel for GFB and Arsen Avakian. *See* (Appx. 2 Ex. U).

17. On October 7, 2021, the court entered an order continuing all pending matters to October 14, 2021.

18. On October 14, 2021, the court entered three orders, which granted Levenfeld Pearlstein's motion to withdraw; granted Judgment Creditor's motion for turnover relating to its separate citation to Chase Bank, ordering the turnover of $98,048.29; and continued all other matters for hearing to November 4, 2021.

2