# Interim Order Exhibit A

## DEBTOR-IN-POSSESSION LOAN AGREEMENT

On this 26th day of October, 2021, Golden Fleece Beverages, Inc., a Delaware corporation ("**Borrower**"), and, individually and collectively, G & K Investment Holdings, Vicinet, LLC, and GTeaVentures, LLC (individually, each a "**Lender**" and collectively, the "**Lenders**"), and Gerald Muizelaar, as administrative agent on behalf of the Lenders ("**Agent**"), enter into this Debtor-in-Possession Loan Agreement (the "**Agreement**") as follows:

## RECITALS

WHEREAS, Borrower intends to file a Petition for Relief pursuant to Chapter 11 of Title 11 of the U.S. Code with the United States Bankruptcy Court for the Northern District of Illinois (the "**Bankruptcy Court**") on or about October 27, 2021 (the "**Petition Date**");

WHEREAS, Borrower intends to continue to possess its assets and manage its business as a debtor-in-possession pursuant to 11 U.S.C. Sections 1182 and 1184;

WHEREAS, Borrower asked Lenders to provide the Loan to Borrower in the initial principal amount of $145,000 with the ability to increase the borrowing amount up to $500,000 upon the written consent of the Lenders;

WHEREAS, to secure repayment of the Loan and the performance of Borrower's other obligations under this Agreement, Borrower has agreed to provide Lenders with Liens on the Collateral; and

WHEREAS, Lenders are willing to make the Loan to Borrower on the express terms and conditions of this Agreement.

NOW, THEREFORE, for this and other good and valuable consideration, the receipt and sufficiency of which the parties expressly acknowledge, Lenders and Borrower agree as follows:

1. **Definitions**. The following terms will have the meaning set forth below for purposes of this Agreement:

    a. **"Availability Period"** means the period from the date of this Agreement to, but excluding, the Maturity Date.

    b. **"Banking Day"** means any day that is not a Saturday, Sunday or other day on which commercial banks in the State of Illinois are authorized or required to remain closed.

    c. **"Bankruptcy Code"** means Title 11 of the U.S. Code, as amended from time to time.

    d. **"Base Rate"** means the pre-default interest rate provided for in Section 6 of this Agreement.

    e. **"Borrowing Request"** means a Borrowing Request as described in Section 4 of this Agreement.

f.  ***"Budget"*** means the budget attached hereto as **Exhibit A** and any subsequent budget agreed to by Borrower and Lenders in connection with any subsequent written agreement by the Lenders to increase the borrowing amount up to $500,000. The Budget shall include provision for the fees and expenses of professionals approved pursuant to 11 U.S.C. § 330(a), the wages, benefits, and reimbursements owed to the Borrower's employees, and all other obligations incurred by the Debtor in the ordinary course of its business after the Petition Date.

g.  ***"Carveout"*** means a carve out from the Collateral and claims granted to the Lenders under this Agreement for the benefit of (i) holders of prepetition tax liens (if any) of governmental units and (ii) all operational and case-related costs identified in the Budget, which obligations shall remain superior to the Lenders' liens and claims.

h.  ***"Cash Collateral"*** means any cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents held or obtained by the Borrower that is subject to a Prior Permitted Lien.

i.  ***"Chapter 11 Case"*** means the case that will be filed by Debtor in the Bankruptcy Court within five days of the execution of this Agreement by both Parties.

j.  ***"Collateral"*** means all personal property, real property and other assets of Borrower, whether now owned or hereinafter acquired (including any such assets acquired under any trade or fictitious names), and whether leased to or from Borrower, regardless of where located, including: (a) cash and cash equivalents; (b) all funds in any account of Borrower; (c) all accounts and other receivables; (d) contract rights; (e) instruments, documents, and chattel paper; (f) machinery; (g) equipment; (h) inventory; (i) work in process; (j) general intangibles; (k) patents, trademarks, tradenames, copyrights and all other intellectual property; (l) capital stock; (m) investment property; (n) commercial tort claims and all other claims and causes of action; (o) supporting obligations; (p) letter of credit rights; (q) the proceeds of all claims or causes of action (excluding rights or the proceeds thereof of any actions arising under Chapter 5 of the Bankruptcy Code); and (r) to the extent not covered by the foregoing, Collateral also includes: i) all other assets or property of Borrower (whether tangible or intangible, real, personal, or mixed); ii) all products and proceeds of each of the foregoing; iii) all accessions to, substitutions of, and replacements for any of the foregoing; iv) all rents, profits, and proceeds of the foregoing; and v) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to Borrower form time to time with respect to any of the foregoing; *provided, however*, that Collateral shall not include Borrower's rights or entitlement to proceeds, indemnity, warranty or contribution under past or present insurance policies covering directors and officers, professional negligence, workers compensation, or similar non-property related liabilities.

k.  **"Commitment"** means the amount that a Lender has agreed to advance to Borrower in writing pursuant to Sections 2 and 4 of this Agreement.

l.  "***Debtor Relief Law***" means the Bankruptcy Code and all other liquidation, bankruptcy, assignment for the benefit of creditors, conservatorship, moratorium, receivership,

insolvency, rearrangement, reorganization or similar debtor relief laws of the US or other applicable jurisdictions in effect from time.

m.  ***"Default"*** has the meaning set forth in Section 14 of this Agreement.

n.  ***"Default Rate"*** means a rate *per annum* of 5.0% over the Base Rate.

o.  ***"Defaulting Lender"*** means any Lender that: (a) has failed to (i) fund all or any part of its Commitment within 3 Banking Days of the date such funding is due, unless such Lender delivers written notice to the Agent and the Borrower stating that such failure is the result of such Lender's determination that one or more conditions precedent to funding has not been satisfied, and specifically identifies each such condition precedent and any applicable default in such written notice, or (ii) pay to the Agent or any other Lender any other amount required to be paid by it hereunder within 3 Banking Days of the date when due, (b) has delivered written notice to the Borrower or the Agent stating that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding cannot be satisfied, and specifically identifies such condition precedent and any applicable default in such writing or public statement), (c) has failed, within 4 Banking Days after its receipt of a written request by the Agent or the Borrower, to confirm in writing to the Agent and the Borrower that it will comply with its prospective funding obligations hereunder; provided that, if such Lender has become a Defaulting Lender under this clause (c) by failing to make such confirmation, upon receipt by the Agent and the Borrower of such written confirmation of such Lender, such Lender shall cease to be a Defaulting Lender under this clause (c), or (d) has, or has a direct or indirect parent company that has (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) for which a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets. Notwithstanding anything to the contrary herein, a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the US or from the enforcement of judgments or writs of attachment on its assets or permits such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Agent that a Lender is a Defaulting Lender under clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender delivery of written notice of such determination to the Borrower and each Lender.

p.  ***"DIP Financing Orders"*** means the Interim Order and the Final Order, as applicable.

q.  ***"Event of Default"*** means a Default that has not been cured or waived following notice of Default by Lenders to Borrower within any time period designated in this Agreement.

r.  ***"Final Order"*** means a final, non-appealable order of the Bankruptcy Court approving the Loan, in form and substance satisfactory to Lenders, in their sole discretion.

s.  ***"Indemnified Tax"*** means any tax imposed on or with respect to any payment made by or on account of any obligation of Borrower under any Loan Documents, all filing or recording fees or stamps, and similar charges, but will not include any taxes relating to Lenders' income, profit, or general business operations.

t.  ***"Interim Order"*** means the interim order of the Bankruptcy Court approving the Loan in form and substance satisfactory to Lenders, in their sole discretion.

u.  ***"Lien"*** means any mortgage, encumbrance, pledge, hypothecation, security interest, lien (whether statutory or otherwise) of any kind with respect to any asset.

v.  ***"Loan"*** has the meaning set forth in Section 2 of this Agreement.

w.  ***"Loan Documents"*** means this Agreement, the DIP Financing Orders, and any other documents, instruments, or agreements executed or delivered in connection with this Agreement regarding the Loan.

x.  ***"Material Adverse Effect"*** means an effect that (whether due to a single event, act, or condition, or multiple events, acts, or conditions) causes or reasonably threatens to cause a material adverse effect on: a) the business, results of operations, financial condition, assets, liabilities or prospects of Borrower taken as a whole (other than the commencement of the Chapter 11 Case); b) the ability of Borrower to perform its obligations under the Loan Documents; c) the rights or remedies of Lenders under the Loan Documents; d) the validity or enforceability of any of the Loan Documents; e) the value of the Collateral; or f) the perfection or priority of any Liens in favor of Lenders pursuant to the Loan Documents.

y.  ***"Obligations"*** means all amounts Borrower owes to Lenders pursuant to or in connection with any Loan Document, including all principal, interest, fees, expenses, indemnification, and reimbursement obligations, whether direct or indirect, absolute or contingent, liquidated or unliquidated, now owing or hereinafter arising.

z.  ***"Permitted Adequate Protection Payments"*** means adequate protection payments made to the holder of a Prior Permitted Lien pursuant to court order.

aa.  ***"Prepetition Debt"*** means any debt, as defined in 11 U.S.C. Section 101(12) that arose before the Petition Date.

bb.  ***"Prior Permitted Liens"*** has the meaning set forth in Section 11(d) of this Agreement.

cc.  ***"Sub V Trustee"*** means the trustee appointed to this case pursuant to Section 1183 of the Bankruptcy Code.

DocuSign Envelope ID: EA83D205-44D0-4FDC-AD30-3846B7987BBB

dd. ***"Superpriority DIP Claims"*** means all of Lenders' claims on account of the Obligations, which claims will be entitled to the benefits of 11 U.S.C. Section 364(c)(1), 364(c)(2), 364(c)(3), and 364(d)(1), subject to the Prior Permitted Liens.

ee. ***"Termination Date"*** has the meaning set forth in Section 15 of this Agreement.

ff. ***"UCC"*** means the Uniform Commercial Code as incorporated in applicable state law. Unless otherwise defined in this Agreement, any term used in this Agreement that is also defined in the UCC will have the meaning provided in the UCC.

gg. ***"Walgreens Receivable"*** means all the monies currently owed by Walgreens to the Debtor, payment of which has been delayed because of a third party citation to discover assets served on Walgreens arising out of litigation styled 550 St. Clair Retail Associates, LLC v. Argo Tea, Inc. and Argo Tea St. Clair, LLC, case 2016 CH 02547 pending in Cook County Circuit Court.

2. **Loan**. Subject to the terms and conditions of this Agreement, Lenders agree to lend to Borrower, from time to time during the Availability Period, such amounts as Borrower may request under this Agreement (the "***Loan***"), up to $145,000 in outstanding borrowing (the "***Initial Loan Limit***"). Subject to each of the Lenders' sole discretion, the parties may agree to increase the Loan Limit up to but not exceeding the amount of $500,000 (the "***Maximum Loan Limit***") without further order of court. Any increase in the amount of the Loan above the Initial Loan Limit shall be in writing.

3. **Payment and Re-borrowing**. During the Availability Period, and subject to the limitations in Section 2 of this Agreement, Borrower will be entitled to borrow and prepay the Loan in accordance with the terms and conditions of this Agreement; *provided, however*, that Borrower may not borrow any amounts under this Agreement if there is an existing Event of Default, and Borrower may not re-borrow any portion of the Loan that Borrower has repaid absent Lenders' written consent.

4. **Advances**.

   a. Each Borrowing Request should set forth the anticipated advance Borrower requests and the applicable period for which the request is made. If there is no existing Default, the Borrowing Request complies with this Agreement, and subject to the terms and conditions of the Loan Documents, Lenders will make an advance on the Loan, directly to the applicable account, as requested in a Borrowing Request as promptly as is commercially reasonable. Borrower will reimburse Lenders for all wire and other bank fees Lenders incur in making each advance. Interest will accrue on all funds advanced beginning on the date that Lenders advances those funds to the Debtor's account.

   b. Each Lender's Commitment obligation on each such advance up to but not exceeding the Initial Loan Limit shall be joint and several with all the Lenders.  In the event one or more Lenders agrees, pursuant to Section 2, to increase the Loan Limit over the Initial Loan Limit in any amount up to the Maximum Loan Limit (an "***Availability Increase***"), each such Lender's Commitment obligation for advances made pursuant

to such Availability Increase shall be joint and several with all Lenders that have agreed to such Availability Increase.

5. **Maturity Date.** The Loan shall mature and Borrower's ability to borrow further shall terminate one hundred twenty (120) days following the Petition Date, absent written consent of the Lenders to extend the Loan and court approval of the extension. In addition, the Borrower's right to borrow shall terminate upon (a) the occurrence of an Event of Default or the expiration of the cure period for certain Defaults (as provided in Section 14 of this Agreement) if the Default is not cured, (b) upon receipt by Debtor of the Walgreens Receivable in full, or (c) the effective date of a confirmed plan of reorganization in this case. The first of these events to occur shall be the "*Maturity Date*." In the event a portion of the Walgreens Receivable is received by Borrower but that amount is insufficient to repay Lenders in full, Borrower shall pay such proceeds to Lenders as partial repayment on the Obligations then outstanding.

6. **Repayment**. On the Maturity Date, Borrower will repay to the order of Lenders the principal amount of all outstanding Loans, plus all accrued interest, fees, expenses, and other Obligations then outstanding.

7. **Interest and Fees**. Borrower will pay interest on the unpaid principal of the Loan at the rate of 0.86% *per annum* (the "*Base Rate*"), which is the Applicable Federal Rate for mid-term loans as of September 2021, until the outstanding principal balance is paid in full. Interest will accrue on all unpaid principal of the Loan at the Default Rate from and after an Event of Default until the outstanding principal balance is paid in full. Interest will be calculated on the basis of a year of 360 days for the actual number of days elapsed.

8. **Payments**. All payments due pursuant to any Loan Document will be made in lawful money of the United States, and in immediately available funds.

9. **Books and Records**. Lenders will record in its books and records all advances, charges, expenses, interest, payments, and other debits or credits pursuant to this the Loan, or the Loan Documents (the "Books and Records"). Absent manifest error, the Books and Records will be conclusive evidence of the amount owing pursuant to the Loan, or the Loan Documents. Borrower waives presentment, notice of dishonor, protest, and any other notice or formality with respect to the Loan or the Loan Documents.

10. **Commitment Fee**. There is no commitment fee.

11. **Conditions to Obligation of Lenders**. Lenders' obligation to make the Loan, and to make each advance under the Loan, is conditioned upon the timely satisfaction of each of the following:

    a. *Evidence of Existence*. Borrower will deliver to Lenders certified (as of the date of this Agreement) copies of Borrower's organizational documents, appropriate resolutions and incumbency certificates authorizing Borrower to enter into the Loan and execute the Loan Documents as the Lenders may require. Borrower will provide Lenders any written evidence Lenders request concerning Borrower's principal places

of business, tax identification number, doing business names and all information Lenders may require to perfect their interest in the Collateral.

b. ***Execution and Delivery***. All Loan Documents must be duly executed, acknowledged, and delivered to Lenders.

c. ***Authorization***. Borrower will provide Lenders with the evidence Lenders require that Borrower's representatives are authorized to execute and deliver the Loan Documents to Lenders.

d. ***Liens and Claims***. Lenders shall have a valid and perfected Lien on, and security interest in, all Collateral on the basis and with the priority set forth in the Interim Order, and that Lien and security interest shall be senior to all other Liens that exist as of the Petition Date other than any lien of a governmental unit for taxes ("Prior Permitted Liens").   Except to the extent the DIP Financing Orders permit the same, Borrower will not suffer or permit any administrative expense claim (as set forth in 11 U.S.C. Section 503), Lien or other claim to arise or continue to the extent such Lien, expense, or claim is *pari passu* with or senior to Lenders' claims or Liens; *provided, however*, that the Carveout obligations  shall be senior to the liens and claims of the Lenders.

e. ***Absence of Default***. Lenders have no obligation to fund the Loan, advance credit, or make any financial accommodation to Borrower if a Default has occurred and is continuing, or if such funding, advance, or accommodation would cause a Default.

f. ***Fees and Expenses***. Borrower has paid all fees, charges, payments, or escrows provided for in the Loan Documents.

g. ***Insurance***. Lenders have received valid certificates of in-force insurance in form and amount satisfactory to Lenders for all policies Lenders require.

h. ***Motions***. All motions and other documents to be filed with and submitted to the Bankruptcy Court regarding the Loan, and the Bankruptcy Court's approval thereof, shall be in form and substance satisfactory to Lenders in their sole discretion.

i. ***Orders***. With respect to all advances up to the initial $145,000 Loan Limit, the Bankruptcy Court has entered the Interim Order, in form and substance satisfactory to Lenders, in their sole discretion. With respect to all advances after entry of the Interim Order, the parties may agree to increase the Loan Limit up to $500,000 pending entry of a Final Order approving the Loan in form and substance satisfactory to Lenders, and the DIP Financing Orders must remain in full force and effect, without modification, at the time of each advance.

j. ***Additional Documentation***. Lenders have received any other information, approvals, opinions, signatures, or documents it may reasonably request.

k. ***Borrowing Request***. Borrowers have delivered a Borrowing Request to Lenders in compliance with Section 4 of this Agreement.

l. ***Representations and Warranties***. All representations and warranties of Borrower in the Loan Documents remain true and correct.

m. ***Compliance with Law***. The advance does not violate any Law or order, including any order the Bankruptcy Court has issued.

n. ***Material Adverse Effect***. No Material Adverse Effect has occurred.

12. **Indemnified Taxes**. Borrower will make all payments pursuant to any Loan Document without deduction or withholding for any tax, except as applicable Law requires. If applicable Law requires Borrower to deduct or withhold any tax from any such payment, Borrower will immediately pay the full amount deducted or withheld to the relevant governmental authority. If the tax is an Indemnified Tax, then the amount owing pursuant to the applicable Loan Document, will increase by the amount so deducted or withheld.

13. **Representations and Warranties**. Borrower represents and warrants to Lenders as follows:

a. ***Formation, Good Standing, and Due Qualification***. Borrower is a corporation, duly formed, validly existing, and in good standing under the laws of the State of Delaware. Borrower is authorized to do business in the State of Delaware, and, pursuant to 11 U.S.C. Sections 1182 and 1184, has the authority to own its assets and to transact the business in which it is now engaged or in which it proposes to be engaged, subject to the restrictions set forth in the Bankruptcy Code.

b. ***Corporate Power and Authority***. Subject to the restrictions set forth in the Bankruptcy Code, Borrower has the authority to execute, deliver, and perform its obligations under the Loan Documents. Borrower shall take the necessary action to authorize the Chapter 11 Case, and to execute, deliver and perform its obligations under the Loan Documents without any further consent or approval other than Bankruptcy Court's entry of the DIP Financing Orders. The execution, delivery, and performance under the Loan Documents does not (and will not): 1) violate or contravene any bylaws, agreements, order, law, rule, or regulation; or 2) result in a breach or default under any agreement to which Borrower is a party.

c. ***Legally Enforceable Agreement***. Each of the Loan Documents once executed by Borrower and Lenders and the Bankruptcy Court approves Debtor's execution thereof by entering the DIP Financing Orders, will be: 1) legal, valid, and binding obligations of Borrower and Lenders; and 2) enforceable against Borrower and Lenders in accordance with their respective terms.

d. ***Disclosures and Financial Information Accurate***. All financial information Borrower has given to Lenders was, when made, and remains, accurate. Borrower has disclosed to Lenders all material liabilities (whether fixed or contingent, liquidated or unliquidated, due or yet to mature). No statement of fact that Borrower has made in any Loan Document contains any untrue statement of material fact or fails to disclose a fact necessary to prevent the statements made from being misleading. All information that Borrower will provide to Lenders in the future will be true and correct and will fully disclose all material facts.

e. ***Environmental Compliance***. Borrower and its property are and shall be in compliance with all environmental, health and safety laws, rules and regulations. Borrower is not subject to any liability or obligation for remedial action thereunder. No investigation or inquiry by any governmental authority is or shall be pending or, to the knowledge of Borrower, is threatened against it, or any of its property with respect to any toxic waste, toxic substance or hazardous material. Except in the ordinary course of its business, no hazardous materials are or shall be located on or under the property of Borrower. Except in the ordinary course of its business, Borrower has not caused or permitted, and will not cause or permit, any toxic or hazardous waste or substance to be stored, transported, or disposed of on or under or released from any of its property.

f. ***Agreements and Representations.*** Borrower has not relied on any agreement, promise, or statement from Lenders in entering into any Loan Document except to the extent such agreement, promise, or statement is expressly set forth in the subject Loan Document.

g. ***Lenders' Duty***. Lenders do not (and will not) have any fiduciary or similar duty to Borrower, Borrower's bankruptcy estate, or to any other person on account of providing the Loan.

14. **Default**. Any of the following will constitute an Event of Default:

a. ***Payment***. Borrower fails to pay any Obligation to Lenders as and when due and payable;

b. ***Representations and Warranties***. Any representation or warranty Borrower has made, or makes in the future proves to have been incorrect, incomplete, or misleading in any material respect on or as of the date it is made or deemed made, and Borrower does not cure such breach to Lenders' satisfaction within five (5) Banking Days of receipt of written notice of such breach by Lenders;

c. ***Breach of Term or Condition***. Borrower fails to perform or observe any other material term or condition of this Agreement with Lenders, and Borrower does not cure such breach to Lenders' satisfaction with five (5) Banking Days of receipt of written notice of such breach by Lenders;

d. ***Lenders' Rights***. Any of the Liens or other rights of Lenders in the Collateral at any time are not (or Borrower claims the right is not) a first (super) priority, valid, and perfected interest in the Collateral as set forth in the DIP Financing Orders or as otherwise provided herein with respect to any holder of a Prior Permitted Lien;

e. ***Other Proceedings***. Borrower becomes involved in any proceeding that Lenders reasonably believe would result in a forfeiture of all or a substantial part of Borrower's assets, or in the entry of a material judgment against Borrower;

f. ***Bankruptcy Matters***. Any of the following occurs in the Chapter 11 Case:

i.  The Chapter 11 Case is dismissed or converted a proceeding under Chapter 7 of the Bankruptcy Code, or the Bankruptcy Court displaces the debtor as a debtor in possession pursuant to 11 U.S.C. Section 1185.

ii.  Any party other than Lenders obtains relief from the automatic stay imposed pursuant to 11 U.S.C. Section 362(a), or obtains confirmation from the Bankruptcy Court that such automatic stay does not apply;

iii.  Any person files a plan of reorganization or liquidation under Chapter 11 of the Bankruptcy Code that does not propose to immediately and indefeasibly repay the Obligations in full and in cash;

iv.  Borrower files, supports, or fails to resist any pleading that seeks to vacate or modify any of the DIP Financing Orders without Lenders' prior written consent;

v.  Entry of an order that modifies or amends any of the DIP Financing Orders without Lenders' prior written consent;

vi.  Reversal, vacation or stay of any of the DIP Financing Orders;

vii.  Appointment of a responsible officer or examiner with enlarged powers relating to the business operations of Borrower without Lenders' prior written consent;

viii.  Borrower files, supports, or fails to resist a motion that seeks an order granting any claim or Lien (except in favor of Lenders) that is senior to, or *pari passu* with, Lenders' claims and rights, or any court enters such an order;

ix.  Except as provided in this Agreement or the DIP Financing Orders or any other court order, Borrower pays any adequate protection with respect to any Prepetition Debt;

x.  Borrower loses its exclusive right to file a plan of reorganization pursuant to 11 U.S.C. Section 1189(a) or if applicable Section 1121(b), or that right is modified;

xi.  Unless otherwise provided in the Interim Order or the Final Order, or upon Lenders' prior written consent, Borrower seeks (or the Bankruptcy Court authorizes) an order pursuant to 11 U.S.C. Section 365 authorizing Borrower to reject a material lease that is part of (or whose premises contains any of) the Collateral;

xii.  The Bankruptcy Court fails to authorize (or terminates the authorization of) Borrower to use cash collateral.

15. **Remedies upon Event of Default**. If an Event of Default occurs, all Obligations will become immediately due and owing in full. Lenders may thereafter, in their sole and absolute discretion, deliver written notice to Borrower, the Bankruptcy Court, the U.S. Trustee, and the Sub V Trustee of the occurrence of the Event of Default (the "***Notice of Event of Default***"). Ten (10) days following the delivery of a Notice of Event of Default, the automatic stay

DocuSign Envelope ID: EA83D205-11D0-4FDC-AD30-3846B7987BBB

provisions of 11 U.S.C. Section 362 will be vacated and modified to the extent necessary to permit Lenders to exercise all rights and remedies set forth in any of the Loan Documents (the "***Termination Date***"). Upon the occurrence of the Termination Date, Lenders may also (in their sole and absolute discretion) take any of the following actions without further notice, and without further order from, or application to, the Bankruptcy Court:

    a.   ***Terminate Commitment***. Terminate any obligation to make any further advances or financial accommodations to Borrower;

    b.   ***Collateral***. Subject to the rights of any holder of a Prior Permitted Lien, enforce all rights against any Collateral in the possession of Lenders or Agent, including disposing of the Collateral solely for application towards the Obligations; and/or

    c.   ***Other Action***. Take any other action, or enforce any other right or remedy, provided by any applicable Law, or the Loan Documents.

16. **Borrower Cooperation**. Upon the receipt of the Notice of Event of Default, Borrower will fully cooperate with Lenders in the exercise of Lenders' rights and remedies. Borrower waives any right to seek relief under the Bankruptcy Code (including 11 U.S.C. Section 105) to the extent the relief would restrict or impair Lenders' rights and remedies under the DIP Financing Orders, or the Loan Documents.

17. **Bankruptcy Matters**.

    a.   **Superpriority**. Except for the Carveout, Borrower agrees that the Obligations will be: i) Superpriority DIP Claims over all administrative expense claims and unsecured claims against Borrower now existing or hereinafter arising, including all administrative expense claims set forth in 11 U.S.C. Sections 105, 326, 328, 330, 331, 332, 333, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114, or any other provision of the Bankruptcy Code; and ii) secured pursuant to  11 U.S.C. Sections 364(c)(2) and (c)(3), and (with the exception of Prior Permitted Liens) Section 364(d)(1), and to the extent provided in the DIP Financing Orders will not be subject to any claims against the Collateral pursuant to 11 U.S.C. Section 506(c).

    b.   **Orders Control**. In the event the Interim Order or the Final Order conflict with any of the Loan Documents, the Interim Order or the Final Order, as the case may be, will control. Provided, however, that nothing in this Section 17(b) waives or releases any rights or remedies Lenders may have in the event the court enters any order that does not comply with the terms and conditions of this Agreement.

    c.   **Perfection**. Notwithstanding anything in this Agreement, or elsewhere, to the contrary:

        i.   Lenders' Liens in the Collateral will be valid, enforceable, and perfected (with the priority set forth in this Agreement and the DIP Financing Orders) immediately upon entry of the Interim Order, and will continue to be so valid, perfected, and prior regardless of any non-bankruptcy law, and without regard to the dismissal or conversion to another Chapter of the Bankruptcy Code of the Chapter 11 Case. Lenders will not be required to file or enter any financing

statement, mortgage, control agreement, or other document or notice, and will not be required to take possession of any Collateral, in order to obtain or perfect any of its rights (including any Lien or the priority thereof) as granted pursuant to the Loan Documents, or the DIP Financing Orders. However, Lenders may (in their sole discretion), at Borrower's expense, file or enter into any financing statement, mortgage, control agreement, or other document or notice that it desires with respect to any right (including any Lien) that is granted pursuant to the Loan Documents, or the DIP Financing Orders. If Lenders elect to enforce its rights pursuant to the preceding sentence, the document or action will be deemed to have occurred as of the date the Bankruptcy Court enters the Interim Order, and Lenders' actions will not negate or impair the existence, validity, or priority of this Section 17(c) or any other rights in favor of Lenders.

ii.   The Liens, priorities, Superpriority DIP Claims, and other rights and remedies of Lenders pursuant to the Loan Documents, and the DIP Financing Orders, will not be modified or impaired by any other extension of credit to Borrower (whether pursuant to 11 U.S.C. Section 364 or otherwise), or by the dismissal or conversion of the Chapter 11 Case to another Chapter of the Bankruptcy Code, or by any other act or omission unless Lenders grant their prior written consent to the same.

18. **Grant of Security**. To secure the full and prompt performance of all of the Obligations, effective immediately upon the entry of the Interim Order, pursuant to 11 U.S.C. Sections 361, 362, 364(c)(2), 364(c)(3), and 364(d)(1), Lenders are granted a continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected post-petition, first (and super) priority security interest in and lien on all Collateral, subject only to the Prior Permitted Liens. To the extent applicable Law allows, Borrower irrevocably authorizes Lenders, their counsel and other representatives to at any time (and from time to time) file in the name of Borrower or otherwise all such UCC financing statements or continuation statements Lenders may deem necessary or appropriate without further authorization from Borrower.

19. **Fees and Expenses**. Lenders and Agent may seek allowance of their fees and expenses as provided for under 11 U.S.C. § 506(b) by filing a motion or through any other procedure permitted under the Bankruptcy Code or any order of the Bankruptcy Court.  Borrower shall not object to such request on any ground other than reasonableness.

20. **Hold Harmless and Indemnification**. Lenders and Agent are not responsible for performing Borrower's obligations with respect to the Collateral. Borrower will indemnify and hold Lenders and Agent harmless from all claims, damages, and liabilities (including attorneys' fees and legal expenses) (collectively, "Indemnified Claims") in any matter relating to or arising out of any Loan Document, or in any way relating to the Collateral (including those Indemnified Claims involving hazardous materials). Borrower will promptly provide Lenders and Agent with written notice of any Indemnified Claim. Upon Lenders' request, Borrower will defend Lenders from all Indemnified Claims, and will pay the attorneys' fees, legal expenses and other costs Lenders incur in connection therewith. Lenders may, in their sole discretion, at Borrower's expense, employ Lenders' own legal counsel to defend any Indemnified Claims.  Indemnified Claims shall not include any claims, assertions, or actions

undertaken by an official committee, patient care ombudsman or patient privacy ombudsman appointed in this case, or by the Office of the United States Trustee.

21. **Power of Attorney**. Borrower appoints Lenders as their attorney-in-fact to endorse its name on all instruments and other documents payable to Borrower. Lenders may perform any action or execute any document that the Loan Documents require Borrower to take or execute. Lenders' exercise of their rights under this Section does not relieve Borrower of any obligation under the Loan Documents. These powers of attorney are coupled with an interest and are irrevocable.

22. **Participations**. Lenders may sell or transfer, whether now or later, one or more participation or other interests in the Loan (and the Loan Documents) to an affiliate of Lenders ("Affiliate"). Lenders may provide to such Affiliate any information or knowledge Lenders may have about Borrower or about any other matter relating to the Loan; provided, however, that such Affiliate shall be bound by the Lenders joint and several obligations under this Agreement, by any existing non-disclosure agreement between Lenders and Borrower, and by any law that may restrict or condition the transfer of information to such purchaser or potential purchaser. Such Affiliate will receive and keep that information in full confidence and will use that information solely for the purpose of determining whether to acquire an interest in the Loan. Lenders shall notify Borrower of an intent to share information with an Affiliate. Lenders shall file a notice with the Bankruptcy Court of an intent to assign any portion of the Loan and rights under the Loan Documents to such Affiliate.

23. **Amendments, Modifications, Waiver**. Any amendment, modification, or waiver of any provision of any Loan Document will be effective only if it is in writing and signed by Lenders. Any such amendment, modification, or waiver will be effective only in the specific instance and for the specific purpose for which given.

24. **Entire Agreement**. This Agreement and the Loan Documents constitute the entire agreement between the parties with respect to the Loan.

25. **Notices**. All notices and other communication allowed or required under the Loan Documents will be in writing, and delivered by regular first class U.S. mail, postage prepaid, or via personal delivery or courier, or by electronic email acknowledged by the recipient and addressed as follows:

| If to the Lenders: | With a copy to: |
|---|---|
| G&K Investment Holdings<br>2045 W Grand Ave Ste B, PMB 82152<br>Chicago IL 60612-1577<br>greg@wassonenterprise.com | Thomas B. Quinn<br>Amy C. Andrews<br>Riley, Safer, Holmes & Cancila LLP<br>70 W. Madison Street, Suite 2900<br>Chicago, IL 60602<br>tquinn@rshc-law.com<br>aandrews@rshc-law.com |

Vicinet LLC
250 E Pearson Street Unit 1601
Chicago IL 60611

GTeaVentures, LLC
250 E Pearson Street #1205
Chicago, IL 60611

---

If to the Borrower:

Golden Fleece Beverages, Inc.
Attn: Candace MacLeod, President
Roy Yu, Operating Partner
250 E. Pearson St. #1601
Chicago, IL 60611
candace.pappas@argotea.com
roy.yu@argotea.com

With a copy to:

Jonathan P. Friedland
Sugar Felsenthal Grais & Helsinger
30 N. LaSalle Street, Suite 3000
Chicago, IL 60601
jfriedland@sfgh.com

All notices provided by first class mail in accordance with this Section will be deemed delivered and received three (3) Banking Days after placed for delivery with the U.S Postal Service. All notices provided by personal delivery or by courier shall be deemed delivered on the date received. Emails shall be deemed delivered on the date of the recipient's acknowledgement.

26. **No Waiver**. No failure or delay on the part of Lenders (whether by express waiver or otherwise) in exercising any right, power, or remedy under any Loan Document, will impair or waive Lenders' right to thereafter insist on strict compliance with the terms of such agreement or to exercise any other right, power or remedy thereunder. Lenders' rights under the Loan Documents are cumulative, and are not exclusive of any other rights, powers, or remedies Lenders may now or hereinafter have.

27. **Successors and Assigns**. This Agreement is binding upon and inures to the benefit of Borrower and Lenders and their respective successors and assigns; provide, however, that Borrower may not assign or transfer any of its rights under any Loan Document without prior written consent from Lenders, and in no event will any trustee or successor to Borrower's interests or Borrower's status as debtor in possession be entitled to an extension of credit pursuant to the Loan Documents.

28. **Attorneys' Fees**. Borrower will reimburse Lenders for all costs and expenses (including all attorneys' fees) Lenders incur in protecting or enforcing their rights under the Loan Documents.

29. **Governing Law**. The Loan Documents will be interpreted, construed, and enforced pursuant to the federal laws of the United States and the laws of the state of Illinois without giving effect to the choice of law rules thereof.

30. **Severability of Provisions**. Any provision of any Loan Document that is unenforceable in any jurisdiction will, as to such jurisdiction, be ineffective to the extent of such unenforceability without invalidating the remaining provisions or affecting the validity or enforceability of such provision in any other jurisdiction.

31. **Time of the Essence**. Time is of the essence to Borrower's obligations under the Loan Documents.

32. **Headings**. The headings of the Loan Documents are for the convenience of reference, will not be used to interpret or construe the Loan Documents, and are not a part of the Loan Documents for any purpose.

33. **Venue; Jurisdiction; Service of Process**. Any litigation arising out of or relating to this Agreement or the Loan Documents will be brought in the Bankruptcy Court or a court located in Chicago, IL. Borrower consents to the jurisdiction of any such court. **The Parties each waive personal service of process in any litigation arising out of or relating to any of the Loan Documents, and agree that all such service of process may be made in the manner set forth for notices in Section 25 of this Agreement, and that service so made will be deemed completed one (1) day after delivered in compliance with Section 25 of this Agreement. The Parties expressly waive any other requirements of notice or personal service that any applicable law, regulation, or rule may require.**

34. **Jury Trial Waiver**. LENDER AND BORROWER WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM, OR COUNTERCLAIM, WHETHER IN CONTRACT OR TORT, AT LAW OR IN EQUITY, ARISING OUT OF OR IN ANY WAY RELATED TO THE LOAN DOCUMENTS. NO OFFICER OF LENDER HAS AUTHORITY TO WAIVE, CONDITION, OR MODIFY THIS PROVISION.

35. **Appointment and Authority.**

   a. Each Lender hereby irrevocably appoints Gerald Muizelaar to act on its behalf as the Agent hereunder and under the other Loan Documents and authorizes the Agent to take such actions on its behalf and to exercise such powers as are delegated to the Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article (other than the provisions of Section 40) are solely for the benefit of the Agent, and the Lenders. No Loan Party or any Subsidiary thereof shall have rights as a third party beneficiary of any of the provisions of this Article. The use of the term "agent" or any similar or equivalent term in connection with the appointment of the Agent hereunder is not intended to imply any fiduciary or other duties arising under legal principles governing agency relationships, and such appointment and all rights and duties of the Agent hereunder shall be ministerial in nature.

   b. Each Lender hereby irrevocably appoints Gerald Muizelaar to act on its behalf as the Collateral Agent hereunder and under the other Loan Documents and authorizes the Agent to take such actions on its behalf and to exercise such powers as are delegated to the Agent by the terms hereof or thereof for purposes of acquiring, holding and

enforcing any and all Liens on Collateral granted by the Borrower to secure any of the Secured Obligations, together with such powers and discretion as are reasonably incidental thereto. In this connection, the Agent and any sub-agents appointed by the Agent pursuant to Section 39 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Loan Documents, or for exercising any rights and remedies thereunder at the direction of the Agent, shall be entitled to the benefits of all provisions of this Section 35 (including reimbursement by Lenders), as though such sub-agents were the Agent, as if set forth in full herein with respect thereto.

36. **Rights As a Lender.** The Person serving as the Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender. Accordingly, the Agent, in its capacity as a Lender, may exercise all rights and powers of a Lender as though it were not the Agent, and the Lenders shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Agent hereunder in its individual capacity. Such Person and its affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower, all as if such Person were not the Agent hereunder and without any duty to account therefor to the Lenders.

37. **Exculpatory Provisions.** The Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents, which shall be ministerial and administrative in nature. Without limiting the generality of the foregoing, the Agent:

    a.  shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or an Event of Default has occurred and is continuing;

    b  shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Agent is required to exercise as directed in writing by the Lenders; provided that, the Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Agent to liability or that is contrary to any Loan Document or applicable law, including, for the avoidance of doubt, any Debtor Relief Law applicable to any Defaulting Lender; and

    c.  shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its affiliates that is communicated to or obtained by the Person serving as the Agent or any of its affiliates in any capacity.

38. **Agent Limits of Liability**.  The Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Lenders or (ii) in the absence of its own gross negligence or willful misconduct as determined by a final and non-appealable judgment of a court of competent jurisdiction.

39. **Agent Limits of Knowledge**.  The Agent shall not be deemed to have knowledge of any Default or Event of Default unless and until notice describing such Default or Event of Default is given to the Agent in writing by the Borrower or a Lender. In the event that the Agent obtains

such actual knowledge or receives such notice, such Agent shall give prompt notice thereof to each of the other Lenders. Upon the occurrence of a Default or Event of Default, the Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders. Unless and until the Agent shall have received such direction, the Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to any such Default or Event of Default as it shall deem advisable in the best interest of the Lenders. In no event shall the Agent be required to comply with any such directions to the extent that such Agent believes that its compliance with such directions would be unlawful.

40. **Agent Limits on Investigation.**  The Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or the creation, perfection or priority of any Lien purported to be created by the Lien documents or (v) the value or the sufficiency of any Collateral.

41. **Reliance By Agent.** The Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including, but not limited to, any electronic message, internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Agent may presume that such condition is satisfactory to such Lender unless the Agent shall have received written notice to the contrary from such Lender prior to the making of such Loan. The Agent may consult with legal counsel (who may be counsel for any Loan Party), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

42. **Delegation of Duties.** The Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Agent. The Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities as well as activities as such Agent. The Agent shall have no responsibility for the conduct or negligence of any sub¬agent appointed by it hereunder, except to the extent that the Agent acted with gross negligence or willful misconduct in the appointment of such sub-agent.

43. **Resignation And Removal of Agent.**

    a.  The Agent may at any time give written notice of its resignation to the Lenders and the Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right to appoint a successor Agent. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Agent gives notice of its resignation, or by such earlier date as agreed by the Required Lenders (the "Agent Resignation Date"), then the retiring Agent may, but shall not be obligated to, on behalf of the Lenders, appoint a successor Agent meeting the qualifications set forth above; provided that no successor Agent shall be a Defaulting Lender. Regardless of whether a qualifying Person has accepted such appointment, such resignation shall nonetheless become effective in accordance with such notice on the Agent Resignation Date.

    b.  The Agent may be removed as Agent, for good cause by all the Lenders (other than any Lender acting as the Agent) upon [thirty (30)] days' prior written notice to the Agent (the "Agent Removal Date"). If the Person serving as Agent becomes a Defaulting Lender within the meaning of clause (d) of the definition thereof, the Required Lenders may, to the extent permitted by applicable law, upon [thirty (30)] days' notice in writing to the Borrower and the Agent (such date, the "Agent Removal Date") remove the Agent. Upon any such removal, the Required Lenders (other than any Lender then acting as Agent) shall have the right to appoint a successor Agent. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment on the Agent Removal Date, such removal shall nonetheless become effective in accordance with such notice on the Agent Removal Date.

    c.  With effect from the Agent Resignation Date or the Agent Removal Date, as applicable (i) the retiring or removed Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any Collateral held by the Agent on behalf of the Lenders under any of the Loan Documents, the retiring or removed Agent shall continue to hold such collateral security until such time as a successor Agent is appointed) and (ii) except for any indemnity payments owing to the retiring or removed Agent, all payments, communications and determinations provided to be made by, to or through the Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders appoint a successor Agent as provided for above in this Section. Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring or removed Agent (except with respect to indemnity payments owed to the retiring or removed Agent), and the retiring or removed Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents. The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring or removed Agent's resignation or removal hereunder and under the other Loan Documents, the provisions of this Article and Sections 19 and 20 shall continue in effect for the benefit of such retiring or removed Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be

taken by any of them while the retiring [or removed] Agent was acting as Agent hereunder.

44. **Non-Reliance on Agent and Other Lenders.** Each Lender acknowledges that it has, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

45. **No Other Duties, Etc.** Anything herein to the contrary notwithstanding, none of the Lenders listed on the cover page hereof shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Agent or a Lender.

46. **Agent May File Proofs of Claim.** In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Borrower, the Agent (irrespective of whether the principal of any Loan shall then be due and payable as set forth herein or by declaration or otherwise and irrespective of whether the Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated), by intervention in such proceeding or otherwise:

    a.  to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid, and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the Agent and the other Lenders (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the Agent, such Lenders and their respective agents and counsel and all other amounts due the Lenders, the Agent and such Lenders under Sections 9 and 20) allowed in such judicial proceeding; and

    b.  to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

    c.  and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Agent and, if the Agent shall consent to the making of such payments directly to the Lenders, to pay to the Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agent and its agents and counsel, and any other amounts due the Agent under Sections 19 and 20.

47. **Limitation on Agent Authority.** Nothing contained herein shall be deemed to authorize the Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights


of any or to authorize the Agent to vote in respect of the claim of any Lender in any such proceeding.

**IMPORTANT: READ BEFORE SIGNING. THE TERMS OF THIS AGREEMENT SHOULD BE READ CAREFULLY BECAUSE ONLY THOSE TERMS IN WRITING ARE ENFORCEABLE. NO OTHER TERMS OR ORAL PROMISES NOT CONTAINED IN THIS WRITTEN CONTRACT MAY BE LEGALLY ENFORCED. YOU MAY CHANGE THE TERMS OF THIS AGREEMENT ONLY BY ANOTHER WRITTEN AGREEMENT.**

Agreed to as of this 26th day of October, 2021:

**LENDERS**

G&K Investment Holdings

By: Greg Wasson
    Greg Wasson

Its: _____


Vicinet LLC

By: Arsen Avakian
    Arsen Avakian

Its: _____


GTeaVentures, LLC

By: Glen Tullman
    Glen Tullman

Its: _____


**BORROWER**

Golden Fleece Beverages, Inc.

Candace MacLeod

By: Candace MacLeod

Its: President

# Exhibit A

# Budget

*Preliminary Draft - Confidential*

**Golden Fleece Beverages, Inc.**
**Cash Receipts and Payments**

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending: | 29-Oct-21 | 5-Nov-21 | 12-Nov-21 | 19-Nov-21 | 26-Nov-21 | 3-Dec-21 | 10-Dec-21 | 17-Dec-21 | 24-Dec-21 | 31-Dec-21 | 7-Jan-22 | 14-Jan-22 | 21-Jan-22 |
| Shopify Receipts | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 |
| CPG Receipts (Walgreens) | - | - | - | - | - | - | 760,945 | 18,593 | 250 | 42,965 | 45,980 | 45,980 | 45,980 |
| CPG Receipts (Kwik Trip) | - | - | - | - | 28,482 | - | - | - | - | - | - | - | - |
| CPG Receipts (Other) | - | 14,689 | - | 1,970 | 14,815 | - | - | - | 9,100 | 5,715 | - | - | - |
| Licensing Receipts | 2,438 | 16,968 | 3,960 | 16,278 | 7,238 | 10,490 | 3,084 | 7,056 | 5,916 | 10,490 | 3,084 | 7,056 | 7,056 |
| DIP Loan | 145,000 | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Receipts** | **147,688** | **31,907** | **4,210** | **18,498** | **50,785** | **10,740** | **764,279** | **25,900** | **15,266** | **59,420** | **49,314** | **53,286** | **53,286** |
| | | | | | | | | | | | | | |
| Payroll (6 Employees) | - | 24,000 | - | 24,000 | - | 24,000 | - | 24,000 | - | - | 24,000 | - | 24,000 |
| Commission Payout | - | - | - | - | - | 440 | - | 21,045 | - | - | 2,258 | - | - |
| SS Tax Deferral Repayment | - | - | - | - | - | - | - | - | - | 6,494 | - | - | - |
| Expense Report Estimates | - | 19,869 | - | - | - | - | 6,275 | - | - | - | 6,275 | - | - |
| CPG Production | 19,000 | - | - | - | 12,675 | - | 86,600 | - | 40,000 | - | - | - | - |
| Retail Production | - | - | - | - | - | - | - | 13,640 | - | - | - | - | - |
| Warehousing | 375 | 375 | 375 | 375 | 375 | 2,175 | 375 | 375 | 375 | 375 | 2,175 | 375 | 375 |
| Transportation | 8,000 | 10,000 | 10,000 | 10,000 | - | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| Chapter 11 DIP Professionals | 70,000 | - | - | - | - | - | 100,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 |
| Insurance (Health & Business) | - | 452 | 2,355 | 1,834 | - | 452 | - | 4,189 | - | - | 452 | 3,418 | 3,418 |
| Storage | - | 972 | - | - | - | 972 | - | - | - | - | 972 | - | - |
| G&A | - | 2,000 | - | - | - | 2,000 | - | - | - | - | 2,000 | - | - |
| Retail | - | - | - | 2,000 | - | 2,000 | - | 2,000 | - | 2,000 | - | 2,000 | 2,000 |
| Taxes (Franchise & Sales) | - | - | - | - | - | - | 1,124 | - | - | - | - | - | - |
| Cure Amounts | - | - | - | - | - | - | 49,303 | 15,026 | 29,248 | 21,416 | - | 35,846 | - |
| DIP Loan Repayment | - | - | - | - | - | - | 145,000 | - | - | - | - | - | - |
| Bank/CC Fees | 150 | - | - | - | - | 100 | - | - | - | - | 50 | - | - |
| **Total Payments** | **97,525** | **57,668** | **12,730** | **38,209** | **13,050** | **42,139** | **398,677** | **115,275** | **104,623** | **65,285** | **73,182** | **76,639** | **64,793** |
| | | | | | | | | | | | | | |
| Net Flow | 50,163 | (25,761) | (8,520) | (19,711) | 37,735 | (31,399) | 365,602 | (89,376) | (89,357) | (5,865) | (23,868) | (23,352) | (11,506) |
| | | | | | | | | | | | | | |
| Balance | 50,163 | 24,402 | 15,881 | (3,830) | 33,905 | 2,506 | 368,108 | 278,732 | 189,375 | 183,510 | 159,642 | 136,289 | 124,783 |

**Assumptions**

*CPG Receipts*
Kwik Trip receipt targeted at Day 30, but this may be aggressive. Associated customer deduction is an assumption made based on past practice.

Walgreens receipt targeted at Day 45, but this may be aggressive. Line item accounts for associated customer deduction credits totaling $224,267.36.

Payments/escrows showing as paid/deposited in Week 7 to be paid/deposited sooner if CPG Receipts are paid to Debtor sooner.

*Licensing Receipts*
Assumes business revenue consistent with previous months

*Retail*
Estimates $2,000 in expenses to purchase goods (branded paper/plastics)

*Expense Report Estimates*
Payments represent reimbursement of expenses advanced on behalf of the Debtor and submitted for reimbursement in the ordinary course. These include both: (a) customary charges for travel, lodging, and meals; and (b) certain online software platform subscriptions, overnight service charges, and freight charges paid on the Debtor's behalf using individual credit cards when no other method of payment is accepted within the necessary timeframe.

*Chapter 11 DIP Professionals*
To be paid to escrow account only; actual payments permitted only upon Bankruptcy Court approval.

*Cure Amounts*
Payment of cure amounts assumes approval of planned motions to assume and counterparties agreeing to payment plans.