# Exhibit A

**THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION**

| | |
|---|---|
| **550 ST. CLAIR RETAIL ASSOCIATES, LLC,** | ) |
| | ) |
| **Plaintiff,** | ) |
| **vs.** | ) **Case No. 2016 CH 02547** |
| | ) **Consolidated with Case No. 2019 L 005567** |
| **ARGO TEA, INC. AND ARGO TEA ST. CLAIR, LLC,** | ) |
| | ) |
| **Defendants.** | ) |

<u>**EMERGENCY PETITION TO INTERVENE AND UNFREEZE ASSETS**</u>

Golden Fleece Beverages, Inc., by and through its undersigned attorneys, Levenfeld Pearlstein, LLC, and for its Emergency Petition to Intervene and Unfreeze Assets, respectfully states as follows:

1.      On May 7, 2021, Plaintiff 550 St. Clair Retail Associates, LLC ("Plaintiff") issued a third-party citation to Walgreens Business Services, LLC ("Walgreens") wherein it requested:

1.  A copy of all documents evidencing any contractual relationship with Argo Tea, Inc., or any other entity to sell and/or distribute products that bear the name of Argo Tea, Inc. or Argo Tea, or products originating from the family of Argo Tea products.

2.  A copy of all documents evidencing all financial transactions with Argo Tea, Inc., or any other entity that provides products for sale at retail that bear the name of Argo Tea, Inc., or products originating from the family of Argo Tea products.

3.  A copy of all documents evidencing all transactions where consideration of any type was provided to any person or entity, including but not limited to Argo Tea, Inc., in exchange for products to be sold at retail that bear the name of Argo Tea, Inc. or Argo Tea, or products originating from the family of Argo Tea products.

A true and correct copy of the citation is attached hereto as <u>**Exhibit A**</u>.

2.      As set forth in further detail below, Golden Fleece Beverages, Inc. ("Golden Fleece") is the owner of all of Argo Tea's personal property, including but not limited to all of Argo Tea's Accounts, Chattel Paper, Commercial Tort Claims, Deposit Accounts, Documents, Equipment, Fixtures, General Intangibles, Health Care Insurance Receivables, Farm Products, Goods, Instruments, Intellectual Property, Inventory, Investment Property, Leases, Letter-of-Credit Rights, Money, Supporting

Obligations and Identified Claims; (b) all books and records pertaining to any of the foregoing; (c) all Proceeds and products of any of the foregoing, and (d) all collateral security and guaranties given by any Person with respect to any of the foregoing by virtue of a public sale of collateral conducted in accordance with section 9-610 of the Uniform Commercial Code.

3.      Specifically, on or about December 8, 2015, Argo Tea entered into a Convertible Term Loan Note ("Term Note") with Caribou Coffee Company, Inc. ("Caribou Coffee") in the original principal amount of $10,000,000.00. A true and correct copy of the Term Note is attached hereto as **Exhibit B**.

4.      In connection therewith, Argo Tea and Caribou also entered into a Credit Agreement, Guaranty and Collateral Agreement and Deposit Account Control Agreement, true and correct copies of which are attached hereto as **Exhibits C-E**, respectively, and may hereinafter collectively with the Note be referred to as the "Loan Documents."

5.      As set forth in the Loan Documents, Argo Tea granted Caribou Coffee a security interest in certain collateral, including but not limited to Argo Tea's Intellectual Property, Inventory and Products, some of which are sold at Walgreens. *See Exhibit E.*

6.      On January 15, 2020, Caribou Coffee sold and assigned all of its rights, title and interest as lender under the Loan Documents to Golden Fleece. A true and correct copy of the Assignment and Assumption Agreement is attached hereto as **Exhibit F**.

7.      On February 4, 2020, Golden Fleece sent Argo Tea and other interested parties notification of a public sale of collateral pursuant to the Uniform Commercial Code for a sale scheduled for February 14, 2020. A true and correct copy of the Notification of Disposition of Collateral is attached hereto as **Exhibit G**.

8.      Golden Fleece also published the sale in the Chicago Tribune Business Section on February 5, 2020 and the Chicago Tribune Auction Mart section on February 9, 2020 and February 12, 2020. True and correct copies of the Affidavits of Publication are attached hereto as **Exhibit H.**

9.      On February 14, 2020, Golden Fleece held the UCC sale, where it was the successful bidder for the collateral, including Argo Tea's Intellectual Property, Inventory and Products, some of which are sold at Walgreens.

10.     Thus, at all relevant times, Golden Fleece has been the owner of Argo Tea's Intellectual Property, Inventory and Products, including those that are sold at Walgreens.

11.     In connection with the citation issued by Plaintiff, Walgreens has frozen Golden Fleece's account, including its right to payment by virtue of Walgreens' sales of Golden Fleece's products. Plaintiff does not have a judgment against Golden Fleece, and thus under no circumstances should any citation freeze attach to assets owed to Golden Fleece.

12.     Therefore, Golden Fleece requests that this Court allow it to intervene in this action for the purpose of requesting that its assets be unfrozen, and that based on the foregoing, this Court order the accounts of Golden Fleece be released and citation dismissed as to any assets of Golden Fleece that have been improperly frozen pursuant thereto. This Motion is being brought on an emergency basis as Golden Fleece will suffer irreparable harm in the event its assets and right to payment from Walgreens remains frozen – despite the fact that Golden Fleece is not a judgment debtor herein.

WHEREFORE, Golden Fleece Beverages, Inc., respectfully requests that this Court allow it to intervene in this action; that the freeze on its account at Walgreens be released and the citation issued by Plaintiff dismissed as to any assets of Golden Fleece; and for such other and further relief as is just and proper.

GOLDEN FLEECE BEVERAGES, INC.

By: _____
    Jamie L. Burns

Jamie L. Burns
Levenfeld Pearlstein, LLC
Attorneys for Plaintiff
2 N. LaSalle Street, Ste. 1300
Chicago, IL 60602
Phone: (312) 346-8380
Firm ID: 57133
*Attorney for Golden Fleece Beverages, Inc. – Adverse Claimant*

# EXHIBIT A

FILED
5/7/2021 11:30 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2016CH02547

13243454

FILED DATE: 5/7/2021 11:30 AM    2016CH02547

<u>Citation to Discover Assets</u>                                      (12/01/20) CCG 0005 A

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

550 St. Clair Retail Associates, LLC

v.                                          Case No.    2016 CH 02547

Argo Tea, Inc. and Argo Tea St. Clair, LLC    Consolidated with 2019 L 005567

Hearing Date: 6/15/2021 10:00 AM - 10:00 /

**ALIAS**
**CITATION TO DISCOVER ASSETS**

To:  Walgreens Business Services, LLC c/o Walgreen Co., Manager c/o John Stanfley, President

YOU ARE COMMANDED to appear before Judge  Patrick J. Heneghan

or any judge sitting in his/her stead in Room  2503  at the location

of  Richard J. Daley Center, 50 West Washington, Chicago  , Illinois, on  06/15/2021

at  10:00  ⊙ AM  ○ PM to be examined under oath to discover assets or income not

exempt from enforcement of a judgment. A judgment in favor of  550 St. Clair Retail Associates, LLC

and against  Argo Tea, Inc.  was entered on  9/10/20  (or revived

on _____ ) in the amount of $ _____ 779,384.41* and $ _____ 779,384.41 remains

unsatisfied, plus interest, costs, and attorney's fees.

**\* (The 9/10/20 judgment in the**
**amount of $779,384.41 includes a**

YOU ARE COMMANDED to produce at the examination:    **8/4/20 judgment in the amount**
**of $453,946.40, which became**

All documents identified in the Citation Rider attached hereto as "Exhibit A"    **final on 9/10/20.)**

and all books, papers or records in you possession or control which may contain information
concerning the property or income of, or indebtedness due judgment debtor.

YOU ARE PROHIBITED from making or allowing any transfer or other disposition of, or
interfering with, any property not exempt from execution or garnishment belonging to the judgment
debtor or to which the judgment debtor may be entitled or which may be acquired by or become due
to the judgment debtor and from paying over or otherwise disposing of any money not so exempt,
which is due or becomes due to the judgment debtor, until further order of court or termination of
the proceedings. You are not required to withhold the payment of any money beyond double the
amount of the judgment.

<u>WARNING</u>: **YOUR FAILURE TO APPEAR IN COURT AS HEREIN DIRECTED MAY CAUSE YOU TO BE**
**ARRESTED AND BROUGHT BEFORE THE COURT TO ANSWER TO CHARGE OF CONTEMPT OF**
**COURT, WHICH MAY BE PUNISHABLE BY IMPRISONMENT IN THE COUNTY JAIL.**

Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois
cookcountyclerkofcourt.org

FILED DATE: 5/7/2021 11:30 AM  2016CH02547

Citation to Discover Assets _____ (12/01/20) CCG 0005 B

## CERTIFICATE OF ATTORNEY (OR NON-ATTORNEY)

**NOTE:** THIS CITATION MUST BE ACCOMPANIED AT THE TIME OF SERVICE BY EITHER A COPY OF THE UNDERLYING MEMORANDUM OF JUDGMENT OR A CERTIFICATION BY EITHER THE CLERK THAT ENTERED THE JUDGMENT OR THE ATTORNEY FOR THE JUDGMENT CREDITOR SETTING FORTH THE FOLLOWING:

In the Circuit Court of Cook County (or other Jurisdiction _____ )

on __9/10/20__ , a judgment in the amount of $ ____779,384.41____ was entered in favor

of __550 St. Clair Retail Associates, LLC____ and against __Argo Tea, Inc.____ in

Case No. __2016 CH 02547____ and a balance of $ ____779,384.41____ plus interest, costs, and attorneys' fees, remains unsatisfied.

I, the undersigned certify to the Court, under penalties as provided by law pursuant to 735 ILCS 5/1-109 that all information stated herein is true.

Atty. No.: __08189__

Atty Name: __Peter G. Frezados  -  Regas, Frezados & Dallas, LLP__  /s/ _____ Signature of Attorney

Atty. for: __Plaintiff__    WITNESS Date: __5/7/2021 11:30 AM IRIS Y. MARTINEZ__

Address: __20 North Clark Street, Suite 1103__

City: __Chicago__    Clerk of the Circuit Court

State: __IL__  Zip: __60602__

Telephone: __312-236-4400__    SEAL

Primary Email: __pgf@rfd-law.com__

_____ on oath states:

I am over 18 years of age and not a party to this case. I served the Citation To Discover Assets as follows:

on _____ by leaving a copy with him/her personally on _____ at the hour

of _____ ○ AM ○ PM at _____ , Illinois,

or

On _____ at his/her usual place of abode with, _____ a person of his/her family of the age of 13 or upwards informing that person of the contents of the Citation to Discover

Assets, and also by sending on a true and correct copy on _____ , by prepaid Registered Mail, addressed to him/her; Return Receipt Requested, delivery limited to addressee only. The registry receipt signed by addressee

on _____ , is attached.

(attach receipt here)    /s/ _____

**\*\* If service is made by sheriff, return may be made by certificate rather than by sworn affidavit.**    Under penalties as provided by law pursuant to 735 ILCS 5/1-109 the above signed certifies that the statements set forth herein are true and correct.

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org

FILED DATE: 5/7/2021 11:30 AM    2016CH02547

## EXHIBIT A

YOU, WALGREENS BUSINESS SERVICES, LLC (HEREIN "CITEE"), ARE COMMANDED TO PRODUCE AT THE EXAMINATION (BRING WITH YOU) ALL BOOKS, PAPERS OR RECORDS IN YOUR POSSESSION OR OVER WHICH YOU HAVE CONTROL, WHICH MAY CONTAIN INFORMATION CONCERNING THE FOLLOWING:

1. A copy of all documents evidencing any contractual relationship with Argo Tea, Inc., or any other entity to sell and/or distribute products that bear the name of Argo Tea, Inc. or Argo Tea, or products originating from the family of Argo Tea products.

2. A copy of all documents evidencing all financial transactions with Argo Tea, Inc., or any other entity that provides products for sale at retail that bear the name of Argo Tea, Inc., or products originating from the family of Argo Tea products.

3. A copy of all documents evidencing all transactions where consideration of any type was provided to any person or entity, including but not limited to Argo Tea, Inc., in exchange for products to be sold at retail that bear the name of Argo Tea, Inc. or Argo Tea, or products originating from the family of Argo Tea products.

FILED
5/10/2021 10:55 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2016CH02547

FILED DATE: 5/10/2021 10:55 AM    2016CH02547

**Citation Notice** _____ **(12/01/20) CCG 0648 A**

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

- (●) Richard J Daley Center
  50 W Washington
  Chicago, IL 60602
- (○) District 2 - Skokie
  5600 Old Orchard Rd
  Skokie, IL 60077

- (○) District 3 - Rolling Meadows
  2121 Euclid
  Rolling Meadows, IL 60008
- (○) District 4 - Maywood
  1500 Maybrook Ave
  Maywood, IL 60153

- (○) District 5 - Bridgeview
  10220 S 76th Ave
  Bridgeview, IL 60455
- (○) District 6 - Markham
  16501 S Kedzie Pkwy
  Markham, IL 60428

### CITATION NOTICE

| | |
|---|---|
| 550 St. Clair Retail Associates, LLC _____ Judgment Creditor | Case No. 2016 CH 02547 |
| v. | Court Date: 6/15/21 |
| Argo Tea, Inc. and Argo Tea St. Clair, LLC _____ Judgment Debtor | Time: 10:00  ◉ AM  ○ PM |

Judgment Debtor's last known:

Name: Argo Tea, Inc.

Address: 16 W. Randolph St.          City: Chicago

State: IL    Zip: 60601    Telephone: (312) 553-1550

Primary Email: info@argotea.com

A judgment in favor of  550 St. Clair Retail Associates, LLC _____ and

against  Argo Tea, Inc. _____ was entered on  9/10/20 , (or revived

on _____ in the amount of $ 779,384.41* and $ 779,384.41 plus interest, costs,and attorney's fees, remains unsatisfied.

* (The 9/10/20 judgment in the amount of $779,384.41 includes a 8/4/20
judgment in the amount of $453,946.40, which became final on 9/10/20.)

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org
Page 1 of 3

FILED DATE: 5/10/2021 10:55 AM   2016CH02547

**Citation Notice** _____ (12/01/20) CCG 0648 B

Name and address of Attorney for Judgment Creditor or Judgment Creditor (if without an attorney):

◉ Atty. No.: 08189 _____

○ Pro Se 99500

Name: Peter G. Frezados - Regas, Frezados & Dallas, LLP

Atty. for (if applicable):

Plaintiff 550 St. Clair Retail Associates, LLC

Address: 20 North Clark Street Suite 1103

City: Chicago

State: IL   Zip: 60602

Telephone: 312-236-4400

Primary Email: pgf@rfd-law.com

Name of person to receive Citation: Walgreens Business Services, LLC c/o Walgreen Co., Manager
c/o John Stanfley, President

**NOTICE:** The court has issued a citation against the person named above. The citation directs that person to appear in court to be examined for the purpose of allowing the judgment creditor to discover income and assets belonging to the judgment debtor or in which the judgment debtor has an interest. The citation was issued on the basis of a judgment against the judgment debtor and in favor of the judgment creditor in the amount stated above. On or after the court date stated above, the court may compel the application of any discovered income or assets toward payment on the judgment.

The amount of income or assets that may be applied toward the judgment is limited by federal and Illinois law. THE JUDGMENT DEBTOR HAS THE RIGHT TO ASSERT STATUTORY EXEMPTIONS AGAINST CERTAIN INCOME OR ASSETS OF THE JUDGMENT DEBTOR WHICH MAY NOT BE USED TO SATISFY THE JUDGMENT IN THE AMOUNT STATED ABOVE.

1. Under Illinois or federal law, the exemption of personal property owned by the debtor includes the debtor's equity interest, not to exceed $4,000 in value, in any personal property as chosen by the debtor, including money in a bank account.
2. Social Security and SSI benefits;
3. Public assistance benefits;
4. Unemployment compensation benefits;
5. Worker's compensation benefits;
6. Veteran's benefits;
7. Circuit breaker property tax relief benefits;
8. The debtor's equity interest, not to exceed $2,400 in value, in any one motor vehicle;
9. The debtor's equity interest, not to exceed $1,500 in value, in any implements, professional books, or tools of the trade of the debtor;
10. Under Illinois law every person is entitled to an estate in homestead, when it is owned and occupied as a residence, to the extent in value of $15,000, which homestead is exempt from judgment.

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org

FILED DATE: 5/10/2021 10:55 AM   2016CH02547

**Citation Notice** _____ **(12/01/20) CCG 0648 C**

11. Under Illinois law, the amount of wages that may be applied toward a judgment is limited to the lesser of (i) 15% of gross weekly wages or (ii) the amount by which disposable earnings for a week exceed the total of 45 times the greater of the state or federal minimum hourly wage.

12. Under federal law, the amount of wages that may be applied toward a judgment is limited to the lesser of (i) 25% of disposable earnings for a week or (ii) the amount by which disposable earnings for a week exceed 30 times the federal minimum hourly wage.

13. Pension and retirement benefits (including IRA accounts) and refunds may be claimed as exempt under Illinois law.

The judgment debtor may have other possible exemptions under the law.

THE JUDGMENT DEBTOR HAS THE RIGHT AT THE CITATION HEARING TO DECLARE EXEMPT CERTAIN INCOME OR ASSETS OR BOTH. The judgment debtor also has the right to seek a declaration at an earlier date by notifying the clerk in writing at the office of

the Clerk of the Circuit Court in Room    2503    , 50 W. Washington St.         Chicago    ,
                                                           Street                          City

Illinois. When so notified, the Clerk of the Circuit Court will obtain a prompt hearing date from the court and will provide the necessary forms that must be prepared by the judgment debtor or the attorney for the judgment debtor and sent to the judgment creditor or the judgment creditor's attorney by regular first class mail, regarding the time and location of such hearing.

This notice may be sent to the judgment debtor by regular first class mail.

---

**CERTIFICATION OF MAILING BY JUDGMENT CREDITOR OR ATTORNEY FOR JUDGMENT CREDITOR**

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure (735 ILCS 5/109), the undersigned certifies that s/he mailed by regular first-class mail a copy of the citation notice and this citation to defendant at each address shown below upon filing of the citation or within three business days of service if served upon Third Party Respondent.

Signature: _____    Name: Peter G. Frezados _____

---

Preparer Information

_____
Preparer's Signature

◉ Atty. No.:  08189
○ Pro Se 99500

Name: Peter G. Frezados - Regas, Frezados & Dallas, LLP

Atty. for (if applicable):

Plaintiff 550 St. Clair Retail Associates, LLC

Address: 20 North Clark Street Suite 1103

City: Chicago

State: IL   Zip: 60602

Telephone: 312-236-4400

Primary Email: pgf@rfd-law.com

**Citation Notice and Citation Mailed to:**

Argo Tea, Inc.
c/o Arsen Avakian, President
16 W. Randolph St.
Chicago, Illinois 60601

Argo Tea, Inc.
c/o Arsen Avakian, President
250 East Pearson Street
Chicago, Illinois 60611

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| 550 ST. CLAIR RETAIL ASSOCIATES, LLC,<br>an Illinois Limited Liability Company,<br><br>Plaintiff,<br><br>v.<br><br>ARGO TEA, INC., a Delaware Corporation, and,<br>ARGO TEA ST. CLAIR, LLC, an Illinois Limited<br>Liability Company,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.  2016 CH 02547<br><br>(Consolidated with 2019 L 02547)<br><br>Judge Patrick J. Heneghan<br><br>Calendar 5 |

## NOTICE OF REMOTELY CONDUCTED PROCEEDINGS

To:  Respondent
     Walgreens Business Services, LLC
     c/o Illinois Corporation Service C, Registered Agent
     801 Adlai Stevenson Dr.
     Springfield, IL 62703

     Walgreens Business Services, LLC
     c/o Diana Garcia, Legal Coordinator
     Diana.garciagarcia@walgreens.com

Counsel for Non-Moving Party
C. Jeffrey Thut, Esq.
Noonan, Perillo & Thut
25 N. County Street
Waukegan, IL 60085
jthut@npt-law.com

PLEASE TAKE NOTICE that on **June 15, 2021, at 10:00 a.m.**, the above-named Respondent is commanded to appear remotely through **zoom.com** before the Honorable Judge Patrick J. Heneghan, or any Judge sitting in his stead in Courtroom 2503 of the Richard J. Daley Center, to respond to Citations to Discover Assets issued by 550 St. Clair Retail Associates, LLC, copies of which are hereby served upon you, along with copies of the Citation Notices therefor.

**THIS INITIAL HEARING ON THE CITATIONS <u>WILL NOT BE CONDUCTED IN PERSON</u> IN THE DALEY CENTER ON THE DATE AND TIME STATED. INSTEAD, THE MATTER WILL BE HANDLED REMOTELY, THROUGH <u>ZOOM.COM</u>, A VIDEO CONFERENCING SERVICE.  YOU <u>SHALL NOT</u> PHYSICALLY APPEAR IN THE DALEY CENTER ON THE DATE AND TIME STATED.**

<u>Zoom.com</u> conference log-in information:     Zoom ID No.: **967 3454 1119**
                                                Password:    **268697**

1

Court personnel for Calendar 5 may be contacted as follows:

- General email address: LAW.CAL5cc@cookcountyil.gov
- Clerk: Anohki Patel ajpatel@cookcountycourt.com; 312-603-446
- Court Coordinator Ann Ostrowski: ann.ostrowski@cookcountyil.gov; 312-603-5533
- Law Clerk Isabella Janusz: isabella.janusz@cookcountyil.gov

**IN THE EVENT THE NON-MOVING PARTY OR OTHER RESPONDENT FAILS TO APPEAR DURING THE REMOTELY CONDUCTED HEARING, THE COURT MAY ENTER AN ORDER THAT ADVERSELY AFFECTS THE INTERESTS OF THE NON-MOVING PARTY OR OTHER RESPONDENT.**

Peter G. Frezados (pgf@rfd-law.com)
William D. Dallas (wdd@rfd-law.com)
Steven M. Dallas (stevend@rfd-law.com)
Regas, Frezados & Dallas LLP
20 North Clark Street, Suite 1103
Chicago, Illinois 60602
(312) 236-4400
(815) 353-2463
Attorney No. 08189

Regas, Frezados & Dallas LLP

By:

Attorneys for 550 St. Clair Retail
Associates, LLC

    The undersigned certifies that I served the foregoing Notice, together with the documents referred to therein, upon the persons listed above at the email address indicated by email transmission on May 14 , 2021.

[✓]    Under penalties provided by law
pursuant to 735 ILCS 5/1-109, I
certify that the statements set
forth herein are true and correct.

Signature

2

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

550 ST. CLAIR RETAIL ASSOCIATES, LLC,       )
an Illinois Limited Liability Company,       )
                                             )
                Plaintiff,                   )
                                             )
        v.                                   )    Case No.  2016 CH 02547
                                             )
ARGO TEA, INC., a Delaware Corporation, and, )    Consolidated with 2019 L 005567
ARGO TEA ST. CLAIR, LLC, an Illinois Limited )
Liability Company,                           )    Judge Anna M. Loftus
                                             )
                Defendants.                  )    Calendar 15
_____)
BEAR CONSTRUCTION COMPANY,                   )
                                             )
                Plaintiff,                   )
                                             )
        v.                                   )
                                             )
ARGO TEA, INC., and                          )
ARGO TEA ST. CLAIR, LLC,                     )
                                             )
                Defendants.                  )

## ORDER

This cause coming before the Court on 550 St. Clair Retail Associates, LLC's (herein "Plaintiff") Verified Petition for Attorney's Fees and Costs, due notice having been given to all parties entitled thereto and the Court being fully advised of the Premises;

IT IS HEREBY ORDERED:

1       On August 4, 2020, this Court granted Plaintiff's Verified Petition for Attorney's Fees and Costs in part and entered judgment in favor of 550 St. Clair Retail Associates, LLC and against Argo Tea, Inc. and Argo Tea St. Clair, LLC in the amount of $453,946.40. The Court retained jurisdiction to decide whether Plaintiff is entitled to recover the additional attorney's fees requested in Plaintiff's Verified Petition for Attorney's Fees and Costs.

2.      The Court finds that Plaintiff is entitled to recover its reasonable attorneys' fees and costs for services rendered in the underlying action against Argo Tea St. Clair, LLC. The additional relief requested in Plaintiff's Verified Petition for Attorney's Fees and Costs is hereby granted. Judgment is entered in favor of 550 St. Clair Retail

Associates, LLC and against Argo Tea, Inc. and Argo Tea St. Clair, LLC in the
additional amount of $325,438.01.

3. There is no just reason to delay the enforcement or appeal of this Final Judgment
Order pursuant to Illinois Supreme Court Rule 304(a).

4. This cause is continued for status on the claims of Bear Construction Company in
consolidated Case No. 2019 L 005567 to October 9, 2020 at 10:00 a.m. If counsel
for Bear Construction Company does not appear on that date, its claims may be
dismissed for want of prosecution.

5. Counsel for 550 St. Clair Retail Associates, LLC is to tender a copy of this order to
counsel for Bear Construction Company, and send a copy to Defendants at their
last known address, within seven days of entry

Dated:  September 10, 2020.

ENTERED:

/s/ Anna M. Loftus

Judge Anna M. Loftus, No. 2102

Peter G. Frezados (pgf@rfd-law.com)
William D. Dallas (wdd@rfd-law.com)
Steven M. Dallas (stevend@rfd-law.com)
Regas, Frezados & Dallas LLP
Attorneys for Plaintiff
20 North Clark Street, Suite 1103
Chicago, Illinois 60602
(312) 236-4400
Attorney No. 08189

2

# EXHIBIT B

# EXHIBIT B

## CONVERTIBLE TERM LOAN NOTE

December 8, 2015
New York, New York

$10,000,000

The undersigned, for value received, jointly and severally, promise to pay to the order of **CARIBOU COFFEE COMPANY, INC.,** a Minnesota corporation, ("Lender") at its office in Minneapolis, Minnesota the aggregate unpaid amount of all Term Loans made to the undersigned by Lender pursuant to the Credit Agreement referred to below (as shown on the schedule attached hereto (and any continuation thereof) or in the records of Lender), such principal amount to be payable on the dates and in the manner (including, pursuant to a Conversion) set forth in the Credit Agreement.

The undersigned further, jointly and severally, promise to pay interest on the unpaid principal amount of each Term Loan from the date of such Term Loan until such Term Loan is paid in full or otherwise converted in accordance with Section 18.1 of the Credit Agreement (defined below), payable at the rate(s) and at the time(s) set forth in the Credit Agreement. Payments of both principal and interest are to be made in lawful money of the United States of America.

This Term Loan Note (this "Note") evidences indebtedness incurred under, and is subject to the terms and provisions of, the Credit Agreement, dated as of December 8, 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"; terms not otherwise defined herein are used herein as defined in the Credit Agreement), among the undersigned and Lender, to which Credit Agreement reference is hereby made for a statement of the terms and provisions under which this Note may or must be paid prior to its due date or its due date accelerated.

This Note is made under and governed by the laws of the State of New York applicable to contracts made and to be performed entirely within such State.

*(Signature Page Follows)*

*(Signature Page to Convertible Term Loan Note)*

**BORROWERS:**

ARGO TEA, INC., a Delaware corporation

By: _____
Name: Arsen Avakian
Title:  President

**ARGO TEA RUSH, LLC**, an Illinois limited liability company

**ARGO TEA STATE/RANDOLPH, LLC**, an Illinois limited liability company

**ARGO TEA UCH, LLC**, an Illinois limited liability company

**ARGO TEA BROADWAY, LLC**, an Illinois limited liability company

**ARGO TEA MARQUETTE, LLC**, an Illinois limited liability company

**ARGO TEA NW, LLC**, an Illinois limited liability company

**ARGO TEA FRANKLIN, LLC**, an Illinois limited liability company

**ARGO TEA MENA, LLC**, a Delaware limited liability company

By: Argo Tea, Inc., Manager for each of the above listed Borrowers

By: _____
Name: Arsen Avakian
Title:  President

# EXHIBIT C

*Execution Version*

**CREDIT AGREEMENT**

**dated as of December 8, 2015**
**among**

**ARGO TEA, INC.**
**ARGO TEA RUSH, LLC**
**ARGO TEA STATE/RANDOLPH, LLC**
**ARGO TEA UCH, LLC**
**ARGO TEA BROADWAY, LLC**
**ARGO TEA MARQUETTE, LLC**
**ARGO TEA NW, LLC**
**ARGO TEA FRANKLIN, LLC**
**ARGO TEA MENA, LLC**
**(individually and collectively, jointly and severally),**
**as Borrower,**

**and**

**CARIBOU COFFEE COMPANY, INC.,**

**as Lender**

# TABLE OF CONTENTS

**Page**

1.    DEFINITIONS ............................................................................................................1
    1.1    Definitions ........................................................................................................1
    1.2    Other Interpretive Provisions ..........................................................................1

2.    COMMITMENT OF LENDER .................................................................................2
    2.1    Commitment .....................................................................................................2

3.    EVIDENCING OF LOANS .......................................................................................3
    3.1    Notes .................................................................................................................3
    3.2    Recordkeeping ..................................................................................................3

4.    INTEREST .................................................................................................................3
    4.1    Interest Rates ....................................................................................................3
    4.2    Interest Payment Dates .....................................................................................3
    4.3    Computation of Interest ....................................................................................3

5.    [RESERVED] .............................................................................................................3

6.    PAYMENTS AND PREPAYMENTS .......................................................................3
    6.1    Prepayments .....................................................................................................3
    6.2    Application of Prepayments; Prepayment Fees ................................................5
    6.3    Repayments ......................................................................................................5

7.    MAKING AND PRORATION OF PAYMENTS; SETOFF; TAXES ........................5
    7.1    Making of Payments .........................................................................................5
    7.2    Application of Certain Payments ......................................................................5
    7.3    Due Date Extension ..........................................................................................5
    7.4    Setoff ................................................................................................................6
    7.5    Reserved ...........................................................................................................6
    7.6    Taxes. ...............................................................................................................6

8.    [RESERVED] .............................................................................................................8

9.    REPRESENTATIONS AND WARRANTIES ...........................................................8
    9.1    Organization .....................................................................................................8
    9.2    Authorization; No Conflict ...............................................................................8
    9.3    Validity and Binding Nature ............................................................................9
    9.4    Financial Condition ..........................................................................................9
    9.5    No Material Adverse Change ............................................................................9
    9.6    Litigation and Contingent Liabilities ...............................................................9
    9.7    Ownership of Properties; Liens ........................................................................9
    9.8    Equity Ownership; Subsidiaries .......................................................................9
    9.9    Pension Plans ..................................................................................................10
    9.10   Investment Company Act ................................................................................10
    9.11   Compliance with Laws ...................................................................................10
    9.12   Regulation U ...................................................................................................11

i

| 9.13 | Taxes | 11 |
| 9.14 | Solvency, etc. | 11 |
| 9.15 | Environmental Matters | 11 |
| 9.16 | Insurance | 12 |
| 9.17 | Real Property | 12 |
| 9.18 | Information | 12 |
| 9.19 | Intellectual Property | 13 |
| 9.20 | Reserved | 13 |
| 9.21 | Labor Matters | 13 |
| 9.22 | Anti-Terrorism Laws | 13 |
| 9.23 | No Default | 13 |
| 9.24 | OFAC | 14 |
| 9.25 | Patriot Act | 14 |
| 9.26 | Reserved | 14 |
| 9.27 | Subordinated Debt | 14 |
| 10. | AFFIRMATIVE COVENANTS | 15 |
| 10.1 | Reports, Certificates and Other Information. Furnish to Lender | 15 |
| 10.2 | Books, Records and Inspections | 18 |
| 10.3 | Maintenance of Property; Insurance | 18 |
| 10.4 | Compliance with Laws; Payment of Taxes and Liabilities | 19 |
| 10.5 | Maintenance of Existence, etc. | 19 |
| 10.6 | Use of Proceeds | 19 |
| 10.7 | Employee Benefit Plans | 19 |
| 10.8 | Environmental Matters | 20 |
| 10.9 | Further Assurances | 20 |
| 10.10 | Accounts | 21 |
| 10.11 | [Post-Closing Obligations | 21 |
| 10.12 | [Reserved] | 21 |
| 10.13 | [Reserved] | 21 |
| 10.14 | Observer | 21 |
| 11. | NEGATIVE COVENANTS | 22 |
| 11.1 | Debt | 22 |
| 11.2 | Liens | 23 |
| 11.3 | [Reserved] | 25 |
| 11.4 | Restricted Payments | 25 |
| 11.5 | Mergers, Consolidations, Sales | 25 |
| 11.6 | Modification of Organizational Documents | 26 |
| 11.7 | Transactions with Affiliates | 26 |
| 11.8 | Unconditional Purchase Obligations | 26 |
| 11.9 | Inconsistent Agreements | 26 |
| 11.10 | Business Activities; Issuance of Equity | 26 |
| 11.11 | Investments | 27 |
| 11.12 | Restriction of Amendments to Certain Documents | 27 |
| 11.13 | Fiscal Year | 27 |
| 11.14 | Financial Covenants | 27 |
| 11.15 | Cancellation of Debt | 29 |

1924780-NYCSR07A - MSW

11.16    Transfer to Subsidiaries ..............................................................................29
11.17    Compliance with Laws ...............................................................................29

12.    EFFECTIVENESS; CONDITIONS OF LENDING, ETC. ...................................29
12.1    Initial Credit Extension ..............................................................................29

13.    EVENTS OF DEFAULT AND THEIR EFFECT ...................................................32
13.1    Events of Default ........................................................................................32
13.2    Effect of Event of Default...........................................................................34
13.3    Credit Bidding ............................................................................................34

14.    RESERVED ..............................................................................................................35

15.    GENERAL ................................................................................................................35
15.1    Waiver; Amendments ..................................................................................35
15.2    Confirmations .............................................................................................35
15.3    Notices ........................................................................................................35
15.4    Computations ..............................................................................................35
15.5    Costs, Expenses and Taxes .........................................................................35
15.6    Assignments; Participations ........................................................................36
15.7    GOVERNING LAW ....................................................................................37
15.8    Confidentiality ............................................................................................37
15.9    Severability .................................................................................................38
15.10   Nature of Remedies......................................................................................38
15.11   Entire Agreement ........................................................................................38
15.12   Counterparts ................................................................................................38
15.13   Successors and Assigns................................................................................38
15.14   Captions .......................................................................................................38
15.15   Customer Identification – USA Patriot Act Notice .....................................38
15.16   INDEMNIFICATION BY LOAN PARTIES ...............................................39
15.17   Nonliability of Lender.................................................................................39
15.18   FORUM SELECTION AND CONSENT TO JURISDICTION ..........................40
15.19   WAIVER OF JURY TRIAL.........................................................................41
15.20   Disclosure ...................................................................................................41

16.    JOINT AND SEVERAL LIABILITY ....................................................................41

17.    APPOINTMENT OF BORROWER REPRESENTATIVE .............................................45

18.    CONVERSION .........................................................................................................45

iii

# ANNEXES

ANNEX A          Definitions
ANNEX B          Addresses for Notices

# SCHEDULES

SCHEDULE 1.2     Deemed EBITDA
SCHEDULE 9.6     Litigation and Contingent Liabilities
SCHEDULE 9.8     Equity Ownership; Subsidiaries
SCHEDULE 9.16    Insurance
SCHEDULE 9.17    Real Property
SCHEDULE 9.21    Labor Matters
SCHEDULE 10.11   Post-Closing Obligations
SCHEDULE 11.1    Existing Debt
SCHEDULE 11.2    Existing Liens
SCHEDULE 11.11   Investments
SCHEDULE 12.1    Debt to be Repaid

# EXHIBITS

EXHIBIT A        Form of Note
EXHIBIT B        Form of Compliance Certificate
EXHIBIT C        Form of Shareholder Agreement

1924780-NYCSR07A - MSW

# CREDIT AGREEMENT

This **CREDIT AGREEMENT** dated as of December 8, 2015 (this "Agreement"), is entered into among **ARGO TEA, INC.**, a Delaware corporation ("Argo Tea"), **ARGO TEA RUSH, LLC**, an Illinois limited liability company, **ARGO TEA STATE/RANDOLPH, LLC**, an Illinois limited liability company, **ARGO TEA UCH, LLC**, an Illinois limited liability company, **ARGO TEA BROADWAY, LLC**, an Illinois limited liability company, **ARGO TEA MARQUETTE, LLC**, an Illinois limited liability company, **ARGO TEA NW, LLC**, an Illinois limited liability company, **ARGO TEA FRANKLIN, LLC**, an Illinois limited liability company, and **ARGO TEA MENA, LLC**, a Delaware limited liability company (individually and collectively, jointly and severally, "Borrower"), and CARIBOU COFFEE COMPANY, INC., a Minnesota corporation (together with its successors and assigns, "Lender").

## RECITALS

WHEREAS, Borrower has requested that Lender make a term loan to Borrower in the principal amount of $10,000,000 (i) to refinance the Debt to be Repaid, (ii) an amount not to exceed $200,000, to pay accrued bonuses for officers of Argo Tea,  (iii) to pay obligations related to financial advisor fees to First Beverage Group not to exceed $450,000, (iv) to pay fees and expenses associated with the closing of this Agreement, and (v) any amount remaining thereafter, for general corporate purposes and Lender is willing to do so on the terms and conditions set forth herein.

WHEREAS, to secure the Loans and other Obligations, each Loan Party is granting to Lender, a security interest in and lien upon substantially all of its real and personal property.

In consideration of the mutual agreements herein contained, the parties hereto agree as follows:

1. DEFINITIONS.

1.1  Definitions. When used herein, the terms set forth in Annex A shall have the meanings set forth therein.

1.2  Other Interpretive Provisions. (a) The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)  Section, Annex, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(c)  The term "including" is not limiting and means "including without limitation."

(d)  In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding", and the word "through" means "to and including."

1924780-NYCSR07A - MSW

(e)     Unless otherwise expressly provided herein, (i) references to agreements (including this Agreement and the other Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, supplements and other modifications thereto, but only to the extent such amendments, restatements, supplements and other modifications are not prohibited by the terms of any Loan Document, and (ii) references to any statute or regulation shall be construed as including all statutory and regulatory provisions amending, replacing, supplementing or interpreting such statute or regulation.

(f)     This Agreement and the other Loan Documents may use several different limitations, tests or measurements to regulate the same or similar matters. All such limitations, tests and measurements are cumulative and each shall be performed in accordance with its terms.

(g)     This Agreement and the other Loan Documents are the result of negotiations among and have been reviewed by counsel to Lender, Borrower and the other parties thereto and are the products of all parties. Accordingly, they shall not be construed against Lender merely because of Lender's involvement in their preparation.

(h)     Notwithstanding anything to the contrary contained in this Agreement, in the event of a change in GAAP requiring leases to be capitalized, only those leases (assuming for purposes hereof that they were in existence on the Closing Date) that would constitute a Capital Lease on the Closing Date (before giving effect to such change in GAAP) shall be considered a Capital Lease (and all other leases shall continue to be treated as operating leases to the extent they have been treated as such before giving effect to such change in GAAP), and all calculations and deliverables under this Agreement or the other Loan Documents shall be made in accordance therewith (other than the financial statements delivered to Lender pursuant to this Agreement; provided that such financial statements delivered to Lender in accordance with the terms of this Agreement after the effective date of such change in GAAP shall be accompanied by a schedule showing the adjustments necessary to reconcile such financial statements with GAAP as in effect immediately prior to such change in GAAP).

2.     COMMITMENT OF LENDER.

2.1     Commitment.

2.1.1     On and subject to the terms and conditions of this Agreement, Lender agrees to make a loan to Borrower on the Closing Date in the aggregate amount of the Term Loan Commitment. The commitment of Lender to make such loan shall expire concurrently with the making of such loan on the Closing Date.

2.1.2     Amounts repaid or prepaid with respect to any Term Loans may not be re-borrowed.

2

3.    EVIDENCING OF LOANS.

3.1    Notes. At Lender's request, the Loans of Lender shall be evidenced by a Note in the form of Exhibit A attached hereto, with appropriate insertions, payable to the order of Lender in a face principal amount equal to the principal amount of Lender's Term Loans.

3.2    Recordkeeping. Lender shall record in its records, the date and amount of each Loan made by Lender and each repayment thereof. The aggregate unpaid principal amount so recorded shall be rebuttably presumptive evidence of the principal amount of the Loans owing and unpaid. The failure to so record any such amount or any error in so recording any such amount shall not, however, limit or otherwise affect the Obligations of Borrower hereunder or under any Note to repay the principal amount of the Loans hereunder, together with all interest accruing thereon.

4.    INTEREST.

4.1    Interest Rates. Borrower agrees to pay interest on the unpaid principal amount of each Loan for the period commencing on the date of such Loan until such Loan is paid in full at a rate per annum equal to the Applicable Margin; provided that at any time an Event of Default exists, the interest rate applicable to each Loan shall be increased by five percent (5%) (and, in the case of Obligations not bearing interest, such Obligations shall bear interest at the Applicable Margin plus five percent (5%)) (such five percent (5%) increase and (in respect of Obligations not otherwise bearing interest) interest rate, are referred to herein as the "Default Interest"), provided further that such Default Interest may thereafter be rescinded by Lender. In no event shall interest payable by Borrower to Lender hereunder exceed the maximum rate permitted under applicable law, and if any such provision of this Agreement is in contravention of any such law, such provision shall be deemed modified to limit such interest to the maximum rate permitted under such law.

4.2    Interest Payment Dates. Accrued interest on each Loan shall be payable at maturity (it being understood that no interest, other than accrued Default Interest (if any), shall be payable in respect of any of the Loans advanced hereunder, if the Conversion is exercised in accordance with the terms of this Agreement). Accrued Default Interest shall be payable on demand.

4.3    Computation of Interest. Interest for each full calendar month during the term of this Agreement will be calculated on the basis of a 360-day year consisting of 12 months of 30 days each.

5.    [RESERVED]

6.    PAYMENTS AND PREPAYMENTS.

6.1    Prepayments.

6.1.1    Voluntary Prepayments. At any time after the Specified Option Expiration Date, Borrower may from time to time prepay the Loans in whole or in part; provided that Borrower Representative shall give Lender notice thereof not later than

10:00 A.M., Minneapolis, Minnesota time, on the day of such prepayment of any Term Loan (which shall be a Business Day), specifying the date and amount of prepayment. Any such partial prepayment of a Term Loan shall be in an amount equal to $500,000 or a higher integral multiple of $100,000.  Any voluntary prepayment of the Loans shall be accompanied by the accrued but unpaid interest on that portion of the Loan being prepaid.

6.1.2    <u>Mandatory Prepayments</u>.

(a)    During the Specified Covenant Period, Borrower shall offer to Lender to make a prepayment of the Term Loans until paid in full upon the occurrence, during the Specified Covenant Period, of any of the following at the following times and in the following amounts (it being understood and agreed that the Lender shall have the right to elect not to accept any such prepayment in its sole discretion):

(i)    Concurrently with the receipt by any Loan Party of any Net Cash Proceeds from any Asset Disposition, in an amount equal to 100% of such Net Cash Proceeds, <u>provided</u>, <u>however</u>, that up to $250,000 in the aggregate of such Net Cash Proceeds for all Loan Parties received in respect of Asset Dispositions entered into during the Specified Covenant Period (but exclusive of any other amounts which may be excluded from such prepayment requirement pursuant to 6.1.2(b) of this Agreement) shall not be subject to prepayment.

(ii)    Concurrently with the receipt by any Loan Party of any Net Cash Proceeds from any issuance of Capital Securities of Borrower or any other Loan Party or from any capital contribution received by any Loan Party (excluding (x) any issuance by Borrower of common Capital Securities to an employee or director pursuant to any employee or director option program, benefit plan or compensation program and (y) any issuance by a Subsidiary to Borrower or another Wholly-Owned Subsidiary), in an amount equal to 50% of such Net Cash Proceeds.

(iii)    Concurrently with the receipt by any Loan Party of any Net Cash Proceeds from any issuance of any Debt of any Loan Party (excluding Debt permitted by Section 11.1), in an amount equal to 100% of such Net Cash Proceeds.

(b)    Notwithstanding the foregoing an offer to make a prepayment described in Section 6.1.2(a)(i) shall not be required provided that (i) Borrower Representative delivers to Lender a certificate, executed by Borrower Representative's chief financial officer, that it intends within one hundred eighty (180) days after receipt thereof to use all of such Net Cash Proceeds to purchase assets of similar utility, (ii) such Net Cash Proceeds shall be held in deposit accounts over which Lender has a first priority perfected Lien by virtue of "control" (as defined in the UCC) of such accounts, until such time as such Net Cash Proceeds are used to purchase such assets, (iii) the aggregate amount of all

Net Cash Proceeds not subject to prepayment under this Section shall not exceed $250,000 in the aggregate during the term of this Agreement and (iv) no Default or Event of Default has occurred and is continuing at the time of the receipt of such Net Cash Proceeds or at the time of the usage of such Net Cash Proceeds or as a result thereof. Any such Net Cash Proceeds not so used on or before the earlier of the following dates shall promptly (but in any event within three (3) Business Days after such date) be offered to the Lender to be made as a prepayment of the Term Loans: (A) the date that is one hundred eighty (180) days after receipt thereof, and (B) the date on which Borrower Representative shall have notified Lender of its determination not to purchase such assets with such Net Cash Proceeds; provided that the Lender shall have the right to elect not to accept such prepayment in its sole discretion, in which case any such declined prepayment amount shall be retained by the Borrower.

6.2     Application of Prepayments; Prepayment Fees.

6.2.1     All prepayments of Term Loans shall be applied pro rata among the Term Loans according to the principal amounts thereof and, as to each Term Loan to the remaining principal amount thereof.

6.2.2     [Reserved].

6.2.3     [Reserved].

6.3     Repayments. Unless sooner paid in full or converted in full into Conversion Shares (as defined in Section 18.1 hereof) pursuant to Section 18.1 hereof, the outstanding principal balance of the Term Loans shall be paid in full on the Term Loan Maturity Date.

7.     MAKING AND PRORATION OF PAYMENTS; SETOFF; TAXES.

7.1     Making of Payments. All payments of principal or interest on the Note(s), and of all fees, shall be made by Borrower to Lender in immediately available funds at the office specified by Lender not later than noon, Minneapolis, Minnesota time, on the date due; and funds received after that hour shall be deemed to have been received by Lender on the following Business Day. All payments under Section 8.1 shall be made by Borrower directly to Lender without setoff, counterclaim or other defense.

7.2     Application of Certain Payments. So long as no Default or Event of Default has occurred and is continuing, (a) payments matching specific scheduled payments then due shall be applied to those scheduled payments and (b) voluntary and mandatory prepayments shall be applied as set forth in Section 6.2. After the occurrence and during the continuance of a Default or an Event of Default, all amounts collected or received by Lender shall be applied as Lender shall determine in its sole discretion.

7.3     Due Date Extension. If any payment of principal or interest with respect to any of the Loans, or of any fees, falls due on a day which is not a Business Day, then such due date shall be extended to the immediately following Business Day and, in the case of principal, additional interest shall accrue and be payable for the period of any such extension.

1924780-NYCSR07A - MSW

7.4    <u>Setoff</u>. Borrower, for itself and each other Loan Party, agrees that Lender has all rights of set-off and bankers' lien provided by applicable law, and in addition thereto, Borrower, for itself and each other Loan Party, agrees that at any time any Event of Default exists, Lender may apply to the payment of any Obligations of Borrower and each other Loan Party hereunder, whether or not then due, any and all balances, credits, deposits, accounts or moneys of Borrower and each other Loan Party then or thereafter with Lender.

7.5    <u>Reserved</u>.

7.6    <u>Taxes.</u>

(a)    <u>Payments Free of Setoff, Taxes, Etc.</u> All payments made by Borrower hereunder or under any Loan Documents shall be made without setoff, counterclaim, or other defense. Except as otherwise provided in Section 7.6(b), all payments hereunder or under the Loan Documents (including any payment of principal, interest, or fees) to, or for the benefit, of any Person shall be made by Borrower free and clear of and without deduction or withholding for, or account of, any Taxes now or hereinafter imposed by any taxing authority.

(b)    <u>Withholding Taxes; Gross-Up</u>. If Borrower makes any payment hereunder or under any Loan Document in respect of which it is required by applicable law to deduct or withhold any Taxes, Borrower shall (i) increase the payment hereunder or under any such Loan Document such that after the reduction for the amount of Taxes withheld (and any taxes withheld or imposed with respect to the additional payments required under this Section 7.6(b)), the amount paid to Lender equals the amount that would have been paid hereunder or under any such Loan Document had no such deduction by Borrower for Taxes been made, (ii) pay the full amount deducted to the relevant taxing authority within the time allowed for payment under applicable law, and (iii) within 30 days after it has made payment to such authority, deliver to Lender a receipt issued by such authority (or other evidence satisfactory to Lender) evidencing the payment of all amounts so required to be deducted or withheld from such payment.

(c)    <u>Payment of Other Taxes by Borrower</u>. Borrower shall timely pay to the relevant taxing authority in accordance with applicable law, or at the option of Lender timely reimburse it for the payment of, any Other Taxes.

(d)    <u>Indemnification by Borrower</u>. If Lender is required by law to make any payments of any Taxes (including any Other Taxes) on or in relation to any amounts received or receivable hereunder or under any other Loan Document, or any Tax (including any Other Tax) is assessed against Lender with respect to amounts received or receivable hereunder or under any other Loan Document, Borrower will indemnify such Person against (i) such Tax (and any reasonable counsel fees and out-of-pocket expenses arising therefrom or with respect thereto) and (ii) any taxes imposed as a result of the receipt of the payment under this Section 7.6(d). A certificate prepared in good faith as to the amount of such payment by Lender shall, absent manifest error, be final, conclusive, and binding on all parties. Notwithstanding the foregoing, the Loan Parties shall not be obligated to make payment to Lender pursuant to this Section 7.6 in respect of penalties,

6

interest and other liabilities attributable to any Taxes or Other Taxes, if (and only in respect of), (i) such penalties, interest and other liabilities were imposed or accrued after one hundred eighty (180) days following the date on which Lender received written notice of the imposition of the Taxes or Other Taxes to which such amounts are attributable and the accrual or imposition is not in any way attributable to an act or failure or omission to act or failure or omission to comply with this Agreement or applicable laws or regulations, in each case, by Borrower or any of Borrower's Affiliates, or (ii) such penalties, interest and other liabilities have accrued after Borrower has indemnified or paid an additional amount due as of the date of such payment pursuant to this Section 7.6 and the imposition or accrual of such amount is not in any way attributable to an act or failure or omission to act or failure or omission to comply with this Agreement or applicable laws, in each case, by Borrower or its Affiliates.

(e)     FATCA. If a payment made to Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), Lender shall deliver to Borrower, at the time or times prescribed by law and at such time or times reasonably requested by Borrower such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Borrower as may be necessary for Borrower to comply with its obligations under FATCA and to determine that Lender has complied with its obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this paragraph, "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(f)     Status of Lenders. To the extent permitted by applicable law, if Lender is not a United States person within the meaning of Code Section 7701(a)(30) (a "Non-U.S. Participant") Lender shall deliver to Borrower on or prior to the Closing Date (or in the case of an Assignee, on the date of such assignment) two accurate and complete original signed copies of IRS Form W-8BEN, W-8ECI, or W-8IMY (or any successor or other applicable form prescribed by the IRS) certifying to Lender's entitlement to a complete exemption from, or a reduced rate in, United States withholding tax on interest payments to be made hereunder or on any Loan. If Lender is a Non-U.S. Participant claiming a complete exemption from withholding on interest pursuant to Code Sections 871(h) or 881(c), Lender shall deliver (along with two accurate and complete original signed copies of IRS Form W-8BEN) a certificate in form and substance reasonably acceptable to Lender (any such certificate, a "Withholding Certificate"). In addition, if Lender is a Non-U.S. Participant, Lender agrees that from time to time after the Closing Date, (or in the case of an Assignee, after the date of the assignment), when a lapse in time (or change in circumstances occurs) renders the previously delivered certificate obsolete or inaccurate in any material respect, Lender shall, to the extent permitted under applicable law, deliver to Borrower new and accurate and complete original signed copies of an IRS Form W-8BEN, W-8ECI, or W-8IMY (or any successor or other applicable forms prescribed by the IRS), and if applicable, a new Withholding Certificate, to confirm or establish the entitlement of Lender to an exemption from, or reduction in, United States withholding tax on interest payments to be made hereunder or on any Loan.

7

(g)     Treatment of Certain Refunds. If Lender determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 7.6 (including by the payment of additional amounts pursuant to this Section 7.6), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 7.6 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses of the Lender and without interest (other than any interest paid by the relevant governmental authority with respect to such refund). Such indemnifying party, upon the request of Lender, shall repay to the Lender the amount paid over by Lender to Borrower pursuant to this Section 7.6(g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event the Lender is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this Section 7.6(g), in no event will the Lender be required to pay any amount to any indemnifying party pursuant to this Section 7.6(g), the payment of which would place the Lender in a less favorable net after-tax position than the Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts giving rise to such refund had never been paid. This paragraph (g) shall not be construed to require the Lender to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

8.     [RESERVED].

9.     REPRESENTATIONS AND WARRANTIES.

To induce Lender to enter into this Agreement and to induce Lender to make Loans, Borrower represents and warrants to Lender that:

9.1     Organization. Each Loan Party is validly existing and in good standing under the laws of its jurisdiction of organization; and each Loan Party is duly qualified to do business in each jurisdiction where, because of the nature of its activities or properties, such qualification is required, except in jurisdictions where the failure to be so qualified could not be reasonably expected to have a Material Adverse Effect.

9.2     Authorization; No Conflict. Each Loan Party is duly authorized to execute and deliver each Loan Document to which it is a party, Borrower is duly authorized to borrow monies hereunder and each Loan Party is duly authorized to perform its Obligations under each Loan Document to which it is a party.  The execution, delivery and performance by each Loan Party of each Loan Document to which it is a party, and the borrowings by Borrower hereunder, do not and will not (a) require any consent or approval of any governmental agency or authority (other than any consent or approval which has been obtained and is in full force and effect), (b) conflict with (i) any provision of law, (ii) the charter, by-laws or other organizational documents of any Loan Party or (iii) in any material respect, any material agreement, indenture, instrument or other material document, or any judgment, order or decree, which is binding upon any Loan Party or any of their respective properties or (c) require, or result in, the creation or imposition of any Lien on any asset of any Loan Party (other than Liens in favor of Lender created pursuant to the Collateral Documents).

8

9.3     <u>Validity and Binding Nature</u>. Each of this Agreement and each other Loan Document to which any Loan Party is a party is the legal, valid and binding obligation of such Person, enforceable against such Person in accordance with its terms, subject to bankruptcy, insolvency and similar laws affecting the enforceability of creditors' rights generally and to general principles of equity.

9.4     <u>Financial Condition</u>. The unaudited consolidated financial statements of Borrower and its Subsidiaries as at December 31, 2014, and the unaudited consolidated financial statements of Borrower and its Subsidiaries as at June 30, 2015, copies of each of which have been delivered to Lender, were prepared in accordance with GAAP (subject, in the case of such unaudited statements, to the absence of footnotes and to normal year-end adjustments) and present fairly the consolidated financial condition of Borrower and its Subsidiaries as at such dates and the results of their operations for the periods then ended.

9.5     <u>No Material Adverse Change</u>. Since June 30, 2015, there has been no material adverse change in the financial condition, operations, assets, business, properties or prospects of the Loan Parties taken as a whole.

9.6     <u>Litigation and Contingent Liabilities</u>. No litigation (including derivative actions), arbitration proceeding or governmental investigation or proceeding is pending or, to Borrower's knowledge, threatened in writing against any Loan Party that involve any of the Transactions contemplated hereby or an amount in controversy individually in excess of $150,000, except as set forth in Schedule 9.6.  Other than any liability incident to such litigation or proceedings, no Loan Party has any material contingent liabilities not listed on Schedule 9.6 or permitted by Section 11.1.

9.7     <u>Ownership of Properties; Liens</u>. Each Loan Party owns good and, in the case of real property, marketable title to all of its material properties and assets, real and personal, tangible and intangible, of any nature whatsoever (including patents, trademarks, trade names, service marks and copyrights), free and clear of all Liens, charges and claims (including infringement claims with respect to patents, trademarks, service marks, copyrights and the like) except for Permitted Liens.  No financing statement or other public notice with respect to all or any part of the Collateral is on file or of record in any public office, except filings evidencing Permitted Liens and filings for which termination statements have been delivered to Lender.

9.8     <u>Equity Ownership; Subsidiaries</u>. All issued and outstanding Capital Securities of each Loan Party and other Subsidiary are duly authorized and validly issued, fully paid, non-assessable, and free and clear of all Liens other than those in favor of Lender, and such securities were issued in compliance with all applicable state and federal laws concerning the issuance of securities. Schedule 9.8 sets forth the authorized Capital Securities of each Loan Party and other Subsidiary as of the Closing Date. All of the issued and outstanding Capital Securities of Borrower and each other Subsidiary are owned as set forth on Schedule 9.8 as of the Closing Date, and all of the issued and outstanding Capital Securities of each Subsidiary is, directly or indirectly, owned by Borrower.  As of the Closing Date, except as set forth on <u>Schedule 9.8</u>, the Borrower does not own, directly or indirectly, any Subsidiary. As of the Closing Date, except as set forth on Schedule 9.8, there are no pre-emptive or other outstanding rights, options, warrants,

9

conversion rights or other similar agreements or understandings for the purchase or acquisition of any Capital Securities of any Loan Party.

9.9     Pension Plans. (a) The Unfunded Liability of all Pension Plans does not in the aggregate exceed twenty percent (20%) of the Total Plan Liability for all such Pension Plans. Each Pension Plan complies in all material respects with all applicable requirements of law and regulations. No contribution failure under Section 430 of the Code, Section 303 of ERISA or the terms of any Pension Plan has occurred with respect to any Pension Plan, sufficient to give rise to a Lien under Section 303(k) of ERISA, or otherwise to have a Material Adverse Effect. There are no pending or, to the knowledge of Borrower, threatened, claims, actions, investigations or lawsuits against any Pension Plan, any fiduciary of any Pension Plan, or any Loan Party or any other member of the Controlled Group with respect to a Pension Plan or a Multiemployer Pension Plan which could reasonably be expected to have a Material Adverse Effect. No Loan Party and no other member of the Controlled Group has engaged in any prohibited transaction (as defined in Section 4975 of the Code or Section 406 of ERISA) in connection with any Pension Plan or Multiemployer Pension Plan which would subject that Person to any material liability. Within the past five years, no Loan Party and no other member of the Controlled Group has engaged in a transaction which resulted in a Pension Plan with an Unfunded Liability being transferred out of the Controlled Group, which could reasonably be expected to have a Material Adverse Effect. No Termination Event has occurred or is reasonably expected to occur with respect to any Pension Plan, which could reasonably be expected to have a Material Adverse Effect.

(b)     All contributions (if any) have been made to any Multiemployer Pension Plan that are required to be made by Loan Parties or any other member of the Controlled Group under the terms of the plan or of any collective bargaining agreement or by applicable law; no Loan Party and no other member of the Controlled Group has withdrawn or partially withdrawn from any Multiemployer Pension Plan, incurred any withdrawal liability with respect to any such plan or received notice of any claim or demand for withdrawal liability or partial withdrawal liability from any such plan, and no condition has occurred which, if continued, could result in a withdrawal or partial withdrawal from any such plan; and no Loan Party and no other member of the Controlled Group has received any notice that any Multiemployer Pension Plan is in reorganization, that increased contributions may be required to avoid a reduction in plan benefits or the imposition of any excise tax, that any such plan is or has been funded at a rate less than that required under Section 412 of the Code, that any such plan is or may be terminated, or that any such plan is or may become insolvent.

9.10     Investment Company Act. No Loan Party is an "investment company" or a company "controlled" by an "investment company" or a "subsidiary" of an "investment company," within the meaning of the Investment Company Act of 1940.

9.11     Compliance with Laws. Each Loan Party and each Subsidiary thereof is in compliance in all material respects with the requirements of all laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which such requirement of law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted.

9.12    Regulation U. No Loan Party is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying Margin Stock.

9.13    Taxes. Each Loan Party has timely filed all federal, state and other material tax returns and reports required by law to have been filed by it and has paid all federal, state and other material taxes and governmental charges due and payable with respect to such return, except any such taxes or charges which are being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP shall have been set aside on its books. The Loan Parties have made adequate reserves on their books and records in accordance with GAAP for all taxes that have accrued but which are not yet due and payable. No Loan Party has participated in any transaction that relates to a year of the taxpayer (which is still open under the applicable statute of limitations) which is a "reportable transaction" within the meaning of Treasury Regulation Section 1.6011-4(b)(2) (irrespective of the date when the transaction was entered into). No Loan Party is a party to any tax sharing, tax indemnity or similar agreement or arrangement with any other Person.

9.14    [Reserved].

9.15    Environmental Matters.

(a)    Each of the Facilities and all past and current operations of a Loan Party at or from the Facilities are in compliance in all material respects with all applicable Environmental Laws, and there is no violation of any Environmental Law with respect to the Facilities or the Loan Party's operations, and there are no conditions relating to the Facilities or the Loan Party's operations, in each case, that could give rise to any material liability or obligation under any applicable Environmental Laws.

(b)    None of the Facilities contains or, to the knowledge of Borrower, has previously contained any Hazardous Substances at, on or under the Facilities in amounts or concentrations that constitute or constituted a violation of, or could give rise to liability under, Environmental Laws.

(c)    Each Loan Party has obtained, and maintained in good standing, all licenses, permits, authorizations, registrations and other approvals required under any Environmental Law and required for their respective ordinary course operations, and for their reasonably anticipated future operations, and each Loan Party is in compliance in all material respects with all terms and conditions thereof.

(d)    No Loan Party has received or reasonably anticipates the issuance of any written or verbal notice of, or inquiry from, or agreement with, any federal, state or local governmental authority regarding any violation, alleged violation, non-compliance, liability or potential liability arising under Environmental Laws with regard to any of the Facilities or the Loan Party's operations, nor does any Loan Party have knowledge or reason to believe that any such notice will be received or is being threatened.

(e)    Hazardous Substances have not been transported or disposed of from the Facilities, or generated, treated, stored or disposed of at, on or under any of the Facilities

11

or any other location, in each case by or on behalf of any Loan Party, or arising from any Loan Party's operations, in violation of, or in a manner that would be reasonably likely to give rise to liability under, any applicable Environmental Law.

(f)    No judicial proceeding or governmental or administrative action is pending or, to the knowledge of the Loan Parties, threatened in writing, under any Environmental Law to which any Loan Party is or will be named as a party, nor are there any consent decrees or other decrees, consent orders, administrative orders or other orders, or other administrative or judicial requirements outstanding under any Environmental Law with respect to any Loan Party, the Facilities or the Loan Party's operations.

(g)    There has been no release of Hazardous Substances at or from the Facilities, or arising from or related to the operations (including disposal) of any Loan Party in connection with the Facilities or otherwise in connection with the Loan Party's operations, in violation of or in amounts or in a manner that could give rise to liability under Environmental Laws.

(h)    No Loan Party has any underground storage tanks that are not properly registered or permitted under applicable Environmental Laws or that at any time have released, leaked, disposed of or otherwise discharged Hazardous Substances.

9.16    Insurance. Set forth on Schedule 9.16 is a complete and accurate summary of the property and casualty insurance program of the Loan Parties as of the Closing Date (including the names of all insurers, policy numbers and amounts and types of coverage). Each Loan Party and its properties are insured with financially sound and reputable insurance companies which are not Affiliates of the Loan Parties, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where such Loan Parties operate.

9.17    Real Property. Set forth on Schedule 9.17 is a complete and accurate list, as of the Closing Date, of the address of all real property owned or leased by any Loan Party, together with, in the case of leased property, the name and mailing address of the lessor of such property.

9.18    Information. All information heretofore or contemporaneously herewith furnished in writing by any Loan Party to Lender for purposes of or in connection with this Agreement and the transactions contemplated hereby is, and all written information hereafter furnished by or on behalf of any Loan Party to Lender pursuant hereto or in connection herewith will be, true and accurate in every material respect on the date as of which such information is dated or certified, and none of such information is or will be incomplete by omitting to state any material fact necessary to make such information not misleading in light of the circumstances under which made (it being recognized by Lender that any projections and forecasts provided by Borrower are based on good faith estimates and assumptions believed by Borrower to be reasonable as of the date of the applicable projections or assumptions and that actual results during the period or periods covered by any such projections and forecasts may differ from projected or forecasted results).

9.19    <u>Intellectual Property</u>. Each Loan Party owns and possesses or has a license or other right to use all patents, patent rights, trademarks, trademark rights, trade names, trade name rights, service marks, service mark rights and copyrights as are necessary for the conduct of the businesses of the Loan Parties, without any infringement upon rights of others.

9.20    <u>Reserved</u>.

9.21    <u>Labor Matters</u>. Except as set forth on Schedule 9.21, no Loan Party is subject to any labor or collective bargaining agreement. There are no controversies pending or, to the knowledge of Borrower, threatened in writing or anticipated between any Loan Party and any of its employees, other than employee grievances arising in the ordinary course of business which are not, in the aggregate, material to the continued financial success and well-being of the Loan Parties. There are no existing or threatened strikes, lockouts or other labor disputes involving any Loan Party. Hours worked by and payment made to employees of the Loan Parties are not in violation of the Fair Labor Standards Act or any other applicable law, rule or regulation dealing with such matters. All payments due from a Loan Party, or for which any claim may be made against a Loan Party, on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of Loan Parties. The consummation of the transactions contemplated by this Agreement will not give rise to a right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which a Loan Party is a party or by which a Loan Party is bound.

9.22    <u>Anti-Terrorism Laws</u>. (a)  No Loan Party (and, to the knowledge of each Loan Party, no joint venture or subsidiary thereof) is in violation in any material respects of any United States Requirements of Law relating to terrorism, sanctions or money laundering, including the United States Executive Order No. 13224 on Terrorist Financing (the "<u>Anti-Terrorism Order</u>") and the Patriot Act.

(b)    No Loan Party (and, to the knowledge of each Loan Party, no joint venture or subsidiary thereof) (i) is listed in the annex to, or is otherwise subject to the provisions of, the Anti-Terrorism Order, (ii) is owned or controlled by, or acting for or on behalf of, any person listed in the annex to, or is otherwise subject to the provisions of, the Anti-Terrorism Order, (iii) commits, threatens or conspires to commit or supports "terrorism" as defined in the Anti-Terrorism Order or (iv) is named as a "specially designated national and blocked person" in the most current list published by OFAC.

(c)    No Loan Party (and, to the knowledge of each Loan Party, no joint venture or Affiliate thereof) (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any person described in clauses (b)(i) through (b)(iv) above, (ii) deals in, or otherwise engages in any transactions relating to, any property or interests in property blocked pursuant to the Anti-Terrorism Order or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

9.23    <u>No Default</u>. No Default or Event of Default exists or would result from the incurrence by any Loan Party of any Debt hereunder or under any other Loan Document. Except

13

as set forth on Schedule 9.23, no Loan Party is in default under any of its Material Contracts and no event has occurred or is continuing that with lapse of time would constitute a default under such agreements. A "Material Contract" shall mean any agreement (other than agreements governing Debt to be Repaid) that (i) involves aggregate payments of $250,000 over the course of any twelve (12) month period, (ii) involves aggregate payments of $250,000 over the term of such agreement, or (iii) is otherwise material to the business of a Argo Tea or the Loan Parties taken as a whole.

9.24    OFAC. Each Loan Party is and will remain in compliance with all U.S. economic sanctions laws, Executive Orders and implementing regulations as promulgated by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"), and all applicable anti-money laundering and counter-terrorism financing provisions of the Bank Secrecy Act and all regulations issued pursuant to it. No Loan Party and no Affiliate of a Loan Party (i) is a Person designated by the U.S. government on the list of the Specially Designated Nationals and Blocked Persons (the "SDN List") with which a U.S. Person cannot deal with or otherwise engage in business transactions, (ii) is a Person who is otherwise the target of U.S. economic sanctions laws such that a U.S. Person cannot deal or otherwise engage in business transactions with such Person or (iii) is controlled by (including without limitation by virtue of such person being a director or owning voting shares or interests), or acts, directly or indirectly, for or on behalf of, any person or entity on the SDN List or a foreign government that is the target of U.S. economic sanctions prohibitions such that the entry into, or performance under, this Agreement or any other Loan Document would be prohibited under U.S. law.

9.25    Patriot Act. Loan Parties and each of their Affiliates are in compliance with (a) the Trading with the Enemy Act, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B Chapter V, as amended) and any other enabling legislation or executive order relating thereto, (b) the Patriot Act and (c) other federal or state laws relating to "*know your customer*" and anti-money laundering rules and regulations. No part of the proceeds of any Loan will be used directly or indirectly for any payments to any government official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977.

9.26    Reserved.

9.27    Subordinated Debt. The subordination provisions of the Subordinated Debt are enforceable against the holders of the Subordinated Debt by Lender. All Obligations constitute senior Debt entitled to the benefits of the subordination provisions contained in the Subordinated Debt. As of the Closing Date, the Borrower and its Subsidiaries do not have any Subordinated Debt.  Borrower acknowledges that Lender is entering into this Agreement and is extending the Term Loan Commitment and making the Loans in reliance upon the subordination provisions of the Subordinated Debt and this Section 9.27.

14

10.     AFFIRMATIVE COVENANTS.

Until all Obligations hereunder and under the other Loan Documents are paid in full, Borrower agrees that, unless at any time Lender shall otherwise expressly consent in writing, it will:

10.1     <u>Reports, Certificates and Other Information. Furnish to Lender.</u>

10.1.1   <u>Annual Report</u>. Promptly when available and in any event within one hundred twenty (120) days after the close of each Fiscal Year: (a) a copy of the annual audit report of Borrower and its Subsidiaries for such Fiscal Year, including therein consolidated balance sheets and statements of earnings and cash flows of Borrower and its Subsidiaries as at the end of such Fiscal Year, certified without adverse reference to going concern value and without qualification by independent auditors of recognized standing selected by Borrower and reasonably acceptable to Lender, together with (i) a written statement from such accountants to the effect that in making the examination necessary for the signing of such annual audit report by such accountants, nothing came to their attention that caused them to believe that Loan Parties were not in compliance with any provision of Sections 11.1, 11.4 or 11.14 of this Agreement insofar as such provision relates to accounting matters or, if something has come to their attention that caused them to believe that Loan Parties were not in compliance with any such provision, describing such non-compliance in reasonable detail and (ii) a comparison with the budget for such Fiscal Year and a comparison with the previous Fiscal Year; and (b) a consolidated balance sheet of Borrower and its Subsidiaries as of the end of such Fiscal Year and consolidated statement of earnings and cash flows for Borrower and its Subsidiaries for such Fiscal Year, certified by a Senior Officer of Borrower.

10.1.2   <u>Interim Reports</u>.  (a) Promptly when available and in any event within forty-five (45) days after the end of each of the first three Fiscal Quarters of each Fiscal Year, consolidated balance sheets of Borrower and its Subsidiaries as of the end of such Fiscal Quarter, together with consolidated statements of earnings and cash flows for such Fiscal Quarter and for the period beginning with the first day of such Fiscal Year and ending on the last day of such Fiscal Quarter, together with a comparison with the corresponding period of the previous Fiscal Year and a comparison with the budget for such period of the current Fiscal Year, certified by a Senior Officer of Borrower; and (b) promptly when available and in any event within thirty (30) days after the end of each month (other than a Fiscal Quarter-end month), consolidated balance sheets of Borrower and its Subsidiaries as of the end of such month, together with consolidated statements of earnings and a consolidated statement of cash flows for such month and for the period beginning with the first day of such Fiscal Year and ending on the last day of such month, together with a comparison with the corresponding period of the previous Fiscal Year and a comparison with the budget for such period of the current Fiscal Year, certified by a Senior Officer of Borrower.

10.1.3   <u>Compliance Certificates</u>. Contemporaneously with the furnishing of a copy of each annual audit report pursuant to Section 10.1.1 and each set of quarterly statements pursuant to Section 10.1.2(a), a duly completed Compliance Certificate in the

form of Exhibit B, with appropriate insertions, dated the date of such annual report or such statements and signed by a Senior Officer of Borrower, containing (i) a computation of each of the financial tests and restrictions set forth in Section 11.14 and to the effect that such officer has not become aware of any Default or Event of Default that has occurred and is continuing or, if there is any such event, describing it and the steps, if any, being taken to cure it and (ii) a written statement, in form and substance reasonably acceptable to Lender, of Borrower's management setting forth a discussion of Borrower's and its Subsidiaries' financial condition, changes in financial condition and results of operations.

10.1.4   <u>Reports to the SEC and to Shareholders</u>. Promptly upon the filing or sending thereof, copies of all regular, periodic or special reports of any Loan Party filed with the SEC; copies of all registration statements of any Loan Party filed with the SEC (other than on Form S-8); and copies of all proxy statements or other communications made to security holders generally.

10.1.5   <u>Notice of Default, Litigation and ERISA Matters</u>. Promptly upon becoming aware of any of the following, written notice describing the same and the steps being taken by Borrower or the Subsidiary affected thereby with respect thereto:

(a)      the occurrence of a Default or an Event of Default;

(b)      any litigation, arbitration or governmental investigation or proceeding not previously disclosed by Borrower to Lender which has been instituted or, to the knowledge of Borrower, is threatened in writing against any Loan Party or to which any of the properties of any thereof is subject which might reasonably be expected to have a Material Adverse Effect;

(c)      the institution of any steps by any member of the Controlled Group or any other Person to terminate any Pension Plan, or the failure of any member of the Controlled Group to make a required contribution to any Pension Plan (if such failure is sufficient to give rise to a Lien under Section 303(k) of ERISA) or to any Multiemployer Pension Plan, or the taking of any action with respect to a Pension Plan which could result in the requirement that any Loan Party furnish a bond or other security to the PBGC or such Pension Plan, or the occurrence of any event with respect to any Pension Plan or Multiemployer Pension Plan which could result in the incurrence by any member of the Controlled Group of any material liability, fine or penalty (including any claim or demand for withdrawal liability or partial withdrawal from any Multiemployer Pension Plan), or any material increase in the contingent liability of any Loan Party with respect to any post-retirement welfare benefit plan or other employee benefit plan of any Loan Party or another member of the Controlled Group, or any notice that any Multiemployer Pension Plan is in reorganization, that increased contributions may be required to avoid a reduction in plan benefits or the imposition of an excise tax, that any such plan is or has been funded at a rate less than that required under Section 412 of the Code, that any such plan is or may be terminated, or that any such plan is or may become insolvent;

(d)      any cancellation or material change in any insurance maintained by any Loan Party;

(e)      any change of any Loan Party's executive officers, directors or key employees; or

(f)      any other event (including (i) any violation of any Environmental Law or the assertion of any Environmental Claim or (ii) the enactment or effectiveness of any law, rule or regulation) which could reasonably be expected to have a Material Adverse Effect.

10.1.6   [Reserved].

10.1.7   <u>Management Reports</u>. Promptly upon receipt thereof, copies of all detailed financial and management reports submitted to Borrower by independent auditors in connection with each annual or interim audit made by such auditors of the books of Borrower and its Subsidiaries.

10.1.8   <u>Projections</u>. As soon as practicable, and in any event not later than thirty (30) days prior to the commencement of each Fiscal Year, financial projections for Borrower and its Subsidiaries for such Fiscal Year (including a business plan, monthly operating and cash flow budgets and a capital expenditures budget) prepared in a manner consistent with the projections delivered by Borrower to the Lender prior to the Closing Date or otherwise in a manner reasonably satisfactory to Lender, accompanied by a certificate of a Senior Officer of Borrower on behalf of Borrower to the effect that (a) such projections were prepared by Borrower in good faith, (b) Borrower has a reasonable basis for the assumptions contained in such projections, (c) such projections have been prepared in accordance with such assumptions, and (d) Borrower's board of directors (or similar governing body) have approved such projections.

10.1.9   <u>Subordinated Debt Notices</u>. Promptly following receipt or delivery, copies of any notices (including notices of default or acceleration) received from or delivered to any holder or trustee (or any representative of any of the foregoing) of, under or with respect to any Subordinated Debt.

10.1.10   <u>Updated Schedule</u>. Contemporaneously with the furnishing of each annual audit report pursuant to Section 10.1.1, an updated version of Schedule 9.17 showing information as of the date of such audit report (it being agreed and understood that this requirement shall be in addition to the other notice and delivery requirements set forth herein).

10.1.11   [Reserved].

10.1.12   <u>Other Information</u>. Promptly from time to time, such other information (including, without limitation, business or financial data, reports, appraisals and projections) concerning the Loan Parties and their Subsidiaries, their properties or business, as Lender may reasonably request.

10.2    <u>Books, Records and Inspections</u>.  Keep, and cause each other Loan Party to keep, its books and records in accordance with sound business practices sufficient to allow the preparation of financial statements in accordance with GAAP; permit, and cause each other Loan Party to permit, Lender, or any representative or agent thereof, to inspect the properties and operations of the Loan Parties; and permit, and cause each other Loan Party to permit, at any reasonable time and with reasonable notice (or at any time without notice if an Event of Default exists), Lender, or any representative or agent thereof, to visit any or all of its offices, to discuss its financial matters with its officers and its independent auditors (and Borrower hereby authorizes such independent auditors to discuss such financial matters with Lender, or any representative or agent thereof), and to examine (and, at the expense of the Loan Parties, photocopy extracts from) any of its books or other records; and permit, and cause each other Loan Party to permit, Lender, and its representatives and agents, to inspect the Inventory and other tangible assets of the Loan Parties, to perform appraisals of the equipment of the Loan Parties, and to inspect, audit, check and make copies of and extracts from the books, records, computer data, computer programs, journals, orders, receipts, correspondence and other data relating to Inventory, Accounts and any other Collateral. All such inspections or audits by Lender shall be at Borrower's expense; <u>provided</u>, <u>however</u>, unless a Default or an Event of Default has occurred and is continuing, Borrower shall only be required to pay the expenses of one such inspection or audit of all Loan Parties during any Fiscal Year.

10.3    <u>Maintenance of Property; Insurance</u>. (a) Keep, and cause each other Loan Party to keep, all property useful and necessary in the business of the Loan Parties in good working order and condition, ordinary wear and tear excepted.

(b)    Maintain, and cause each other Loan Party to maintain, with responsible insurance companies, such insurance coverage as may be required by any law or governmental regulation or court decree or order applicable to it and such other insurance, to such extent and against such hazards and liabilities, as is customarily maintained by companies similarly situated (including, without limitation, business interruption insurance); and, upon request of Lender furnish to Lender, original or electronic copies of policies evidencing such insurance, and a certificate setting forth in reasonable detail the nature and extent of all insurance maintained by the Loan Parties.

(c)    **DURING THE CONTINUANCE OF AN EVENT OF DEFAULT, UNLESS BORROWER PROVIDES LENDER WITH EVIDENCE OF THE INSURANCE COVERAGE REQUIRED BY THIS AGREEMENT, LENDER MAY PURCHASE SUCH INSURANCE AT BORROWER'S EXPENSE . BORROWER MAY LATER CANCEL ANY INSURANCE PURCHASED BY LENDER, BUT ONLY AFTER PROVIDING LENDER WITH EVIDENCE THAT LOAN PARTIES HAVE OBTAINED INSURANCE AS REQUIRED BY THIS AGREEMENT. IF LENDER PURCHASES INSURANCE FOR THE COLLATERAL, BORROWER WILL BE RESPONSIBLE FOR THE COSTS OF THAT INSURANCE, INCLUDING INTEREST AND ANY OTHER CHARGES THAT MAY BE IMPOSED WITH THE PLACEMENT OF THE INSURANCE, UNTIL THE EFFECTIVE DATE OF THE CANCELLATION OR EXPIRATION OF THE INSURANCE. THE COSTS OF THE INSURANCE MAY BE ADDED TO THE PRINCIPAL AMOUNT OF THE LOANS OWING HEREUNDER. THE**

**COSTS OF THE INSURANCE MAY BE MORE THAN THE COST OF THE INSURANCE THE LOAN PARTIES MAY BE ABLE TO OBTAIN ON THEIR OWN.**

10.4    <u>Compliance with Laws; Payment of Taxes and Liabilities</u>. (a) Comply, and cause each other Loan Party to comply in all material respects, with all applicable laws, rules, regulations, decrees, orders, judgments, licenses and permits; (b) without limiting clause (a) above, ensure, and cause each other Loan Party to ensure, that no person who owns a controlling interest in or otherwise controls a Loan Party is or shall be (i) listed on the Specially Designated Nationals and Blocked Person List maintained by the OFAC, Department of the Treasury, and/or any other similar lists maintained by OFAC pursuant to any authorizing statute, Executive Order or regulation or (ii) a person designated under Section 1(b), (c) or (d) of Executive Order No. 13224 (September 23, 2001), any related enabling legislation or any other similar Executive Orders, (c) without limiting clause (a) above, comply, and cause each other Loan Party to comply, with all applicable Bank Secrecy Act and anti-money laundering laws and regulations and (d) pay, and cause each other Loan Party to pay, prior to delinquency, all federal, state and other material taxes and other governmental charges against it or any of its property, as well as claims of any kind which, if unpaid, could become a Lien on any of its property; <u>provided</u> that the foregoing shall not require any Loan Party to pay any such tax, charge or claim so long as it shall contest the validity thereof in good faith by appropriate proceedings and shall set aside on its books adequate reserves with respect thereto in accordance with GAAP and, in the case of a claim which could become a Lien on any Collateral, such contest proceedings shall stay the foreclosure of such Lien or the sale of any portion of the Collateral to satisfy such claim.

10.5    <u>Maintenance of Existence, etc.</u> Maintain and preserve, and (subject to Section 11.5) cause each other Loan Party to maintain and preserve, (a) its existence and good standing in the jurisdiction of its organization and (b) its qualification to do business and good standing in each jurisdiction where the nature of its business makes such qualification necessary.

10.6    <u>Use of Proceeds</u>. Use the proceeds of the Loans solely (i) to refinance the Debt to be Repaid, (ii) an amount not to exceed $200,000, to pay accrued bonuses for officers of Argo Tea, (iii) to pay obligations related to financial advisor fees to First Beverage Group not to exceed $450,000, (iv) to pay fees and expenses associated with the closing of this Agreement and (v) any amount remaining thereafter, for general corporate purposes; and not use or permit any proceeds of any Loan to be used, either directly or indirectly, for the purpose, whether immediate, incidental or ultimate, of "purchasing or carrying" any Margin Stock.

10.7    <u>Employee Benefit Plans</u>.

(a)    Maintain, and cause each other member of the Controlled Group to maintain, each Pension Plan in substantial compliance with all applicable requirements of law and regulations.

(b)    Make, and cause each other member of the Controlled Group to make, on a timely basis, all required contributions to any Multiemployer Pension Plan.

(c)    Not, and not permit any other member of the Controlled Group to (i) seek a waiver of the minimum funding standards of ERISA, (ii) terminate or withdraw from any Pension Plan or Multiemployer Pension Plan or (iii) take any other action with respect to any Pension Plan that would reasonably be expected to entitle the PBGC to terminate, impose liability in respect of, or cause a trustee to be appointed to administer, any Pension Plan, unless the actions or events described in clauses (i), (ii) and (iii) individually or in the aggregate would not have a Material Adverse Effect.

10.8    <u>Environmental Matters</u>. (a) If any release or threatened release or other disposal of Hazardous Substances shall occur or shall have occurred on any of the Facilities or any other assets of any Loan Party, Borrower shall, or shall cause the applicable Loan Party to, cause the prompt containment and removal of such Hazardous Substances and the remediation of such real property or other assets as necessary to comply with all Environmental Laws and to preserve the value of such real property or other assets. Without limiting the generality of the foregoing, Borrower shall, and shall cause each other Loan Party to, comply with any Federal or state judicial or administrative order requiring the performance at any of the Facilities of any Loan Party of activities in response to the release or threatened release of a Hazardous Substance. To the extent that the transportation, handling, storage, generation, treatment or disposal of Hazardous Substances is permitted by this Agreement, Borrower shall, and shall cause each other Loan Party to comply with Environmental Laws in all such activities and to dispose of such Hazardous Substances, or of any other wastes, only at licensed disposal facilities operating in compliance with Environmental Laws.

(b)    Borrower shall comply in all material respects with the requirements of all federal, state, and local Environmental Laws applicable to the Loan Parties or the Facilities; notify the Lender promptly in the event of any spill, release or disposal of Hazardous Substances on, or hazardous waste pollution or contamination affecting, the Facilities in material violation of applicable Environmental Laws of which a Loan Party has actual knowledge; forward to the Lender promptly any written notices relating to such matters received from any Governmental Authority; and pay when due any fine or assessment against the Facilities arising under Environmental Laws, <u>provided</u>, that the Loan Parties shall not be required to pay any such fine or assessment so long as the validity thereof shall be diligently contested in good faith by appropriate proceedings and they shall have set aside on their books reasonable reserves (in accordance with GAAP) with respect to any such fine or assessment so contested; and <u>provided</u> <u>further</u> that, in any event, payment of any such fine or assessment shall be made before any of the Facilities shall be subjected to a Lien or be seized or sold in satisfaction thereof.

(c)    Borrower shall promptly notify the Lender upon becoming aware of any fact or change in circumstances that would be expected to cause any of the representations and warranties contained in Section 9.15 to cease to be true in all material respects for any time before the Closing Date.

10.9    <u>Further Assurances</u>.

(a)    Take, and cause each other Loan Party to take, such actions as are necessary or as Lender may reasonably request from time to time to ensure that the

1924780-NYCSR07A - MSW

Obligations of each Loan Party under the Loan Documents are secured by a first priority and (subject any limitation expressly set forth in the Guaranty and Collateral Agreement) perfected Lien in favor of Lender (subject to Permitted Liens) on all of the assets of Borrower and each Loan Party (as well as all Capital Securities of each Subsidiary) constituting Collateral and guaranteed by each Loan Party (including, promptly (but in no event more than ten Business Days) after the acquisition or creation thereof (or such longer period as the Lender may provide in its sole discretion), any Subsidiary (other than a Tax Preferred Subsidiary (as defined in the Guaranty and Collateral Agreement)) acquired or created after the Closing Date), in each case as Lender may determine, including (a) the execution and delivery of guaranties, security agreements, pledge agreements, financing statements, opinions of counsel and other documents, in each case in form and substance reasonably satisfactory to Lender, and the filing or recording of any of the foregoing, (b) the delivery of certificated securities and other Collateral with respect to which perfection is obtained by possession in accordance with the Guaranty and Collateral Agreement, and (c) with respect to any real property acquired by any Loan Party after the Closing Date, the delivery within forty-five (45) days after the date such real property was acquired (or such longer period as the Lender may provide in its sole discretion) of each of the Real Estate Documents with respect to such real property; provided, however, that delivery of Real Estate Documents shall not be required for real property so long as the aggregate fair market value of all real property excluded from this clause (c) is less than $150,000.

Notwithstanding the foregoing, no land-lord waivers or bailee letters shall be required hereunder with respect to any leased location or any bailee or other third-party storage locations of any Loan Party.

10.10   Accounts. Subject to the post-closing grace period provided herein pursuant to Section 10.11, maintain all of their deposit accounts and securities accounts, other than Excluded Accounts, with an institution that has entered into a control agreement with Lender and the applicable Loan Party granting "control" (as defined in the UCC) of such accounts to Lender and otherwise in form and substance satisfactory to Lender.

10.11   Post-Closing Obligations. Borrower shall satisfy the requirements and/or provide to Lender each of the documents, instruments, agreements and information set forth on Schedule 10.11, in form and substance acceptable to Lender, on or before the date specified for such requirement in such Schedule or such later date to be determined by Lender in its sole discretion, each of which shall be completed or provided in form and substance satisfactory to Lender.

10.12   [Reserved].

10.13   [Reserved].

10.14   Observer. Borrower shall, and Borrower shall cause each Loan Party to, give Lender notice of each meeting of the board of directors (or similar governing body) of Borrower and each other Loan Party and of each committee thereof at the same time and in the same manner and method of communication as notice of each such meeting is given to the directors (or managers or other equivalent) on the board of directors (or similar governing body) of

21

Borrower, each other Loan Party and such committee. In addition, two individuals designated by Lender ("Observers"), shall be entitled to attend in person, as observers, all meetings held in person and to listen to the entirety of all telephonic meetings of the board of directors (or similar governing body) of Borrower, each other Loan Party and each such committee. There shall be not fewer than one (1) board meeting per quarter per Loan Party and four (4) board meetings per year per Loan Party. Observers shall be entitled to receive all notices, written materials and other information (including, without limitation, copies of meeting minutes) given to directors (or managers or other equivalent) in connection with such meetings at the same time such materials and information are given to the directors (or managers or other equivalent). Borrower shall reimburse Observers for reasonable documented out-of-pocket expenses incurred in connection with attending each meeting of the board of directors (or similar governing body) of Borrower, each other Loan Party and any committee thereof. Loan Parties agree to take any and all actions necessary to effectuate the intent of the foregoing provisions of this Section. Notwithstanding any contrary provision of this Section 10.14, (a) Observers do not have any right to vote at any such meeting, (b) no Loan Party shall be under any obligation to take any action with respect to any proposals made or advice furnished by Observers at any such meeting, (c) Observers shall not be entitled to attend or participate in (including via telephone) any relevant portions of meetings or receive any relevant portions of materials in any instance, and solely to the extent, where the board of directors of such Loan Party (or committee thereof) is advised by legal counsel that Observers (or any entity or constituency on behalf of which it is acting) has direct interest with respect to matters to be discussed at such portion of meetings or included in such portion of materials and such participation or sharing would conflict with the interest of such Loan Party or (ii) discussions of a specified matter in the presence of a person who is not a member of the board of directors of such Loan Party (or committee thereof) or sending specified board materials to Observers, in each case, would result in the loss of attorney-client privilege for such Loan Party with respect to such specified matter.

11.    NEGATIVE COVENANTS.

Until all Obligations hereunder and under the other Loan Documents are paid in full, Borrower agrees that, unless at any time Lender shall otherwise expressly consent in writing, it will:

11.1    Debt. Not, and not permit any other Subsidiary to, create, incur, assume or suffer to exist any Debt, except:

(a)    Obligations under this Agreement and the other Loan Documents;

(b)    Debt secured by Liens permitted by Section 11.2(d), and extensions, renewals and refinancings thereof; provided that the aggregate amount of all such Debt at any one time outstanding shall not exceed $500,000;

(c)    Debt incurred in the ordinary course of business in respect of (i) contingent liabilities under surety bonds or similar instruments incurred in the ordinary course of business in connection with the construction or improvement of store locations, (ii) guarantees by Borrower in connection with store locations leased by any Loan Party and (iii) performance bonds, bid bonds, appeal bonds, surety bonds and completion

22

guarantees, return of money and similar obligations, in each case for sums not overdue or being diligently contested in good faith by appropriate proceedings which stay the execution or other enforcement thereon, and not involving any advances or borrowed money or the deferred purchase price of property or services and, in each case, for which it maintains adequate reserves in accordance with GAAP;

(d)     Debt described on Schedule 11.1 and any extension, renewal or refinancing thereof so long as the principal amount thereof is not increased;

(e)     the Debt to be Repaid (so long as such Debt is repaid on the Closing Date with the proceeds of the Loans hereunder);

(f)     Debt of any Subsidiary owing to another Loan Party arising pursuant to Investments permitted under Section 11.11(f);

(g)     The Metropolitan Capital Letters of Credit, and any other letters of credit issued after the date hereof for the account of Borrower in the ordinary course of business that serve as collateral for Borrower's or any other Loan Party's retail store lease obligations; provided, however, that all such letters of credit shall be unsecured except for cash collateralization not exceeding the amount of each such letter of credit, individually;

(h)     Debt arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, provided that such Debt is extinguished within five (5) Business Days after its incurrence;

(i)     Debt owing to banks or other financial institutions under corporate credit cards issued to officers and employees of a Loan Party for business related expenses in the ordinary course of business;

(j)     Subordinated Debt incurred after the Closing Date in an aggregate principal amount not to exceed $1,000,000 at any one time outstanding; and

(k)     unsecured Debt in an aggregate principal amount not to exceed $250,000 at any one time outstanding;

provided that, the principal amount (including the face amount of any letters of credit) of Debt outstanding pursuant to clauses (b), (g) (other than the Metropolitan Letters of Credit outstanding as of the Closing Date) and (k) of this Section 11.1, together with the amount of Liens outstanding pursuant to Section 11.2(j), shall not exceed $1,500,000 in the aggregate at any one time.

11.2     Liens. Not, and not permit any Subsidiary to, create or permit to exist any Lien on any of its real or personal properties, assets or rights of whatsoever nature (whether now owned or hereafter acquired), except:

(a)    Liens for taxes or other governmental charges not at the time delinquent or thereafter payable without penalty or being diligently contested in good faith by appropriate proceedings and, in each case, for which it maintains adequate reserves in accordance with GAAP and the execution or other enforcement of which is effectively stayed;

(b)    Liens arising in the ordinary course of business (such as (i) Liens of carriers, warehousemen, mechanics and materialmen and other similar Liens imposed by law and (ii) Liens in the form of deposits or pledges incurred in connection with worker's compensation, unemployment compensation and other types of social security (excluding Liens arising under ERISA) or in connection with surety bonds, bids, performance bonds and similar obligations) for sums not overdue or being diligently contested in good faith by appropriate proceedings and not involving any advances or borrowed money or the deferred purchase price of property or services and, in each case, for which it maintains adequate reserves in accordance with GAAP and the execution or other enforcement of which is effectively stayed;

(c)    Liens described on Schedule 11.2 as of the Closing Date;

(d)    subject to the limitation set forth in Section 11.1(b), Liens that constitute purchase money security interests on any equipment securing debt incurred for the purpose of financing all or any part of the cost of acquiring such property, provided that any such Lien attaches to such property within twenty (20) days of the acquisition thereof and attaches solely to the property so acquired;

(e)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(f)    Liens consisting of judgment or judicial attachment liens with respect to judgments the existence of which do not constitute an Event of Default;

(g)    Liens created in the ordinary course of business and not securing any borrowed money in favor of collecting banks arising by operation of law under Section 4-210 of the UCC or, with respect to collecting banks located in the State of New York, under Section 4-208 of the UCC;

(h)    Lien on cash collateral securing Debt described in (and to the extent permitted by) Section 11.1(g);

(i)    Liens arising under the Loan Documents; and

(j)    other Liens not otherwise specifically described herein in an aggregate principal amount not to exceed $500,000 at any one time outstanding; provided that, the amount Liens outstanding pursuant to this Section 11.2(j), together with the principal amount (including the face amount of any letters of credit) of Debt outstanding pursuant to clauses (b), (g) (other than the Metropolitan Letters of Credit outstanding as of the Closing Date) and (k) of Section 11.1, shall not exceed $1,500,000 in the aggregate at any one time.

24

Notwithstanding anything contained herein to the contrary, Borrower shall not, and shall cause its Subsidiaries to not, create or permit to exist any Lien on (x) any real or personal properties, assets or rights of whatsoever nature (whether now owned or hereafter acquired) of any foreign Subsidiary, or (y) any Capital Securities issued by any foreign Subsidiary (other than Liens arising under the Loan Documents).

11.3    [Reserved].

11.4    Restricted Payments. Not, and not permit any Subsidiary to, (a) make any distribution to any holders of its Capital Securities, (b) purchase or redeem any of its Capital Securities, (c) pay any management fees, transaction-based fees or similar fees to any of its equity holders or any Affiliate thereof (including, without limitation, any fees under any management agreement), (d) make any redemption, prepayment (whether mandatory or optional), defeasance, repurchase or any other payment in respect of any Subordinated Debt, other than to the extent such payments are permitted pursuant to the terms of the applicable Subordination Agreement, or (e) set aside funds for any of the foregoing; except that Subsidiaries may make dividends or distributions directly or indirectly to a Loan Party.

11.5    Mergers, Consolidations, Sales. Not, and not permit any Subsidiary to, (a) be a party to any merger or consolidation, (b) sell, transfer, dispose of, convey or lease any of its assets or Capital Securities (including the sale of Capital Securities of any Subsidiary), or (c) sell or assign with or without recourse any receivables, except:

(a)    (A) sales of Inventory in the ordinary course of business, or (B) dispositions of obsolete or worn out equipment which is no longer used or useful in a Loan Party's business, all in the ordinary course of business;

(b)    any such merger, consolidation, sale, transfer, conveyance, lease or assignment of or by any Subsidiary of Argo Tea, into Argo Tea or any other Loan Party;

(c)    usage of cash and cash equivalents in the ordinary course of business to the extent not prohibited under the Loan Documents;

(d)    the granting of Permitted Liens;

(e)    dispositions resulting from any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of any Loan Party provided that the Net Cash Proceeds thereof are offered to the repayment of the Loans (or otherwise reinvested) to the extent required under the terms of Section 6.1.2;

(f)    equity issuances permitted under Section 11.10; and

(g)    sales of assets (other than Capital Securities) not otherwise permitted under this Section 11.5 which are made for fair market value; provided, that (i) at the time of any such disposition, no Default or Event of Default shall exist or shall result from such disposition, (ii) not less than 85% of the aggregate sales price from such disposition shall be paid in cash contemporaneously with such disposition, (iii) the

25

aggregate fair market value of all assets sold by Loan Parties pursuant to this clause (g) shall not exceed $250,000 prior to the Special Option Expiration Date (the "Pre-Option Allowance"), and thereafter, an additional $250,000 plus any unutilized portion of the Pre-Option Allowance; provided, that, in the case of sales of owned real property or leasehold interests (but not any other assets) to a franchisee or otherwise shall be permitted, so long as aggregate fair market value thereof does not exceed $500,000 in any Fiscal Year, and (iv) the Net Cash Proceeds thereof are offered to the repayment of the Loans (or otherwise reinvested) to the extent required under the terms of Section 6.1.2.

11.6    Modification of Organizational Documents. Not permit the charter, by-laws or other organizational documents of any Loan Party to be amended or modified in any way which could reasonably be expected to materially adversely affect the interests of Lender; not change, or allow any Loan Party to change, its state of formation or its organizational form.

11.7    Transactions with Affiliates. Not, and not permit any Subsidiary to, enter into, or cause, suffer or permit to exist any transaction, arrangement or contract with any of its other Affiliates (other than the Loan Parties) which is on terms which are less favorable than are obtainable from any Person which is not one of its Affiliates.

11.8    Unconditional Purchase Obligations. Not, and not permit any Subsidiary to, enter into or be a party to any contract for the purchase of materials, supplies or other property or services if such contract requires that payment be made by it regardless of whether delivery is ever made of such materials, supplies or other property or services.

11.9    Inconsistent Agreements. Not, and not permit any Subsidiary to, enter into any agreement containing any provision which would (a) be violated or breached by any borrowing by Borrower hereunder or by the performance by any Loan Party of any of its Obligations hereunder or under any other Loan Document, (b) prohibit any Loan Party from granting to Lender, a Lien on any of its assets or (c) create or permit to exist or become effective any encumbrance or restriction on the ability of any Subsidiary to (i) pay dividends or make other distributions to Borrower or any Subsidiary, or pay any Debt owed to Borrower or any other Subsidiary, (ii) make loans or advances to any Loan Party or (iii) transfer any of its assets or properties to any Loan Party, other than (A) restrictions or conditions imposed by the Loan Documents or any agreement relating to purchase money Debt and other secured Debt permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Debt and (B) customary provisions in leases and other contracts restricting the assignment thereof.

11.10    Business Activities; Issuance of Equity. Not, and not permit any other Loan Party to:

(a)    Engage in any line of business other than the businesses engaged in on the date hereof and businesses reasonably related thereto;

(b)    Issue any Capital Securities other than (i) any issuance by Borrower of common Capital Securities to an employee or director pursuant to any employee or director option program, benefit plan or compensation program (ii) any issuance by a

26

Subsidiary to Borrower or another Wholly-Owned Subsidiary, (iii) any Qualified Capital Securities, provided the Net Cash Proceeds thereof are offered to the repayment of the Obligations to the extent required under the terms of Section 6.1.2.

11.11   Investments. Not, and not permit any Subsidiary to, make or permit to exist any Investment in any other Person, except the following:

(a)   Investments constituting Debt permitted by Section 11.1 (other than Section 11.1(f));

(b)   Contingent Liabilities constituting Debt permitted by Section 11.1 (other than Section 11.1(f)) or Liens permitted by Section 11.2;

(c)   Cash Equivalent Investments;

(d)   Subject to Section 10.10, bank deposits in the ordinary course of business;

(e)   Investments in securities of Account Debtors received pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of such Account Debtors;

(f)   Investments in any Loan Party; provided, if any Investments are evidenced by notes, such notes shall be pledged to Lender to the extent required pursuant to the Guaranty and Collateral Agreement;

(g)   Investments in an aggregate amount not to exceed $500,000 at any one time outstanding;

(h)   Investments listed on Schedule 11.11 as of the Closing Date; and

(i)   loans and advances to officers, directors and employees of the Loan Parties made in the ordinary course of business for travel, entertainment, relocation and analogous ordinary business purposes in an aggregate principal amount not to exceed $200,000 at any one time outstanding.

provided that any Investment which when made complies with the requirements of the definition of the term Cash Equivalent Investment may continue to be held notwithstanding that such Investment if made thereafter would not comply with such requirements.

11.12   Restriction of Amendments to Certain Documents. Not amend or otherwise modify, or waive any rights under any provisions of any Subordinated Debt (except to the extent permitted under the related Subordination Agreement).

11.13   Fiscal Year. Not change its Fiscal Year.

11.14   Financial Covenants.

11.14.1 <u>Minimum Liquidity</u>. Not permit the Minimum Liquidity of Borrower to be less than $100,000 as of the last day of any calendar month.

11.14.2 <u>Capital Expenditures</u>. Not permit the aggregate amount of all Capital Expenditures made by the Loan Parties in any Fiscal Year set forth below to exceed the corresponding amount set forth below for such Fiscal Year (the "<u>Applicable Amount</u>"):

| Fiscal Year | Amount |
|---|---|
| 2015 | $1,500,000 |
| 2016 | $2,000,000 |
| 2017 | $2,500,000 |
| 2018 | $3,000,000 |
| 2019 | $3,500,000 |
| 2020 | $4,500,000 |

<u>provided</u>, <u>however</u>, in the event the Loan Parties do not expend the Applicable Amount in any Fiscal Year, the Loan Parties may carry forward to the immediately succeeding Fiscal Year (and only to such immediately succeeding calendar year) 100% of the unutilized portion. All Capital Expenditures shall first be applied to reduce the Capital Expenditures permitted for the Fiscal Year incurred, and then to reduce the carry-forward from the previous Fiscal Year.

11.14.3 <u>EBITDA</u>. Not permit EBITDA for any Computation Period to be less than the applicable amount set forth below for such Computation Period:

| Computation Period Ending | EBITDA |
|---|---|
| December 31, 2015 | ($1,500,000) |
| March 31, 2016 | ($1,200,000) |
| June 30, 2016 | ($900,000) |
| September 30, 2016 | ($500,000) |
| December 31, 2016 | $0 |
| March 31, 2017 | $750,000 |
| June 30, 2017 | $1,500,000 |
| September 30, 2017 | $2,250,000 |
| December 31, 2017 | $3,000,000 |
| March 31, 2018 | $3,500,000 |
| June 30, 2018 | $4,000,000 |

28

| Computation Period Ending | EBITDA |
|---|---|
| September 30, 2018 | $4,500,000 |
| December 31, 2018 | $5,000,000 |
| March 31, 2019 | $5,000,000 |
| June 30, 2019 | $5,000,000 |
| September 30, 2019 | $5,000,000 |
| December 31, 2019 | $5,000,000 |
| March 31, 2020 | $5,000,000 |
| June 30, 2020 | $5,000,000 |
| September 30, 2020 | $5,000,000 |

provided, that, if the EBITDA for a Computation Period is less than the applicable amount set forth above for such Computation Period, such failure shall not constitute a breach of this Section 11.14 if Argo notifies Lender thereof in writing (in a duly completed Compliance Certificate or otherwise) no later than at the time the financial statements for such Computation Period are required to be delivered pursuant to Section 10.1.1 or 10.1.2, as applicable (a "**Cure Notice**"); provided that there shall be no more than one such Cure Notice during the term of this Agreement.

11.15    Cancellation of Debt. Not, and not permit any Subsidiary to, cancel any claim or debt owing to it, except for reasonable consideration or in the ordinary course of business.

11.16    Transfer to Subsidiaries. Not, and not permit any Subsidiary to, sell, transfer, assign (by operation of law or otherwise), distribute, loan, advance, invest or otherwise dispose of, any money, assets or property in or to any Subsidiary not constituting a Loan Party, except to the extent expressly permitted under the terms of this Agreement.

11.17    Compliance with Laws. Not, and not permit any Subsidiary to, fail to comply with the laws, regulations and executive orders referred to in Sections 9.24 and 9.25.

12.    EFFECTIVENESS; CONDITIONS OF LENDING, ETC.

The obligation of Lender to make the Loans is subject to the following conditions precedent:

12.1    Initial Credit Extension. The obligation of Lender to make the initial Loans is, in addition to the conditions precedent specified in Section 12.2, subject to the conditions precedent that (a) all Debt to be Repaid has been (or concurrently with the initial borrowing will be) paid in full, and that all agreements and instruments governing the Debt to be Repaid and that all Liens securing such Debt to be Repaid have been (or concurrently with the initial borrowing will be) terminated and (b) Lender shall have received all of the following, each duly executed and dated the Closing Date (or such earlier date as shall be satisfactory to Lender), in form and substance satisfactory to Lender (and the date on which all such conditions precedent have been satisfied or waived in writing by Lender is called the "Closing Date"):

1924780-NYCSR07A - MSW

12.1.1   <u>Agreement, Notes and other Loan Documents</u>. This Agreement and, to the extent requested by Lender, a Note made payable to Lender, and all other Loan Documents.

12.1.2   <u>Authorization Documents</u>. For each Loan Party, such Person's (a) charter (or similar formation document), certified by the appropriate governmental authority as of a recent date; (b) good standing certificates in its state of incorporation (or formation) and in each other state requested by Lender; (c) bylaws (or similar governing document); (d) resolutions of its board of directors (or similar governing body) approving and authorizing such Person's execution, delivery and performance of the Loan Documents to which it is party and the transactions contemplated thereby; and (e) signature and incumbency certificates of its officers executing any of the Loan Documents (it being understood that Lender may conclusively rely on each such certificate until formally advised by a like certificate of any changes therein), all certified by its secretary or an assistant secretary (or similar officer) as being in full force and effect without modification.

12.1.3   <u>Consents, etc.</u> Certified copies of all documents evidencing any necessary corporate or partnership action, consents and governmental approvals (if any) required for the execution, delivery and performance by the Loan Parties of the documents referred to in this Section 12.

12.1.4   <u>Letter of Direction</u>. A letter of direction containing funds flow information with respect to the proceeds of the Loans on the Closing Date.

12.1.5   <u>Guaranty and Collateral Agreement</u>. A counterpart of the Guaranty and Collateral Agreement executed by each Loan Party and the Lender, together with all instruments, transfer powers and other items required to be delivered in connection therewith.

12.1.6   <u>Perfection Certificate</u>.  A Perfection Certificate completed and executed by each Loan Party.

12.1.7   <u>Opinions of Counsel</u>. Opinions of counsel for each Loan Party, including local counsel, reasonably satisfactory to the Lender.

12.1.8   <u>Insurance</u>. Evidence of the existence of insurance required to be maintained pursuant to Section 10.3(b).

12.1.9   <u>Payment of Fees</u>. Evidence of payment by Borrower of all accrued and unpaid fees, costs and expenses to the extent then due and payable on the Closing Date together with all Attorney Costs of Lender to the extent invoiced prior to the Closing Date, plus such additional amounts of Attorney Costs as shall constitute Lender's reasonable estimate of Attorney Costs incurred or to be incurred by Lender through the closing proceedings (provided that such estimate shall not thereafter preclude final settling of accounts between Borrower and Lender).

12.1.10 <u>Search Results; Lien Terminations</u>. Certified copies of Uniform Commercial Code and other customary search reports dated a date reasonably near to the Closing Date, listing all effective financing statements or other Liens, as applicable, which name any Loan Party (under their present names and any previous names) as debtors, together with (a) copies of such financing statements, (b) payoff letters evidencing repayment in full of all Debt to be Repaid (including the Breakwater Indebtedness), the termination of all agreements relating thereto and the release of all Liens granted in connection therewith, with Uniform Commercial Code or other appropriate termination statements and documents effective to evidence the foregoing (other than Liens permitted by Section 11.2) and (c) such other Uniform Commercial Code termination statements as Lender may reasonably request.

12.1.11 <u>Filings, Registrations and Recordings</u>. Lender shall have received each document (including Uniform Commercial Code financing statements) required by the Collateral Documents or under law or reasonably requested by Lender to be filed, registered or recorded in order to create in favor of Lender a perfected Lien on the Collateral described therein, prior to any other Liens (subject only to Liens permitted pursuant to Section 11.2), in proper form for filing, registration or recording.

12.1.12 <u>Financial Statements</u>. Lender shall have received and been reasonably satisfied with such financial statements of Loan Parties requested by Lender, including, without limitation, the financial statements described in Section 9.4.

12.1.13 <u>No Material Adverse Change</u>. There shall not have occurred since June 30, 2015, any developments or events which individually or in the aggregate with other such circumstances has had or could reasonably be expected to have a Material Adverse Effect.

12.1.14 <u>Investment Documents</u>. Lender shall have received confirmation of ownership and capital structure of the Loan Parties and be satisfied with the constituent documents of the Loan Parties and related investment agreements.

12.1.15 <u>Diligence</u>. Lender shall have received all due diligence materials as Lender has requested and Lender shall have found such due diligence satisfactory to it, including, without limitation, material contracts.

12.1.16 <u>Financial Condition</u>. Lender shall have completed a satisfactory examination of the financial condition of the Loan Parties.

12.1.17 <u>Other</u>. Such other documents as Lender may reasonably request.

12.1.18 <u>Compliance with Warranties, No Default, etc.</u> Both before and after giving effect to any borrowing, the following statements shall be true and correct:

(a)    the representations and warranties of each Loan Party set forth in this Agreement and the other Loan Documents shall be true and correct in all material respects (or, in the case of representations and warranties qualified by materiality, in all respects) with the same effect as if then made (except to the extent stated to relate to a

31

specific earlier date, in which case such representations and warranties shall be true and correct in all material respects (or, in the case of representations and warranties qualified by materiality, in all respects) as of such earlier date); and

(b)    no Default or Event of Default shall have then occurred and be continuing.

12.1.19  Confirmatory Certificate. Lender shall have received a certificate dated the date of such requested Loan and signed by a duly authorized representative of Borrower as to (A) the matters set out in Section 12.1.18 (it being understood that each request by Borrower for the making of a Loan shall be deemed to constitute a representation and warranty by Borrower that the conditions precedent set forth in Section 12.1.18 will be satisfied at the time of the making of such Loan), together with such other documents as Lender may reasonably request in support thereof and (B) the projections delivered to the Lender on or before the date hereof (which projections shall be attached as an Annex to such certificate).

The acceptance by Borrower of any Loans made on the Closing Date shall be deemed to be a representation and warranty made by Borrower to the effect that all of the conditions precedent to the making of such Loans have been satisfied.

13.    EVENTS OF DEFAULT AND THEIR EFFECT.

13.1    Events of Default. Each of the following shall constitute an Event of Default under this Agreement:

13.1.1    Non-Payment of the Loans, etc. Default in the payment when due of the principal of any Loan; or default, and continuance thereof for three days, in the payment when due of any interest, fee or other amount payable by any Loan Party hereunder or under any other Loan Document.

13.1.2    Non-Payment of Other Debt. Any default or other event shall occur under the terms applicable to any Debt of any Loan Party in an aggregate amount (for all such Debt so affected and including undrawn committed or available amounts and amounts owing to all creditors under any combined or syndicated credit arrangement) exceeding $200,000 and such default or other event shall (a) consist of the failure to pay such Debt when due, whether by acceleration or otherwise, or (b) cause the acceleration of such Debt or permit the holder or holders thereof, or any trustee or agent for such holder or holders, to cause such Debt to become due and payable (or require any Loan Party to prepay, purchase or redeem such Debt or post cash collateral in respect thereof) prior to its expressed maturity.

13.1.3    Other Material Obligations. Default in the payment when due, or in the performance or observance of, any Material Contract.

13.1.4    Bankruptcy, Insolvency, etc. Any Loan Party becomes insolvent or generally fails to pay, or admits in writing its inability or refusal to pay, debts as they become due; or any Loan Party applies for, consents to, or acquiesces in the appointment of a trustee, receiver or other custodian for such Loan Party or any property thereof, or

32

makes a general assignment for the benefit of creditors; or, in the absence of such application, consent or acquiescence, a trustee, receiver or other custodian is appointed for any Loan Party or for a substantial part of the property of any thereof and is not discharged within sixty (60) days; or any bankruptcy, reorganization, debt arrangement, or other case or proceeding under any bankruptcy or insolvency law, or any dissolution or liquidation proceeding, is commenced in respect of any Loan Party, and if such case or proceeding is not commenced by such Loan Party, it is consented to or acquiesced in by such Loan Party, or remains for sixty (60) days undismissed; or any Loan Party takes any action to authorize, or in furtherance of, any of the foregoing.

13.1.5    Non-Compliance with Loan Documents. (a) Failure by any Loan Party to comply with or to perform any covenant set forth in Sections 10.1, 10.2, 10.3(b), 10.5, 10.6, 10.10, 10.11, 10.14 or Section 11 (other than Section 11.8) or failure by Argo Tea to comply with or to perform its obligations under Section 18.1; or (b) failure by any Loan Party to comply with or to perform any other provision of this Agreement or any other Loan Document (and not constituting an Event of Default under any other provision of this Section 13) and continuance of such failure described in this clause (b) for thirty (30) days.

13.1.6    Representations; Warranties. Any representation or warranty made by any Loan Party herein or any other Loan Document is breached or is false or misleading in any material respect (or, if such representation or warranty is already qualified by materiality, in any respect), or any schedule, certificate, financial statement, report, notice or other writing furnished by any Loan Party to Lender in connection herewith is false or misleading in any material respect on the date as of which the facts therein set forth are stated or certified.

13.1.7    Pension Plans. (a) Any Person institutes steps to terminate a Pension Plan if as a result of such termination Borrower or any member of the Controlled Group could be required to make a contribution to such Pension Plan, or could incur a liability or obligation to such Pension Plan, in excess of $250,000; (b) a contribution failure occurs with respect to any Pension Plan sufficient to give rise to a Lien under Section 302(f) of ERISA; (c) the Unfunded Liability exceeds twenty percent (20%) of the Total Plan Liability, or (d) there shall occur any withdrawal or partial withdrawal from a Multiemployer Pension Plan and the withdrawal liability (without unaccrued interest) to Multiemployer Pension Plans as a result of such withdrawal (including any outstanding withdrawal liability that Borrower or any member of the Controlled Group have incurred on the date of such withdrawal) exceeds $250,000.

13.1.8    Judgments. Final judgments or awards which exceed an aggregate of $250,000 (excluding amounts covered by insurance to the extent the relevant independent third-party insurer has acknowledged coverage therefor provided, however, such insurance shall have been paid to Borrower within thirty (30) days of the rendering of such judgment or award) shall be rendered against any Loan Party and shall not have been paid, discharged or vacated or had execution thereof stayed pending appeal within thirty (30) days after entry or filing of such judgments or awards.

13.1.9    Invalidity of Collateral Documents, etc. The Liens created by the Collateral Documents shall at any time not constitute a valid and perfected first priority Lien on a material portion of the Collateral intended to be covered thereby (other than any Collateral released with the consent of the Lender) in favor of the Lender, free and clear of all other Liens (other than Permitted Liens), or, except for expiration or termination in accordance with its terms or with the consent of the Lender, any of the Loan Documents shall for whatever reason be terminated or cease to be in full force and effect, or enforceability thereof shall be contested by any Loan Party.

13.1.10    Invalidity of Subordination Provisions, etc. Any subordination provision in any document or instrument governing Subordinated Debt, or any subordination provision in any subordination agreement that relates to any Subordinated Debt, or any subordination provision in any guaranty by any Loan Party of any Subordinated Debt, shall cease to be in full force and effect or enforceable; or any Loan Party or any other Person (including the holder of any applicable Subordinated Debt) shall contest in any manner the validity, binding nature or enforceability of any such provision.

13.1.11    Change of Control. A Change of Control shall occur.

13.2    Effect of Event of Default. If any Event of Default described in Section 13.1.4 shall occur, the Term Loan Commitment shall immediately terminate and the Loans and all other Obligations hereunder shall become immediately due and payable, all without presentment, demand, protest or notice of any kind; and, if any other Event of Default shall occur and be continuing, Lender may (i) declare the Term Loan Commitment to be terminated in whole or in part and/or declare all or any part of the Loans and all other Obligations hereunder to be due and payable, whereupon the Term Loan Commitment shall immediately terminate (or be reduced, as applicable) and/or the Loans and other Obligations hereunder shall become immediately due and payable (in whole or in part, as applicable), all without presentment, demand, protest or notice of any kind and (ii) exercise any or all rights and remedies under the Collateral Documents and applicable law. Lender shall promptly advise Borrower of any such declaration, but failure to do so shall not impair the effect of such declaration. It being understood and agreed that, if (A) Lender exercises its right to accelerate the Loans in accordance with clause (i) above or (B) if an Event of Default is continuing and (x) Argo Tea has made a request in writing for a waiver from Lender for such Event of Default and (y) Lender has rejected (or failed to respond to) such waiver request within sixty (60) days after receipt thereof, then, notwithstanding any restrictions on voluntary prepayments in this Agreement to the contrary, the Borrower may prepay the Loans in whole without premium or penalty.

13.3    Credit Bidding. The Loan Parties hereby irrevocably authorize Lender to Credit Bid and purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (and the Loan Parties shall approve Lender as a qualified bidder and such Credit Bid as qualified bid) at any sale thereof conducted by Lender, under any provisions of the Uniform Commercial Code, as part of any sale or investor solicitation process conducted by any Loan Party, any interim receiver, receiver, receiver and manager, administrative receiver, trustee, agent or other Person pursuant or under any insolvency laws.

1924780-NYCSR07A - MSW

For purposes of the preceding sentence, the term "Credit Bid" shall mean, an offer submitted by Lender to acquire the property of any Loan Party or any portion thereof in exchange for and in full and final satisfaction of all or a portion (as determined by Lender) of the claims and Obligations under this Agreement and other Loan Documents.

14.    RESERVED.

15.    GENERAL.

15.1    Waiver; Amendments. No delay on the part of Lender in the exercise of any right, power or remedy shall operate as a waiver thereof, nor shall any single or partial exercise by any of them of any right, power or remedy preclude other or further exercise thereof, or the exercise of any other right, power or remedy. No amendment, modification or waiver of, or consent with respect to, any provision of this Agreement or the other Loan Documents shall in any event be effective unless the same shall be in writing and executed and delivered by Lender, and then any such amendment, modification, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

15.2    Confirmations. Borrower and each holder of a Note agree from time to time, upon written request received by it from the other, to confirm to the other in writing the aggregate unpaid principal amount of the Loans then outstanding under such Note.

15.3    Notices. All notices hereunder shall be in writing (including facsimile transmission) and shall be sent to the applicable party at its address shown on Annex B or at such other address as such party may, by written notice received by the other parties, have designated as its address for such purpose. Notices sent by facsimile transmission shall be deemed to have been given when sent; notices sent by mail shall be deemed to have been given three (3) Business Days after the date when sent by registered or certified mail, postage prepaid; and notices sent by hand delivery or overnight courier service shall be deemed to have been given when received.

15.4    Computations. Where the character or amount of any asset or liability or item of income or expense is required to be determined, or any consolidation or other accounting computation is required to be made, for the purpose of this Agreement, such determination or calculation shall, to the extent applicable and except as otherwise specified in this Agreement, be made in accordance with GAAP, consistently applied; provided that if Borrower notifies Lender that Borrower wishes to amend any covenant in Sections 10 or 11.14 (or any related definition) to eliminate or to take into account the effect of any change in GAAP on the operation of such covenant (or if Lender notifies Borrower that Lender wishes to amend Sections 10 or 11.14 (or any related definition) for such purpose), then Borrower's compliance with such covenant shall be determined on the basis of GAAP in effect immediately before the relevant change in GAAP became effective, until either such notice is withdrawn or such covenant (or related definition) is amended in a manner satisfactory to Borrower and Lender.

15.5    Costs, Expenses and Taxes. Each Loan Party, jointly and severally agrees to pay (i) no later than 15 days from demand thereof, all reasonable out-of-pocket costs and expenses of Lender (including Attorney Costs and any indemnified Taxes payable under Section 7.6) in

35

connection with administration (including perfection and protection of any Collateral) of this Agreement, the other Loan Documents and all other documents provided for herein or delivered hereunder, or in connection with the preparation, execution and delivery of all other documents required to be delivered hereunder or in connection herewith after the Closing Date (including any amendment, supplement or waiver to any Loan Document), and   (ii) on demand, all reasonable out-of-pocket costs and expenses (including Attorney Costs and any indemnified Taxes payable under Section 7.6) incurred by Lender in connection with the collection of the Obligations after an Event of Default or the enforcement of this Agreement the other Loan Documents or any such other documents or during any workout, restructuring or negotiations in respect thereof. In addition, each Loan Party agrees to pay, and to save Lender harmless from all liability for, any fees of Borrower's auditors in connection with any reasonable exercise by Lender of its rights pursuant to Section 10.2. All Obligations provided for in this Section 15.5 shall survive repayment of the Loans, cancellation of the Notes, and termination of this Agreement.

15.6    <u>Assignments; Participations</u>.

15.6.1    Assignments. (a) Lender may at any time assign to one or more Persons (any such Person, an "<u>Assignee</u>") all or any portion of the Loans and Term Loan Commitment with the prior written consent of Borrower (which consent of Borrower shall not be unreasonably withheld or delayed), <u>provided</u>, <u>however</u>, consent of Borrower shall not be required (x) for an assignment by Lender to an Affiliate of Lender or an Approved Fund or (y) during the existence of a Default or an Event of Default. Borrower shall be deemed to have granted its consent to any assignment requiring its consent hereunder unless Borrower has expressly objected to such assignment within three (3) Business Days after notice thereof.

(b)    From and after the date on which such assignment shall have occurred, (i) such Assignee shall be deemed automatically to have become a party hereto and, to the extent that rights and obligations hereunder have been assigned to such Assignee, Assignee shall have the same rights and obligations of Lender hereunder and (ii) Lender, to the extent that rights and obligations hereunder have been assigned by it, shall be released from its rights (other than its indemnification rights) and obligations hereunder. Upon the request of Assignee (and the assignor), Borrower shall execute and deliver to Lender a Note in the principal amount of Assignee's Term Loans (and, as applicable, a Note in the principal amount of the principal amount of the Term Loans retained by the assignor). Each such Note shall be dated the effective date of such assignment. Borrower hereby agrees to execute and deliver, and cause each of the other Loan Parties to execute and deliver, any amendment and/or any other document that may be requested by Lender to effectuate any assignment, including an amendment to this Agreement or any of the other Loan Documents to provide for multiple lenders and an administrative agent to act on behalf of such lenders.

(c)    Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; <u>provided</u> that no

such pledge or assignment of a security interest shall release Lender from any of its obligations hereunder or substitute any such pledgee or assignee for Lender as a party hereto.

15.6.2   <u>Participations</u>. Lender may at any time sell to one or more Persons participating interests in the Loans, Term Loan Commitment or other interests hereunder (any such Person, a "<u>Participant</u>"). In the event of a sale by Lender of a participating interest to a Participant, (a) Lender's obligations hereunder shall remain unchanged for all purposes, (b) Borrower shall continue to deal solely and directly with Lender in connection with Lender's rights and obligations hereunder and (c) all amounts payable by Borrower shall be determined as if Lender had not sold such participation and shall be paid directly to Lender. Borrower agrees that if amounts outstanding under this Agreement are due and payable (as a result of acceleration or otherwise), each Participant shall be deemed to have the right of set-off in respect of its participating interest in amounts owing under this Agreement to the same extent as if the amount of its participating interest were owing directly to it as Lender under this Agreement. Borrower also agrees that each Participant shall be entitled to the benefits of Section 7.6 or 8 as if it were Lender (provided that on the date of the participation no Participant shall be entitled to any greater compensation pursuant to Section 7.6 or 8 than would have been paid to Lender on such date if no participation had been sold).

15.7   <u>GOVERNING LAW</u>. **THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.**

15.8   <u>Confidentiality</u>. Lender agrees to use commercially reasonable efforts (equivalent to the efforts Lender applies to maintain the confidentiality of its own confidential information) to maintain as confidential all information provided to it by any Loan Party and designated as confidential, except that Lender may disclose such information (a) to employees, officers, directors investors, agents or representatives of the Lender and to Persons employed or engaged by Lender's Affiliates or Approved Funds in evaluating, approving, structuring or administering the Loans and the Term Loan Commitment, (b) to any assignee or participant or potential assignee or participant that has agreed to comply with the covenant contained in this Section 15.8 (and any such assignee or participant or potential assignee or participant may disclose such information to Persons employed or engaged by them as described in clause (a) above); (c) as required or requested by any federal or state regulatory authority or examiner, or any insurance industry association, or as reasonably believed by Lender to be compelled by any court decree, subpoena or legal or administrative order or process, (d) as, on the advice of Lender's counsel, is required by law, (e) in connection with the exercise of any right or remedy under the Loan Documents or in connection with any litigation to which Lender is a party, (f) to any nationally recognized rating agency that requires access to information about Lender's investment portfolio in connection with ratings issued with respect to Lender, (g) to any Affiliate of Lender, (h) to Lender's independent auditors, creditors and other professional advisors as to which such information has been identified as confidential; or (i) that ceases to be confidential through no fault of Lender.

15.9    <u>Severability</u>. Whenever possible each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement. All obligations of the Loan Parties and rights of Lender expressed herein or in any other Loan Document shall be in addition to and not in limitation of those provided by applicable law.

15.10    <u>Nature of Remedies</u>. All Obligations of the Loan Parties and rights of Lender expressed herein or in any other Loan Document shall be in addition to and not in limitation of those provided by applicable law. No failure to exercise and no delay in exercising, on the part of Lender, any right, remedy, power or privilege hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

15.11    <u>Entire Agreement</u>. This Agreement, together with the other Loan Documents, embodies the entire agreement and understanding among the parties hereto and supersedes all prior or contemporaneous agreements and understandings of such Persons, verbal or written, relating to the subject matter hereof and thereof and any prior arrangements made with respect to the payment by the Loan Parties of (or any indemnification for) any fees, costs or expenses payable to or incurred (or to be incurred) by or on behalf of Lender.

15.12    <u>Counterparts</u>. This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute but one and the same Agreement. Receipt of an executed signature page to this Agreement by facsimile or other electronic transmission shall constitute effective delivery thereof. Electronic records of executed Loan Documents maintained by Lender shall deemed to be originals.

15.13    <u>Successors and Assigns</u>. This Agreement shall be binding upon Borrower and Lender and their respective successors and assigns, and shall inure to the benefit of Borrower, Lender and the successors and assigns of Lender. No other Person shall be a direct or indirect legal beneficiary of, or have any direct or indirect cause of action or claim in connection with, this Agreement or any of the other Loan Documents. No Loan Party may assign or transfer any of its rights or Obligations under this Agreement without the prior written consent of Lender.

15.14    <u>Captions</u>. Section captions used in this Agreement are for convenience only and shall not affect the construction of this Agreement.

15.15    <u>Customer Identification – USA Patriot Act Notice</u>. Lender hereby notifies the Loan Parties that, pursuant to the requirements of the USA Patriot Act, Title III of Pub. L. 10756, signed into law October 26, 2001 (the "<u>Patriot Act</u>"), it is or may be required to obtain, verify and record information that identifies the Loan Parties, which information includes the name and address of the Loan Parties and other information that will allow Lender to identify the Loan Parties in accordance with the Patriot Act.

15.16  <u>INDEMNIFICATION BY LOAN PARTIES</u>. IN CONSIDERATION OF THE EXECUTION AND DELIVERY OF THIS AGREEMENT BY LENDER AND THE AGREEMENT TO EXTEND THE COMMITMENTS PROVIDED HEREUNDER, BORROWER HEREBY AGREES TO INDEMNIFY, EXONERATE AND HOLD LENDER AND EACH OF THE OFFICERS, DIRECTORS, EMPLOYEES, AFFILIATES, APPROVED FUNDS AND AGENTS OF LENDER (EACH A "<u>LENDER PARTY</u>") FREE AND HARMLESS FROM AND AGAINST ANY AND ALL ACTIONS, CAUSES OF ACTION, SUITS, LOSSES, LIABILITIES, DAMAGES AND EXPENSES, INCLUDING ATTORNEY COSTS (COLLECTIVELY, THE "<u>INDEMNIFIED LIABILITIES</u>"), INCURRED BY THE LENDER PARTIES OR ANY OF THEM AS A RESULT OF, OR ARISING OUT OF, OR RELATING TO (a) ANY TENDER OFFER, MERGER, PURCHASE OF CAPITAL SECURITIES, PURCHASE OF ASSETS OR OTHER SIMILAR TRANSACTION FINANCED OR PROPOSED TO BE FINANCED IN WHOLE OR IN PART, DIRECTLY OR INDIRECTLY, WITH THE PROCEEDS OF ANY OF THE LOANS, (b) THE USE, HANDLING, RELEASE, EMISSION, DISCHARGE, TRANSPORTATION, STORAGE, TREATMENT OR DISPOSAL OF ANY HAZARDOUS SUBSTANCE AT ANY PROPERTY OWNED OR LEASED AT ANY TIME BY ANY LOAN PARTY, (c) ANY VIOLATION, OBLIGATION OR LIABILITY IN CONNECTION WITH ANY ENVIRONMENTAL LAWS WITH RESPECT TO CONDITIONS AT ANY PROPERTY OWNED OR LEASED BY ANY LOAN PARTY AT ANY TIME OR THE OPERATIONS CONDUCTED THEREON, (d) THE INVESTIGATION, CLEANUP OR REMEDIATION OF OFFSITE LOCATIONS AT WHICH ANY LOAN PARTY OR THEIR RESPECTIVE PREDECESSORS ARE ALLEGED TO HAVE DIRECTLY OR INDIRECTLY DISPOSED OF HAZARDOUS SUBSTANCES OR OTHERWISE BE LIABLE UNDER ENVIRONMENTAL LAWS OR (e) THE EXECUTION, DELIVERY, PERFORMANCE OR ENFORCEMENT OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT BY ANY OF THE LENDER PARTIES, EXCEPT FOR ANY SUCH INDEMNIFIED LIABILITIES ARISING ON ACCOUNT OF THE APPLICABLE LENDER PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AS DETERMINED BY A FINAL, NONAPPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION. IF AND TO THE EXTENT THAT THE FOREGOING UNDERTAKING MAY BE UNENFORCEABLE FOR ANY REASON, EACH LOAN PARTY HEREBY AGREES TO MAKE THE MAXIMUM CONTRIBUTION TO THE PAYMENT AND SATISFACTION OF EACH OF THE INDEMNIFIED LIABILITIES WHICH IS PERMISSIBLE UNDER APPLICABLE LAW. ALL OBLIGATIONS PROVIDED FOR IN THIS SECTION 15.16 SHALL SURVIVE REPAYMENT OF THE LOANS, CANCELLATION OF THE NOTES, ANY FORECLOSURE UNDER, OR ANY MODIFICATION, RELEASE OR DISCHARGE OF, ANY OR ALL OF THE COLLATERAL DOCUMENTS AND TERMINATION OF THIS AGREEMENT.

15.17  <u>Nonliability of Lender</u>. The relationship between Borrower on the one hand and Lender on the other hand shall be solely that of borrower and lender. Lender has no fiduciary relationship with or duty to any Loan Party arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Loan Parties, on the one hand and Lender on the other hand, in connection herewith or therewith is solely that of debtor and creditor. Lender does not undertake any responsibility to any Loan Party to review or inform any Loan Party of any matter in connection with any phase of any Loan Party's business or operations. Borrower agrees, on behalf of itself and each other Loan Party, that Lender shall not

have liability to any Loan Party (whether sounding in tort, contract or otherwise) for losses suffered by any Loan Party in connection with, arising out of, or in any way related to the transactions contemplated and the relationship established by the Loan Documents, or any act, omission or event occurring in connection therewith, unless it is determined in a final non-appealable judgment by a court of competent jurisdiction that such losses resulted from the gross negligence or willful misconduct of the party from which recovery is sought. **NO LENDER PARTY SHALL BE LIABLE FOR ANY DAMAGES ARISING FROM THE USE BY OTHERS OF ANY INFORMATION OR OTHER MATERIALS OBTAINED THROUGH INTRALINKS OR OTHER SIMILAR INFORMATION TRANSMISSION SYSTEMS IN CONNECTION WITH THIS AGREEMENT, NOR SHALL ANY LENDER PARTY HAVE ANY LIABILITY WITH RESPECT TO, AND BORROWER ON BEHALF OF ITSELF AND EACH OTHER LOAN PARTY, HEREBY WAIVES, RELEASES AND AGREES NOT TO SUE FOR ANY SPECIAL, PUNITIVE, EXEMPLARY, INDIRECT OR CONSEQUENTIAL DAMAGES RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR ARISING OUT OF ITS ACTIVITIES IN CONNECTION HEREWITH OR THEREWITH (WHETHER BEFORE OR AFTER THE CLOSING DATE).** Each Loan Party acknowledges that it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents to which it is a party. No joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among Lender and the Loan Parties.

15.18   <u>FORUM SELECTION AND CONSENT TO JURISDICTION.</u>

**EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT IT WILL NOT COMMENCE ANY ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR IN TORT OR OTHERWISE, AGAINST ANY OTHER PARTY IN ANY WAY RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS RELATING HERETO OR THERETO, IN ANY FORUM OTHER THAN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS  AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION, LITIGATION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST**

**ANY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.**

**EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN THIS SECTION 15.18. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.**

15.19  <u>WAIVER OF JURY TRIAL</u>. **EACH LOAN PARTY, AND LENDER HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS AGREEMENT, ANY NOTE, ANY OTHER LOAN DOCUMENT AND ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION HEREWITH OR THEREWITH OR ARISING FROM ANY LENDING RELATIONSHIP EXISTING IN CONNECTION WITH ANY OF THE FOREGOING, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.**

15.20  <u>Disclosure</u>. Neither Borrower nor any Affiliate thereof will (or will permit any officer, director, employee, investor, agent or representative to) issue any press releases or make any other disclosure using the name of Lender or its Affiliates or referring to this Agreement or the other Loan Documents (or disclosing the contents hereof or thereof) without at least three (3) Business Days' prior notice to Lender and without the prior written consent of Lender unless (and only to the extent that) Borrower or such Affiliate is required to do so under applicable law and then, in any event, Borrower or such Affiliate will consult with Lender before issuing such press release or making such other disclosure. Borrower hereby consents to the publication by Lender of a tombstone or similar advertising material relating to the financing transactions contemplated by this Agreement. Lender reserves the right to provide to industry trade organizations information necessary and customary for inclusion in league table measurements.

16.    JOINT AND SEVERAL LIABILITY.

16.1    Borrower is defined collectively to include all Persons constituting Borrower; <u>provided</u>, <u>however</u>, that any references herein to "any Borrower", "each Borrower", "a Borrower" or similar references, shall be construed as a reference to each individual Person comprising Borrower. In addition, each Person comprising Borrower hereby acknowledges and agrees that all of the representations, warranties, covenants, obligations, conditions, agreements and other terms contained in this Agreement shall be applicable to and shall be binding upon each Person comprising Borrower unless expressly otherwise stated herein.

41

16.2    Each Borrower shall be jointly and severally liable for all of the Obligations of each other Borrower, regardless of which Borrower actually receives the proceeds or other benefits of the Loans or other extensions of credit hereunder or the manner in which Borrower or Lender accounts therefor in their respective books and records.

16.3    Each Borrower acknowledges that it will enjoy significant benefits from the business conducted by each other Borrower because of, inter alia, their combined ability to bargain with other Persons including without limitation their ability to receive the Loans and other credit extensions under this Agreement and the other Loan Documents which would not have been available to any Borrower acting alone. Each Borrower has determined that it is in its best interest to procure the credit facilities contemplated hereunder, with the credit support of each other Borrower as contemplated by this Agreement and the other Loan Documents.

16.4    Lender has advised Borrower that it is unwilling to enter into this Agreement and the other Loan Documents and make available the credit facilities extended hereby or thereby to Borrower unless each Borrower agrees, among other things, to be jointly and severally liable for the due and proper payment of the Obligations of each other Borrower. Each Borrower has determined that it is in its best interest and in pursuit of its purposes that it so induce Lender to extend credit pursuant to this Agreement and the other documents executed in connection herewith (a) because of the desirability to each Borrower of the credit facilities hereunder and the interest rates and the modes of borrowing available hereunder and thereunder, (b) because each Borrower may engage in transactions jointly with other Borrowers and (c) because each Borrower may require, from time to time, access to funds under this Agreement for the purposes herein set forth. Each Borrower, individually, expressly understands, agrees and acknowledges, that the credit facilities contemplated hereunder would not be made available on the terms herein in the absence of the collective credit of all the Borrowers, and the joint and several liability of all the Borrowers. Accordingly, each Borrower acknowledges that the benefit of the accommodations made under this Agreement to the Borrower, as a whole, constitutes reasonably equivalent value, regardless of the amount of the indebtedness actually borrowed by, advanced to, or the amount of credit provided to, or the amount of collateral provided by, any one Borrower.

16.5    To the extent that applicable law otherwise would render the full amount of the joint and several obligations of any Borrower hereunder and under the other Loan Documents invalid or unenforceable, such Person's obligations hereunder and under the other Loan Documents shall be limited to the maximum amount which does not result in such invalidity or unenforceability; provided, however, that each Borrower's obligations hereunder and under the other Loan Documents shall be presumptively valid and enforceable to their fullest extent in accordance with the terms hereof or thereof, as if this Section 16 were not a part of this Agreement.

16.6    To the extent that any Borrower shall make a payment under this Section 16 of all or any of the Obligations (a "Joint Liability Payment") which, taking into account all other Joint Liability Payments then previously or concurrently made by any other Borrower, exceeds the amount that such Borrower would otherwise have paid if each Borrower had paid the aggregate Obligations satisfied by such Joint Liability Payments in the same proportion that such Person's Allocable Amount (as defined below) (as determined immediately prior to such Joint Liability

42

Payments) bore to the aggregate Allocable Amounts of each Borrower as determined immediately prior to the making of such Joint Liability Payments, then, following Payment in Full (as defined in the Guaranty and Collateral Agreement), such Borrower shall be entitled to receive contribution and indemnification payments from, and be reimbursed by, each other Borrower for the amount of such excess, pro rata based upon their respective Allocable Amounts in effect immediately prior to such Joint Liability Payments. As of any date of determination, the "Allocable Amount" of any Borrower shall be equal to the maximum amount of the claim which could then be recovered from such Borrower under this Section 16 without rendering such claim voidable or avoidable under § 548 of Chapter 11 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law.

16.7    Each Borrower assumes responsibility for keeping itself informed of the financial condition of each other Borrower, and any and all endorsers and/or guarantors of any instrument or document evidencing all or any part of such other Borrower's Obligations, and of all other circumstances bearing upon the risk of nonpayment by such other Borrower of their Obligations, and each Borrower agrees that Lender shall not have any duty to advise such Borrower of information known to Lender regarding such condition or any such circumstances or to undertake any investigation not a part of its regular business routine. If Lender, in its sole discretion, undertakes at any time or from time to time to provide any such information to a Borrower, Lender shall not be under any obligation to update any such information or to provide any such information to such Borrower or any other Person on any subsequent occasion.

16.8    Lender is hereby authorized to, at any time and from time to time, (a) in accordance with the terms of this Agreement, renew, extend, accelerate or otherwise change the time for payment of, or other terms relating to, Obligations incurred by any Borrower or any other Loan Party, otherwise modify, amend or change the terms of any promissory note or other agreement, document or instrument now or hereafter executed by any Borrower or any other Loan Party and delivered to Lender; (b) accept partial payments on an Obligation incurred by any Borrower; (c) take and hold security or collateral for the payment of an Obligation incurred by any Borrower hereunder or for the payment of any guaranties of an Obligation incurred by any Borrower or other liabilities of any Borrower and exchange, enforce, waive and release any such security or collateral; (d) apply such security or collateral and direct the order or manner of sale thereof as Lender, in its sole discretion, may determine; and (e) settle, release, compromise, collect or otherwise liquidate an Obligation incurred by any Borrower and any security or collateral therefor in any manner, without affecting or impairing the obligations of any other Borrower. In accordance with the terms of this Agreement, Lender shall have the exclusive right to determine the time and manner of application of any payments or credits, whether received from a Borrower or any other source, and such determination shall be binding on each Borrower. In accordance with the terms of this Agreement, all such payments and credits may be applied, reversed and reapplied, in whole or in part, to any of an Obligation incurred by any Borrower as Lender shall determine in its sole discretion without affecting the validity or enforceability of the Obligations of any other Borrower. Nothing in this Section 16 shall modify any right of any Borrower or Lender to consent to any amendment or modification of this Agreement or the other Loan Documents in accordance with the terms hereof or thereof.

16.9    Each Borrower hereby agrees that, except as hereinafter provided, its obligations hereunder shall be unconditional, irrespective of (a) the absence of any attempt to collect an Obligation incurred by Borrower from any Borrower or any guarantor or other action to enforce the same, (b) failure by Lender to take any steps to perfect and maintain its security interest in, or to preserve its rights to, any security or collateral for an Obligation incurred by any Borrower, (c) of any proceeding under the Bankruptcy Code, or any similar proceeding, by or against any Borrower or any other Loan Party, or Lender's election in any such proceeding of the application of § 1111(b)(2) of the Bankruptcy Code, (d) any borrowing or grant of a security interest by any Borrower as debtor-in-possession under § 364 of the Bankruptcy Code, (e) the disallowance, under § 502 of the Bankruptcy Code, of all or any portion of Lender's claim(s) for repayment of any of an Obligation incurred by any Borrower, or (f) any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor unless such legal or equitable discharge or defense is that of a Borrower in its capacity as a Borrower.

16.10    Any notice given by Borrower Representative hereunder shall constitute and be deemed to be notice given by all Borrowers, jointly and severally. Notice given by Lender to Borrower Representative hereunder or pursuant to any other Loan Documents in accordance with the terms hereof or thereof shall constitute notice to each Borrower. The knowledge of any Borrower shall be imputed to all Borrower and any consent by Borrower Representative or any Borrower shall constitute the consent of and shall bind all Borrower.

16.11    This Section 16 is intended only to define the relative rights of Borrower and nothing set forth in this Section 16 is intended to or shall impair the obligations of Borrower, jointly and severally, to pay any amounts as and when the same shall become due and payable in accordance with the terms of this Agreement or any other Loan Documents. Nothing contained in this Section 16 shall limit the liability of any Borrower to pay the credit facilities made directly or indirectly to such Borrower and accrued interest, fees and expenses with respect thereto for which such Borrower shall be primarily liable.

16.12    The parties hereto acknowledge that the rights of contribution and indemnification hereunder shall constitute assets of each Borrower to which such contribution and indemnification is owing. The rights of any indemnifying Borrower against the other Borrowers under this Section 16 shall be exercisable upon the full and payment of the Obligations and the termination of the Term Loan Commitment.

16.13    No payment made by or for the account of a Borrower, including, without limitation, (a) a payment made by such Borrower on behalf of an Obligation of another Borrower or (b) a payment made by any other Person under any guaranty, shall entitle such Borrower, by subrogation or otherwise, to any payment from such other Borrower or from or out of property of such other Borrower and such Borrower shall not exercise any right or remedy against such other Borrower or any property of such other Borrower by reason of any performance of such Borrower of its joint and several obligations hereunder, until, in each case, the termination of the Term Loan Commitment and Payment in Full (as defined in the Guaranty and Collateral Agreement).

44

17.     APPOINTMENT OF BORROWER REPRESENTATIVE.

17.1     Each Borrower hereby irrevocably appoints and constitutes the Borrower Representative as its agent to request and receive the proceeds of advances in respect of the Loans (and to otherwise act on behalf of such Borrower pursuant to this Agreement and the other Loan Documents) from Lender in the name or on behalf of each such Borrower. Lender may disburse such proceeds to the bank account of Borrower Representative (or any other Borrower) without notice to any other Borrower or any other Loan Party.

17.2     Each Borrower hereby irrevocably appoints and constitutes the Borrower Representative as its agent to (a) receive statements of account and all other notices from Lender with respect to the Obligations or otherwise under or in connection with this Agreement and the other Loan Documents, (b) execute and deliver Compliance Certificates and all other notices, certificates and documents to be executed and/or delivered by any Borrower under this Agreement or the other Loan Documents; and (c) otherwise act on behalf of such Borrower pursuant to this Agreement and the other Loan Documents.

17.3     The authorizations contained in this Section 17 are coupled with an interest and shall be irrevocable, and Lender may rely on any notice, request, information supplied by the Borrower Representative, every document executed by the Borrower Representative, every agreement made by the Borrower Representative or other action taken by the Borrower Representative in respect of any Borrower or other Loan Party as if the same were supplied, made or taken by such Borrower or Loan Party. Without limiting the generality of the foregoing, the failure of one or more Borrowers or other Loan Party to join in the execution of any writing in connection herewith shall not relieve any Borrower or other Loan Party from obligations in respect of such writing.

17.4     No purported termination of the appointment of Borrower Representative as agent shall be effective without the prior written consent of Lender.

18.     CONVERSION.

18.1     Conversion.     (a)     Lender shall have the right, at any time prior to the Term Loan Maturity Date, on 5 business days advance written notice, to convert all (but not less than all) of the outstanding principal amount of Term Loans due under this Agreement into such number of shares of Common Stock (the "Conversion Shares") determined by dividing the outstanding principal amount of the Term Loans by $0.186078 (the "Conversion Price"), which as of the date hereof would be 53,740,842 shares of Common Stock (representing, as of the date hereof, 21% of the total issued and outstanding shares of fully paid and non-assessable shares of the Common Stock on a fully diluted basis), subject to adjustment as provided herein (such conversion, the "Conversion"). On the date on which the Conversion occurs (the "Conversion Date"), Lender shall be entitled to rights and protections set forth in the Sixth Amended and Restated Investors' Rights Agreement, dated as of the date hereof, among Argo Tea, the Lender and the other shareholders of Argo Tea party thereto, as the same may be amended from time to time.

(b)    <u>Mechanics and Effect of Conversion</u>.  The Conversion into the Conversion Shares pursuant to <u>Section 18.1(a)</u> hereof will be deemed to have been made immediately at the Conversion Date and Lender will be treated for all purposes as the record holder of such Conversion Shares on the Conversion Date.  Upon such Conversion, the Borrower will be forever released from such amount of Term Loans under this Agreement as so converted.  No fractional shares will be issued upon any such Conversion.  In lieu of any fractional share to which Lender would otherwise be entitled, Argo Tea will pay the cash value of that fractional share to the Lender as provided herein. Argo Tea will, as soon as practicable after the Conversion, issue and deliver to Lender a certificate or certificates for the number of Conversion Shares to which the Lender is entitled (bearing such legends as may be required by applicable state and federal securities laws in the opinion of legal counsel of Argo Tea and/or under the Argo Tea's organizational documents), including a check payable to the Lender for any cash amounts payable for any Default Interest Payment resulting from the Conversion.

(c)    <u>Reservation of Stock</u>.  Argo Tea shall reserve and keep available out of its authorized but unissued capital stock the number of shares required for issuance upon the Conversion.

18.2    <u>Antidilution and Adjustment Provisions</u>.  The number of Conversion Shares for which the Term Loans are convertible and the Conversion Price shall be subject to adjustment from time to time as set forth in this <u>Section 18.2</u>.

(a)    <u>Upon Issuance of Common Stock</u>.  If Argo Tea shall, at any time or from time to time after the Closing Date, issue any shares of Common Stock, options to purchase or rights to subscribe for Common Stock, securities by their terms convertible into or exchangeable for Common Stock, or options to purchase or rights to subscribe for such convertible or exchange-able securities without consideration or for consideration per share less than the Conversion Price in effect immediately prior to the issuance of such Common Stock or securities, then such Conversion Price shall forthwith be lowered to a price per share equal to the price per share obtained by multiplying:

(i)    the Conversion Price in effect immediately prior to the issuance of such Common Stock, options, rights or securities by

(ii)    a fraction of which (x) the numerator shall be the sum of (i) the number of shares of Common Stock Outstanding on a fully-diluted basis immediately prior to such issuance and (ii) the number of additional shares of Common Stock which the aggregate consideration for the number of shares of Common Stock so offered would purchase at the Conversion Price in effect immediately prior to such issuance and (y) the denominator shall be the number of shares of Common Stock Outstanding on a fully-diluted basis immediately after such issuance.

(b)    [<u>Intentionally Omitted</u>]

(c)    <u>Provisions Applicable to Adjustments</u>.  For the purposes of any adjustment of the Conversion Price pursuant to <u>Section 18.2(a)</u>, the following provisions shall be applicable:

1924780-NYCSR07A - MSW

(i)      In the case of the issuance of Common Stock for cash in a public offering or private placement, the consideration shall be deemed to be the amount of cash paid therefor before deducting therefrom any discounts, commissions or placement fees payable by Argo Tea to any underwriter or placement agent in connection with the issuance and sale thereof.

(ii)     In the case of the issuance of Common Stock for a consideration in whole or in part other than cash, the consideration other than cash shall be deemed to be the fair market value thereof, as determined in good faith by the board of directors of Argo Tea.

(iii)    In the case of the issuance of options to purchase or rights to subscribe for Common Stock, securities by their terms convertible into or exchangeable for Common Stock, or options to purchase or rights to subscribe for such convertible or exchangeable securities:

(A)      the aggregate maximum number of shares of Common Stock deliverable upon exercise of such options to purchase or rights to subscribe for Common Stock shall be deemed to have been issued at the time such options or rights were issued and for a consideration equal to the consideration (determined in the manner provided in subparagraphs (i) and (ii) above), if any, received by Argo Tea upon the issuance of such options or rights plus the minimum purchase price provided in such options or rights for the Common Stock covered thereby;

(B)      the aggregate maximum number of shares of Common Stock deliverable upon conversion of or in exchange for any such convertible or exchangeable securities or upon the exercise of options to purchase or rights to subscribe for such convertible or exchangeable securities and subsequent conversion or exchange thereof shall be deemed to have been issued at the time such securities, options, or rights were issued and for a consideration equal to the consideration received by Argo Tea for any such securities and related options or rights (excluding any cash received on account of accrued interest or accrued dividends), plus the additional consideration, if any, to be received by Argo Tea upon the conversion or exchange of such securities or the exercise of any related options or rights (the consideration in each case to be determined in the manner provided in paragraphs (i) and (ii) above);

(C)      on any change in the number of shares or exercise price of Common Stock deliverable upon exercise of any such options or rights or conversions of or exchanges for such securities, other than a change resulting from the antidilution provisions thereof, the Conversion Price shall forthwith be readjusted to such Conversion Price as would have been obtained had the adjustment made upon the issuance of such options, rights or securities not converted prior to such change or options or rights related to such securities not converted prior to such change been made upon the basis of such change;

47

(D)    upon the expiration of any options to purchase or rights to subscribe for Common Stock which shall not have been exercised, the Conversion Price computed upon the original issue thereof (or upon the occurrence of a record date with respect thereto), and any subsequent adjustments based thereon, shall, upon such expiration, be recomputed as if the only additional shares of Common Stock issued were the shares of Common Stock, if any actually issued upon the exercise of such options to purchase or rights to subscribe for Common Stock, and the consideration received therefor was the consideration actually received by Argo Tea for the issue of the options to purchase or rights to subscribe for Common Stock that were exercised; and

(E)    no further adjustment of the Conversion Price adjusted upon the issuance of any such options, rights, convertible securities or exchangeable securities shall be made as a result of the actual issuance of Common Stock on the exercise of any such rights or options or any conversion or exchange of any such securities.

(d)    <u>Upon Stock Dividends, Subdivisions or Splits</u>.  If, at any time after the Closing Date, the number of shares of Common Stock Outstanding is increased by a stock dividend payable in shares of Common Stock or by a subdivision or split-up of shares of Common Stock, then, following the record date for the determination of holders of Common Stock entitled to receive such stock dividend, or to be affected by such subdivision or split-up, the Conversion Price shall be appropriately decreased by multiplying the Conversion Price by a fraction, the numerator of which is the number of shares of Common Stock Outstanding immediately prior to such increase and the denominator of which is the number of shares of Common Stock Outstanding immediately after such increase in Outstanding shares.

(e)    <u>Upon Combinations or Reverse Stock Splits</u>.  If, at any time after the Closing Date, the number of shares of Common Stock Outstanding is decreased by a combination or reverse stock split of the Outstanding shares of Common Stock into a smaller number of shares of Common Stock, then, following the record date to determine shares affected by such combination or reverse stock split, the Conversion Price shall be appropriately increased by multiplying the Conversion Price by a fraction, the numerator of which is the number of shares of Common Stock Outstanding immediately prior to such decrease and the denominator of which is the number of shares of Common Stock Outstanding immediately after such decrease in Out-standing shares.

(f)    <u>Upon Reclassifications, Reorganizations, Consolidations or Mergers</u>.  In the event of any capital reorganization of Argo Tea, any reclassification of the stock of Argo Tea (other than a change in par value or from par value to no par value or from no par value to par value or as a result of a stock dividend or subdivision, split-up or combination of shares), or any consolidation or merger of Argo Tea with or into another Person (where Argo Tea is not the surviving Person or where there is a change in or distribution with respect to the Common Stock), the conversion rights hereunder shall after such reorganization, reclassification, consolidation, or merger be exercisable for the kind and number of shares of stock or other securities or property of Argo Tea or of the successor Person resulting from such consolidation or surviving such merger, if any, to which the holder of the number of shares of Common Stock

48

deliverable (immediately prior to the time of such reorganization, reclassification, consolidation or merger) upon exercise of such conversion rights would have been entitled upon such reorganization, reclassification, consolidation or merger.  The provisions of this clause shall similarly apply to successive reorganizations, reclassifications, consolidations, or mergers.  Argo Tea shall not effect any such reorganization, reclassification, consolidation or merger unless, prior to the consummation thereof, the successor Person (if other than Argo Tea) resulting from such reorganization, reclassification, consolidation or merger, shall assume, by written instrument, the obligation to deliver to the Lender such shares of stock, securities or assets, which, in accordance with the foregoing provisions, the Lender shall be entitled to receive upon Conversion.

(g)    Deferral in Certain Circumstances.  In any case in which the provisions of this Section 18.2 shall require that an adjustment shall become effective immediately after a record date of an event, Argo Tea may defer until the occurrence of such event (a) issuing to the Lender after such record date and before the occurrence of such event the shares of capital stock issuable upon such exercise of the conversion right hereunder by reason of the adjustment required by such event and issuing to the Lender only the shares of capital stock issuable upon such exercise before giving effect to such adjustments, and (b) paying to Lender any amount in cash in lieu of a fractional share of capital stock; provided, however, that Argo Tea shall deliver to the Lender an appropriate instrument or due bills evidencing the Lender's right to receive such additional shares or such cash.

(h)    Adjustment of Conversion Price Upon the Occurrence of Certain Events. In the event of the occurrence of any of the events set forth on Schedule 18.2(i)(1), the Conversion Price will be adjusted as set forth in Schedule 18.2(i)(2).

(i)    Adjustment of Number of Shares Purchasable.  Upon any adjustment of the Conversion Price as provided in this Section 18.2, the Lender shall thereafter be entitled to purchase upon Conversion, at the Conversion Price resulting from such adjustment, the number of shares of  Common Stock (calculated to the nearest 1/100th of a share) obtained by multiplying the Conversion Price in effect immediately prior to such adjustment by the number of shares of Common Stock issuable on the exercise of the conversion right immediately prior to such adjustment and dividing the product thereof by the Conversion Price resulting from such adjustment.

[SIGNATURE PAGES FOLLOW]

49

The parties hereto have caused this Credit Agreement to be duly executed and delivered by their duly authorized officers as of the date first set forth above.

**BORROWERS**

**ARGO TEA, INC.**, a Delaware corporation

By: _____
Name: Arsen Avakian
Title:  President

**ARGO TEA RUSH, LLC**, an Illinois limited liability company
**ARGO TEA STATE/RANDOLPH, LLC**, an Illinois limited liability company
**ARGO TEA UCH, LLC**, an Illinois limited liability company
**ARGO TEA BROADWAY, LLC**, an Illinois limited liability company
**ARGO TEA MARQUETTE, LLC**, an Illinois limited liability company
**ARGO TEA NW, LLC**, an Illinois limited liability company
**ARGO TEA FRANKLIN, LLC**, an Illinois limited liability company
**ARGO TEA MENA, LLC**, a Delaware limited liability company

By: **ARGO TEA, INC.**, Manager for each of the above listed Borrowers

By: _____
Name: Arsen Avakian
Title:  President

[Signature Page to Credit Agreement]

LENDER:

CARIBOU COFFEE COMPANY, INC.,

By:

Name: Mike Tatlersfield

Title: CEO

[Signature Page to Credit Agreement]

## ANNEX A

## DEFINITIONS

"Account" or "Accounts" is defined in the UCC.

"Account Debtor" is defined in the Guaranty and Collateral Agreement.

"Acquisition" means any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the acquisition of all or a substantial portion of the assets of a Person, or of all or a substantial portion of any business or division of a Person, (b) the acquisition of in excess of 50% of the Capital Securities of any Person, or otherwise causing any Person to become a Subsidiary, or (c) a merger or consolidation or any other combination with another Person.

"Affiliate" of any Person means (a) any other Person which, directly or indirectly, controls or is controlled by or is under common control with such Person, (b) any officer, manager or director of such Person and (c) with respect to Lender, any entity administered or managed by Lender or an Affiliate or investment advisor thereof and which is engaged in making, purchasing, holding or otherwise investing in commercial loans. A Person shall be deemed to be "controlled by" any other Person if such Person possesses, directly or indirectly, power to vote 5% or more of the securities (on a fully diluted basis) having ordinary voting power for the election of directors or managers or power to direct or cause the direction of the management and policies of such Person whether by contract or otherwise. Unless expressly stated otherwise herein, Lender shall not be deemed an Affiliate of any Loan Party.

"Agreement" is defined in the preamble of this Agreement.

"Allocable Amount" is defined in Section 16.6.

"Anti-Terrorism Order" is defined in Section 9.22.

"Applicable Margin" means six percent (6%) per annum.

"Approved Fund" means (i) any Person (other than a natural person) engaged in making, purchasing, holding, or investing in commercial loans and similar extensions of credit and that is advised, administered, or managed by Lender, an Affiliate of Lender (or an entity or an Affiliate of an entity that administers, advises or manages Lender); (ii) any investment fund that invests in loans and that is advised, administered or managed by the same investment advisor as Lender or by an Affiliate of such investment advisor; and (iii) any third party which provides "warehouse financing" to a Person described in the preceding clause (i) or (ii) (and any Person described in said clause (i) or (ii) shall also be deemed an Approved Fund with respect to such third party providing such warehouse financing).

"Argo Tea" is defined in the preamble of this Agreement.

"Asset Disposition" means the sale, lease, assignment or other transfer for value (each, a "Disposition") by any Loan Party to any Person (other than Borrower) of any asset or right of

such Loan Party (including, the loss, destruction or damage of any thereof or any actual or threatened (in writing to any Loan Party) condemnation, confiscation, requisition, seizure or taking thereof) other than Dispositions permitted under Section 11.5(b), (c), (d) and (f).

"<u>Assignee</u>" is defined in Section 15.6.1.

"<u>Attorney Costs</u>" means, with respect to any Person, all reasonable out of pocket fees and charges of any counsel to such Person, all reasonable disbursements of such counsel and all court costs and similar out of pocket legal expenses.

"<u>Bankruptcy Code</u>" means the Federal Bankruptcy Reform Act of 1978 (11 U.S.C. § 101, et seq.), as amended and in effect from time to time and the regulations issued from time to time thereunder.

"<u>Borrower</u>" is defined in the preamble of this Agreement.

"<u>Borrower Representative</u>" means Argo Tea.

"<u>Breakwater Indebtedness</u>" means the Debt owing under the Credit Agreement dated as of December 18, 2014, among Argo Tea, Argo Tea Rush, LLC, Argo Tea State/Randolph, LLC, Argo Tea Uch, LLC, Argo Tea Broadway, LLC,  Argo Tea Marquette, LLC, Argo Tea NW, LLC, Argo Tea Franklin, LLC, Argo Tea Mena, LLC and Breakwater Credit Opportunities Fund, L.P.

"<u>Business Day</u>" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, California.

"<u>Capital Expenditures</u>" means all expenditures which, in accordance with GAAP, would be required to be capitalized and shown on the consolidated balance sheet of Loan Parties, including expenditures in respect of Capital Leases and capitalized software, but excluding expenditures made in connection with the replacement, substitution or restoration of assets to the extent financed (a) from insurance proceeds (or other similar recoveries) paid on account of the loss of or damage to the assets being replaced or restored or (b) with awards of compensation arising from the taking by eminent domain or condemnation of the assets being replaced.

"<u>Capital Lease</u>" means, with respect to any Person, any lease of (or other agreement conveying the right to use) any real or personal property by such Person that, in conformity with GAAP, is accounted for as a capital lease on the balance sheet of such Person.

"<u>Capital Securities</u>" means, with respect to any Person, all shares, interests, participations or other equivalents (however designated, whether voting or non-voting) of such Person's capital, whether now outstanding or issued or acquired after the Closing Date, including common shares, preferred shares, membership interests in a limited liability company, limited or general partnership interests in a partnership, interests in a trust, interests in other unincorporated organizations or any other equivalent of such ownership interest.

"<u>Cash Equivalent Investment</u>" means, at any time, (a) any evidence of Debt, maturing not more than one year after such time, issued or guaranteed by the United States or any agency

thereof, (b) commercial paper, maturing not more than one year from the date of issue, or corporate demand notes, in each case rated at least A-l by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. or P-l by Moody's Investors Service, Inc., (c) any certificate of deposit, time deposit or banker's acceptance, maturing not more than one year after such time, or any overnight Federal Funds transaction that is issued or sold by a commercial banking institution that is a member of the Federal Reserve System and has a combined capital and surplus and undivided profits of not less than $500,000,000, (d) any repurchase agreement entered into with any commercial banking institution of the nature referred to in clause (c) which (i) is secured by a fully perfected security interest in any obligation of the type described in any of clauses (a) through (c) above and (ii) has a market value at the time such repurchase agreement is entered into of not less than 100% of the repurchase obligation of such commercial banking institution thereunder and (e) money market accounts or mutual funds which invest exclusively in assets satisfying the foregoing requirements, and (f) other short term liquid investments approved in writing by Lender.

"Change of Control" means the occurrence of any of the following events: (a) Mosaix Ventures, LP, Arsen Avakian, Glen Tullman and Azadea Properties, LTD, in the aggregate, shall cease to, directly or indirectly, free and clear of all Liens, rights, options, warrants or other similar agreements or understandings, own and control at least fifty-one percent (51%) of the voting and economic interests of the outstanding Capital Securities of Argo Tea; (b) Argo Tea shall cease to, directly or indirectly, free and clear of all Liens, rights, options, warrants or other similar agreements or understandings, other than Liens in favor of Lender, own and control 100% of each class of the outstanding Capital Securities of each of the other Loan Parties; (c) a "Change of Control" (or similar event) shall occur under any documents evidencing or relating to Subordinated Debt; or (d) Arsen Avakian shall cease to be President and CEO of Argo Tea and a replacement President and CEO of Argo Tea reasonably satisfactory to Lender is not appointed by the board of directors of Argo Tea within ninety (90) days of such vacancy.

"Closing Date" is defined in Section 12.1.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral" means "Collateral" (as defined in the Guaranty and Collateral Agreement) and any and all other property now or hereafter securing Obligations.

"Collateral Documents" means, collectively, the Guaranty and Collateral Agreement, each Mortgage, each Perfection Certificate, each control agreement and any other agreement or instrument pursuant to which Borrower, any other Loan Party or any other Person grants or purports to grant collateral to Lender or otherwise relates to such collateral.

"Compliance Certificate" means a Compliance Certificate in substantially the form of Exhibit B.

"Computation Period" means each period of four consecutive Fiscal Quarters ending on the last day of a Fiscal Quarter.

"Consolidated Net Income" means, with respect to Loan Parties for any period, the consolidated net income (or loss) of Loan Parties for such period, excluding (i) any gains or losses from Asset Dispositions, (ii) any gains or losses from discontinued operations, (iii) any extraordinary or non-recurring gains or losses, provided that such losses shall not exceed (i) Five Hundred Thousand and 00/100 Dollars ($500,000.00) in the aggregate during any period of four Fiscal Quarters or (ii) One Million Five Hundred Thousand and 00/100 Dollars ($1,500,000.00) in the aggregate during the term of this Agreement, (iv) the income of any Person (other than a Subsidiary of a Borrower) in which Borrower or any of its Subsidiaries has an ownership interest, except to the extent that any such income is actually received by Borrower or such Subsidiary in the form of dividends or similar distributions, (v) the undistributed earnings of any Subsidiary of Borrower to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary is not at the time permitted by the terms of any Contractual Obligation, governing document or law applicable to such Subsidiary, and (vi) the income of any Subsidiary of Borrower which is not a guarantor of the Obligations.

"Contingent Liability" means, with respect to any Person, each obligation and liability of such Person and all such obligations and liabilities of such Person incurred pursuant to any agreement, undertaking or arrangement by which such Person: (a) guarantees, endorses or otherwise becomes or is contingently liable upon (by direct or indirect agreement, contingent or otherwise, to provide funds for payment, to supply funds to, or otherwise to invest in, a debtor, or otherwise to assure a creditor against loss) the indebtedness, dividend, obligation or other liability of any other Person in any manner (other than by endorsement of instruments in the course of collection), including any indebtedness, dividend or other obligation which may be issued or incurred at some future time; (b) guarantees the payment of dividends or other distributions upon the Capital Securities of any other Person; (c) undertakes or agrees (whether contingently or otherwise): (i) to purchase, repurchase, or otherwise acquire any indebtedness, obligation or liability of any other Person or any property or assets constituting security therefor, (ii) to advance or provide funds for the payment or discharge of any indebtedness, obligation or liability of any other Person (whether in the form of loans, advances, stock purchases, capital contributions or otherwise), or to maintain solvency, assets, level of income, working capital or other financial condition of any other Person, or (iii) to make payment to any other Person other than for value received; (d) agrees to lease property or to purchase securities, property or services from such other Person with the purpose or intent of assuring the owner of such indebtedness or obligation of the ability of such other Person to make payment of the indebtedness or obligation; (e) to induce the issuance of, or in connection with the issuance of, any letter of credit for the benefit of such other Person; or (f) undertakes or agrees otherwise to assure a creditor against loss, including, without limitation, any Guarantees of such Person. The amount of any Contingent Liability shall (subject to any limitation set forth herein) be deemed to be the outstanding principal amount (or maximum permitted principal amount, if larger) of the indebtedness, obligation or other liability guaranteed or supported thereby.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its assets or property is bound.

"Controlled Group" means all members of a controlled group of corporations, all members of a controlled group of trades or businesses (whether or not incorporated) under

common control and all members of an affiliated service group which, together with Borrower or any of its Subsidiaries, are treated as a single employer under Section 414 of the Code or Section 4001 of ERISA.

"<u>Conversion</u>" is defined in Section 18.1.

"<u>Conversion Date</u>" is defined in Section 18.1.

"<u>Conversion Price</u>" is defined in Section 18.1.

"<u>Conversion Shares</u>" is defined in Section 18.1.

"<u>Credit Bid</u>" is defined in Section 13.3.

"<u>Cure Notice</u>" is defined in Section 11.14.

"<u>Debt</u>" of any Person means, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all indebtedness evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person as lessee under Capital Leases which have been or should be recorded as liabilities on a balance sheet of such Person in accordance with GAAP, (d) all obligations of such Person to pay the deferred purchase price of property or services (excluding trade accounts payable in the ordinary course of business), (e) all indebtedness secured by a Lien on the property of such Person, whether or not such indebtedness shall have been assumed by such Person; <u>provided</u> that if such Person has not assumed or otherwise become liable for such indebtedness, such indebtedness shall be measured at the fair market value of such property securing such indebtedness at the time of determination, (f) all obligations, contingent or otherwise, with respect to the face amount of all letters of credit (whether or not drawn), bankers' acceptances and similar obligations issued for the account of such Person, (g) all Hedging Obligations of such Person, (h) all Contingent Liabilities of such Person, (i) all Debt of any partnership of which such Person is a general partner, (j) all non-compete payment obligations, earn-outs and similar obligations and (k) any Capital Securities or other equity instrument, whether or not mandatorily redeemable, that under GAAP are characterized as debt, whether pursuant to financial accounting standards board issuance No. 150 or otherwise.

"<u>Debt to be Repaid</u>" means Debt listed on Schedule 12.1.

"<u>Default</u>" means any event that, if it continues uncured, will, with lapse of time or notice or both, constitute an Event of Default.

"<u>Default Interest</u>" is defined in Section 4.1.

"<u>Default Interest Payment</u>" is defined in Section 18.1.

"<u>Disqualified Capital Security</u>" shall mean any Capital Security which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures or is mandatorily redeemable (other than solely for Qualified Capital Securities), pursuant to a sinking fund obligation or otherwise (except as a

result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event are subject to the payment in full of all Loans and other Obligations), or is redeemable at the option of the holder thereof, in whole or in part, or requires the payment of any cash dividend or any other cash payment or otherwise contains any repurchase obligation that may come into effect, in each case at any time on or prior to the 180th day following the Term Loan Maturity Date, or (b) is convertible into or exchangeable for (i) Debt or (ii) any Capital Security referred to in clause (a) above at any time on or prior to the 180th day following the Term Loan Maturity Date; provided, that (x) only the portion of such Capital Security which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Capital Security, (y) if such Capital Securities are issued pursuant to a plan for the benefit of officers, directors, managers, employees, members of management or consultants of a Person or any Subsidiary thereof, such Capital Securities shall not constitute Disqualified Capital Securities solely because they may be required to be repurchased by such Person or any such Subsidiary in order to satisfy applicable statutory or regulatory obligations or as a result of the termination, death or disability of any applicable natural person.

"Dollar" and the sign "$" mean lawful money of the United States of America.

"EBITDA" means, for any period, Consolidated Net Income for such period *plus*, (a) to the extent deducted in determining such Consolidated Net Income, without duplication, the sum of (i) Interest Expense, income tax expense, depreciation and amortization, in each case, for such period, (ii) any non-cash losses or charges for such period, (iii) all fees, costs and expenses incurred during such period in connection with or relating to this Agreement and the transactions contemplated hereby (including without limitation any capitalized fees and expenses, in each case in respect of the Indebtedness under this Agreement), (iv) all transaction-related (and proposed transaction related) expenses (including the fees, expenses and disbursements of appraisers, consultants, advisors, brokers, accountants and counsel) and all seller-related pre-closing and transaction-related costs and expenses in each case relating to any proposed or permitted capital transaction or Investment not prohibited under this Agreement incurred during such period, (v) non-cash stock-based compensation expense for such period, (vi) consolidated store Pre-Opening Costs for such period, provided that such Pre-Opening Costs shall not exceed on average for each café, Thirty-Five Thousand and 00/100 Dollars ($35,000.00) (or such greater amount as approved by Lender), (vii) all losses and charges incurred in connection with (A) the St. Clair Litigation (as defined on Schedule 18.2(i)(1)), in an amount not to exceed $739,000, (B) the Natick Litigation (as defined on Schedule 18.2(i)(1)), in an amount not to exceed $1,006,500 and (C) the Tremont Litigation (as defined on Schedule 18.2(i)(1)), in an amount not to exceed $1,501,733, and (viii) all legal and consultant fees and expenses incurred in connection with litigating the matters described in clause (vii), *minus* (b) without duplication and to the extent included in consolidated Net Income, any non-cash items of income for such period, all calculated for the Borrower and its Subsidiaries on a consolidated basis in accordance with GAAP.

"Environmental Claims" means all claims, however asserted, by any governmental, regulatory, or judicial authority or other Person alleging any potential liability or responsibility, contingent or otherwise (including for damages, losses, punitive damages, consequential

damages, costs of environmental investigation and remediation, fines, penalties, indemnities or expenses) or other obligation, directly or indirectly resulting from or based upon (a) violation of or pursuant to any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Substances, (c) exposure to any Hazardous Substances, (d) the release or threatened release of any Hazardous Substances into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Environmental Laws" means the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601, et seq.), the Hazardous Materials Transportation Act (49 U.S.C. § 5101, et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901, et seq.), the Federal Clean Water Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.), the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), the Safe Drinking Water Act (42 U.S.C. § 300f to 300j-26 et seq.), the Oil Pollution Act of 1990 (33 U.S.C. § 2701 et seq.) and the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.), and any other present or future federal, state, local, foreign and other applicable statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions and common law relating to pollution, the protection of the environment, natural resources, human health or the release of any Hazardous Substances into the environment, including indoor and outdoor air, soil, groundwater, surface water, storm water, wetlands, sediment and discharges of wastewater to public treatment systems, all as may be amended or otherwise modified from time to time.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"Event of Default" means any of the events described in Section 13.1.

"Excluded Accounts" means (a) any deposit account that is used solely for payment of employee payroll, employee bonuses, employee benefits, other employee compensation and related employee expenses, (b) any deposit account of any Loan Party so long as the amounts on deposit therein consist solely of cash collateral required to secure obligations under the Metropolitan Capital Letters of Credit, (c) any deposit account that zero balances no less frequently than once every three (3) Business Days to an account subject to the Lien of Agent and (d) other deposit accounts, amounts on deposit in which do not exceed $100,000 in the aggregate at any one time, provided, however, that the aggregate balance on deposit at any time in all accounts described in clause (a) above shall not exceed 105% of the amount to be applied for the pay period next ending.

"Excluded Taxes" means (a) taxes based upon, or measured by Lender's (or a branch of Lender's) overall net income, overall net receipts, or overall net profits (including franchise taxes imposed in lieu of such taxes), but only to the extent such taxes are imposed by a taxing authority (i) in a jurisdiction in which Lender is organized, (ii) in a jurisdiction which Lender's principal office is located, (iii) in a jurisdiction in which Lender's lending office (or branch), in respect of which payments under this Agreement are made, is located, or (iv) Other Connection Taxes, (b) any U.S. federal withholding taxes imposed under FATCA, and (c) in the case of a Non-US Participant, Taxes that are imposed on amounts payable to such Non-US Participant at the time such Non-US Participant becomes a party hereto (or designates a new lending office (or

branch)), or is attributable to the failure (other than as a result of a change in any law (including the Code), regulation (including any Treasury regulations promulgated pursuant to the Code) or other binding legal or regulatory authority)) by a Non-U.S. Participant to deliver the documentation required to be delivered to Borrower pursuant to Section 7.6(e) hereof (with respect to such Non-U.S. Participant), except to the extent that such Non-US Participant (or its assignor, if any) was entitled, at the time of designation of a new lending office or branch (or assignment), to receive additional amounts from the Loan Parties with respect to such Tax pursuant to Section 7.6 hereof.

"Facilities" means, at any time, the facilities or real properties owned, leased, managed or operated by any Loan Party.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code.

"Fiscal Quarter" means a fiscal quarter of a Fiscal Year.

"Fiscal Year" means the fiscal year of Borrower and its Subsidiaries, which period shall be the 12-month period ending on December 31 of each year.

"FRB" means the Board of Governors of the Federal Reserve System or any successor thereto.

"fully-diluted basis" means, as of any date of determination, the sum of (i) all issued and outstanding Common Stock plus (ii) the number of shares of Common Stock then issuable upon conversion of the Series A Preferred Stock, the Series A-1 Preferred Stock, the Series A-2 Preferred Stock or the Conversion Option plus (iii) the number of shares of Common Stock then issuable upon exercise of any outstanding warrants, options or other instruments convertible or exercisable or exchangeable for Common Stock; provided, however, that for purposes of determining the "fully-diluted basis," shares of Common Stock issuable upon exercise of the Option Agreement shall be excluded.

"GAAP" means generally accepted accounting principles set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the U.S. accounting profession) and the Securities and Exchange Commission, which are applicable to the circumstances as of the date of determination.

"Guarantees" of a Person means any agreement, undertaking or arrangement by which such Person assumes, guarantees, endorses, contingently agrees to purchase or provide funds for the payment of, or otherwise becomes or is contingently liable upon, the Indebtedness of any other Person, or agrees to maintain the net worth or working capital or other financial condition

of any other Person, or otherwise assures any holder of Indebtedness of such other Person against loss in respect of such Indebtedness.

"Guarantor" means each Subsidiary that shall be required to execute and deliver a guaranty pursuant to Section 10.09, or otherwise becomes a party to the Guaranty and Collateral Agreement after the Closing Date.

"Guaranty and Collateral Agreement" means the Guaranty and Collateral Agreement dated as of the date hereof executed and delivered by the Loan Parties, together with any joinders thereto and any other guaranty and collateral agreement executed by a Loan Party, in each case in form and substance satisfactory to Lender.

"Hazardous Substances" means all explosive or radioactive substances, materials or waste and all hazardous waste, hazardous substance, pollutant, contaminant, toxic substance, oil, hazardous material, chemical or other substance regulated by any Environmental Law.

"Hedging Agreement" means any bank underwritten cash and/or derivative financial instrument including, but not limited to, any interest rate, currency or commodity swap agreement, cap agreement, collar agreement, spot foreign exchange, forward foreign exchange, foreign exchange option (or series of options) and any other agreement or arrangement designed to protect a Person against fluctuations in interest rates, currency exchange rates or commodity prices.

"Hedging Obligation" means, with respect to any Person, any liability of such Person under any Hedging Agreement.

"Indemnified Liabilities" is defined in Section 15.16.

"Interest Expense" means for any period the consolidated interest expense of Loan Parties for such period (including all imputed interest on Capital Leases).

"Inventory" is defined in the Guaranty and Collateral Agreement.

"Investment" means, with respect to any Person, any investment in another Person, whether by acquisition of any debt or Capital Security, by making any loan or advance, by becoming obligated with respect to a Contingent Liability in respect of obligations of such other Person (other than travel and similar advances to employees in the ordinary course of business) or by making an Acquisition.

"Joint Liability Payment" is defined in Section 16.6.

"Lender" is defined in the preamble of this Agreement.

"Lender Party" is defined in Section 15.16.

"Lien" means, with respect to any Person, any interest granted by such Person in any real or personal property, asset or other right owned or being purchased or acquired by such Person (including an interest in respect of a Capital Lease) which secures payment or performance of

any obligation and shall include any mortgage, lien, encumbrance, title retention lien, charge or other security interest of any kind, whether arising by contract, as a matter of law, by judicial process or otherwise.

"<u>Loan</u>" or "<u>Loans</u>" means, as the context may require, Term Loans.

"<u>Loan Documents</u>" means this Agreement, the Notes, each Perfection Certificate, the Collateral Documents, the Subordination Agreements and all documents, instruments and agreements delivered in connection with the foregoing.

"<u>Loan Party</u>" means Borrower and each Guarantor.

"<u>Margin Stock</u>" means any "margin stock" as defined in Regulation U.

"<u>Material Adverse Effect</u>" means (a) a material adverse change in, or a material adverse effect upon, the financial condition, operations, assets, business or properties of the Loan Parties taken as a whole, (b) a material impairment of the ability of any Loan Party to perform any of the Obligations under any Loan Document or (c) a material adverse effect upon any substantial portion of the Collateral under the Collateral Documents or upon the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document.

"<u>Material Contract</u>" is defined in Section 9.23.

"<u>Metropolitan Capital Letters of Credit</u>" means the following letters of credit with Metropolitan Capital Bank as the issuing lender:

| LC # | Borrower | Beneficiary | Amount | Maturity Date | Account # |
|------|----------|-------------|--------|---------------|-----------|
| 08-114 | Argo Tea, Inc. | Dep. Of Aviation | $ 28,050.00 | 9/18/2016 | 100067743 |
| 09-105 | Argo Tea, Inc. | Flatiron Leasing Partners, LLC | $ 45,999.78 | 11/5/2016 | 100059823 |
| 09-108 | Argo Tea, Inc. | Central Park South Associates, LLC | $ 38,634.17 | 12/18/2015 | 100060672 |
| 11-101 | Argo Tea, Inc. | 275 Seventh Avenue Building, LLC C/O Unite Here | $ 60,000.00 | 2/15/2016 | 100061860 |
| 14-135 | Argo Tea, Inc. | OAKBROOK SHOPPING CENTER LLC C/O OAKBROOK CENTER | $ 31,250.00 | 7/2/2016 | 100064930 |
| 15-101 | Argo Tea, Inc. | State and Randolph, LLC | $ 20,000.00 | 5/14/2016 | 100062595 |

"<u>Minimum Liquidity</u>" means as of any date, the amount of Qualified Cash at the close of business on such date.

"<u>Mortgage</u>" means a mortgage, deed of trust, leasehold mortgage or similar instrument granting Lender a Lien on real property of any Loan Party.

"<u>Multiemployer Pension Plan</u>" means a multiemployer plan, as defined in Section 4001(a)(3) of ERISA, to which Borrower or any other member of the Controlled Group may have any liability.

"<u>Net Cash Proceeds</u>" means:

a.      with respect to any Asset Disposition, the aggregate cash proceeds (including (A) cash proceeds received pursuant to policies of insurance or by way of

Annex A – Page 10

deferred payment of principal pursuant to a note, installment receivable or otherwise and (B) any such proceeds received by way of a purchase price adjustment receivable or return of funds held in escrow for indemnification obligations or otherwise, but in each case only as and when received) received by any Loan Party pursuant to such Asset Disposition net of (i) the direct costs relating to such sale, transfer or other disposition (including sales commissions and legal, accounting and investment banking fees), (ii) taxes paid or reasonably estimated by Borrower to be payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements) and (iii) amounts required to be applied to the repayment of any Debt secured by a Lien on the asset subject to such Asset Disposition (other than the Loans);

       b.     with respect to any issuance of Capital Securities or receipt of a capital contribution, the aggregate cash proceeds received by Borrower or any other Loan Party pursuant to such issuance or contribution, net of the direct costs relating to such issuance or contribution (including sales and underwriters' commissions); and

       c.     with respect to any issuance of Debt, the aggregate cash proceeds received by any Loan Party pursuant to such issuance, net of the direct costs of such issuance (including up-front, underwriters' and placement fees).

"Non-U.S. Participant" is defined in Section 7.6.

"Note" means a promissory note substantially in the form of Exhibit A.

"Obligations" means all unpaid principal of and accrued and unpaid interest on the Loans, all accrued and unpaid fees and all expenses, reimbursements, indemnities and all other obligations, liabilities and indebtedness (including interest and fees accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) of any of the Loan Parties, individually or collectively, existing on the date hereof or arising thereafter, direct or indirect, joint or several, absolute or contingent, matured or unmatured, liquidated or unliquidated, secured or unsecured, arising by contract, operation of law or otherwise, arising or incurred under this Agreement or any of the other Loan Documents or in respect of any of the Loans made or other obligations incurred in connection therewith.

"Observer" is defined in Section 10.14.

"OFAC" is defined in Section 9.24.

"Option Agreement" means the Option Agreement, dated as of the date hereof, between Argo Tea and the Lender, pursuant to which Argo Tea has granted to the Lender the right to purchase shares of Common Stock, upon the terms and conditions set forth therein.

"Other Connection Taxes" means, with respect to Lender, taxes imposed as a result of a present or former connection between such Person and the jurisdiction imposing such tax (other than connections arising from such Person having executed, delivered or become a party to, performed its obligations under, received payments under, received or perfected a security

interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such taxes that are Other Connection Taxes imposed with respect to an assignment.

"Outstanding" means, when used with reference to Common Stock, at any date as of which the number of shares thereof is to be determined, all issued shares of Common Stock, except shares then owned or held by or for the account of the Company or any Subsidiary, and shall include all shares issuable in respect of outstanding scrip or any certificates representing fractional interests in shares of Common Stock.

"Participant" is defined in Section 15.6.2.

"Patriot Act" is defined in Section 15.15.

"PBGC" means the Pension Benefit Guaranty Corporation and any entity succeeding to any or all of its functions under ERISA.

"Pension Plan" means a "pension plan", as such term is defined in Section 3(2) of ERISA, which is subject to Title IV of ERISA or the minimum funding standards of ERISA (other than a Multiemployer Pension Plan), and as to which Borrower or any member of the Controlled Group may have any liability, including any liability by reason of having been a substantial employer within the meaning of Section 4063 of ERISA at any time during the preceding five years, or by reason of being deemed to be a contributing sponsor under Section 4069 of ERISA.

"Perfection Certificate" means a perfection certificate executed and delivered to Lender by a Loan Party.

"Permitted Lien" means a Lien expressly permitted hereunder pursuant to Section 11.2.

"Person" means any natural person, corporation, partnership, trust, limited liability company, association, governmental authority or unit, or any other entity, whether acting in an individual, fiduciary or other capacity.

"Pre-Opening Costs" means "start-up costs" (such term used herein as defined in SOP 98-5 published by the American Institute of Certified Public Accountants) related to the acquisition, opening and organizing of new cafes, including, without limitation, the costs of feasibility studies, staff training, and recruiting and travel costs for employees engaged in such start-up activities.

"Pre-Option Allowance" is defined in Section 11.5(g).

"Qualified Capital Securities" means, with respect to Borrower, all Capital Securities of Borrower that are not Disqualified Capital Securities.

"Qualified Cash" means as of any date of determination, cash owned by Borrower and its Subsidiaries as of such date (a) that is held in deposit accounts over which Lender has a first priority perfected Lien by virtue of "control" (as defined in the UCC) of such accounts, and (b) that is not subject to any Lien other than a Lien in favor of Lender.

"Real Estate Documents" means, with respect to any real property of Borrower or any Subsidiary, all of the following (except to the extent waived by Lender in its sole discretion): (a) a duly executed Mortgage providing for a first priority perfected Lien (subject to Permitted Liens), in favor of Lender, in all right, title and interest of Borrower or such Subsidiary in such real property; (b) an ALTA Loan Title Insurance Policy, issued by an insurer acceptable to Lender, insuring Lender's first priority Lien (subject to Permitted Liens) on such real property and containing such endorsements as Lender may reasonably require (it being understood that the amount of coverage, exceptions to coverage and status of title set forth in such policy shall be reasonably acceptable to Lender); (c) copies of all documents of record concerning such real property as shown on the commitment for the ALTA Loan Title Insurance Policy referred to above; (d) original or certified copies of all insurance policies required to be maintained with respect to such real property by this Agreement, the applicable Mortgage or any other Loan Document; (e) a survey certified to Lender meeting such standards as Lender may reasonably establish and otherwise reasonably satisfactory to Lender; (f) a flood insurance policy concerning such real property, if required by the Flood Disaster Protection Act of 1973; and (g) an appraisal, prepared by an independent appraiser acceptable to Lender, of such parcel of real property or interest in real property, which appraisal shall satisfy the requirements of the Financial Institutions Reform, Recovery and Enforcement Act, if applicable, and shall evidence compliance with the supervisory loan-to-value limits set forth in the Federal Deposit Insurance Corporation Improvement Act of 1991, if applicable.

"Regulation U" means Regulation U of the FRB.

"Reportable Event" means a reportable event as defined in Section 4043 of ERISA and the regulations issued thereunder as to which the PBGC has not waived the notification requirement of Section 4043(a), or the failure of a Pension Plan to meet the minimum funding standards of Section 412 of the Code (without regard to whether the Pension Plan is a plan described in Section 4021(a)(2) of ERISA) or under Section 302 of ERISA.

"SEC" means the Securities and Exchange Commission or any other governmental authority succeeding to any of the principal functions thereof.

"Senior Officer" means, with respect to any Loan Party, any of the president, the chief executive officer, the chief financial officer or the treasurer of such Loan Party.

"SDN List" is defined in Section 9.24.

"Special Option Expiration Date" means June 8, 2017

"Specified Covenant Period" means the period commencing on the Special Option Expiration Date and ending on the earlier of (i) the Term Loan Maturity Date and (ii) the Conversion Date.

"Subordinated Debt" means any Debt of Borrower and its Subsidiaries which Debt is subject to a Subordination Agreement and has been approved in writing by Lender prior to the incurrence thereof and which Debt has subordination terms, covenants, pricing and other terms which have been approved in writing by Lender.

"Subordination Agreements" means all subordination agreements executed by a holder of Subordinated Debt in favor of Lender from time to time on or after the Closing Date in form and substance and on terms and conditions satisfactory to Lender.

"Subsidiary" means, with respect to any Person, a corporation, partnership, limited liability company or other entity of which such Person owns, directly or indirectly, such number of outstanding Capital Securities as have more than 50% of the ordinary voting power for the election of directors or other managers of such corporation, partnership, limited liability company or other entity. Unless the context otherwise requires, each reference to Subsidiaries herein shall be a reference to Subsidiaries of Argo Tea.

"Taxes" means any and all present and future taxes, duties, levies, imposts, deductions, assessments, charges or withholdings, and any and all liabilities (including interest and penalties and other additions to taxes) with respect to the foregoing, but excluding Excluded Taxes.

"Term Loan Commitment" means Lender's commitment to make Term Loans under this Agreement. The amount of Lender's Term Loan Commitment is $10,000,000.

"Term Loan Maturity Date" means December 8, 2020.

"Term Loans" means the loan(s) made by Lender pursuant to Section 2.1.1.

"Termination Event" means, with respect to a Pension Plan that is subject to Title IV of ERISA, (a) a Reportable Event, (b) the withdrawal of Borrower or any other member of the Controlled Group from such Pension Plan during a plan year in which Borrower or any other member of the Controlled Group was a "substantial employer" as defined in Section 4001(a)(2) of ERISA or was deemed such under Section 4068(f) of ERISA, (c) the termination of such Pension Plan, the filing of a notice of intent to terminate the Pension Plan or the treatment of an amendment of such Pension Plan as a termination under Section 4041 of ERISA, (d) the institution by the PBGC of proceedings to terminate such Pension Plan or (e) any event or condition that might constitute grounds under Section 4042 of ERISA for the termination of, or appointment of a trustee to administer, such Pension Plan.

"Total Plan Liability" means, at any time, the present value of all vested and unvested accrued benefits under all Pension Plans, determined as of the then most recent valuation date for each Pension Plan, using PBGC actuarial assumptions for single employer plan terminations.

"UCC" is defined in the Guaranty and Collateral Agreement.

"Unfunded Liability" means the amount (if any) by which the present value of all vested and unvested accrued benefits under all Pension Plans exceeds the fair market value of all assets allocable to those benefits, all determined as of the then most recent valuation date for each Pension Plan, using PBGC actuarial assumptions for single employer plan terminations.

"Wholly-Owned Subsidiary" means, as to any Person, a Subsidiary all of the Capital Securities of which (except directors' qualifying Capital Securities as required by applicable law) are at the time directly or indirectly owned by such Person and/or another Wholly-Owned Subsidiary of such Person. Unless the context otherwise requires, each reference to Wholly-Owned Subsidiaries shall be a reference to Wholly-Owned Subsidiaries of Borrower.

"Withholding Certificate" is defined in Section 7.6(f).

**ANNEX B**

**ADDRESSES FOR NOTICES**

BORROWER AND BORROWER REPRESENTATIVE:

Argo Tea, Inc.
16 West Randolph Street
Chicago, Illinois 60601
Attn: Arsen Avakian
Telephone: (312) 553-1559
Facsimile: (312) 873-4123

With a mandatory copy to:

Golenbock Eiseman Assor Bell & Peskoe LLP
437 Madison Avenue, 40th Floor
New York, New York 10022
Attention: Alex Kaplun
Telephone: (212) 907-7375
Facsimile: (212) 754-0330

LENDER:

Caribou Coffee Company, Inc.
3900 Lakebreeze Avenue N.,
Minneapolis, Minnesota 55429
Attention: Tim Hennessy, Chief Financial Officer
Telephone: (736) 592-2222
Email: TJHennessy@cariboucoffee.com

With a mandatory copy to:

Caribou Coffee Company, Inc.
3900 Lakebreeze Avenue N.,
Minneapolis, Minnesota 55429
Attention: Mike Peterson, Controller
Telephone: (736) 592-2240
Email: mpeterson@cariboucoffee.com

With a mandatory copy to:

Skadden, Arps, Slate, Meagher & Flom LLP
4 Times Square
New York, New York 10036
Attention: Steven Messina
Telephone: (212) 735-3509
Facsimile: (212) 777-3509
Email: steven.messina@skadden.com

1924780-NYCSR07A - MSW

## EXHIBIT A

## FORM OF CONVERTIBLE TERM LOAN NOTE

December [__, 2015]

$10,000,000                                          New York, New York

The undersigned, for value received, jointly and severally, promise to pay to the order of **CARIBOU COFFEE COMPANY, INC.,** a Minnesota corporation, ("<u>Lender</u>") at its office in Minneapolis, Minnesota the aggregate unpaid amount of all Term Loans made to the undersigned by Lender pursuant to the Credit Agreement referred to below (as shown on the schedule attached hereto (and any continuation thereof) or in the records of Lender), such principal amount to be payable on the dates and in the manner (including, pursuant to a Conversion) set forth in the Credit Agreement.

The undersigned further, jointly and severally, promise to pay interest on the unpaid principal amount of each Term Loan from the date of such Term Loan until such Term Loan is paid in full or otherwise converted in accordance with Section 18.1 of the Credit Agreement (defined below), payable at the rate(s) and at the time(s) set forth in the Credit Agreement. Payments of both principal and interest are to be made in lawful money of the United States of America.

This Term Loan Note (this "<u>Note</u>") evidences indebtedness incurred under, and is subject to the terms and provisions of, the Credit Agreement, dated as of December 8, 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>"; terms not otherwise defined herein are used herein as defined in the Credit Agreement), among the undersigned and Lender, to which Credit Agreement reference is hereby made for a statement of the terms and provisions under which this Note may or must be paid prior to its due date or its due date accelerated.

This Note is made under and governed by the laws of the State of New York applicable to contracts made and to be performed entirely within such State.

*(Signature Page Follows)*

*(Signature Page to Convertible Term Loan Note)*

**BORROWERS:**                                **ARGO TEA, INC**., a Delaware corporation

By: _____
Name: Arsen Avakian
Title:  President

**ARGO TEA RUSH, LLC**, an Illinois
limited liability company

**ARGO TEA STATE/RANDOLPH, LLC**,
an Illinois limited liability company

**ARGO TEA UCH, LLC**, an Illinois limited
liability company

**ARGO TEA BROADWAY, LLC**, an
Illinois limited liability company

**ARGO TEA MARQUETTE, LLC**, an
Illinois limited liability company

**ARGO TEA NW, LLC**, an Illinois limited
liability company

**ARGO TEA FRANKLIN, LLC**, an Illinois
limited liability company

**ARGO TEA MENA, LLC**, a Delaware
limited liability company

By: **ARGO TEA, INC**., Manager for each
of the above listed Borrowers

By: _____
Name: Arsen Avakian
Title:  President

[Signature Page to Convertible Term Loan Note]

**EXHIBIT B**

**<u>FORM OF COMPLIANCE CERTIFICATE</u>**

To:    **CARIBOU COFFEE COMPANY, INC.**, as Lender

Please refer to the Credit Agreement dated as of December 8, 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>"), among **ARGO TEA, INC.**, a Delaware corporation ("<u>Argo Tea</u>"), **ARGO TEA RUSH, LLC**, an Illinois limited liability company, **ARGO TEA STATE/RANDOLPH, LLC**, an Illinois limited liability company, **ARGO TEA UCH, LLC**, an Illinois limited liability company, **ARGO TEA BROADWAY, LLC**, an Illinois limited liability company, **ARGO TEA MARQUETTE, LLC**, an Illinois limited liability company, **ARGO TEA NW, LLC**, an Illinois limited liability company, **ARGO TEA FRANKLIN, LLC**, an Illinois limited liability company, and **ARGO MENA, LLC**, a Delaware limited liability company; and together with each other borrower party from time to time party thereto, individually and collectively, jointly and severally referred to herein as the "<u>Company</u>"), in favor of **CARIBOU COFFEE COMPANY, INC.**, ("<u>Lender</u>"). Terms used but not otherwise defined herein are used herein as defined in the Credit Agreement.

I.    <u>Reports</u>. Enclosed herewith is a copy of the **[annual audited/quarterly]** report of Borrower and its Subsidiaries as at _____, ____ (the "<u>Computation Date</u>"), which report fairly presents in all material respects the financial condition and results of operations **[(subject to the absence of footnotes and to normal year-end adjustments)]** of Borrower and its Subsidiaries as of the Computation Date and has been prepared in accordance with GAAP consistently applied.

II.    <u>Financial Tests</u>. Borrower Representative hereby certifies and warrants that the following is a true and correct computation as at the Computation Date of the following ratios and/or financial restrictions and/or financial calculations contained in the Credit Agreement:

A.    **Section 11.14.1 – Minimum Liquidity**

|  |  |  |
|---|---|---|
| 1. | Amount of Qualified Cash | $ |
| 2. | Minimum Required | $100,000 |
|  | Requirement Satisfied | Yes or No |

B.    **11.14.2 – Capital Expenditures**

|  |  |  |
|---|---|---|
| 1. | Capital Expenditures from January 1, [____] through the last day of the most recently ended Computation Period | $ |

2.      Applicable Amount                                    $ _____

3.      Permitted Unused Cap-Ex Carry-Over                   $ _____
        Amount (e.g. the Applicable Amount for
        the preceding Fiscal Year less actual
        Capital Expenditures from the preceding
        Fiscal Year)

5.      Maximum Permitted Capital Expenditures               $ _____
        (e.g. sum 2 and 3)

        Requirement Satisfied                                Yes or No

C.      **Section 11.14.3 – EBITDA for any Computation Period.**  See calculations on <u>Exhibit A</u> hereto.

Borrower further certifies to you that no Default or Event of Default has occurred and is continuing.

*(Signature Page Follows)*

B-2

*(Signature Page to Compliance Certificate)*

Borrower has caused this Certificate to be executed and delivered by its duly authorized officer on [_____ ___, _____].

**BORROWER REPRESENTATIVE:**          **ARGO TEA, INC.**, a Delaware corporation

By: _____
Name: Arsen Avakian
Title:   President

B-3

**DISCLOSURE SCHEDULE**
**TO**
**CREDIT AGREEMENT**
**AMONG**

**ARGO TEA, INC., ARGO TEA RUSH, LLC, ARGO TEA STATE/RANDOLPH, LLC, ARGO TEA UCH, LLC, ARGO TEA BROADWAY, LLC, ARGO TEA DAVIS, LLC, ARGO TEA MARQUETTE, LLC, ARGO TEA NW, LLC, ARGO TEA FRANKLIN, LLC, AND ARGO MENA, LLC (INDIVIDUALLY AND COLLECTIVELY, JOINTLY AND SEVERALLY), AS BORROWER,**

**AND**

**CARIBOU COFFEE COMPANY, INC., AS LENDER**

**DATED AS OF DECEMBER 8, 2015**

This following disclosure schedules constitute the "Schedules" referred to in the above-referenced Credit Agreement (the "Agreement").  Capitalized terms used herein and not otherwise defined herein have the meanings ascribed to such terms in the Agreement.

Certain matters and items disclosed in the Schedules may not be required to be disclosed herein, but may be disclosed herein for informational purposes only and matters of a similar nature are not necessarily disclosed.  No particular disclosure shall constitute an indication or admission of the materiality thereof or create a standard of disclosure.  Inclusion of any item in the Schedules shall not constitute, or be deemed to be, an admission to any third party concerning such item.  In addition, all descriptions of agreements or other matters appearing in any Schedule are not complete descriptions of agreements and other matters and are qualified by reference to the documents and records referred to thereby.  If a specific date other than the date hereof is referred to herein as the date as of which certain information is supplied, the specific date shall govern.  Headings and subheadings contained in the Schedules are for convenience of reference only and are not intended to define or limit the contents of any Section. Notwithstanding any cross-referencing which may be undertaken in the Schedules, any matter identified in any one or more of the Schedules shall be deemed disclosed for purposes of every other section of the Schedules to which the relevance of such matter is reasonably apparent**.**

2371852.5

**SCHEDULE 9.6**

Litigation and Contingent Liabilities

1. Bear Construction, a former general contractor for the 550 St. Clair, Chicago, IL location has filed suit seeking payment from Argo Tea St. Clair, LLC ("St. Clair") for approximately $79,193.92 in construction costs associated with the initial build out. Argo Tea does not believe St. Clair is responsible for these costs as such construction was part of the landlord's scope of work, and it has asserted a third party action against the landlord, 550 St. Clair Retail, LLC (the "Landlord"). Subsequent to Argo Tea, Inc.'s third party action against the Landlord, the Landlord filed a third party suit against St. Clair for breach of lease claiming approximately $660,000 in damages. The court has entered judgment against St. Clair in the amount of $79,193.92 and together with interest at 10% from August 23, 2010 and the claim against the landlord has not yet been determined. Argo Tea, Inc. believes there is minimal potential for any liability given that Argo Tea, Inc. is not a party or guarantor of the contracts or leases at issue and St. Clair was properly formed and operated as a stand-alone entity (effectively estopping any lawful joinder of Argo Tea, Inc. to the foregoing action).

2. The Company has been threatened by the former landlord at its Clark Street, Chicago, IL location for amounts due under a terminated lease held by Argo Tea Clark, LLC ("Clark"). At this time, no lawsuit has been filed and it is too early to determine whether there is liability and how much liability. There were approximately 14 months remaining under the lease when the property was vacated in the fall of 2010, and the landlord has not previously requested compensation. We also have no information at this time regarding the landlord's effort at mitigation or amounts received from re-letting the property. The amount payable during the remaining term of the lease was $70,850. As of the date hereof, Clark has been dissolved and is no longer a subsidiaries of Argo Tea, Inc. The statute of limitations applicable to this claim is 10 years.

3. Under its lease for the Armitage store, Argo Tea Café, LLC ("Café") had the option to renew for up to ten years in two-year increments. In 2011, Café sent notice extending the lease with a typo, thereby extending the lease until 2015 rather than 2013. Shortly after such notice was sent to the landlord, Café sent notice to the landlord of the typo, which the landlord acknowledged but denied as effective. In 2013 Café vacated the premises. While the landlord has not made any claims that any amounts are due to the landlord under the lease in the year since Café vacated the premises, it is possible that the landlord may attempt to claim that Café owes it rent through 2015. As of the date, hereof, Café has been dissolved and is no longer a subsidiary of Argo Tea, Inc.

4. On August 7, 2015, the Company was served with a lawsuit filed by GGP-Natick West, L.L.C. in Middlesex County, MA., Civil Action No. 1581CV05135B, for Breach of Lease, Breach of Storage License and violation of Massachusetts General Laws, Chapter 93A in connection with the Company's lease dated August 18, 2014, for the premises known as space no. 5562 in the Natick West Shopping Mall, Natick, Middlesex County, MA (the "Lease"). GGP-Natick West, L.L.C. is seeking damages for the remaining term of the Lease and Storage License in the amount of $971,749.20 and $34,705.20 respectively, plus

additional punitive damages under Massachusetts General Laws, Chapter 93A. The Company has just recently (September 25, 2015) filed its answer and counterclaim to the suit seeking reimbursement for its security deposit.

5.  On august 19, 2015, the Company was served with a lawsuit filed by Transplace Texas, LP filed in the United States District Court for the Southern District of Texas, Houston Division, Civil Action No. 4:15-cv-02296 for Breach of Contract in connection with freight brokerage services provided by Transplace Texas, LP in the amount of $206,773.08. The Company's answer is not due until October 19, 2015.

6.  On September 14, 2015, the Company was served with a lawsuit filed by Bridge Over Troubled Waters, Inc. in Suffolk County, MA., Boston Municipal Court Department of the Trial Court for Civil Business Central Division, Civil Action No. 2015-01-CE-41, for possession of the premises commonly known as 147 Tremont Street (47 West Street) in Boston, MA. (the "Premises") in connection with the Company's lease of the Premises dated January 8, 2015 (the "Lease"), and the Company's termination of the Lease dated June 10, 2015. The Company has just recently (September 21, 2015) filed its answer to the possession proceedings. Bridge Over Troubled Waters, Inc. has also demanded payment of the remaining balance of rent due under the Lease in the amount of $1,501,733.10 but has not filed suit for such damages at this time.

3

## SCHEDULE 9.8

### Equity Ownership; Subsidiaries

I. Capitalization of Argo Tea, Inc.

**Argo Tea, Inc.**
**Pro Forma Capitalization Table**

| | Common | | | Current: Stock & Options | | Preferred | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Stock | Options | Warrants | A | A-1 | A-2 | A-2 Warrants | % Preferred | Total Shares | % |
| Mosaix Ventures, LP | 363,980 | | | 43,918,695 | 10,523,532 | 5,456,111 | 303,994 | 42.71% | 60,566,312 | 30.49% |
| Glen Tullman | 4,704,497 | | | 9,958,739 | 1,798,062 | 1,774,235 | 167,563 | 9.72% | 18,403,096 | 9.27% |
| Azadea Properties Limited | | | | 15,959,701 | 2,140,349 | 202,139 | | 12.99% | 18,302,189 | 9.21% |
| Yuri Avagyan & Armenuhi Nersessyan | 10,674,411 | | | 1,214,302 | 221,662 | | | 1.02% | 12,110,375 | 6.10% |
| Avakian Family Insurance Trust | 10,674,411 | | | 1,214,302 | 221,662 | | | 1.02% | 12,110,375 | 6.10% |
| Arsen Avakian | 9,440,141 | | | 1,040,829 | 189,997 | | | 0.87% | 10,670,967 | 5.37% |
| Breakwater Credit Opportunities Fund | | | 3,556,882 | | | | 6,967,317 | 4.94% | 10,524,199 | 5.30% |
| Wanxiang International Investment Corporation | | | | | | 4,807,009 | 379,993 | 3.68% | 5,187,002 | 2.61% |
| Stelac SPV VIIB | | | | 3,071,938 | 862,956 | 932,854 | 88,665 | 3.52% | 4,956,413 | 2.50% |
| Stanley Nitzberg | 350,566 | 305,624 | | 2,888,247 | 118,398 | 874,943 | 50,666 | 2.79% | 4,588,444 | 2.31% |
| 7Wire Ventures LLC - Series Argo | | | | | | 3,806,201 | | 2.70% | 3,806,201 | 1.92% |
| Joe Cugine | | 3,431,141 | | | | | | 0.00% | 3,431,141 | 1.73% |
| Akalka Limited | 43,480 | | | 2,788,402 | | | | 1.98% | 2,831,882 | 1.43% |
| Simon Simonian | 2,126,520 | 114,444 | | 351,587 | | | | 0.25% | 2,592,551 | 1.31% |
| Skydeck Holdings I LLC | | | | | | 1,330,358 | 126,664 | 1.03% | 1,457,022 | 0.73% |
| Shyam Lal | 10,180 | | | 828,716 | 245,063 | 349,002 | 6,333 | 1.01% | 1,439,294 | 0.72% |
| Patricia L. Tullman | | | | 1,328,359 | | | | 0.94% | 1,328,359 | 0.67% |
| J. Laurence Costin Jr. | | | | 717,294 | | 528,145 | 50,666 | 0.92% | 1,296,105 | 0.65% |
| Glenn Kaufman | | | | 878,228 | | | | 0.62% | 878,228 | 0.44% |
| Robert A. Compton | | | | | | 793,842 | 75,999 | 0.62% | 869,841 | 0.44% |
| Boston Equity Group, LLC | | | | | | 792,218 | 75,999 | 0.62% | 868,217 | 0.44% |
| LTHS Revocable Trust | | | | 853,333 | | | | 0.61% | 853,333 | 0.43% |
| Stateline LLC | | | | 847,427 | | | | 0.60% | 847,427 | 0.43% |
| Scott Leisher | 28,916 | | | 464,195 | | 262,990 | 25,333 | 0.53% | 781,434 | 0.39% |
| SZ Investments, LLC | | | | 728,825 | | | | 0.52% | 728,825 | 0.37% |
| Oxford Tea Company, LLC | 40,111 | | | 728,825 | | | | 0.52% | 768,936 | 0.39% |
| Daniel Lindwasser | 236,872 | 60,278 | | 279,255 | | | | 0.20% | 576,405 | 0.29% |
| Robert S Pitts | | | | 512,000 | | | | 0.36% | 512,000 | 0.26% |
| Steve Seidman | 36,145 | | | 474,226 | | | | 0.34% | 510,371 | 0.26% |
| ROBI Investments | 36,145 | | | 422,883 | | | | 0.30% | 459,028 | 0.23% |
| Rick Poulton | | | | | | 400,169 | 37,999 | 0.31% | 438,168 | 0.22% |
| Blair Husain | | | | 342,297 | | | | 0.24% | 342,297 | 0.17% |
| Vardges Avagyan | | | | 327,332 | | | | 0.23% | 327,332 | 0.16% |
| Thomas Weisel Partners Group Inc | | | | 315,246 | | | | 0.22% | 315,246 | 0.16% |
| Rouben Terzian | | 313,114 | | | | | | 0.00% | 313,114 | 0.16% |
| Voob Trust | 18,072 | | | 283,990 | | | | 0.20% | 302,062 | 0.15% |
| Muttduck Trust | 18,072 | | | 283,990 | | | | 0.20% | 302,062 | 0.15% |
| Lee Shapiro | | | | | | 266,779 | 25,333 | 0.21% | 292,112 | 0.15% |
| Laurie McGraw | | | | | | 263,906 | 25,333 | 0.21% | 289,239 | 0.15% |
| VEF IM, LLC | | | | | | 261,407 | 25,333 | 0.20% | 286,740 | 0.14% |
| Dan Madock | | 100,000 | | 13,016 | | | | 0.01% | 113,016 | 0.06% |
| Pooba Trust | | | | 49,785 | | | | 0.04% | 49,785 | 0.03% |
| ESOP Exercised Options | 554,755 | | | | | | | 0.00% | 554,755 | 0.28% |
| ESOP Options Outstanding | | 5,205,279 | | | | | | 0.00% | 5,205,279 | 2.62% |
| ESOP Options Reserve | | 5,226,679 | | | | | | 0.00% | 5,226,679 | 2.63% |
| Phantom Stock Outstanding | | 11,663 | | | | | | 0.00% | 11,663 | 0.01% |
| Caribou Coffee Company | | | | | | | | | | |
| **Total** | 39,357,274 | 14,768,222 | 3,556,882 | 77,126,263 | 30,141,033 | 25,040,518 | 8,635,329 | 100.00% | 198,625,521 | 100.00% |

II.    <u>Capitalization of each other Borrower</u>.

| Owner | Issuer | Pledged Equity Description | Percentage of Issuer |
|---|---|---|---|
| Argo Tea, Inc. | Argo Tea Rush, LLC | Membership Interests | 100% |
| | Argo Tea State/Randolph, LLC | Membership Interests | 100% |
| | Argo Tea UCH, LLC | Membership Interests | 100% |
| | Argo Tea Broadway, LLC | Membership Interests | 100% |
| | Argo Tea Marquette, LLC | Membership Interests | 100% |
| | Argo Tea NW, LLC | Membership Interests | 100% |
| | Argo Tea Franklin, LLC | Membership Interests | 100% |
| | Argo Tea MENA, LLC | Membership Interests | 100% |

III.    Preemptive Rights, Options, Warrants, Other Conversion Rights.

1.    Warrant to purchase Shares of Series A-2 Preferred Stock of Argo Tea, Inc., in favor of the parties set forth in the table above in Item I of this Schedule 9.8.

2.    Warrant to purchase Common Stock in favor of Breakwater Structured Growth Opportunities Fund, LP.

3.    Options issuable from time to time pursuant to the following Argo Tea, Inc. stock plans:

- 2004 Employee Stock Option Plan; and

- 2008 Phantom Stock Plan.

5

**SCHEDULE 9.16**

Insurance

| Policy Type | Insurer | Policy No. | Term | Coverage Limits |
|---|---|---|---|---|
| Commercial Property | Hartford Fire Insurance Company | 37UUNAQ3118 | 09/01/2015– 09/01/2016 | Varies from location to location. From $50,000 to $225,000 for improvements and betterments and $125,000 to $650,000 for business personal property. |
| Additional Property Coverage | Hartford Fire Insurance Company | 37UUNAQ3118 | 09/01/2015– 09/01/2016 | • Blanket Improvements & Betterments / Business Personal Property $7,375,000<br>• Flood $1,000,000 Aggregate<br>• Off Premises Business Personal Property $450,000 |
| Commercial General Liability | Hartford Fire Insurance Company | 37UUNAQ3118 | 09/01/2015– 09/01/2016 | • $2,000,000 General Aggregate<br>• $2,000,000 Products/Completed Operations Aggregate<br>• $1,000,000 Each Occurrence<br>• $1,000,000 Personal and Advertising Injury<br>• $300,000 Fire Damage Legal Liability<br>• $10,000 Medical Expense Limit (Any one person) |
| Business Interruption | Hartford Fire Insurance Company | 37UUNAQ3118 | 09/01/2015– 09/01/2016 | • $3,000,000 limit for special business income insurance per occurrence |
| Commercial Package – Business Automobile | Hartford Fire Insurance Company | 37UUNAQ3118 | 09/01/2015– 09/01/2016 | • $1,000,000 Liability Limit<br>• $1,000,000 Uninsured Motorist<br>• $1,000,000 Underinsured Motorist<br>• $5,000 Auto Medical Payment |
| Workers Compensation Coverage - Statutory | Hartford Insurance Company | 37WEAA9766 | 09/01/2015– 09/01/2016 | • $1,000,000 Each Accident – Bodily Injury by Accident<br>• $1,000,000 Policy Limit – Bodily Injury by Disease<br>• $1,000,000 Each Employee – Bodily Injury by Disease |

6

| Policy Type | Insurer | Policy No. | Term | Coverage Limits |
|---|---|---|---|---|
| Commercial Umbrella | Hartford Insurance Company | 37XHUAQ2396 | 09/01/2015– 09/01/2016 | • $9,000,000 Each Occurrence Limit<br>• $9,000,000 General Aggregate Limit (Other than Products-Completed Operations, Bodily Injury by Disease and Automobile)<br>• $9,000,000 Products – Completed Operations Aggregate Limit<br>• $9,000,000 Bodily Injury by Disease Aggregate Limit<br>• $5,000 Retention |
| Additional Coverages | Hartford Fire Insurance Company | 37UUNAQ3118 | 09/01/2015– 09/01/2016 | • Employee Benefits Liability $2,000,000 aggregate<br>• Data Breach Expenses $25,000 aggregate limit<br>• Good Faith Advertising Services Limit $5,000 aggregate limit<br>• Legal and Forensic Services Limit $5,000 aggregate limit<br>• Data Breach Defense and Liability $50,000 aggregate limit |

7

## SCHEDULE 9.17

### Real Property

| Loan Party | Real Property Location or Place of Business | Lessor | Lessor Address |
|---|---|---|---|
| Argo Tea Rush, LLC | 819 N. Rush Street Chicago, IL 60611 | Loyola University of Chicago N-F-P Corporation | 820 N. Michigan Ave, Suite 13, 60611 |
| Argo Tea State/Randolph, LLC | 14 - 18 W. Randolph Street Chicago, IL 60601 | State/Randolph LLC | Mid-America Asset Mgmt., Inc. One Parkview Plaza 9th Floor Oakbrook Terrace IL 60181 |
| Argo Tea UCH, LLC | UCH - 5758 S. Maryland Ave Chicago, IL 60637 | University of Chicago Hospitals | University of Chicago Hospital 1122 Paysphere Circle Chicago, IL 60612 |
| Argo Tea Broadway, LLC | 3135 N. Broadway Chicago, IL 60657 | Jin An Creative America, Inc. | Jin An Creative America, Inc. 713 Locust Rd. Wilmette, Il 60019 |
| Argo Tea Marquette, LLC | Marquette Building 50-52 W. Adams Street Chicago, IL 60603 | John D. & Catherine T. Macarthur Foundation | c/o L. J. Sheridan & Co. 140 S. Dearborn, Chicago, IL 60603 |
| Argo Tea NW, LLC | 250 E Superior Street Prentice Women's Hospital Chicago, IL 60611 | Northwestern Memorial Hospital | Northwestern Memorial Hospital Property Operations c/o Marilyn R. Kangas 22929 Network Place Chicago, IL 60673-1229 |
| Argo Tea, Inc. | Space #113 Merchandise Mart Chicago, IL 60654 | Merchandise Mart Properties, Inc. | Merchandise Mart L.L.C. 1728 Paysphere Circle Chicago, IL 60674 |
| Argo Tea Franklin LLC | La Quinta Inn 1 South Franklin Chicago, IL 60606 | LQ Acquisition Properties LLC | LQ Chicago L.L.C. 909 Hidden Ridge Suite 600 Irving, TX 75038 Ellison Stollenwerck Riley |
| Argo Tea, Inc. | Willis Tower 233 South Wacker Drive Chicago, IL 60606 | 233 S. Wacker LLC | 233 S. Wacker LLC PO Box 3085 Account No. 2744061249 Hicksville, NY 11802-3085 |
| Argo Tea, Inc. | Terminal 2 Space O'Hare Airport Chicago, IL 60666 | City of Chicago | Office of the Comptroller Enterprise Funds 333 North State Street Chicago, IL |

8

| Loan Party | Real Property Location or Place of Business | Lessor | Lessor Address |
|---|---|---|---|
| Argo Tea, Inc. | Tribune Tower 435 N. Michigan Ave Ste 101A Chicago, IL 60611 | Chicago Tribune Company | Tribune Company Attn: General Counsel/Real Estate 435 N. Michigan Ave. Chicago, IL 60611 Tribune Company c/o MacMunnis |
| Argo Tea, Inc. | Connors Park 871 N. Wabash Ave Chicago, IL 60611 | Chicago Park District | Park Concession Management, L.L.C. 20 North Michigan Ave 2nd Floor Chicago, IL 60602 Attn: Eve Kranz |
| Argo Tea, Inc. | Terminal 3 Space Concourse L O'Hare Airport Chicago, IL 60666 | City of Chicago | Office of the Comptroller Enterprise Funds 333 North State Street Chicago, IL |
| Argo Tea, Inc. | Terminal 3 Space Concourse H O'Hare Airport Chicago, IL 60666 | City of Chicago | Office of the Comptroller Enterprise Funds 333 North State Street Chicago, IL |
| Argo Tea, Inc. | Woodfield Mall 5 Woodfield Mall Schaumburg, IL 60173 | Woodfield Mall LLC | Woodfield Mall, LLC 7409 Solution Center Chicago, IL 60677-7004 |
| Argo Tea, Inc. | Oakbrook Shopping Center 100 Oakbrook Center Oak Brook, IL 60523 | Oakbrook Shopping Center LLC | Oakbrook Shopping Center, LLC SDS-12-2892 PO Box 86 Minneapolis, MN 55486-2892 |
| Argo Tea, Inc. | Flatiron Building 949 Broadway New York, NY 10010 | Flatiron Leasing Partners, LLC | Flatiron Leasing Partners c/o Newmark Knight Frank 125 Park Avenue New York, NY 10017 |
| Argo Tea, Inc. | 530 1st Avenue NYU Langone Medical Center New York, NY 10016 | NYU Hospitals Center | NYU Langone Medical Center 339 East 28th Street New York, NY 10016 |
| Argo Tea, Inc. | 1792 Broadway New York, NY 10019 | Central Park South Associates, LLC | Central Park South Associates, LLC 240 Central Park South c/o Omnispective Management New York, NY 10019 |
| Argo Tea, Inc. | 75 University Place New York, NY 10003 | 23 East 10 Retail LLC | 23 East 10 Retail LLC 290 Park Ave South, 14th Floor c/o TF Cornerstone New York, NY 10010 |
| Argo Tea, Inc. | 275 Seventh Ave New York, NY 10001 | 275 Seventh Avenue Building LLC | 275 Seventh Avenue New York, NY 10001 |

9

| Loan Party | Real Property Location or Place of Business | Lessor | Lessor Address |
|---|---|---|---|
| Argo Tea, Inc. | 750 S. Halstead Rm. 209 and 209A, Chicago, IL 60612 | University of Illinois Office of Capital Programs and Real Estate Services | 506 S. Wright, Room 208, MC 321 Urbana, IL 61801 |

10

## **SCHEDULE 9.21**

Labor Matters

None.

2371852.5

### SCHEDULE 9.23

Default

On May 27, 2015, Breakwater Investment Management, LLC provided notice to the Company that pursuant to the Credit Agreement, dated as of December 18, 2014, among Borrower and Breakwater Credit Opportunities Fund, L.P., ("Breakwater Credit Agreement"), an Event of Default occurred on March 31st, 2015 when the Company breached the twelve month EBITDA covenant for the twelve months ending March 31st, 2015. As result, pursuant to Section 4.1 of the Breakwater Credit Agreement, the applicable interest rate increased from 12% to 17%. However, Breakwater Credit Opportunities Fund, L.P. allowed for this incremental interest to accrue but reserved the right to request this additional interest in cash in the future.

2371852.5

## SCHEDULE 10.11

Post-Closing Obligations

Control Agreements. Promptly following, but in any event not later than sixty (60) days after the Closing Date, Loan Parties shall use their best efforts to deliver to Lender deposit account control agreements and securities account control agreements with respect to each deposit account and securities account of Borrower (other than Excluded Accounts), fully executed by Borrower and Metropolitan Capital Bank.

Stock Certificates/Promissory Notes. No later than 5 Business Days after the Closing Date, the Borrower shall deliver, or cause to be delivered, to the Lender (i) the stock certificates (together with undated instruments of transfer covering such certificates duly executed in blank) as required by the Guaranty and Collateral Agreement and (ii) that certain Promissory Note, dated August 3, 2012, by Stapleton-Spence Packing Company in favor of Argo Tea, Inc., duly indorsed in a manner satisfactory to Lender.

Amendment of Company 2004 Stock Plan. Within thirty (30) days from the Closing Date, evidence in form and substance reasonably acceptable to Lender of an amendment to the Company's 2004 Stock Plan (as amended and restated through the date of this Agreement) (the "Equity Plan"), providing that any all grants of options or stock purchase rights (collectively, "Stock Rights") thereunder will be subject to Lender's "Call Right" under the Sixth Amended and Restated Investors' Rights Agreement, dated as of December 8, 2015, among Lender, the Company and the shareholders of the Company (as may be amended, restated or otherwise modified after the date here (the "IRA").

Investor Rights Agreement. Within thirty (30) days from the Closing Date, a duly executed joinder agreement to the IRA from each existing holder of Stock Rights that is not currently a party to the IRA.

## SCHEDULE 11.1

Existing Debt

1.      The Master Lease Agreement by and between LEAF Capital Funding LLC, and Argo Tea, Inc., dated March 1, 2012 (in which equipment is leased to 16 West Randolph Street, Chicago, IL 60601, with a monthly payment of $631.91).

2.      The Master Lease Agreement by and between LEAF Capital Funding LLC, and Argo Tea, Inc., dated March 1, 2012 (in which equipment is leased to 214 Main Street So., Sark Centre, MN 56378, with a monthly payment of $1955.02).

3.      The Master Lease Agreement by and between LEAF Capital Funding LLC, and Argo Tea, Inc., dated March 1, 2012 (in which equipment is leased to 1900 Hwy 99, Gridley, CA 95948, with a monthly payment of $309.56.)

4.      The Equipment Lease Schedule by and between VAR Resources, Inc. and Argo Tea, Inc., dated June 27, 2012 (monthly payment of $965.48).

5.      The Equipment Lease Schedule no. 2 by and between VAR Resources, Inc. and Argo Tea, Inc., dated August 22, 2012 (monthly payment of $547.33).

6.      Note issued by Argo Tea in favor of Sleeve Seal, LLC in the amount of $164,013.86, dated November 3, 2015.

14

## SCHEDULE 11.2

Existing Liens

Administrative Judgment Lien in favor of the City of Chicago (Case No. 2008-M1-677871) in the amount of $290.00 (and accrued 9% annual interest rate commencing on October 23, 2008).

15

## **SCHEDULE 11.11**

Investments

1.      See Schedule 9.8 – Capitalization.

2.      Promissory Note in the original principal amount of Three Hundred and Fifty Thousand ($350,000), by and between Stapleton-Spence Packing Company and Argo Tea, Inc. dated April 3, 2012.

3.      Certificates of Deposit with Metropolitan Capital Bank and Trust, in the aggregate principal amount of $223,993.95

2371852.5

## SCHEDULE 12.1

Debt to be Repaid

Breakwater Indebtedness

**SCHEDULE 18.2(I)(1)**

Adjustment Events

Each of the items identified below (each, an "<u>Adjustment Event</u>") shall give rise to an adjustment to the Conversion Price pursuant to <u>Schedule 18.2(i)(2)</u>:

1.      In the event that any liability for the company results from Item 1. of Schedule 9.6 (the "<u>St. Clair Litigation</u>", by way of a judgment or settlement, then the amount of such liability shall be included as "Additional Indebtedness" for purposes of calculating the Conversion Price on <u>Schedule 18.2(i)(2)</u>; provided, however, that if the St. Clair Litigation has not been resolved prior to the Conversion Date, an amount equal to fifty percent (50%) of $739,000 shall be included as "Additional Indebtedness" for such purposes.

2.      In the event that any liability for the company results from Item 3. of Schedule 9.6 (the "<u>Natick Litigation</u>", by way of a judgment or settlement, then the amount of such liability shall be included as "Additional Indebtedness" for purposes of calculating the Conversion Price on <u>Schedule 18.2(i)(2)</u>; provided, however, that if the Natick Litigation has not been resolved prior to the Conversion Date, an amount equal to fifty percent (50%) of $1,006,500 shall be included as "Additional Indebtedness" for such purposes.

3.      In the event that any liability for the company results from Item 5. of Schedule 9.6 (the "<u>Tremont Litigation</u>", by way of a judgment or settlement, then the amount of such liability shall be included as "Additional Indebtedness" for purposes of calculating the Conversion Price on <u>Schedule 18.2(i)(2)</u>; provided, however, that if the Tremont Litigation has not been resolved prior to the Conversion Date, an amount equal to fifty percent (50%) of $1,501,733 shall be included as "Additional Indebtedness" for such purposes.

4.      In the event that Argo Tea pays and discharges its obligations related to financial advisor fees to First Beverage Group for less than $450,000, the amount by which $450,000 exceeds the amount actually paid to First Beverage Group to settle such liability shall be reduced from "Additional Indebtedness" for purposes of calculating the Conversion price on Schedule 18.2(i)(2).

B-1

## SCHEDULE 18.2(I)(2)

Calculation of Adjusted Conversion Price

$$\text{Conversion Price} = \frac{\$37,592,734 - \text{Additional Indebtedness}}{202,026,515}$$

# EXHIBIT D

*Execution Version*

**GUARANTY AND COLLATERAL AGREEMENT**

dated as of December 8, 2015

among

**ARGO TEA, INC.**
**ARGO TEA RUSH, LLC**
**ARGO TEA STATE/RANDOLPH, LLC**
**ARGO TEA UCH, LLC**
**ARGO TEA BROADWAY, LLC**
**ARGO TEA MARQUETTE, LLC**
**ARGO TEA NW, LLC**
**ARGO TEA FRANKLIN, LLC**
**ARGO TEA MENA, LLC,**

and

**THE OTHER PARTIES HERETO,**
as Grantors,

and

**CARIBOU COFFEE COMPANY, INC.,**
as Lender

## GUARANTY AND COLLATERAL AGREEMENT

This **GUARANTY AND COLLATERAL AGREEMENT** dated as of December 8, 2015 (this "Agreement"), is entered into among **ARGO TEA, INC.**, a Delaware corporation ("Argo Tea"), **ARGO TEA RUSH, LLC**, an Illinois limited liability company, **ARGO TEA STATE/RANDOLPH, LLC**, an Illinois limited liability company, **ARGO TEA UCH, LLC**, an Illinois limited liability company, **ARGO TEA BROADWAY, LLC**, an Illinois limited liability company, **ARGO TEA MARQUETTE, LLC**, an Illinois limited liability company, **ARGO TEA NW, LLC**, an Illinois limited liability company, **ARGO TEA FRANKLIN, LLC**, an Illinois limited liability company, and **ARGO TEA MENA, LLC,** a Delaware limited liability company (each of the foregoing, together with each other borrower from time to time party to the Credit Agreement, individually and collectively, jointly and severally referred to herein as "Company"; and together with any other Person that becomes a party hereto as provided herein, each a "Grantor" and collectively "Grantors"), in favor of **CARIBOU COFFEE COMPANY, INC.**, a Minnesota corporation, (together with its successors and assigns, "Lender").

Lender has agreed to extend credit to Company pursuant to the Credit Agreement. Each entity comprising Company is affiliated with each other Grantor. The proceeds of credit extended under the Credit Agreement will be used in part to enable Company to make valuable transfers to Grantors in connection with the operation of their respective businesses. Company and the other Grantors are engaged in interrelated businesses, and each Grantor will derive substantial direct and indirect benefit from extensions of credit under the Credit Agreement. It is a condition precedent to Lender's obligation to extend credit under the Credit Agreement that Grantors shall have executed and delivered this Agreement to Lender.

In consideration of the premises and to induce Lender to enter into the Credit Agreement and to induce Lender to extend credit thereunder, each Grantor hereby agrees with Lender, as follows:

SECTION 1.   DEFINITIONS.

1.1    Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement, and the following terms are used herein as defined in the UCC: Account Debtors, Accounts, Certificated Security, Commercial Tort Claims, Deposit Accounts, Documents, Electronic Chattel Paper, Equipment, Farm Products, Goods, Health Care Insurance Receivables, Instruments, Inventory, Leases, Letter-of-Credit Rights, Money, Payment Intangibles, Supporting Obligations, Tangible Chattel Paper.

1.2    When used herein the following terms shall have the following meanings:

"Agreement" has the meaning set forth in the preamble hereto.

"Bankruptcy Code" means Title 11 of the United States Code (11 U.S.C. § 101 et seq.) or any replacement or supplemental federal statute dealing with the bankruptcy of debtors.

"Chattel Paper" means all "chattel paper" as such term is defined in Section 9-102(a)(11) of the UCC and, in any event, including with respect to any Grantor, all Electronic Chattel Paper and Tangible Chattel Paper.

"Collateral" means (a) all of the personal property now owned or at any time hereafter acquired by any Grantor or in which any Grantor now has or at any time in the future may acquire any right, title or interest, including all of each Grantor's Accounts, Chattel Paper, Commercial Tort Claims, Deposit Accounts, Documents, Equipment, Fixtures, General Intangibles, Health Care Insurance Receivables, Farm Products, Goods, Instruments, Intellectual Property, Inventory, Investment Property, Leases, Letter-of-Credit Rights, Money, Supporting Obligations and Identified Claims, (b) all books and records pertaining to any of the foregoing, (c) all Proceeds and products of any of the foregoing, and (d) all collateral security and guaranties given by any Person with respect to any of the foregoing. Where the context requires, terms relating to the Collateral or any part thereof, when used in relation to a Grantor, shall refer to such Grantor's Collateral or the relevant part thereof.

"Company Obligations" means all Obligations of Company.

"Copyrights" means all copyrights arising under the laws of the United States, any other country or any political subdivision thereof, whether registered or unregistered and whether published or unpublished, including those listed on Schedule 5, all registrations and recordings thereof, and all applications in connection therewith, including all registrations, recordings and applications in the United States Copyright Office, and the right to obtain all renewals of any of the foregoing.

"Credit Agreement" means the Credit Agreement of even date herewith between Company and Lender, as amended, supplemented, restated or otherwise modified from time to time.

"Domestic Holding Company" means any Domestic Subsidiary of Argo Tea that is treated as a disregarded entity for U.S. federal income tax purposes and all of its assets (other than de minimis assets) consist of the Equity Interests of one or more CFCs.

"Domestic Subsidiary" means any Subsidiary that is not a Foreign Subsidiary.

"Equity Interest" means shares of capital stock (including common and preferred shares), partnership interests, membership interests in a limited liability company, beneficial interests in a trust, and other equity interests.

"Excluded Collateral" means (a) any "intent-to-use" application for registration of a Trademark filed pursuant to Section 1(b) of the Lanham Act, 15 U.S.C. § 1051, prior to the filing and acceptance of a "Statement of Use" pursuant to Section 1(d) of the Lanham Act or an "Amendment to Allege Use" pursuant to Section 1 (c) of the Lanham Act with respect thereto, solely to the extent, if any, that, during the period, if any, in which, the grant of a security interest would impair the validity or enforceability of any registration that issues from such intent-to-use application under applicable federal law, (b) to the extent entered into in the ordinary course of business in good faith and not in contemplation of circumventing any Grantor's obligations under the Loan Documents, any rights or interests in any license, contract or agreement to which

2

any Grantor is a party to the extent, but only to the extent, that a grant of a security interest therein to Lender, under the terms of such license, contract or agreement, constitute or result in (i) a breach or termination pursuant to the terms of, or a default under, any such license, contract or agreement, or (ii) a violation of applicable law, rule or regulation; provided, that this clause (b) shall not be construed to apply to the extent that any such prohibition or restriction would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the UCC or other applicable law or principles of equity and such prohibition has not been waived or the consent of the other party to such license, contract or agreement has not been obtained; provided further, that (i) immediately upon the ineffectiveness, lapse, waiver, termination or other remedy of any such prohibition, the Collateral shall include, and each Grantor shall be deemed to have granted a security interest in, such license, contract or agreement, as applicable, as of the date hereof as if such prohibition had never been in effect, (ii) notwithstanding any such prohibition, the Collateral shall include all rights incident or appurtenant to any such license, contract or agreement, and the right to receive all proceeds derived from, or in connection with the sale, assignment or transfer of, such license, contract or agreement, including, without limitation, monies due or to become due under any such license, contract or agreement (including any Accounts or other Receivables), and (iii) to the extent severable, Collateral shall include any portion of such license, contract or agreement that does not result in a prohibition or violation. For greater certainty, the Collateral excluded by this definition shall not include any Accounts or any constituent or other organizational documents of any Grantor, (c) voting Equity Interests of any Tax Preferred Subsidiary to the extent that (i) such Equity Interests represent more than 66% of the outstanding voting Equity Interests of such Tax Preferred Subsidiary, and (ii) pledging more than 66% of the total outstanding voting Equity Interests of such Tax Preferred Subsidiary would reasonable be expected to result in a material adverse tax consequence to Borrower, (d) Equipment or other assets that are subject to a security interest securing purchase money indebtedness or a capital lease, in each case, as permitted by the Credit Agreement but only for so long as such equipment or other asset are subject to such security interest and the contract or other agreement in which such security interest is granted (or in the documentation providing for such capital lease) prohibits or requires the consent of any Person as a condition to the creation of any other Lien on such equipment or other asset and such consent has not been obtained and (e) assets subject to certificates of title the perfection of a Lien on which is excluded from the UCC in the relevant jurisdiction.

"Fixtures" means "fixtures" as such term is defined in Section 9-102(a)(41) of the UCC and, in any event, including with respect to any Grantor, all of the following, whether now owned or hereafter acquired by a Grantor: plant fixtures, business fixtures, other fixtures and storage facilities, wherever located; and all additions and accessories thereto and replacements therefor.

"Foreign Subsidiary" means a Person that is (a) not a U.S. Person and (b) a controlled foreign corporation (within the meaning of Section 957(a) of the Code) with respect to which Argo Tea (or any corporation which in addition to Argo Tea is a member of an affiliated group, within the meaning of Sction 1504(a) of the Code, for which a consolidated return is filed pursuant to Section 1501 of the Code) is a United States sharholder within the meaning of Section 951(b) of the Code.

3

"General Intangibles" means all "general intangibles" as such term is defined in Section 9-102(a)(42) of the UCC and, in any event, including with respect to any Grantor, all Payment Intangibles, all contracts, agreements, instruments and indentures in any form, and portions thereof, to which such Grantor is a party or under which such Grantor has any right, title or interest or to which such Grantor or any property of such Grantor is subject, as the same from time to time may be amended, supplemented or otherwise modified, including, without limitation, (a) all rights of such Grantor to receive moneys due and to become due to it thereunder or in connection therewith, (b) all rights of such Grantor to damages arising thereunder and (c) all rights of such Grantor to perform and to exercise all remedies thereunder.

"Guarantor Obligations" means, collectively, with respect to each Guarantor, all Obligations of such Guarantor.

"Guarantors" means the collective reference to each Grantor other than Company.

"Identified Claims" means the Commercial Tort Claims described on Schedule 7 as such schedule shall be supplemented from time to time.

"Indemnified Liabilities" has the meaning set forth in Section 8.3 hereof.

"Intellectual Property" means the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including the Copyrights, the Patents, the Trademarks, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Intellectual Property Licenses" means all written agreements naming any Grantor as licensor on the date hereof, including those listed on Schedule 5, granting any right (a) under any Copyright, including the grant of rights to manufacture, distribute, exploit and sell materials derived from any Copyright, (b) to manufacture, use or sell any invention covered in whole or in part by a Patent, and (c) to use any Trademark.

"Intercompany Note" means any promissory note evidencing loans made by any Grantor to any other Grantor.

"Investment Property" means the collective reference to (a) all "investment property" as such term is defined in Section 9-102(a)(49) of the UCC, (b) all "financial assets" as such term is defined in Section 8-102(a)(9) of the UCC, and (c) whether or not constituting "investment property" as so defined, all Pledged Notes and all Pledged Equity.

"Issuers" means the collective reference to each issuer of any Investment Property. "Lender Party" has the meaning set forth in Section 8.3 hereof.

"Paid in Full" or "Payment in Full" means the termination of the Term Loan Commitment and payment in full in cash and/or pursuant to a Conversion of the Secured Obligations (other than contingent indemnification Obligations not then asserted).

"Patents" means (a) all letters patent of the United States, any other country or any political subdivision thereof, all reissues and extensions thereof and all goodwill associated therewith, including any of the foregoing referred to in Schedule 5, (b) all applications for letters patent of the United States or any other country and all divisions, continuations and continuations-in-part thereof, including any of the foregoing referred to in Schedule 5, and (c) all rights to obtain any reissues or extensions of any of the foregoing.

"Pledged Equity" means the equity interests listed on Schedule 1, together with any other equity interests, certificates, options or rights of any nature whatsoever in respect of the equity interests of any Person that may be issued or granted to, or held by, any Grantor while this Agreement is in effect.

"Pledged Notes" means all promissory notes listed on Schedule 1, all Intercompany Notes at any time issued to any Grantor and all other promissory notes issued to or held by any Grantor.

"Proceeding" means any voluntary or involuntary proceeding commenced by or against any Grantor under any provision of the Bankruptcy Code, or under any other bankruptcy or insolvency law, including assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with its creditors, or proceedings seeking dissolution, receivership, reorganization, arrangement or other similar relief.

"Proceeds" means all "proceeds" as such term is defined in Section 9-102(a)(64) of the UCC and, in any event, shall include all dividends or other income from the Investment Property, collections thereon or distributions or payments with respect thereto.

"Receivable" means any right to payment for goods sold or leased or for services rendered, whether or not such right is evidenced by an Instrument or Chattel Paper and whether or not it has been earned by performance (including any Accounts).

"Secured Obligations" means, collectively, the Company Obligations and the Guarantor Obligations.

"Securities Act" means the Securities Act of 1933, as amended.

"Subordinated Lender Remedies" means any action (a) to take from or for the account of any Grantor by set-off or in any other manner, the whole or any part of any moneys which may now or hereafter be owing by any Grantor with respect to the Subordinated Obligations, (b) to sue for payment of, or to initiate or participate with others in any suit, action or proceeding (including any Proceeding) against any Grantor to (i) enforce payment of or to collect the whole or any part of the Subordinated Obligations or (ii) commence judicial enforcement of any of the rights and remedies with respect to the Subordinated Obligations, (c) to accelerate the Subordinated Obligations, (d) to exercise any put, repurchase or similar option or to cause any Grantor to honor any redemption or mandatory prepayment obligation with respect to any Subordinated Obligations, or (e) to take any action under the provisions of any state or federal law, including the UCC, or under any contract or agreement, to enforce, foreclose upon, take possession of, realize upon or sell any property or assets of any Grantor on account of the Subordinated Obligations.

5

"<u>Subordinated Obligations</u>" means, with respect to each Grantor, all indebtedness, liabilities, and other obligations of any other Grantor owing to such Grantor in respect of any and all loans or advances made by such Grantor to such other Grantor whether now existing or hereafter arising, and whether due or to become due, absolute or contingent, liquidated or unliquidated, determined or undetermined, including all fees and all other amounts payable by any other Grantor to such Grantor under or in connection with any documents or instruments related thereto.

"<u>Tax Preferred Subsidiary</u>" means any Domestic Holding Company and any Foreign Subsidiary.

"<u>Trademarks</u>" means (a) all trademarks, trade names, corporate names, each Grantor's names, business names, fictitious business names, trade styles, service marks, logos and other source or business identifiers, and all goodwill associated therewith, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all applications in connection therewith, whether in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country or any political subdivision thereof, or otherwise, and all common-law rights related thereto, including any of the foregoing referred to in Schedule 5, and (b) the right to obtain all renewals thereof.

"<u>UCC</u>" means the Uniform Commercial Code as in effect on the date hereof <u>and</u> from time to time in the State of New York; <u>provided</u> that if by reason of mandatory provisions of law, the perfection or the effect of perfection or non-perfection of the security interests in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect on or after the date hereof in any other jurisdiction, "UCC" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy.

"<u>U.S. Person</u>" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

SECTION 2.   <u>GUARANTY</u>.

2.1   <u>Guaranty</u>. (a) Each Guarantor hereby, jointly and severally, unconditionally and irrevocably, as a primary obligor and not only as a surety, guarantees to Lender, and its successors, indorsees, transferees and assigns, the prompt and complete payment and performance by Company when due (whether at the stated maturity, by acceleration or otherwise) of the Company Obligations.

(b)   Anything herein or in any other Loan Document to the contrary notwithstanding, the maximum liability of each Guarantor hereunder and under the other Loan Documents shall in no event exceed the amount which can be guaranteed by such Guarantor under applicable federal and state laws relating to the insolvency of debtors (after giving effect to the right of contribution established in <u>Section 2.2</u>).

(c)   Each Guarantor agrees that the Secured Obligations may at any time and from time to time exceed the amount of the liability of such Guarantor hereunder without

impairing the guaranty contained in this <u>Section 2</u> or affecting the rights and remedies of Lender hereunder.

(d)      The guaranty contained in this <u>Section 2</u> shall remain in full force and effect until all of the Secured Obligations shall have been Paid in Full.

(e)      No payment made by Company, any Guarantors, any other guarantor or any other Person or received or collected by Lender from Company, any Guarantors, any other guarantor or any other Person by virtue of any action or proceeding or any set-off or appropriation or application at any time or from time to time in reduction of or in payment of the Secured Obligations shall be deemed to modify, reduce, release or otherwise affect the liability of any Guarantor hereunder which shall, notwithstanding any such payment (other than any payment made by such Guarantor in respect of the Secured Obligations or any payment received or collected from such Guarantor in respect of the Secured Obligations), remain liable for the Secured Obligations up to the maximum liability of such Guarantor hereunder until the Secured Obligations are Paid in Full.

2.2      <u>Right of Contribution</u>. Each Guarantor hereby agrees that to the extent a Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Guarantor shall be entitled to seek and receive contribution from and against any other Guarantor hereunder which has not paid its proportionate share of such payment. Each Guarantor's right of contribution shall be subject to the terms and conditions of <u>Section 2.3</u>. The provisions of this <u>Section 2.2</u> shall in no respect limit the obligations and liabilities of any Guarantor to Lender, and each Guarantor shall remain liable to Lender for the full amount guaranteed by such Guarantor hereunder.

2.3      <u>No Subrogation</u>. Notwithstanding any payment made by any Guarantor hereunder or any set-off or application of funds of any Guarantor by Lender, no Guarantor shall be entitled to be subrogated to any of the rights of Lender against Company or any other Guarantor or any collateral security or guaranty or right of offset held by Lender for the payment of the Secured Obligations, nor shall any Guarantor seek or be entitled to seek any contribution or reimbursement from Company or any other Guarantor in respect of payments made by such Guarantor hereunder, until all of the Secured Obligations are Paid in Full and the Term Loan Commitment is terminated. If any amount shall be paid to any Guarantor on account of such subrogation rights at any time when all of the Secured Obligations shall not have been Paid in Full, such amount shall be held by such Guarantor in trust for Lender, segregated from other funds of such Guarantor, and shall, forthwith upon receipt by such Guarantor, be turned over to Lender in the exact form received by such Guarantor (duly indorsed by such Guarantor to Lender, if required), to be applied against the Secured Obligations, whether matured or unmatured, in such order as Lender may determine.

2.4      <u>Amendments, etc. with Respect to the Secured Obligations</u>. (a) Each Guarantor shall remain obligated hereunder notwithstanding that, without any reservation of rights against any Guarantor and without notice to or further assent by any Guarantor, any demand for payment of any of the Secured Obligations made by Lender may be rescinded by Lender and any of the Secured Obligations continued, and the Secured Obligations, or the liability of any other Person upon or for any part thereof, or any collateral security or guaranty therefor or right of offset with

respect thereto, may, from time to time, in whole or in part, be renewed, extended, amended, modified, accelerated, compromised, waived, surrendered or released by Lender, and the Credit Agreement and the other Loan Documents and any other documents executed and delivered in connection therewith may be amended, modified, supplemented or terminated, in whole or in part, as Lender may deem advisable from time to time. Lender shall not have any obligation to protect, secure, perfect or insure any Lien at any time held by it as security for the Secured Obligations or for the guaranty contained in this <u>Section 2</u> or any property subject thereto.

(b)     Lender may, from time to time, at its sole discretion and without notice to any Guarantor, take any or all of the following actions: (i) retain or obtain a security interest in any property to secure any of the Secured Obligations or any obligation hereunder, (ii) retain or obtain the primary or secondary obligation of any obligor or obligors, in addition to the undersigned, with respect to any of the Secured Obligations, (iii) extend or renew any of the Secured Obligations for one or more periods (whether or not longer than the original period), (iv) alter or exchange any of the Secured Obligations, or release or compromise any obligation of any of the undersigned hereunder or any obligation of any nature of any other obligor with respect to any of the Secured Obligations, (v) release any guaranty or right of offset or its security interest in, or surrender, release or permit any substitution or exchange for, all or any part of any property securing any of the Secured Obligations or any Obligation hereunder, or extend or renew for one or more periods (whether or not longer than the original period) or release, compromise, alter or exchange any obligations of any nature of any obligor with respect to any such property, and (vi) resort to the undersigned (or any of them) for payment of any of the Secured Obligations when due, whether or not Lender shall have resorted to any property securing any of the Secured Obligations or any obligation hereunder or shall have proceeded against any other of the undersigned or any other obligor primarily or secondarily obligated with respect to any of the Secured Obligations.

2.5     <u>Waivers</u>. Each Guarantor waives any and all notice of the creation, renewal, extension or accrual of any of the Secured Obligations and notice of or proof of reliance by Lender upon the guaranty contained in this <u>Section 2</u> or acceptance of the guaranty contained in this <u>Section 2</u>; the Secured Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred, or renewed, extended, amended or waived, in reliance upon the guaranty contained in this <u>Section 2</u>, and all dealings between Company and any Guarantors, on the one hand, and Lender, on the other hand, likewise shall be conclusively presumed to have been had or consummated in reliance upon the guaranty contained in this <u>Section 2</u>. Each Guarantor waives (a) diligence, presentment, protest, demand for payment and notice of default, dishonor or nonpayment and all other notices whatsoever to or upon Company or any Guarantors with respect to the Secured Obligations, (b) notice of the existence or creation or non-payment of all or any of the Secured Obligations and (c) all diligence in collection or protection of or realization upon any Secured Obligations or any security for or guaranty of any Secured Obligations.

2.6     <u>Payments</u>. Each Guarantor hereby guaranties that payments hereunder will be paid to Lender without set-off or counterclaim in United States dollars at the office of Lender specified in the Credit Agreement.

SECTION 3.   <u>GRANT OF SECURITY INTEREST</u>.

3.1   <u>Grant</u>. Each Grantor hereby pledges and grants to Lender a continuing security interest in all of its right, title and interest in and to all Collateral, whether now owned or hereafter acquired, as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the Company Obligations and the Guarantor Obligations. Notwithstanding anything to the contrary contained above, the security interest created by this Agreement shall not extend to, and the term "<u>Collateral</u>" shall not include, any Excluded Collateral, <u>provided</u>, <u>however</u>, that if and when any property shall cease to be Excluded Collateral, a security interest in such property shall be deemed granted therein.

SECTION 4.   <u>REPRESENTATIONS AND WARRANTIES</u>.

To induce Lender to enter into the Credit Agreement and to induce Lender to make its extensions of credit to Company thereunder, each Grantor jointly and severally hereby represents and warrants to Lender that:

4.1   <u>Title; No Other Liens</u>. Except for Permitted Liens, Grantors own each item of the Collateral free and clear of any and all Liens or claims of others. No financing statement or other public notice with respect to all or any part of the Collateral is on file or of record in any public office, except filings evidencing Permitted Liens and filings for which termination statements, properly authorized for filing by the applicable secured party of record have been delivered to Lender.

4.2   <u>Perfected First Priority Liens</u>. The security interests granted pursuant to this Agreement (a) upon (i) completion of the filings specified on <u>Schedule 2</u> (which, in the case of all filings and other documents referred to on <u>Schedule 2</u>, have been delivered to Lender in completed and duly executed form), (ii) in the case any deposit accounts, delivery to Lender of deposit account control agreements in favor of Lender pursuant to which Lender obtains control (within the meaning of the applicable provision of the UCC) with respect to such deposit accounts and (iii) in the case of any Intellectual Property, appropriate filing with the relevant governmental authority, will constitute valid perfected security interests in all of the Collateral in favor of Lender, as collateral security for each Grantor's Obligations, enforceable in accordance with the terms hereof against all creditors of each Grantor and any Persons purporting to purchase any Collateral from each Grantor and (b) are prior to all other Liens on the Collateral in existence on the date hereof except for Permitted Liens for which priority is accorded under applicable law. The filings and other actions specified in clause (a) above constitute all of the filings and other actions necessary to perfect all security interests granted hereunder in the Collateral owned by the Grantors.

4.3   <u>Grantor Information</u>. On the date hereof, <u>Schedule 3</u> sets forth (a) each Grantor's exact legal name and jurisdiction of organization, (b) the location of each Grantor's chief executive office, (c) each Grantor's exact legal name as it appears on its organizational documents and (d) each Grantor's organizational identification number (to the extent a Grantor is organized in a jurisdiction which assigns such numbers) and federal employer identification number.

9

4.4    Collateral Locations. On the date hereof, Schedule 4 sets forth (a) each place of business of each Grantor (including its chief executive office), (b) all locations where all Inventory (other than inventory in transit) with an aggregate fair market value in excess of $150,000, and the Equipment owned by each Grantor is kept and (c) whether each such Collateral location and place of business (including each Grantor's chief executive office) is owned or leased (and if leased, specifies the complete name and notice address of each lessor).

4.5    Certain Property. None of the Collateral constitutes, nor are the Proceeds of, (a) Farm Products, (b) Health Care Insurance Receivables or (c) vessels, aircraft or any other property subject to any certificate of title or other registration statute of the United States, any State or other jurisdiction.

4.6    Investment Property. (a) The Pledged Equity pledged by each Grantor hereunder constitutes, all the issued and outstanding equity interests of each Issuer owned by such Grantor.

(b)    All of the Pledged Equity has been duly and validly issued and is fully paid and nonassessable.

(c)    Each of the Pledged Notes constitutes the legal, valid and binding obligation of the obligor with respect thereto, enforceable in accordance with its terms (subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally, general equitable principles (whether considered in a proceeding in equity or at law) and an implied covenant of good faith and fair dealing).

(d)    On the date hereof, Schedule 1 lists all Investment Property owned by each Grantor. Each Grantor is the record and beneficial owner of, and has good and marketable title to, the Investment Property pledged by it hereunder, free of any and all Liens or options in favor of, or claims of, any other Person, except Permitted Liens.

(e)    The execution, delivery and performance of this Agreement by each Issuer in accordance with its terms will not violate the governing documents of such Issuer or any agreements, instruments or documents to which such Issuer is a party.

4.7    Receivables. (a) No amount representing a payment obligation owing to a Grantor in excess of $150,000 is evidenced by any Instrument or Chattel Paper which has not been delivered to Lender.

(b)    No obligor on any Receivable is a governmental authority.

(c)    The amounts represented by such Grantor to Lender from time to time as owing to such Grantor in respect of the Receivables (to the extent such representations are required by any of the Loan Documents) will at all such times be accurate in all material respects.

4.8    Intellectual Property. (a) Schedule 5 is a true and accurate list of all (i) United States, state and foreign registrations of and applications for Intellectual Property owned by such Grantor in its own name on the date hereof and (ii) Intellectual Property Licenses.

10

(b)     On the date hereof, there are no material Intellectual Property registrations and pending applications for registration of Intellectual Property owned by any Grantor that are invalid, non-subsisting, expired or unenforceable or that have been abandoned or, to such Grantor's knowledge, that infringe the intellectual property rights of any other Person.

(c)     Except as set forth in Schedule 5, and except for non-exclusive licenses of Intellectual Property granted in the ordinary course of business (to the extent constituting a Permitted Lien), none of the Intellectual Property of any Grantor is the subject of any licensing or franchise agreement pursuant to which such Grantor is the licensor or franchisor.

(d)     No holding, decision or judgment has been rendered by any governmental authority against any Grantor which limits, cancels or questions the validity of, or any Grantor's ownership interest in, any material Intellectual Property owned by any Grantor in any respect.

(e)     No action or proceeding is pending, or, to the knowledge of such Grantor, threatened, on the date hereof (i) seeking to limit, cancel or question the validity of, or any Grantor's ownership interest in, any material Intellectual Property owned by any Grantor, or (ii) which, if adversely determined, would adversely affect the value of any material Intellectual Property.

(f)     Each Grantor owns and possesses or has a license or other right to use all Intellectual Property as is necessary for the conduct of the businesses of such Grantor, without any infringement upon Intellectual Property rights of others which could reasonably be expected to have a Material Adverse Effect.

4.9     Depositary and Other Accounts. On the date hereof, all depositary and other accounts maintained by each Grantor are described on Schedule 6 hereto, which description includes for each such account the name of Grantor maintaining such account, the name, address, telephone and fax numbers of the financial institution at which such account is maintained, the account number and the account officer, if any, of such account.

4.10     Reserved.

4.11     Credit Agreement. Each Grantor (other than Company) makes each of the representations and warranties made by Company in Section 9 of the Credit Agreement. Such representations and warranties are incorporated herein by this reference as if fully set forth herein.

SECTION 5.   COVENANTS.

Each Grantor covenants and agrees with Lender that, from and after the date of this Agreement until the Secured Obligations shall have been Paid in Full:

5.1     Delivery of Instruments, Certificated Securities and Chattel Paper. If any amount payable under or in connection with any of the Collateral shall be or become evidenced by any Instrument, Certificated Security or Chattel Paper, in each case where such Collateral (i) prior to the Special Option Expiration Date, individually has a face value in excess of $250,000, or in excess of $500,000 in the aggregate for each such class of Collateral and (ii) after the Special

11

Option Expiration Date, individually has a face value in excess of $100,000, or in excess of $150,000 in the aggregate for each such class of Collateral, such Instrument, Certificated Security or Chattel Paper shall be immediately delivered to Lender, duly indorsed in a manner satisfactory to Lender, to be held as Collateral pursuant to this Agreement, and in the case of Electronic Chattel Paper, the applicable Grantor shall cause Lender to have control thereof within the meaning set forth in Section 9-105 of the UCC.

5.2    Maintenance of Perfected Security Interest; Further Documentation. (a) Such Grantor shall maintain the security interest created by this Agreement as a perfected security interest having at least the priority described in <u>Section 4.2</u> and shall, unless otherwise consented to by Lender, defend such security interest against the claims and demands of all Persons whomsoever.

(b)    Such Grantor will furnish to Lender from time to time statements and schedules further identifying and describing the assets and property of such Grantor and such other reports in connection therewith as Lender may reasonably request from time to time, all in reasonable detail.

(c)    At any time and from time to time, upon the written request of Lender, and at the sole expense of such Grantor, such Grantor will promptly and duly execute and deliver, and have recorded, such further instruments and documents and take such further actions as Lender may reasonably request for the purpose of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted, including (i) filing any financing or continuation statements under the UCC (or other similar laws) in effect in any jurisdiction with respect to the security interests created hereby, (ii) except as otherwise provided in this <u>Section 5</u>, in the case of Investment Property and any other relevant Collateral, taking any actions necessary to enable Lender to obtain "control" (within the meaning of the applicable UCC) with respect thereto and (iii) without limiting the generality of the foregoing, using commercially reasonable efforts to cause each Issuer (other than a Grantor) to execute and deliver to Lender the Acknowledgement signature page to this Agreement. Each Grantor acknowledges and agrees that its signature to this Agreement as a Grantor shall bind it to each and every provision of this Agreement in its capacity as a Grantor and as an Issuer (as applicable).

5.3    <u>Changes in Locations, Name, etc.</u> Such Grantor shall not, except upon thirty (30) days' prior written notice to Lender and delivery to Lender of all additional financing statements and other documents reasonably requested by Lender as to the validity, perfection and priority of the security interests provided for herein (provided that no Collateral Access Agreement shall be required by Lender):

(i)    change its name, jurisdiction of organization or the location of its chief executive office from that specified on <u>Schedule 3</u> or in any subsequent notice delivered pursuant to this <u>Section 5.3</u>; or

(ii)    change its legal identity or corporate structure.

5.4    <u>Notices.</u> Such Grantor will advise Lender promptly, in reasonable detail, of:

12

(a)    any Lien (other than Permitted Liens) on any of the Collateral which would adversely affect the ability of Lender to exercise any of its remedies hereunder; and

(b)    the occurrence of any other event which could reasonably be expected to have a Material Adverse Effect on the aggregate value of the Collateral or on the Liens created hereby.

5.5    <u>Investment Property</u>. (a) If such Grantor shall become entitled to receive or shall receive any certificate, option or rights in respect of the equity interests of any Issuer, whether in addition to, in substitution of, as a conversion of, or in exchange for, any of the Pledged Equity, or otherwise in respect thereof, such Grantor shall accept the same as the agent of Lender, hold the same in trust for Lender and deliver the same forthwith to Lender in the exact form received, duly indorsed by such Grantor to Lender, if required, together with an undated instrument of transfer covering such certificate duly executed in blank by such Grantor and with, if Lender so requests, signature guarantied, to be held by Lender, subject to the terms hereof, as additional Collateral for the Secured Obligations. Upon the occurrence and during the continuance of an Event of Default, (i) unless Lender provides express written notice to the contrary, any sums paid upon or in respect of the Investment Property upon the liquidation or dissolution of any Issuer shall be paid over to Lender to be held by it hereunder as additional Collateral for the Secured Obligations, and (ii) in case any distribution of capital shall be made on or in respect of the Investment Property or any property shall be distributed upon or with respect to the Investment Property pursuant to the recapitalization or reclassification of the capital of any Issuer or pursuant to the reorganization thereof, the property so distributed shall, unless otherwise subject to a perfected Lien in favor of Lender, be delivered to Lender to be held by it hereunder as additional Collateral for the Secured Obligations. Upon the occurrence and during the continuance of an Event of Default, if any sums of money or property so paid or distributed in respect of the Investment Property shall be received by such Grantor, such Grantor shall, until such money or property is paid or delivered to Lender, hold such money or property in trust for Lender, segregated from other funds of such Grantor, as additional Collateral for the Secured Obligations.

(b)    Without the prior written consent of Lender, such Grantor will not (i) vote to enable, or take any other action to permit, any Issuer to issue any equity interests of any nature or to issue any other securities or interests convertible into or granting the right to purchase or exchange for any equity interests of any nature of any Issuer, except, in each case, as permitted by the Credit Agreement, (ii) sell, assign, transfer, exchange, or otherwise dispose of, or grant any option with respect to, the Investment Property or Proceeds thereof (except pursuant to a transaction expressly permitted by the Credit Agreement), (iii) create, incur or permit to exist any Lien or option in favor of, or any claim of any Person with respect to, any of the Investment Property or Proceeds thereof, or any interest therein, except for Permitted Liens, or (iv) enter into or permit to exist any agreement or undertaking, including, without limitation, the governing documents of any Issuer and shareholders' agreements, restricting the right or ability of such Grantor or Lender to sell, assign or transfer any of the Investment Property or Proceeds thereof.

(c)    In the case of each Grantor which is an Issuer, such Issuer agrees that (i) it will be bound by the terms of this Agreement relating to the Investment Property issued by it and will comply with such terms insofar as such terms are applicable to it, (ii) it will notify Lender

promptly in writing of the occurrence of any of the events described in <u>Section 5.5(a)</u> with respect to the Investment Property issued by it, (iii) the terms of <u>Sections 6.3(c)</u> and <u>6.7</u> shall apply to such Issuer with respect to all actions that may be required of it pursuant to <u>Section 6.3(c)</u> or <u>6.7</u> regarding the Investment Property issued by it and (iv) it will not recognize, acknowledge or permit the pledge, transfer, grant of control or other disposition of the Investment Property issued by it (or any portion thereof) other than to or as requested by Lender unless otherwise permitted under the terms of this Agreement or the Credit Agreement.

(d)     With respect to each Subsidiary of a Grantor that is a limited liability company, and which equity interests constitute Collateral, such Grantor shall cause the equity interests of such Subsidiary to be governed by, and to be a "security" within the meaning of, Article 8 (Investment Securities) of the UCC, and no such Subsidiary shall, and no Grantor shall cause any such Subsidiary to, "opt out" of Article 8 of the UCC with respect to such Subsidiary's equity interests.

5.6     <u>Receivables</u>. Upon the occurrence and during the continuance of an Event of Default, other than in the ordinary course of business consistent with its past practice and in amounts which are not material to such Grantor, such Grantor will not (i) grant any extension of the time of payment of any Receivable, (ii) compromise or settle any Receivable for less than the full amount thereof, (iii) release, wholly or partially, any Person liable for the payment of any Receivable, (iv) allow any credit or discount whatsoever on any Receivable or (v) amend, supplement or modify any Receivable in any manner that could adversely affect the value thereof.

5.7     <u>Intellectual Property</u>. (a) Such Grantor (either through itself or its licensees) will (i) continue to use each Trademark material to its business in order to maintain such Trademark in full force free from any claim of abandonment for non-use, (ii) maintain the same (or higher) quality of products and services offered under such Trademark as are currently, or have in the past, been maintained, (iii) use such Trademark with the appropriate notice of registration and all other notices and legends required by applicable law to maintain such Trademark, (iv) not adopt or use any mark which is confusingly similar or a colorable imitation of such Trademark unless Lender shall obtain a perfected security interest in such mark pursuant to this Agreement, and (v) not (and not permit any licensee or sublicensee thereof to) do any act or knowingly omit to do any act whereby such Trademark may become invalidated or impaired in any way.

(b)     Such Grantor (either itself or through licensees) will not do any act, or omit to do any act, whereby any Patent material to its business may become forfeited, abandoned or dedicated to the public.

(c)     Such Grantor (either itself or through licensees) (i) will employ each Copyright material to its business and (ii) will not (and will not permit any licensee or sublicensee thereof to) do any act or knowingly omit to do any act whereby any material portion of such Copyrights may become invalidated or otherwise impaired. Such Grantor will not (either itself or through licensees) do any act whereby any material portion of such Copyrights may fall into the public domain.

14

(d)     Such Grantor (either itself or through licensees) will not do any act that knowingly uses any Intellectual Property material to its business to infringe the intellectual property rights of any other Person.

(e)     Such Grantor will notify Lender promptly (and in any event within 5 days) if it knows that any application or registration relating to any material Intellectual Property has or is reasonably likely to become forfeited, abandoned or dedicated to the public, or of any adverse determination or development (including the institution of, or any such determination or development in, any proceeding in the United States Patent and Trademark Office, the United States Copyright Office or any court or tribunal in any country) regarding such Grantor's ownership of, or the validity of, any material Intellectual Property or such Grantor's right to register the same or to own and maintain the same.

(f)     Whenever such Grantor, either by itself or through any agent, employee, licensee or designee, shall file an application for the registration of any Intellectual Property with the United States Patent and Trademark Office, the United States Copyright Office or any similar office or agency in any other country or any political subdivision thereof, such Grantor shall report such filing to Lender concurrently with the next delivery of financial statements of Company pursuant to Section 10.1 of the Credit Agreement. Upon the request of Lender, such Grantor shall execute and deliver, and have recorded, any and all agreements, instruments, documents and papers as Lender may request to evidence Lender's security interest in any Copyright, Patent or Trademark and the goodwill and general intangibles of such Grantor relating thereto or represented thereby.

(g)     Such Grantor will take all commercially reasonable and necessary steps to maintain and pursue each application (and to obtain the relevant registration) and to maintain each registration of all material Intellectual Property owned by it.

(h)     In the event that any material Intellectual Property is infringed upon or misappropriated or diluted by a third party, such Grantor shall (i) take such actions as such Grantor shall reasonably deem appropriate under the circumstances to protect such Intellectual Property and (ii) if such Intellectual Property is of material economic value, promptly notify Lender after it learns thereof and, to the extent, in its reasonable judgment, such Grantor determines it appropriate under the circumstances, sue for infringement, misappropriation or dilution, to seek injunctive relief where appropriate and to recover any and all damages for such infringement, misappropriation or dilution.

5.8     Depositary and Other Deposit Accounts. Subject to Section 10.10 of the Credit Agreement, no Grantor shall open or maintain any depositary or other deposit accounts unless such accounts are subject to a deposit account control agreement in favor of Lender in form and substance reasonably acceptable to Lender. Grantors shall deliver to Lender a revised version of Schedule 6 showing any changes thereto within five (5) days of any such change (or, if later, together with the next delivery of a Compliance Certificate pursuant to Section 10.1.3). Each Grantor hereby authorizes the financial institutions at which such Grantor maintains a deposit account to provide Lender with such information with respect to such deposit account as Lender may from time to time reasonably request, and each Grantor hereby consents to such information being provided to Lender. Subject to Section 10.10 of the Credit Agreement, each Grantor will,

15

upon Lender's request, cause each financial institution at which such Grantor maintains a depositary or other deposit account not constituting an Excluded Account to enter into a bank agency or other similar agreement with Lender and such Grantor, in form and substance satisfactory to Lender, in order to give Lender "control" (as defined in the UCC) of such account.

5.9    <u>Other Matters</u>. (a) Each Grantor authorizes Lender to, at any time and from time to time, file financing statements, continuation statements, and amendments thereto that describe the Collateral as "all assets, whether now owned or hereafter acquired" of each Grantor, or words of similar effect, and which contain any other information required pursuant to the UCC for the sufficiency of filing office acceptance of any financing statement, continuation statement, or amendment, and each Grantor agrees to furnish any such information to Lender promptly upon request. Any such financing statement, continuation statement, or amendment may be signed by Lender on behalf of any Grantor and may be filed at any time in any jurisdiction.

(b)    Each Grantor shall, at any time and from time and to time, take such steps as Lender may reasonably request (i) during the continuance of an Event of Default, to obtain an acknowledgement, in form and substance reasonably satisfactory to Lender, of any bailee having possession of any of the Collateral, stating that the bailee holds such Collateral for Lender, (ii) subject to <u>Section 5.1</u>, to obtain "control" of any letter-of-credit rights, or electronic chattel paper (as such terms are defined by the UCC with corresponding provisions thereof defining what constitutes "control" for such items of Collateral), with any agreements establishing control to be in form and substance reasonably satisfactory to Lender, and (ii) subject to the other provisions of this <u>Section 5</u>, to otherwise to insure the continued perfection and priority of Lender's security interest in any of the Collateral and of the preservation of its rights therein. If any Grantor shall at any time acquire a "commercial tort claim" (as such term is defined in the UCC), such Grantor shall promptly notify Lender thereof in writing and supplement <u>Schedule 7</u>, therein providing a reasonable description and summary thereof, and upon delivery thereof to Lender, such Grantor shall be deemed to thereby grant to Lender (and such Grantor hereby grants to Lender) a security interest and lien in and to such commercial tort claim and all proceeds thereof, all upon the terms of and governed by this Agreement.

(c)    Without limiting the generality of the foregoing, if any Grantor at any time holds or acquires an interest in any electronic chattel paper or any "transferable record", as that term is defined in Section 201 of the federal Electronic Signatures in Global and National Commerce Act, or in § 16 of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction, in each case where such Collateral individually has a face value in excess of $100,000, or in excess of $150,000 in the aggregate, such Grantor shall promptly notify Lender thereof and, at the request of Lender, shall take such action as Lender may reasonably request to vest in Lender "control" under Section 9-105 of the UCC of such electronic chattel paper or control under Section 201 of the federal Electronic Signatures in Global and National Commerce Act or, as the case may be, § 16 of the Uniform Electronic Transactions Act, as so in effect in such jurisdiction, of such transferable record.

5.10    <u>Reserved</u>.

5.11   Credit Agreement. Each Grantor covenants that it will, and, if necessary, will cause or enable Company to, fully comply with each of the covenants and other agreements set forth in the Credit Agreement.

SECTION 6.   REMEDIAL PROVISIONS.

6.1   Certain Matters Relating to Receivables. (a) At any time and from time to time after the occurrence and during the continuance of an Event of Default, Lender shall have the right to make test verifications of the Receivables in any manner and through any medium that it reasonably considers advisable, and each Grantor shall furnish all such assistance and information as Lender may require in connection with such test verifications. At any time and from time to time after the occurrence and during the continuance of an Event of Default, upon Lender's request and at the expense of the relevant Grantor, such Grantor shall cause independent public accountants or others satisfactory to Lender to furnish to Lender reports showing reconciliations, agings and test verifications of, and trial balances for, the Receivables.

(b)   Lender hereby authorizes each Grantor to collect such Grantor's Receivables, and Lender may curtail or terminate such authority at any time after the occurrence and during the continuance of an Event of Default. If required by Lender at any time after the occurrence and during the continuance of an Event of Default, any payments of Receivables, when collected by any Grantor, (i) shall be forthwith (and, in any event, within two (2) Business Days) deposited by such Grantor in the exact form received, duly indorsed by such Grantor to Lender if required, in a collateral account maintained under the sole dominion and control of Lender, subject to withdrawal by Lender only as provided in Section 6.5, and (ii) until so turned over, shall be held by such Grantor in trust for Lender, segregated from other funds of such Grantor. Each such deposit of Proceeds of Receivables shall, if requested by Lender, be accompanied by a report identifying in reasonable detail the nature and source of the payments included in the deposit.

(c)   At any time and from time to time after the occurrence and during the continuance of an Event of Default, at Lender's request, each Grantor shall deliver to Lender all original and other documents evidencing, and relating to, the agreements and transactions which gave rise to the Receivables, including all original orders, invoices and shipping receipts.

6.2   Communications with Obligors; Grantors Remain Liable. (a) Lender in its own name or in the name of others may at any time after the occurrence and during the continuance of an Event of Default communicate with obligors on the Receivables to verify with them to Lender's satisfaction the existence, amount and terms of any Receivables.

(b)   Upon the request of Lender at any time after the occurrence and during the continuance of an Event of Default, each Grantor shall notify obligors on the Receivables that the Receivables have been assigned to Lender for the ratable benefit of Lender and that payments in respect thereof shall be made directly to Lender.

(c)   Anything herein to the contrary notwithstanding, each Grantor shall remain liable in respect of each of the Receivables to observe and perform all the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of

any agreement giving rise thereto. Lender shall not have any obligation or liability under any Receivable (or any agreement giving rise thereto) by reason of or arising out of this Agreement or the receipt by Lender of any payment relating thereto, nor shall Lender be obligated in any manner to perform any of the obligations of any Grantor under or pursuant to any Receivable (or any agreement giving rise thereto), to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party thereunder, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

(d)     For the purpose of enabling Lender to exercise rights and remedies under this Agreement, each Grantor hereby grants to Lender after the occurrence of and during the continuance of an Event of Default an irrevocable, nonexclusive license (exercisable without payment of royalty or other compensation to such Grantor) to use, license or sublicense any Intellectual Property now owned or hereafter acquired by such Grantor, and wherever the same may be located, and including in such license access to all media in which any of the licensed items may be recorded or stored and to all computer software and programs used for the compilation or printout thereof. At any time after the occurrence and during the continuance of an Event of Default, Lender may refuse to allow Grantor to, and at its sole discretion Lender may, exercise quality control over the products and services offered under the applicable Trademark to prevent invalidation or abandonment of such Trademark.

6.3   <u>Investment Property</u>. (a) Unless an Event of Default shall have occurred and be continuing each Grantor shall be permitted to receive all cash dividends and distributions paid in respect of the Pledged Equity and all payments made in respect of the Pledged Notes, to the extent permitted in the Credit Agreement, and to exercise all voting and other rights with respect to the Investment Property; <u>provided</u>, that no vote shall be cast or other right exercised or action taken which could impair the Collateral or which would be inconsistent with or result in any violation of any provision of the Credit Agreement, this Agreement or any other Loan Document.

(b)     If an Event of Default shall occur and be continuing (i) Lender shall have the right to receive any and all cash dividends and distributions, payments or other Proceeds paid in respect of the Investment Property and make application thereof to the Obligations in such order as Lender may determine, (ii) Lender shall have the right to cause any or all of the Investment Property to be registered in the name of Lender or its nominee, and (iii) Lender or its nominee may exercise (x) all voting and other rights pertaining to such Investment Property at any meeting of holders of the equity interests of the relevant Issuer or Issuers or otherwise (or by written consent) and (y) any and all rights of conversion, exchange and subscription and any other rights, privileges or options pertaining to such Investment Property as if it were the absolute owner thereof (including the right to exchange at its discretion any and all of the Investment Property upon the merger, consolidation, reorganization, recapitalization or other fundamental change in the corporate or other structure of any Issuer, or upon the exercise by any Grantor or Lender of any right, privilege or option pertaining to such Investment Property, and in connection therewith, the right to deposit and deliver any and all of the Investment Property with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as Lender may determine), all without liability except to account for property

18

actually received by it, but Lender shall have no duty to any Grantor to exercise any such right, privilege or option and shall not be responsible for any failure to do so or delay in so doing.

(c)     Each Grantor hereby authorizes and instructs each Issuer of any Investment Property pledged by such Grantor hereunder to, and each such Issuer hereby agrees to immediately, comply with any instruction received by such Issuer from Lender in writing that (x) states that an Event of Default has occurred and is continuing and (y) is otherwise in accordance with the terms of this Agreement, without any other or further instructions or consent of such Grantor, including without limitation, instructions as to the transfer of other disposition of such Investment Property, to pay and remit to Lender or its nominee all dividends, distributions and other amounts payable to such Grantor in respect of such Investment Property (upon redemption of such Investment Property, dissolution of such Issuer or otherwise), and to transfer to, and register such Investment Property in the name of, Lender or its nominee or transferee. Each Grantor agrees that each Issuer shall be fully protected in so complying with such instructions.

6.4     Proceeds to be Turned Over to Lender. In addition to the rights of Lender specified in Section 6.1 with respect to payments of Receivables, if an Event of Default shall occur and be continuing, all Proceeds received by any Grantor consisting of cash, checks and other cash equivalent items shall be held by such Grantor in trust for Lender, segregated from other funds of such Grantor, and shall (unless Lender provides express written notice to the contrary), forthwith upon receipt by such Grantor, be turned over to Lender in the exact form received by such Grantor (duly indorsed by such Grantor to Lender, if required). All Proceeds received by Lender hereunder shall be held by Lender in a collateral account maintained under its sole dominion and control. Such Proceeds, while held by Lender in any collateral account (or by such Grantor in trust for Lender) established pursuant hereto, shall continue to be held as collateral security for the Secured Obligations and shall not constitute payment thereof until applied as provided in Section 6.5.

6.5     Application of Proceeds. If an Event of Default shall have occurred and be continuing, at any time at Lender's election, Lender may apply all or any part of Proceeds from the sale of, or other realization upon, all or any part of the Collateral in payment of the Secured Obligations in such order as Lender shall determine in its sole discretion. Any balance of such Proceeds remaining after the Secured Obligations shall have been Paid in Full shall be paid over to the applicable Grantor or to whomsoever may be lawfully entitled to receive the same.

6.6     Code and Other Remedies. If an Event of Default shall occur and be continuing, Lender may exercise, in addition to all other rights and remedies granted to it in this Agreement and in any other instrument or agreement securing, evidencing or relating to the Secured Obligations, all rights and remedies of a secured party under the UCC or any other applicable law. Without limiting the generality of the foregoing, Lender, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon any Grantor or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived), may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and/or may forthwith sell, lease, assign, give options to purchase, or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or

19

more parcels at public or private sale or sales, at any exchange, broker's board or office of Lender or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery with assumption of any credit risk. Lender shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption in any Grantor, which right or equity is hereby waived and released. Each Grantor further agrees, at Lender's request in connection with its exercise of the foregoing rights, to assemble the Collateral and make it available to Lender at places which Lender shall reasonably select, whether at such Grantor's premises or elsewhere. Lender shall apply the net proceeds of any action taken by it pursuant to this Section 6.6, after deducting all reasonable costs and expenses of every kind incurred in connection therewith or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of Lender hereunder, including Attorney Costs, to the payment in whole or in part of the Secured Obligations, in such order as Lender may elect, and only after such application and after the payment by Lender of any other amount required by any provision of law, to any Grantor. To the extent permitted by applicable law, each Grantor waives all claims, damages and demands it may acquire against Lender arising out of the exercise by it of any rights hereunder. If any notice of a proposed sale or other disposition of Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least ten (10) days before such sale or other disposition.

Private Sales. (a) Each Grantor recognizes that Lender may be unable to effect a public sale of any or all the Pledged Equity, by reason of certain prohibitions contained in the Securities Act and applicable state securities laws or otherwise, and may be compelled to resort to one or more private sales thereof to a restricted group of purchasers which will be obliged to agree, among other things, to acquire such securities for their own account for investment and not with a view to the distribution or resale thereof. Each Grantor acknowledges and agrees that any such private sale may result in prices and other terms that are less favorable than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner. Lender shall be under no obligation to delay a sale of any of the Pledged Equity for the period of time necessary to permit the Issuer thereof to register such securities or other interests for public sale under the Securities Act, or under applicable state securities laws, even if such Issuer would agree to do so..

(b)     Each Grantor agrees to use its best efforts to do or cause to be done all such other acts as may be necessary to make such sale or sales of all or any portion of the Pledged Equity pursuant to this Section 6.7 valid and binding and in compliance with applicable law. Each Grantor further agrees that a breach of any of the covenants contained in this Section 6.7 will cause irreparable injury to Lender, that Lender has no adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained in this Section 6.7 shall be specifically enforceable against such Grantor, and such Grantor hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants except for a defense that no Event of Default has occurred under the Credit Agreement.

6.8     Waiver; Deficiency. Each Grantor waives and agrees not to assert any rights or privileges which it may acquire under Section 9-626 of the UCC. Each Grantor shall remain liable for any deficiency if the proceeds of any sale or other disposition of the Collateral are

insufficient to pay the Secured Obligations in full and the fees and disbursements of any attorneys employed by Lender to collect such deficiency.

SECTION 7. <u>LENDER</u>.

7.1 <u>Lender's Appointment as Attorney-in-Fact; Irrevocable Proxy, etc.</u> (a) Each Grantor hereby irrevocably constitutes and appoints Lender and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Grantor and in the name of such Grantor or in its own name, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this Agreement, and, without limiting the generality of the foregoing, each Grantor hereby gives Lender the power and right, on behalf of and at the expense of such Grantor, without notice to or assent by such Grantor, to do any or all of the following:

(i) in the name of such Grantor or its own name, or otherwise, take possession of and indorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due under any Receivable or with respect to any other Collateral and file any claim or take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by Lender for the purpose of collecting any and all such moneys due under any Receivable or with respect to any other Collateral whenever payable;

(ii) in the case of any Intellectual Property, execute and deliver, and have recorded, any and all agreements, instruments, documents and papers as Lender may request to evidence Lender's security interest in such Intellectual Property and the goodwill and general intangibles of such Grantor relating thereto or represented thereby;

(iii) discharge Liens levied or placed on or threatened against the Collateral, and effect any repairs or insurance called for by the terms of this Agreement and pay all or any part of the premiums therefor and the costs thereof;

(iv) execute, in connection with any sale provided for in <u>Section 6.6</u> or <u>6.7</u>, any indorsements, assignments or other instruments of conveyance or transfer with respect to the Collateral; and

(v) (1) direct any party liable for any payment under any of the Collateral to make payment of any and all moneys due or to become due thereunder directly to Lender or as Lender shall direct; (2) ask or demand for, collect, and receive payment of and receipt for, any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Collateral; (3) sign and indorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications, notices and other documents in connection with any of the Collateral; (4) commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Collateral or any portion thereof and to enforce any other right in respect of any Collateral; (5) defend any

21

suit, action or proceeding brought against such Grantor with respect to any Collateral; (6) settle, compromise or adjust any such suit, action or proceeding and, in connection therewith, give such discharges or releases as Lender may deem appropriate; (7) assign any Copyright, Patent or Trademark throughout the world for such term or terms, on such conditions, and in such manner, as Lender shall in its sole discretion determine; (8) vote any right or interest with respect to any Investment Property; (9) order good standing certificates and conduct lien searches in respect of such jurisdictions or offices as Lender may deem appropriate; and (10) generally sell, transfer, pledge and make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though Lender were the absolute owner thereof for all purposes, and do, at Lender's option and such Grantor's expense, at any time, or from time to time, all acts and things which Lender deems necessary to protect, preserve or realize upon the Collateral and Lender's security interests therein and to effect the intent of this Agreement, all as fully and effectively as such Grantor might do.

Until the Secured Obligations have been Paid in Full, each Grantor hereby irrevocably designates and appoints Lender as its true and lawful proxy, with full power of substitution, for and in its name, place and stead to vote any and all Investment Property owned or held by such Grantor or standing in its name, and do all things which any Grantor might do if present and acting itself. Once exercised by Lender, the right to vote granted pursuant to this proxy shall be exclusive to Lender, and no Grantor shall thereafter be entitled to exercise any right to vote in respect of any Investment Property. THE PROXY AND POWERS GRANTED BY GRANTORS PURSUANT HERETO ARE IRREVOCABLE AND COUPLED WITH AN INTEREST (INCLUDING BUT NOT LIMITED TO THE CREDIT AGREEMENT AND THIS AGREEMENT) AND ARE GIVEN TO SECURE THE SECURED OBLIGATIONS.

Anything in this Section 7.1(a) to the contrary notwithstanding, Lender agrees that it will not exercise any rights under the power of attorney or the irrevocable proxy provided for in this Section 7.1(a) unless an Event of Default shall have occurred and be continuing.

(b)     When an Event of Default has occurred and is continuing, if any Grantor fails to perform or comply with any of its agreements contained herein, Lender, at its option, but without any obligation so to do, may perform or comply, or otherwise cause performance or compliance, with such agreement.

(c)     Each Grantor hereby ratifies all that such attorneys shall lawfully do or cause to be done by virtue hereof. All powers, proxies, authorizations and agencies contained in this Agreement are coupled with an interest and are given to secure the Secured Obligations and are irrevocable until this Agreement is terminated and the security interests created hereby are released.

7.2     Duty of Lender. Lender's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession shall be to deal with it in the same manner as Lender deals with similar property for its own account. Neither Lender nor any of its respective officers, directors, employees or agents shall be liable for any failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of any Grantor or any

other Person or to take any other action whatsoever with regard to the Collateral or any part thereof. The powers conferred on Lender hereunder are solely to protect Lender's interests in the Collateral and shall not impose any duty upon Lender to exercise any such powers. Lender shall be accountable only for amounts that it actually receives as a result of the exercise of such powers, and neither it nor any of its officers, directors, employees or agents shall be responsible to any Grantor for any act or failure to act hereunder.

7.3    Reserved.

SECTION 8.    MISCELLANEOUS.

8.1    Amendments in Writing. None of the terms or provisions of this Agreement may be waived, amended, supplemented or otherwise modified except in accordance with Section 15.1 of the Credit Agreement.

8.2    Notices. All notices, requests and demands to or upon Lender or any Grantor hereunder shall be addressed to Company and effected in the manner provided for in Section 15.3 of the Credit Agreement, and each Grantor hereby appoints Company as its agent to receive notices hereunder.

8.3    Indemnification by Grantors. Section 15.16 of the Credit Agreement is hereby incorporated by reference, having the same effect as if such provisions were expressly set forth herein.

8.4    Enforcement Expenses. (a) Each Grantor agrees, on a joint and several basis, to pay or reimburse on demand Lender for all reasonable out-of-pocket costs and expenses (including Attorney Costs) incurred in collecting against any Guarantor under the guaranty contained in Section 2 or otherwise enforcing or preserving any rights under this Agreement and the other Loan Documents.

(b)    Each Grantor agrees to pay, and to save Lender harmless from, any and all liabilities with respect to, or resulting from any delay in paying, any and all stamp, excise, sales or other taxes which may be payable or determined to be payable with respect to any of the Collateral or in connection with any of the transactions contemplated by this Agreement.

(c)    The agreements in this Section 8.4 shall survive repayment of all (and shall be) Secured Obligations (and termination of the Commitments), any foreclosure under, or any modification, release or discharge of, any or all of the Collateral Documents and termination of this Agreement.

8.5    Captions. Section captions used in this Agreement are for convenience only and shall not affect the construction of this Agreement.

8.6    Nature of Remedies. All Secured Obligations of each Grantor and rights of Lender expressed herein or in any other Loan Document shall be in addition to and not in limitation of those provided by applicable law. No failure to exercise and no delay in exercising, on the part of Lender, any right, remedy, power or privilege hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege

23

hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

8.7 <u>Counterparts</u>. This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute but one and the same Agreement. Receipt of an executed signature page to this Agreement by facsimile or other electronic transmission shall constitute effective delivery thereof and shall be deemed an original signature hereunder.

8.8 <u>Severability</u>. The illegality or unenforceability of any provision of this Agreement or any instrument or agreement required hereunder shall not in any way affect or impair the legality or enforceability of the remaining provisions of this Agreement or any instrument or agreement required hereunder.

8.9 <u>Entire Agreement</u>. This Agreement, together with the other Loan Documents, embodies the entire agreement and understanding among the parties hereto and supersedes all prior or contemporaneous agreements and understandings of such Persons, verbal or written, relating to the subject matter hereof and thereof and any prior arrangements made with respect to the payment by any Grantor of (or any indemnification for) any fees, costs or expenses payable to or incurred (or to be incurred) by or on behalf of Lender.

8.10 <u>Successors; Assigns</u>. This Agreement shall be binding upon Grantors and Lender and their respective successors and assigns, and shall inure to the benefit of Grantors, Lender and the successors and assigns of Lender. No other Person shall be a direct or indirect legal beneficiary of, or have any direct or indirect cause of action or claim in connection with, this Agreement or any of the other Loan Documents. No Grantor may assign or transfer any of its rights or Obligations under this Agreement without the prior written consent of Lender.

8.11 <u>Governing Law</u>. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

8.12 <u>Forum Selection; Consent to Jurisdiction</u>. **EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT IT WILL NOT COMMENCE ANY ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR IN TORT OR OTHERWISE, AGAINST ANY OTHER PARTY IN ANY WAY RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS RELATING HERETO OR THERETO, IN ANY FORUM OTHER THAN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION, LITIGATION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL**

24

**COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.**

**EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN THIS SECTION 8.12. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.**

**<u>Waiver of Jury Trial</u>. EACH GRANTOR AND LENDER HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS AGREEMENT AND ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION HEREWITH AND AGREE THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.**

8.13 <u>Set-off</u>. Each Grantor agrees that Lender has all rights of set-off and bankers' lien provided by applicable law, and in addition thereto, each Grantor agrees that at any time any Event of Default exists, Lender may apply to the payment of any Secured Obligations, whether or not then due, any and all balances, credits, deposits, accounts or moneys of such Grantor then or thereafter with Lender.

8.14 <u>Acknowledgments</u>. Each Grantor hereby acknowledges that:

(a) it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents to which it is a party;

(b) Lender has no fiduciary relationship with or duty to any Grantor arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between Grantors, on the one hand, and Lender, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c) no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among Grantors and Lender.

25

8.15    <u>Additional Grantors</u>. Each Loan Party that is required to become a party to this Agreement pursuant to <u>Section 10.9</u> of the Credit Agreement shall become a Grantor for all purposes of this Agreement upon execution and delivery by such Loan Party of a joinder agreement in the form of <u>Annex I</u> hereto.

8.16    <u>Releases</u>. If any of the Collateral shall be sold, transferred or otherwise disposed of by any Grantor in a transaction permitted by the Credit Agreement, then Lender, at the request and sole expense of such Grantor, shall execute and deliver to such Grantor all releases or other documents reasonably necessary or desirable for the release of the Liens created hereby on such Collateral.

8.17    <u>Obligations and Liens Absolute and Unconditional</u>. Each Grantor understands and agrees that the obligations of each Grantor under this Agreement shall be construed as a continuing, absolute and unconditional without regard to (a) the validity or enforceability of any Loan Document, any of the Secured Obligations or any other collateral security therefor or guaranty or right of offset with respect thereto at any time or from time to time held by Lender, (b) any defense, set-off or counterclaim (other than a defense of payment or performance) which may at any time be available to or be asserted by any Grantor or any other Person against Lender, or (c) any other circumstance whatsoever (with or without notice to or knowledge of any Grantor) which constitutes, or might be construed to constitute, an equitable or legal discharge of any Grantor for the Secured Obligations, in bankruptcy or in any other instance. When making any demand hereunder or otherwise pursuing its rights and remedies hereunder against any Grantor, Lender may, but shall be under no obligation to, make a similar demand on or otherwise pursue such rights and remedies as it may have against any other Grantor or any other Person or against any collateral security or guaranty for the Secured Obligations or any right of offset with respect thereto, and any failure by Lender to make any such demand, to pursue such other rights or remedies or to collect any payments from any other Grantor or any other Person or to realize upon any such collateral security or guaranty or to exercise any such right of offset, or any release of any other Grantor or any other Person or any such collateral security, guaranty or right of offset, shall not relieve any Grantor of any obligation or liability hereunder, and shall not impair or affect the rights and remedies, whether express, implied or available as a matter of law, of Lender against any Grantor. For the purposes hereof, "demand" shall include the commencement and continuance of any legal proceedings.

8.18    <u>Reinstatement</u>. This Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against Grantor or any Issuer of Collateral for liquidation or reorganization, should Grantor or such Issuer become insolvent or make an assignment for the benefit of creditors or should a receiver or trustee be appointed for all or any significant part of Grantor's or such Issuer's assets, and shall continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Secured Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Secured Obligations, whether as a "voidable preference", "fraudulent conveyance" or otherwise, all as though such payment or performance had not been made. In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Secured Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

1924781.09-NYCSR07A - MSW

8.19    <u>Intercompany Subordination</u>. Each Grantor covenants and agrees, irrespective of whether in or outside of any Proceeding, that the payment of any and all of the Subordinated Obligations shall be subordinate and subject in right and time of payment, to the extent and in the manner set forth in this <u>Section 8.20</u>, to Payment in Full. Whether in or outside of any Proceeding, each Grantor hereby agrees that it shall not make (and will not permit any other Grantor to make), and each Grantor hereby agrees that it will not accept, any payment or distribution with respect to the Subordinated Obligations (including, without limitation, any payment or distribution received through the exercise of any right of setoff, counterclaim or crossclaim), until Payment in Full. Until Payment in Full, whether in or outside of any Proceeding, no Grantor shall, without the prior written consent of Lender, exercise any Subordinated Lender Remedies. In the event of and during any Proceeding involving any Grantor: (a) all Obligations shall be Paid in Full before any Grantor shall be entitled to receive any payment or distribution of any kind on account of any Subordinated Obligations (whether in cash, property or securities, including securities issued under a plan of reorganization or liquidation); and (b) any payment or distribution of assets of such Person of any kind or character, whether in cash, property or securities (including securities issued under a plan of reorganization or liquidation), to which any Grantor would be entitled except for these provisions, shall be forthwith paid by the liquidating trustee or agent or other Person making such payment or distribution directly to Lender, to the extent necessary to make Payment in Full, after giving effect to any concurrent payment or distribution or provision therefor to the holders of the Obligations. Until Payment in Full, if a Proceeding shall occur and be continuing, each Grantor shall file all claims it may have against the other Grantors, and shall direct the debtor in possession or trustee in bankruptcy, as appropriate, to forthwith pay over to Lender all amounts due to Grantors on account of the Subordinated Obligations until Payment in Full (which payment shall not be deemed to be a payment of, or otherwise credited against, the Subordinated Obligations). If Grantors fail to file and/or vote such claims prior to thirty (30) days before the expiration of time to do so, Lender may (but shall have no obligation or duty to) prepare, execute, file and/or vote such claims in Grantors' names, and Grantors also irrevocably authorize, empower and direct Lender to demand, sue for, collect and receive (or cause to do the same) every such payment or distribution; <u>provided</u>, <u>however</u>, that Lender shall have no obligation or duty to execute, prepare, verify, deliver and/or file any such claim, and its action or inaction shall not give rise to any claims or liability against Lender. If Lender votes any such claim in accordance with the authority granted hereof, Grantors shall not be entitled to withdraw or change such vote. Subject to Payment in Full and the provisions of <u>Section 8.19</u>, Grantors shall be subrogated to the rights of Lender to receive payments and distributions of cash, property and securities applicable to the Obligations to the extent that distributions otherwise payable to Grantors have been applied to the Obligations, until all amounts payable under the Subordinated Obligations shall have been paid in full. For purposes of such subrogation, no payments or distributions to Lender of any cash, property or securities to which Grantors would be entitled except for the provisions of this <u>Section 8.20</u>, and no payment pursuant to the provisions of this <u>Section 8.20</u> to Lender by Grantors shall, as among Grantors and their creditors (other than Lender), be deemed to be a payment or distribution by Grantors to or on account of Obligations.

***(Signature Pages Follow)***

*Signature Page to Guaranty and Collateral Agreement*

IN WITNESS WHEREOF, intending to be legally bound, each of the undersigned has duly executed and delivered this Guaranty and Collateral Agreement as of the date first above written.

**GRANTORS AND ISSUERS:**

**ARGO TEA, INC.**, a Delaware corporation

By:_____
Name: Arsen Avakian
Title: President

**ARGO TEA RUSH, LLC**, an Illinois limited liability company

**ARGO TEA STATE/RANDOLPH, LLC**, an Illinois limited liability company

**ARGO TEA UCH, LLC**, an Illinois limited liability company

**ARGO TEA BROADWAY, LLC**, an Illinois limited liability company

**ARGO TEA MARQUETTE, LLC**, an Illinois limited liability company

**ARGO TEA NW, LLC**, an Illinois limited liability company

**ARGO TEA FRANKLIN, LLC**, an Illinois limited liability company

**ARGO TEA MENA, LLC**, a Delaware limited liability company

By: **ARGO TEA, INC.**, Manager for each of the above listed Grantors

By:_____
Name: Arsen Avakian
Title: President

[Signature Page to Guaranty and Collateral Agreement]

*Signature Page to Guaranty and Collateral Agreement*

**LENDER:**                                          **CARIBOU COFFEE COMPANY, INC.,**

By: _____

Name: Mike Tattersfield

Title: CEO

**ANNEX I**

## FORM OF JOINDER TO GUARANTY AND COLLATERAL AGREEMENT

This JOINDER AGREEMENT TO GUARANTY AND COLLATERAL AGREEMENT (this "Agreement") dated as of [_____ __, 20__] is executed by the undersigned for the benefit of Caribou Coffee Company, Inc., as lender (the "Lender") in connection with that certain Guaranty and Collateral Agreement dated as of December [__], 2015, among Grantors party thereto and Lender (as amended, restated, supplemented or otherwise modified from time to time, the "Guaranty and Collateral Agreement"). Capitalized terms not otherwise defined herein are being used herein as defined in the Guaranty and Collateral Agreement.

Each Person signatory hereto is required to execute this Agreement pursuant to Section 8.16 of the Guaranty and Collateral Agreement.

In consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each signatory hereby agrees as follows:

1.      Each such Person assumes all the obligations of a Grantor and a Guarantor under the Guaranty and Collateral Agreement and agrees that such person or entity is a Grantor and a Guarantor and bound as a Grantor and a Guarantor under the terms of the Guaranty and Collateral Agreement, as if it had been an original signatory to such agreement. In furtherance of the foregoing, such Person hereby assigns, pledges and grants to Lender, and (to the extent provided herein) its Affiliates, a security interest in all of its right, title and interest in and to the Collateral owned thereby to secure the Secured Obligations.

2.      Schedules 1, 2, 3, 4, 5, 6 and 7 of the Guaranty and Collateral Agreement are hereby amended to add the information relating to each such Person set out on Schedules 1, 2, 3, 4, 5, 6 and 7 respectively, hereof. Each such Person hereby makes to Lender the representations and warranties set forth in the Guaranty and Collateral Agreement applicable to such Person and the applicable Collateral and confirms that such representations and warranties are true and correct after giving effect to such amendment to such Schedules.

3.      In furtherance of its obligations under Section 5.2 of the Guaranty and Collateral Agreement, each such Person agrees to deliver to Lender appropriately complete UCC financing statements naming such person or entity as debtor and Lender as secured party, and describing its Collateral and such other documentation as Lender (or its successors or assigns) may require to evidence, protect and perfect the Liens created by the Guaranty and Collateral Agreement, as modified hereby. Each such Person acknowledges the authorizations given to Lender under Section 5.9(b) of the Guaranty and Collateral Agreement and otherwise.

4.      Each such Person's address for notices under the Guaranty and Collateral Agreement shall be the address of Company set forth in the Credit Agreement, and each such Person hereby appoints Company as its agent to receive notices hereunder.

5.      This Agreement shall be deemed to be part of, and a modification to, the Guaranty and Collateral Agreement and shall be governed by all the terms and provisions of the Guaranty

1924781.09-NYCSR07A - MSW

and Collateral Agreement, with respect to the modifications intended to be made to such agreement, which terms are incorporated herein by reference, are ratified and confirmed and shall continue in full force and effect as valid and binding agreements of each such person or entity enforceable against such person or entity. Each such Person hereby waives notice of Lender's acceptance of this Agreement. Each such Person will deliver an executed original of this Agreement to Lender.

**NEW GRANTOR:**                            [_____], a [Jurisdiction]
                                            [organization]


                                            By:_____
                                            Name:_____
                                            Title:_____

## SCHEDULE 1

## INVESTMENT PROPERTY

### A.   PLEDGED EQUITY

| Grantor (owner of Record of such Pledged Equity) | Issuer | Pledged Equity Description | Percentage of Issuer | Certificate (Indicate No.) |
|---|---|---|---|---|
| Argo Tea, Inc. | Argo Tea Rush, LLC | Membership Interests | 100% | 1 |
| | Argo Tea State/Randolph, LLC | Membership Interests | 100% | 1 |
| | Argo Tea UCH, LLC | Membership Interests | 100% | 1 |
| | Argo Tea Broadway, LLC | Membership Interests | 100% | 1 |
| | Argo Tea Marquette, LLC | Membership Interests | 100% | 1 |
| | Argo Tea NW, LLC | Membership Interests | 100% | 1 |
| | Argo Tea Franklin, LLC | Membership Interests | 100% | 1 |
| | Argo Tea MENA, LLC | Membership Interests | 100% | 1 |

### B.   PLEDGED NOTES

| Grantor (owner of Record of such Pledged Notes) | Issuer | Pledged Notes Description |
|---|---|---|
| Argo Tea, Inc. | Stapleton-Spence Packing Company | Promissory Note in the original principal amount of Three Hundred and Fifty Thousand ($350,000), by and between Stapleton-Spence Packing Company and Argo Tea, Inc. dated April 3, 2012 |

### C.   OTHER INVESTMENT PROPERTY. None.

**SCHEDULE 2**

**FILINGS AND PERFECTION**

| Grantor | Filing Requirement or Other Action | Filing Office |
|---|---|---|
| Argo Tea, Inc. | Filing of UCC-1 financing statement with the applicable filing office | Secretary of State of the State of Delaware |
| Argo Tea Rush, LLC | Filing of UCC-1 financing statement with the applicable filing office | Secretary of State of the State of Illinois |
| Argo Tea State/Randolph, LLC | Filing of UCC-1 financing statement with the applicable filing office | Secretary of State of the State of Illinois |
| Argo Tea UCH, LLC | Filing of UCC-1 financing statement with the applicable filing office | Secretary of State of the State of Illinois |
| Argo Tea Broadway, LLC | Filing of UCC-1 financing statement with the applicable filing office | Secretary of State of the State of Illinois |
| Argo Tea Marquette, LLC | Filing of UCC-1 financing statement with the applicable filing office | Secretary of State of the State of Illinois |
| Argo Tea NW, LLC | Filing of UCC-1 financing statement with the applicable filing office | Secretary of State of the State of Illinois |
| Argo Tea Franklin, LLC | Filing of UCC-1 financing statement with the applicable filing office | Secretary of State of the State of Illinois |
| Argo Tea MENA, LLC | Filing of UCC-1 financing statement with the applicable filing office | Secretary of State of the State of Delaware |

**SCHEDULE 3**

**GRANTOR INFORMATION**

| Grantor (Exact Legal Name) | State of Organization | Federal Employer Identification Number | Chief Executive Office | Organizational Identification Number |
|---|---|---|---|---|
| Argo Tea, Inc. | Delaware | 36-4352648 | 16 W. Randolph Street Chicago, IL 60601 | 3191846 |
| Argo Tea Rush, LLC | Illinois | 20-2641192 | 16 W. Randolph Street Chicago, IL 60601 | 01417746 |
| Argo Tea State/Randolph, LLC | Illinois | 20-2641258 | 16 W. Randolph Street Chicago, IL 60601 | 01469916 |
| Argo Tea UCH, LLC | Illinois | 20-4498906 | 16 W. Randolph Street Chicago, IL 60601 | 01796992 |
| Argo Tea Broadway, LLC | Illinois | 20-4883271 | 16 W. Randolph Street Chicago, IL 60601 | 01796984 |
| Argo Tea Marquette, LLC | Illinois | 20-8555002 | 16 W. Randolph Street Chicago, IL 60601 | 02126303 |
| Argo Tea NW, LLC | Illinois | 26-0815674 | 16 W. Randolph Street Chicago, IL 60601 | 02324776 |
| Argo Tea Franklin, LLC | Illinois | 26-4232363 | 16 W. Randolph Street Chicago, IL 60601 | 02760983 |
| Argo Tea MENA, LLC | Delaware | 36-4352648 | 16 W. Randolph Street Chicago, IL 60601 | 5106074 |

## SCHEDULE 4

## A.    COLLATERAL LOCATIONS (LEASED)

| Grantor | Collateral | Collateral Location or Place of Business (Including Chief Executive Office) | Owner/Lessor (If Leased) |
|---|---|---|---|
| Argo Tea Rush, LLC | Primarily equipment and inventory | 819 N. Rush Street Chicago, IL 60611 | Loyola University of Chicago N-F-P Corporation |
| Argo Tea State/Randolph, LLC | Primarily office equipment, corporate books and records | 14 - 18 W. Randolph Street Chicago, IL 60601 | State/Randolph LLC |
| Argo Tea UCH, LLC | Primarily equipment and inventory | UCH - 5758 S. Maryland Ave Chicago, IL 60637 | University of Chicago Hospitals |
| Argo Tea Broadway, LLC | Primarily equipment and inventory | 3135 N. Broadway Chicago, IL 60657 | Jin An Creative America, Inc. |
| Argo Tea Marquette, LLC | Primarily equipment and inventory | Marquette Building 50-52 W. Adams Street Chicago, IL 60603 | John D. & Catherine T. Macarthur Foundation |
| Argo Tea NW, LLC | Primarily equipment and inventory | 250 E Superior Street Prentice Women's Hospital Chicago, IL 60611 | Northwestern Memorial Hospital |
| Argo Tea, Inc. | Primarily equipment and inventory | Space #113 Merchandise Mart Chicago, IL 60654 | Merchandise Mart Properties, Inc. |
| Argo Tea Franklin LLC | Primarily equipment and inventory | La Quinta Inn 1 South Franklin Chicago, IL 60606 | LQ Acquisition Properties LLC a Delaware limited liability company |
| Argo Tea, Inc. | Primarily equipment and inventory | Willis Tower 233 South Wacker Drive Chicago, IL 60606 | 233 S. Wacker LLC a Delaware limited liability company |
| Argo Tea, Inc. | Primarily equipment and inventory | Terminal 2 Space O'Hare Airport Chicago, IL 60666 | City of Chicago |
| Argo Tea, Inc. | Primarily equipment and inventory | Tribune Tower 435 N. Michigan Ave Ste 101A Chicago, IL 60611 | Chicago Tribune Company an IL corporation |
| Argo Tea, Inc. | Primarily equipment and inventory | Connors Park 871 N. Wabash Ave Chicago, IL 60611 | Chicago Park District |
| Argo Tea, Inc. | Primarily equipment and inventory | Terminal 3 Space Concourse L O'Hare Airport Chicago, IL 60666 | City of Chicago |

| Grantor | Collateral | Collateral Location or Place of Business (Including Chief Executive Office) | Owner/Lessor (If Leased) |
|---|---|---|---|
| Argo Tea, Inc. | Primarily equipment and inventory | Terminal 3 Space Concourse H O'Hare Airport Chicago, IL 60666 | City of Chicago |
| Argo Tea, Inc. | Primarily equipment and inventory | Woodfield Mall | Woodfield Mall LLC |
| Argo Tea, Inc. | Primarily equipment and inventory | Oakbrook Shopping Center | Oakbrook Shopping Center LLC |
| Argo Tea, Inc. | Primarily equipment and inventory | Flatiron Building 949 Broadway New York, NY 10010 | Flatiron Leasing Partners, LLC |
| Argo Tea, Inc. | Primarily equipment and inventory | 530 1st Avenue NYU Langone Medical Center New York, NY 10016 | NYU Hospitals Center |
| Argo Tea, Inc. | Primarily equipment and inventory | 1792 Broadway New York, NY 10019 | Central Park South Associates, LLC |
| Argo Tea, Inc. | Primarily equipment and inventory | 75 University Place New York, NY 10003 | 23 East 10 Retail LLC |
| Argo Tea, Inc. | Primarily equipment and inventory | 275 Seventh Ave New York, NY 10001 | 275 Seventh Avenue New York, NY 10001 |
| Argo Tea, Inc. | Primarily equipment and inventory | 750 S. Halstead Rm. 209 and 209A, Chicago, IL 60612 | University of Illinois Office of Capital Programs and Real Estate Services |

**B.   COLLATERAL IN POSSESSION OF LESSOR, BAILEE, CONSIGNEE OR WAREHOUSEMAN**

| Grantor | Collateral | Lessor/Bailee/Consignee/ Warehouseman |
|---|---|---|
| Argo Tea, Inc. | Inventory | Stapleton-Spence Packing 1900 California 99, Gridley, CA 95948 |
| Argo Tea, Inc. | Inventory | Castle Co-Packers 11 Lloyd Avenue, Latrobe, PA 15650 |
| Argo Tea, Inc. | Inventory | W.J. Beitler Co. 2150 Roswell Drive, Pittsburg PA 15205 |

## SCHEDULE 5

## <u>INTELLECTUAL PROPERTY</u>

**<u>Patents:</u>**

| Grantor | Patent Number | Patent Application Number | Date Patent Issued | Date Patent Applied For |
|---|---|---|---|---|
| Argo Tea, Inc. | D662,422 (US) | 29/373,435 | 26-Jun-12 | 7-Apr-11 |
| Argo Tea, Inc. | ZL201130342459.7 (China) | 201130342459.70 | 2-May-12 | 26-Sep-11 |
| Argo Tea, Inc. | 001922675-001 (RCD) | 1922675 | 26-Sep-11 | 26-Sep-11 |

**<u>Trademarks:</u>**

### A. US Trademarks

| Mark | App. No. | Filing Date | Reg. No. | Reg. Date | Status |
|---|---|---|---|---|---|
| ARGO | 77/373,439 | January 16, 2008 | 3,498,428 | September 9, 2008 | Renewal Due: September 9, 2018 |
| ARGO TEA | 77/373,558 | January 16, 2008 | 3,498,430 | September 9, 2008 | Renewal Due: September 9, 2018 |
| ARGO TEA (Design Mark) | 77/375,773 | January 18, 2008 | 3,539,708 | December 2, 2008 | Renewal Due: December 2, 2018 |
| CHARITEA | 77/553,770 | August 22, 2008 | 3,598,240 | March 31, 2009 | Renewal Due: March 31, 2019 |
| TEA SQUEEZE | 77/666,352 | February 9, 2009 | 3,704,622 | November 3, 2009 | Renewal Due: November 3, 2019 |
| HIBISCUS STEAMER | 77/674,631 | February 20, 2009 | 3,711,457 | November 17, 2009 | Renewal Due: November 17, 2019 |
| WHITE FROSTEA | 77/666,390 | February 9, 2009 | 3,869,064 | November 2, 2010 | 8&15 Affidavit Filed on November 20, 2015 |
| CAROLINA HONEY | 77/666,406 | February 9, 2009 | 3,711,428 | November 17, 2009 | Renewal Due: November 17, 2019 |
| VALENTEA PASSION | 77/666,479 | February 9, 2009 | 3,711,430 | November 17, 2009 | Renewal Due: November 17, 2019 |
| WHITE TEA ACAI SQUEEZE | 77/666,530 | February 9, 2009 | 3,711,431 | November 17, 2009 | Renewal Due: November 17, 2019 |

| | | | | | |
|---|---|---|---|---|---|
| TEA SANGRIA | 77/666,588 | February 9, 2009 | 3,704,624 | November 3, 2009 | Renewal Due: November 3, 2019 |
| GREEN TEA GINGER TWIST | 77/666,568 | February 9, 2009 | 3,672,569 | August 25, 2009 | Renewal Due: August 25, 2019 |
| TEA SPARKLE | 77/666,597 | February 9, 2009 | 3,704,625 | November 3, 2009 | Renewal Due: November 3, 2019 |
| ARGO COFFEE | 85/012,075 | April 12, 2010 | 3,879,762 | November 23, 2010 | 8&15 Affidavit Due: between November 23, 2015-2016 |
| LOYALTEA | 77/929,396 | February 5, 2010 | 3,856,138 | October 5, 2010 | 8&15 Affidavit Filed on October 7, 2015 |
| TEA+INGREDIENTS WITH PURPOSE | 85/296,485 | April 15, 2011 | 4,104,572 | February 28, 2012 | 8&15 Affidavit Due: between February 28, 2017-2018 |
| SMOOTEA | 78/457,650 | July 27, 2004 | 3,065,190 | March 7, 2006 | Renewal Due: March 7, 2016 |
| TEAMOSA | 85/660,243 | June 25, 2012 | 4,299,388 | March 5, 2013 | 8&15 Affidavit Due: between March 5, 2018-2019 |
| PUMPKIN CHAI | 85/734,181 | September 20, 2012 | 4,346,073 | June 4, 2013 | 8&15 Affidavit Due: between June 4, 2018-2019 |
| PUMPKIN CHAI (Supplemental Registration) | 77-666,465 | February 9, 2009 | 3,684,701 | September 15, 2009 | Superceded by "Principal Register" |
| MOJITEA | 85/747,125 | October 5, 2012 | 4,346,452 | June 4, 2013 | 8&15 Affidavit Due: between June 4, 2018-2019 |
| MOJITEA (Supplemental Registration) | 77-666,576 | February 9, 2009 | 3,681,758 | September 8, 2009 | Superceded by "Principal Register" |
| MANGO MATECCINO (Supplemental Register) | 85/253,063 | February 28, 2011 | 4,036,557 | October 4, 2011 | Section 8 Affidavit Due: between October 4, 2016-2017 |
| MANGO MATECCINO (Principal | 85/747,226 | October 5, 2012 | 4,808,866 | September 8, 2015 | 8&15 Affidavit Due: between September 8, 2020- |

| Mark | App. No. | Filing Date | Reg. No. | Reg. Date | Status |
|---|---|---|---|---|---|
| Register) | | | | | 2021 |
| RED VELVET | 85/747,177 | October 5, 2012 | 4,346,454 | June 4, 2013 | 8&15 Affidavit Due: between June 4, 2018-2019 |
| RED VELVET | 77-666,340 | February 9, 2009 | 3,681,757 | September 8, 2009 | Superceded by "Principal Register" |
| TEA-NA COLADA | 86/006,930 | July 10, 2013 | 4,813,386 | September 15, 2015 | 8&15 Affidavit Due: between September 15, 2020-2021 |
| TEAPPUCCINO | 86/070,769 | September 20, 2013 | 4,546,888 | June 10, 2014 | 8&15 Affidavit Due: between June 10, 2019-2020 |

## B. International Trademarks

| Mark | Country | Status | Registration # | Serial/ Application # | Filing Date | Registration Date |
|---|---|---|---|---|---|---|
| ARGO | Lebanon | Registered | 143044 | 4366 | May 15, 2012 | May 21, 2012 |
| ARGO | Egypt | Pending | | 277229 | July 22, 2012 | |
| ARGO | Qatar | Registered | 75439 | 75439 | June 18, 2012 | October 28, 2014 |
| ARGO | Algeria | Pending | | 121228 | April 5, 2012 | |
| ARGO | Bahrain | Registered | 92585 | 92585 | June 19, 2012 | June 19, 2012 |
| ARGO | Kuwait | Registered | 108915 | 134569 | July 11, 2012 | September 22, 2013 |
| ARGO | Saudi Arabia | Registered | 1441/11 | 181511 | April 30, 2012 | May 15, 2013 |
| ARGO | Oman | Registered | 73798 | 73798 | April 11, 2012 | March 19, 2013 |
| ARGO | Turkey | Registered | 32042 | 2012/32042 | April 4, 2012 | April 4, 2012 |
| ARGO | United Arab Emirates | Registered | 171813 | 171813 | April 9, 2012 | November 19, 2013 |
| ARGO | Jordan | Registered | 123290 | 123290 | April 3, 2012 | April 3, 2012 |
| ARGO | EU | Registered | 1186822 | A0039311 | November 15, 2013 | December 26, 2013 |
| ARGO TEA | Canada | Allowed | | 1,693,376 | September 11, 2014 | |

**Copyrights**: None.

**Intellectual Property Licenses**:

1. Licensing Agreement by and between Argo Tea, Inc. and Aramark Food and Support Services Group, Inc., dated as of December 9, 2010 (as amended).
2. Licensing Agreement by and between Argo Tea, Inc. and Compass Group USA, Inc., dated October 14, 2008 (as amended).
3. Form Master Franchise Agreement Argo Tea, Inc. Master Licensing Agreement, by and between Argo Tea, Inc. and Sodexo Operations, LLC, dated June 16, 2014.
4. License Agreement by and between Argo Tea MENA, LLC and Franchise Consortium Limited, dated as of February 10, 2012.
5. Licensing Agreement by and between Argo Tea, Inc. and Delaware North Companies Travel Hospitality Services, dated July 20, 2015.

## SCHEDULE 6

## DEPOSITARY AND OTHER ACCOUNTS

| Grantor | Financial Institution (Name, Address, Telephone And Fax Numbers) | Account Number |
|---|---|---|
| Argo Tea, Inc. | Metropolitan Capital Bank | 100026293 |
| Argo Tea, Inc. | Metropolitan Capital Bank | 100043116 |
| Argo Tea, Inc. | Metropolitan Capital Bank | 100026301 |
| Argo Tea, Inc. | Metropolitan Capital Bank | 100027192 |
| Argo Tea, Inc. | Metropolitan Capital Bank | 100060037 |
| Argo Tea, Inc. | Metropolitan Capital Bank | 100060060 |
| Argo Tea, Inc. | Metropolitan Capital Bank | 100060078 |
| Argo Tea, Inc. | Metropolitan Capital Bank | 100060086 |
| Argo Tea, Inc. | Metropolitan Capital Bank | 100060656 |
| Argo Tea, Inc. | Metropolitan Capital Bank | 100061803 |
| Argo Tea, Inc. | JP Morgan Chase | 000000867196503 |
| Argo Tea, Inc. | JP Morgan Chase | 000000696900315 |
| Argo Tea, Inc. | Bank of America | 291018333895 |
| Argo Tea UCH, LLC | Citibank | 800548616 |
| Argo Tea, Inc. | Citibank | 801015689 |
| Argo Tea, Inc. | Fifth Third Bank | 7234372774 |
| Argo Tea, Inc. | Fifth Third Bank | 7234372873 |
| Argo Tea NW, LLC | First American | 62000009012 |
| Argo Tea Franklin, LLC | PNC Bank | 46-0245-2475 |
| Argo Tea Rush LLC | PNC Bank | 46-0253-8287 |
| Argo Tea Broadway LLC | PNC Bank | 46-0253-8308 |
| Argo Tea, Inc. | Seaway Bank and Trust Company | 0080117801 |
| Argo Tea, Inc. | Seaway Bank and Trust Company | 0080252201 |
| Argo Tea, Inc. | Seaway Bank and Trust Company | 0081188201 |

## SCHEDULE 7

## <u>COMMERCIAL TORT CLAIMS</u>

None.

2375989.2

# EXHIBIT E

## DEPOSIT ACCOUNT CONTROL AGREEMENT

This DEPOSIT ACCOUNT CONTROL AGREEMENT ("Agreement") is made and entered into as of February 2, 2016, by and among METROPOLITAN CAPITAL BANK (the "Bank"), ARGO TEA, INC., a Delaware corporation (the "Borrower") and CARIBOU COFFEE COMPANY, INC., a Minnesota corporation (the "Lender"). All capitalized terms used herein, but not otherwise defined, shall have the respective meanings given to them in the Credit Agreement (as defined below).

A.    Pursuant to that certain Credit Agreement dated as of December 8, 2015, by and among the Borrower, certain affiliates of the Borrower and the Lender (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), the Lender has agreed to make loans and extend other financial accommodations to the Borrower (collectively, the "Loans").

B.    As a condition precedent to the continued making of the Loans by the Lender, the Borrower granted in favor of Lender a security interest and lien upon all assets of the Borrower, including without limitation Borrower's interest in certain deposit accounts from time to time established by Borrower.

C.    The Borrower has established the deposit accounts with Bank, each in the name of the Borrower and identified by the account numbers listed on the "Schedule of Accounts", which is attached hereto as Exhibit A.  For purposes of this Agreement, each of the foregoing deposit accounts and any and all other deposit accounts from time to time established by the Borrower with the Bank (excluding Borrower's certificates of deposit pledged by Borrower to the Bank to secure the Metropolitan Letters of Credit, as defined in, and permitted by, the Credit Agreement) shall be referred to collectively as the "Pledged Accounts."

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, the parties hereto agree as follows:

1.    Security Interest.  To secure, among other things, the Borrower's and its affiliates' indebtedness, obligations and liabilities to Lender under the Credit Agreement and the other Loan Documents described therein, Borrower has granted to Lender a present and continuing security interest in (a) each Pledged Account, (b) all contract rights, claims and privileges in respect of each Pledged Account and (c) all cash, checks, drafts, collection remittances, money orders and other items of value of Borrower now or hereafter paid, deposited, credited, held (whether for collection, provisionally or otherwise) or otherwise in the possession or under the control of, or in transit to, Bank or any agent, bailee or custodian thereof (collectively, "Receipts"), and all proceeds of the foregoing, and Bank acknowledges that this Agreement constitutes notice of Lender's security interest in such collateral and does hereby consent thereto.

2.    Control of Pledged Accounts.  In order to give Lender control over the Pledged Accounts, as control is defined in the Uniform Commercial Code, Bank hereby agrees to comply

with any and all instructions from time to time originated by Lender directing disposition of funds in any and all Pledged Accounts and all other Receipts, without further consent by the Borrower. The parties hereto agree that (a) such instructions may include, without limitation, the giving of stop payment orders and may further include instructions to transfer funds to or for Lender's benefit and (b) Bank shall have no duty to inquire or determine whether Lender is entitled, under the Credit Agreement or any other Loan Document, to give any such instructions. Prior to Bank's receipt of any notice of sole control in the form of Exhibit B (a "Notice of Sole Control") from Lender, Bank shall be entitled to honor the Borrower's instructions and directions with respect to any transfer or withdrawal of funds from any Pledged Account. Borrower hereby agrees that Bank shall be entitled to rely on instructions originated by Lender, as set forth in this Section 2, even if (y) such instructions are contrary to any instructions or demands that the Borrower may deliver to Bank and/or (z) a result of such instructions is the dishonoring by Bank of items which may be presented for payment. Upon Bank's receipt of a Notice of Sole Control, Bank shall cease acting on any orders and instructions from the Borrower regarding the Pledged Accounts and shall, as soon as practical on the business day on which such receipt occurs, transfer the collected and available funds in the Pledged Accounts to the account identified by the Lender in the Notice of Sole Control (or such other account designated by Lender from time to time); provided, however, that if any such Notice of Sole Control is so received by the Bank after 2:00 p.m., New York time, on any business day, the Bank shall so transfer such funds no later than the opening of business on the first business day after the business day on which such receipt occurs. For purposes of this Section 2, a "business day" is any day other than a Saturday, Sunday or other day on which Bank is or is authorized or required by law to be closed.

3.    Certain Representations, Warranties and Covenants.

(a)    Each party hereto represents and warrants to the other parties hereto that such party has all requisite power and authority to execute and deliver this Agreement and to perform its obligations hereunder.

(b)    Each party hereto represents and warrants that such execution, delivery and performance shall not cause a breach of or default under such party's organizational documents and Borrower represents and warrants that such execution, delivery and performance shall not cause a breach under any material contract to it is bound.

(c)    Each party hereto represents and warrants to the other parties hereto that this Agreement is legally valid and binding on such party, enforceable against such party in accordance with its terms, except as limited by bankruptcy or other comparable laws affecting creditors' rights generally, and except as limited by the availability of equitable remedies.

(d)    Bank hereby represents and warrants to Lender that except for this Agreement, Bank has not entered into any agreement with any person or entity pursuant to which Bank is obligated to comply with instructions as to the disposition of funds from the Pledged Accounts. Bank hereby covenants and agrees that Bank shall not, without the prior written consent of Lender, enter into any agreement with any other person or entity pursuant to which Bank is obligated to comply with instructions as to the disposition of funds from the Pledged Accounts.

(e)     Borrower and Bank hereby represent and warrant to Lender that each Pledged Account is a "deposit account" (as such term is defined in the Uniform Commercial Code).

4.     <u>Statements and Other Information</u>.  Bank shall provide Lender, upon Lender's written request therefor, with copies of the regular monthly bank statements provided to the Borrower, together with such other information relating to the Pledged Accounts as shall be reasonably requested from time to time by Lender.

5.     <u>Fees</u>.  The Borrower agrees to pay on demand all usual and customary service charges, transfer fees, account maintenance fees and charges for uncollected items or items returned for insufficient funds (collectively, "<u>Fees</u>") of Bank in connection with the Pledged Accounts. In the event the Borrower fails to timely make a payment to Bank of any Fees, Bank may thereafter exercise its right of set-off against any Pledged Account for such amounts. The Lender shall not have any responsibility or liability for the payment of any Fees.

6.     <u>Set-Off</u>.  Except as otherwise expressly permitted pursuant to the preceding <u>Section 5</u>, Bank hereby agrees that Bank will not exercise or claim any right of set-off, security interests, lien or other interest against any Pledged Account or any deposits therein, and Bank hereby further waives any such right, security interest, lien or interest which it may have against any deposits in any Pledged Account.

7.     <u>Exculpation of Bank; Indemnification by the Borrower</u>.  The Borrower and Lender agree that Bank shall have no liability to either of them for any loss or damage that either or both may claim to have suffered or incurred, either directly or indirectly, by reason of this Agreement or any transaction or service contemplated by the provisions hereof, unless occasioned by the negligence or willful misconduct of Bank or the breach by Bank of any provision hereof. Without limitation of the preceding sentence, the Borrower agrees that Bank shall have no liability to the Borrower for any wrongful dishonor in connection with the execution by Bank of any Lender instructions, as authorized by <u>Section 2</u>, to dishonor any items presented for payment. The Borrower agrees to indemnify Bank and hold it harmless from and against any and all claims, other than those ultimately determined to be founded on gross negligence or willful misconduct of Bank, and from and against any damages, penalties, judgments, liabilities, losses or expenses, (including reasonable attorney's fees and disbursements) (collectively, "<u>Losses</u>") incurred as a result of the assertion of any claim, by any person or entity, arising out of, or otherwise related to, any transaction conducted or service provided by Bank through the use of any Pledged Account at Bank pursuant to the procedures provided for or contemplated by this Agreement.  To the extent such obligations of indemnity are not satisfied by the Borrower within fifteen (15) days after written demand on the Borrower by the Bank, Lender will indemnify Bank and hold it harmless from and against any and all Losses Bank may incur as a result of Bank following any instruction or request of Lender, except to the extent such Losses are caused by Bank's gross negligence, bad faith or willful misconduct.  In no event will Lender be liable for any indirect, special, consequential or punitive damages, whether or not the likelihood of such damages was known to Lender, and regardless of the form of the claim or action, or the legal theory on which it is based.

8.     <u>Termination</u>.  This Agreement may not be terminated by Borrower for any reason. This Agreement may be terminated by Lender at any time, with or without cause, upon its delivery of written notice thereof to each of the Borrower and Bank. This Agreement may be terminated by Bank on not less than 30 days prior written notice delivered to each of the Borrower and Lender. In the case of termination of this Agreement, without further consent by the Borrower, the Pledged Accounts shall be closed and the collected and available funds in the Pledged Accounts shall be transferred to the Lender pursuant to Lender's written instruction, unless the Lender directs the Bank otherwise in writing. To the extent uncollected and unavailable funds are in the Pledged Accounts, then, without further consent by the Borrower, such funds shall be transferred to the Lender pursuant to Lender's written instruction, unless the Lender directs Bank otherwise in writing, after such funds are collected or become available. The provisions of <u>Sections 1</u>, <u>2</u> and <u>6</u> shall survive termination of this Agreement unless and until specifically released by Lender in writing.

9.     <u>Notices</u>.  All notices, requests or other communications given to the Borrower, Lender or Bank shall be given in writing (including by facsimile for Borrower and Lender, and overnight delivery only, for Bank) at the address specified below:

|         |                                              |
|---------|----------------------------------------------|
| Bank:   | METROPOLITAN CAPITAL BANK                    |
|         | 9 East Ontario Street                        |
|         | Chicago, Illinois 60611                      |
|         | Attention:  Manager of Deposit Operations    |
|         |                                              |
| Borrower: | Argo Tea, Inc.                             |
|         | 16 West Randolph Street                      |
|         | Chicago, Illinois 60601                      |
|         | Attn: Arsen Avakian                          |
|         | Facsimile: (312) 873-4123                    |
|         |                                              |
|         | With a mandatory copy to:                    |
|         |                                              |
|         | Golenbock Eiseman Assor Bell & Peskoe LLP    |
|         | 437 Madison Avenue, 40th Floor               |
|         | New York, New York 10022                     |
|         | Attention:  Alex Kaplun                      |
|         | Facsimile:  (212) 754-0330                   |
|         |                                              |
| Lender: | Caribou Coffee Company, Inc.                 |
|         | 3900 Lakebreeze Avenue N.,                   |
|         | Minneapolis, Minnesota 55429                 |
|         | Attention:  Tim Hennessy, Chief Financial Officer |
|         | Telephone:  (736) 592-2222                   |
|         | Email:  TJHennessy@cariboucoffee.com         |
|         |                                              |
|         | With a mandatory copy to:                    |
|         |                                              |
|         | Caribou Coffee Company, Inc.                 |

3900 Lakebreeze Avenue N.,
Minneapolis, Minnesota 55429
Attention: Mike Peterson, Controller
Telephone: (736) 592-2240
Email: mpeterson@cariboucoffee.com

Any party may change its address for notices hereunder by notice to each other party hereunder given in accordance with this <u>Section 9</u>. Each notice, request or other communication shall be effective (a) if given by facsimile, when such facsimile is transmitted to the facsimile number specified in this <u>Section 9</u> and confirmation of receipt is made by the appropriate party, (b) if given by overnight courier, on the business day after such communication is deposited with the overnight courier for delivery, addressed as aforesaid, or (c) if given by any other means, when delivered at the address specified in this <u>Section 9</u>.

10.   <u>Miscellaneous</u>.

(a)   This Agreement shall be deemed to supersede any conflicting terms of any agreement between Bank and the Borrower regarding any Pledged Account.

(b)   This Agreement may be amended only by a written instrument executed by Lender, Bank, and the Borrower acting by their respective duly authorized representatives.

(c)   This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns, but neither the Borrower nor Bank shall be entitled to assign or delegate any of its rights or duties hereunder without first obtaining the express prior written consent of Lender.

(d)   This Agreement may be executed in any number of several counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. Delivery of an executed counterpart of this Amendment by facsimile or by ".PDF" shall be equally as effective as delivery of an original executed counterpart of this Amendment.

(e)   The invalidity, illegality or unenforceability of any provision of this Agreement shall not affect the validity, legality or enforceability of any of the other provisions of this Agreement which shall remain effective.

(f)   This Agreement constitutes the complete and exclusive expression of the terms of the agreement between the parties, and supersedes all prior or contemporaneous communications between the parties relating to the subject matter of this Agreement.

(g)   THIS AGREEMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF ILLINOIS, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES. REGARDLESS OF ANY PROVISION IN ANY OTHER AGREEMENT, FOR PURPOSES OF

THE UNIFORM COMMERCIAL CODE AS IN EFFECT FROM TIME TO TIME IN THE STATE OF ILLINOIS, THE STATE OF ILLINOIS SHALL BE BANK'S JURISDICTION.

(h)     BORROWER, LENDER AND BANK HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT. BORROWER, LENDER AND BANK ACKNOWLEDGE THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THAT EACH WILL CONTINUE TO RELY ON THE WAIVER IN THEIR RELATED FUTURE DEALINGS. BORROWER, LENDER AND BANK WARRANT AND REPRESENT THAT EACH HAS HAD THE OPPORTUNITY OF REVIEWING THIS JURY WAIVER WITH LEGAL COUNSEL, AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS.

[signature page follows]

*(Signature page to Deposit Account Control Agreement)*

IN WITNESS WHEREOF, each of the parties has executed and delivered this Deposit Account Control Agreement as of the day and year first above set forth.

BANK:                           **METROPOLITAN CAPITAL BANK**

By: _____

Name: Jerry L. Frump

Title: Manager of Bank Operations

IN WITNESS WHEREOF, each of the parties has executed and delivered this Deposit Account Control Agreement as of the day and year first above set forth.

**BORROWER:**                    **ARGO TEA, INC., a Delaware corporation**

By: _____ 
    Name: Arsen Avakian
    Title: President

IN WITNESS WHEREOF, each of the parties has executed and delivered this Deposit Account Control Agreement as of the day and year first above set forth.

**LENDER**:                            **CARIBOU COFFEE COMPANY, INC.**

By: _____

     Name: *DAN E. LEE*

     Title: *CLO*

## EXHIBIT A

## LIST OF ALL PLEDGED ACCOUNTS

| Account Number | Description of Account |
|---|---|
| 100026293 | Checking |
| 100043116 | Checking |
| 100026301 | Money Market |
| 100027192 | Money Market |

## <u>EXHIBIT B</u>

[Letterhead of Lender]


**VIA OVERNIGHT DELIVERY**


[Date]

Metropolitan Capital Bank

         [_____]
         [_____]
         Attn: [_____]

Re: Notice of Sole Control

Ladies and Gentlemen:

      We hereby instruct you, pursuant to the terms of that certain Deposit Account Control Agreement dated January [   ], 2016 among the undersigned, ARGO TEA, INC., a Delaware corporation (the "<u>Borrower</u>") and you, as may be amended from time to time (the "<u>Agreement</u>"), (i) to disregard all instructions received from the Borrower with respect to any of the transfers of all amounts constituting collected and available funds on deposit in account number(s) [] and [ ] maintained by the Borrower with you (the "<u>Pledged Accounts</u>"), and (ii) unless and until otherwise directed by the undersigned, on each business day to transfer all amounts constituting collected and available funds on deposit in the Pledged Accounts as follows:

| | |
|---|---|
| Bank Name: | _____ |
| Bank Address: | |
| ABA Routing Number: | _____ |
| Account Title: | ___ [to include Lender's name] |
| Account Number: | _____ |

      Pursuant to the Agreement, please direct your telephonic and facsimile confirmation of receipt of this letter to one of the following officers:

| | |
|---|---|
| Name: | Name: |
| Title: | Title: |
| Telephone Number: _____ | Telephone Number: |
| Facsimile Number: | Facsimile Number: |

The term "business day" and capitalized terms used herein but not defined herein shall have the meanings given to them in the Agreement. This letter is subject to the terms of the Agreement, including, without limitation, the date it shall become effective. Nothing herein shall modify, limit, diminish, negate or alter any rights accorded to you under the Agreement or any other provisions thereof.

Very truly yours,

**CARIBOU COFFEE COMPANY, INC.,** a Minnesota corporation


By: _____
    Name:
    Title:




cc: Argo Tea, Inc.
    16 West Randolph Street
    Chicago, Illinois 60601
    Attn: Arsen Avakian
    Facsimile: (312) 873-4123

With a mandatory copy to:

    Golenbock Eiseman Assor Bell & Peskoe LLP
    437 Madison Avenue, 40th Floor
    New York, New York 10022
    Attention: Alex Kaplun
    Facsimile: (212) 754-0330

# EXHIBIT F

# ASSIGNMENT AND ASSUMPTION

This Assignment and Assumption (the "Assignment and Assumption") is dated as of January 15, 2020 (the "Effective Date"), and is entered into by and between Caribou Coffee Company, Inc., a Minnesota corporation (the "Assignor"), Golden Fleece Beverages, Inc., a Delaware corporation (the "Assignee") and each entity listed on Schedule I hereto (the "Borrowers"). Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Credit Agreement, dated as of December 8, 2015, among the Borrowers, and the Assignor, as Lender (as amended, restated, amended and restated, supplemented and/or otherwise modified from time to time the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee.

1.    Assignment.  In consideration for a purchase price of $1,600,000.00, the Assignor hereby irrevocably sells and assigns to the Assignee (the "Sale"; the date on which such purchase price is received by the Assignor, the "Closing Date") and the Assignee hereby irrevocably purchases and assumes from the Assignor, as of the Closing Date:

(i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to all of the outstanding principal and accrued interest as of the Closing Date under the Term Loan (including any Lien created thereby); and

(ii) all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned by the Assignor to the Assignee pursuant to Section 1, clauses (i) and (ii) hereof being referred to herein collectively as the "Assigned Interest").  For the sake of clarity, Assignor hereby fully and forever waives and releases all claims, suits, causes of action and any other rights of the Assignor arising out of or otherwise related to the Credit Agreement, the other Loan Documents and any other document or instrument delivered pursuant thereto or the transactions governed thereby, to the extent not assigned to Assignee, against the Borrowers, their Subsidiaries or Affiliates and their respective officers, directors, shareholders, agents, attorneys and their respective successors and assignees, and all Persons acting on their behalf, as of the Closing Date under this Assignment and Assumption.

The Sale is without recourse to the Assignor. The Assignor (a) represents and warrants, as of the Effective Date and the Closing Date, that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrowers, any of their Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv)

the performance or observance by the Borrowers, any of their Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

As of the Effective Date and the Closing Date, the Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby, (ii) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of such type, (iii) it has received a copy of the Credit Agreement, and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant thereto, and such other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest and (iv) it has, independently and without reliance upon the Assignor and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest.

2.    <u>Release of the Assignor by the Assignee and Borrowers</u>.  As of the Closing Date, each of the Assignee and the Borrowers on behalf of themselves, each of their respective successors, assigns and affiliates, and any Person claiming by, through or under the Assignee or the Borrowers, as applicable (collectively, the "<u>Releasing Parties</u>"), hereby releases and forever discharges the Assignor, and each of its affiliates and subsidiaries and their respective officers, directors, employees, shareholders, agents, attorneys and representatives as well as their respective successors and assigns, and all Persons acting on their behalf (all such Persons being collectively referred to as the "<u>Released Parties</u>"), from any and all claims, obligations, rights, causes of action, and liabilities, of whatever kind or nature, whether known or unknown, whether foreseen or unforeseen, arising on or before the Closing Date, which the Assignee, the Borrowers or any other Releasing Party ever had, now has or hereafter can, shall or may have for, upon or by reason of any matter, cause or thing whatsoever, arising out of or otherwise related to the Credit Agreement, the other Loan Documents and any other document or instrument delivered pursuant thereto or the transactions governed thereby. Without limiting the generality of the foregoing, the Assignee and the Borrowers hereby waives the provisions of any statute or doctrine that prevents a general release from extending to claims unknown by the releasing party.  The Assignee and the Borrowers on behalf of themselves and each other Releasing Parties, as applicable understands, acknowledges and agrees that the release set forth above may be pleaded as a full and complete defense and may be used as a basis for an injunction against or dismissal of any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such release.  The Assignee and the Borrowers hereby acknowledge, represent and warrant that they have had advice of counsel of their own choosing in negotiations for and the preparation of the foregoing release, that they heave each read the foregoing release, that they have had the foregoing release fully explained by such counsel, and that they are fully aware of its contents and legal effects.

3.    <u>Further Assurances</u>.  After the Closing Date, at the sole cost and expense of the Assignee, the Assignor will execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements and other documents), that may be required, or that the Assignee may reasonably request from time to time, to ensure that each perfected Lien in favor of the Assignor, securing the Obligations of each Loan Party under the Loan Documents, evidences the Sale, all without recourse, representation or warranty to the Assignor.

1829837.12-NYCSR03A - MSW

4.    <u>Governing Law</u>. THE ASSIGNMENT AND ASSUMPTION SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

5.    <u>Amendments</u>. No amendment, modification or waiver of, or consent with respect to, any provision of the Assignment and Assumption shall in any event be effective unless the same shall be in writing and executed and delivered by both the Assignor and the Assignee, and then any such amendment, modification, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

6.    <u>Outside Date</u>. This Assignment and Assumption shall automatically terminate at 5:00 p.m., New York City time, on January 31, 2020 if the Closing Date has not occurred; provided that Sections 4, 6, 7, 10 and 11 shall survive such termination.

7.    <u>Severability</u>. Whenever possible each provision of the Assignment and Assumption shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of the Assignment and Assumption shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of the Assignment and Assumption.

8.    <u>Entire Agreement</u>. The Assignment and Assumption embodies the entire agreement and understanding among the parties hereto and supersedes all prior or contemporaneous agreements and understandings of such Persons, verbal or written, relating to the subject matter hereof and thereof and any prior arrangements made with respect to the payment by the parties hereto of (or any indemnification for) any fees, costs or expenses payable to or incurred (or to be incurred) by or on behalf of the Assignor.

9.    <u>General Provisions</u>. The Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. The Assignment and Assumption may be executed in any number of counterparts and by the different parties hereto on separate counterparts and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute but one and the same Assignment and Assumption. Receipt of an executed signature page to this Assignment and Assumption by facsimile or other electronic transmission shall constitute effective delivery thereof.

10.    <u>FORUM SELECTION AND CONSENT TO JURISDICTION</u>. EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT IT WILL NOT COMMENCE ANY ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR IN TORT OR OTHERWISE, AGAINST ANY OTHER PARTY IN ANY WAY RELATING TO THE ASSIGNMENT AND ASSUMPTION OR THE SALE, IN ANY FORUM OTHER THAN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION, LITIGATION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE

1829837.12-NYCSR03A - MSW

CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THE ASSIGNMENT AND ASSUMPTION IN ANY COURT REFERRED TO IN THIS SECTION 10. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

11.    WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THE ASSIGNMENT AND ASSUMPTION AND ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION HEREWITH OR THEREWITH OR ARISING FROM ANY RELATIONSHIP EXISTING IN CONNECTION WITH ANY OF THE FOREGOING, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

12.    No Waiver. Prior to the Closing Date, Assignor expressly reserves all of its rights, powers, privileges and remedies (including, without limitation, against each and every Loan Party) under the Credit Agreement and the other Loan Documents, applicable law and/or equity. No failure of Assignor to take any action or exercise any right or remedy under the Credit Agreement or other Loan Documents shall constitute a waiver of any Defaults or Events of Default under the Credit Agreement and the other Loan Documents that have occurred or may have occurred or that may occur in the future, whether known or unknown.

*[Signature page follows]*

4

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR

CARIBOU COFFEE COMPANY, INC.

By: _____
Name: JOHN J. BUTCHER
Title: PRESIDENT + CEO

ASSIGNEE

GOLDEN FLEECE BEVERAGES, INC.

By: _____
Name:
Title:

Acknowledged and Consented by:

BORROWERS

ARGO TEA, INC.
ARGO TEA RUSH, LLC
ARGO TEA STATE/RANDOLPH, LLC
ARGO TEA UCH, LLC
ARGO TEA BROADWAY, LLC
ARGO TEA MARQUETTE, LLC
ARGO TEA NW, LLC
ARGO TEA FRANKLIN, LLC
ARGO TEA MENA, LLC

By: _____
Name:
Title:

[Signature Page to Assignment and Assumption]

DocuSign Envelope ID: 64EF4560-3C02-45DB-890D-40E316487B10

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR

CARIBOU COFFEE COMPANY, INC.

By: _____
Name:
Title:

ASSIGNEE

GOLDEN FLEECE BEVERAGES, INC.

By: _____
Name:  Arsen Avakian
Title:    President

Acknowledged and Consented by:

BORROWERS

ARGO TEA, INC.
ARGO TEA RUSH, LLC
ARGO TEA STATE/RANDOLPH, LLC
ARGO TEA UCH, LLC
ARGO TEA BROADWAY, LLC
ARGO TEA MARQUETTE, LLC
ARGO TEA NW, LLC
ARGO TEA FRANKLIN, LLC
ARGO TEA MENA, LLC

By: _____
Name:
Title:

[Signature Page to Assignment and Assumption]

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR

CARIBOU COFFEE COMPANY, INC.

By:  _____
Name:
Title:

ASSIGNEE

GOLDEN FLEECE BEVERAGES, INC.

By:  _____
Name:
Title:

Acknowledged and Consented by:

BORROWERS

ARGO TEA, INC.
ARGO TEA RUSH, LLC
ARGO TEA STATE/RANDOLPH, LLC
ARGO TEA UCH, LLC
ARGO TEA BROADWAY, LLC
ARGO TEA MARQUETTE, LLC
ARGO TEA NW, LLC
ARGO TEA FRANKLIN, LLC
ARGO TEA MENA, LLC

By: _____
Name:
Title:

**Schedule I**

Argo Tea, Inc.

Argo Tea Rush, LLC

Argo Tea State/Randolph, LLC

Argo Tea UCH, LLC

Argo Tea Broadway, LLC

Argo Tea Marquette, LLC

Argo Tea NW, LLC

Argo Tea Franklin, LLC

Argo Tea Mena, LLC

# EXHIBIT G

FILED DATE: 2/18/2020 12:00 AM 2019L013468

## NOTIFICATION OF DISPOSITION OF COLLATERAL

To:             Interested Members of the Public

From:           Golden Fleece Beverages, Inc. ("Secured Party")
                c/o Levenfeld Pearlstein, LLC, Attorney for the Secured Party
                Attn: Jamie L. Burns
                2 N. LaSalle Street, Suite 1300
                Chicago, IL 60602
                (312) 476-7601

Names of Debtors:   Argo Tea, Inc.
                Argo Tea Rush, LLC
                Argo Tea State/Randolph, LLC
                Argo Tea UCH, LLC
                Argo Tea Broadway, LLC
                Argo Tea Marquette, LLC
                Argo Tea NW, LLC
                Argo Tea Franklin, LLC
                Argo Tea Mena, LLC

We will sell the Collateral described below to the highest qualified bidder in public as follows:

Day and Date:    **Friday, February 14, 2020**

Time:            **10:30 a.m.**

Place:           **Levenfeld Pearlstein, LLC**
                **2 N. LaSalle Street, Suite 1300**
                **Chicago, Illinois 60602**
                **(312) 346-8380**

                _____

Collateral:      (a) All of the personal property now owned or at any time hereafter acquired by
                any Debtor or in which any Debtor now has or at any time in the future may
                acquire any right, title or interest, including all of each Debtor's Accounts,
                Chattel Paper, Commercial Tort Claims, Deposit Accounts, Documents,
                Equipment, Fixtures, General Intangibles, Health Care Insurance Receivables,
                Farm Products, Goods, Instruments, Intellectual Property, Inventory, Investment
                Property, Leases, Letter-of-Credit Rights, Money, Supporting Obligations and
                Identified Claims; (b) all books and records pertaining to any of the foregoing;
                (c) all Proceeds and products of any of the foregoing, and (d) all collateral
                security and guaranties given by any Person with respect to any of the foregoing.

The sale will be conducted in accordance with the provisions of the Illinois Uniform Commercial Code.
The bid price must be paid in certified check or cashier's check payable to the order of Golden Fleece
Beverages, Inc. Twenty Percent (20%) of the successful bid price will be paid at the time of sale and the
balance must be paid within two (2) business days of the sale.

If the successful bidder defaults on the secured balance, the Secured Party may retain the initial deposit
and, at the Secured Party's option, sell to the next highest bidder. Secured Party reserves the right to bid
part or all of the amount secured by the Collateral being sold without certified check or cashier's check as

FILED DATE: 2/18/2020 12:00 AM   2019L013468

required for other bidders. The Secured Party reserves the right within three (3) business days of the completion of the bidding to reject all bids. The Secured Party reserves the right to adjourn the sale to another date without further publication or notice by giving notice at the time of the sale.

If the Secured Party accepts a bid, the bidder will receive a Secured Party Bill of Sale of the interest of the Secured Party in the Collateral purchased, subject to the terms hereof. The Secured Party makes no representations or warranties as to the condition of the Collateral and the sale is "as is", where is and with all faults, subject to any and all taxes, liens, claims or encumbrances. There is no warranty as to title, possession, quiet enjoyment, or the like in this disposition.

The Debtors are entitled to an accounting of the unpaid indebtedness, which shall be provided free of charge.

For further information, please contact: Jamie L. Burns, Levenfeld Pearlstein, LLC, 2 N. LaSalle Street, Suite 1300, Chicago, IL 60602, Phone: (312) 476-7601 counsel for Secured Party.

LP  15719951.3 \ 44260-121251

FILED DATE: 2/18/2020 12:00 AM  2019L013468

## CERTIFICATE OF SERVICE
## <u>OF NOTICE OF DISPOSITION OF COLLATERAL</u>

I, Jamie L. Burns, an attorney, state under oath that a copy of the Notice of Sale was served on each of the persons listed below as indicated below on February 4, 2020.

### <u>*Via Federal Express Overnight Delivery and Via Fax:*</u>

Argo Tea, Inc.
16 West Randolph Street
Chicago, Illinois 60601
Attn: Arsen Avakian
Facsimile: (312) 873-4123

Argo Tea, Inc.
321 N. Clark St, Suite 935
Chicago, Illinois 60654
Attention: President and CEO
Facsimile: (312) 283-0063

With a copy to:
Golenbock Eiseman Assor Bell & Peskoe LLP
437 Madison Avenue, 40th Floor
New York, New York 10022
Attention: Alex Kaplun
Facsimile: (212) 754-0330

### <u>*Via Email:*</u>

Jonathan P. Friedland
Sugar Felsenthal Grais & Helsinger
30 North LaSalle Street, Suite 3000
Chicago, Illinois 60602
jfriedland@sfgh.com

### <u>*Via Federal Express Overnight Delivery*</u>

Gordon Food Service, Inc.
c/o: Teller Levit & Silvertrust P.C.
19 S. LaSalle St., Suite 701
Chicago, Illinois 60603

Halssen & Lyon GMBH
c/o: Kaplan Saunders Valente & Beninati LLP
500 N. Dearborn St.
Second Floor
Chicago, IL 60654

LP  15719951.3 \ 44260-121251

3

FILED DATE: 2/18/2020 12:00 AM   2019L013468

Peak, LLC, as Representative
170 West Shirley Avenue, Suite 207
Warrenton, VA 20186

Varilease Finance, Inc.
6340 South 3000 East, Suite 400
Salt Lake City, UT 84121

Glen Tullman, As Administrative Agent
1226 Colgate Avenue
Wilmette, IL 60091

WFC Fund, LLC
2020 West 89th Street, Suite 200
Leawood, KS 66206

### *Via US Mail*

Innovative Energy Solutions
P.O. Box 232
Dana Point, CA 92629

Gordon Food Service, Inc.
1300 Gezon Parkway SW
PO Box 2244
Grand Rapids, MI 49501

LP  15719951.3 \ 44260-121251

# EXHIBIT H

# Chicago Tribune

Sold To:
Miller Legal Services  - CU00031474
220 W 42nd St
Fl 12
New York,NY 10036-7200

Bill To:
Miller Legal Services  - CU00031474
220 W 42nd St
Fl 12
New York,NY 10036-7200

Classified Advertising: 6594826
Purchase Order: R2030004

Certificate of Publication:

State of Illinois - Cook

**Chicago Tribune Media Group** does hereby certify that it is the publisher of the Chicago Tribune. The Chicago Tribune is a secular newspaper, has been continuously published Daily for more than fifty (50) weeks prior to the first publication of the attached notice, is published in the City of Chicago, State of Illinois, is of general circulation throughout that county and surrounding area, and is a newspaper as defined by 715 IL CS 5/5.

This is to certify that a notice, a true copy of which is attached, was published 1 time(s) in the Chicago Tribune, namely one time per week or on 1 successive weeks.  The first publication of the notice was made in the newspaper, dated and published on 2/5/2020, and the last publication of the notice was made in the newspaper dated and published on 2/5/2020.

This notice was also placed on a statewide public notice website as required by 715 ILCS 5/2. 1.

On the following days, to-wit: **Feb 05, 2020**.

Executed at Chicago, Illinois on this

Serina Johnston

Case 21-12228   Doc 35-1   Filed 11/02/21   Entered 11/02/21 18:59:04   Desc
Attachment Exhibits to Declaration   Page 191 of 206

# Virus

*Continued from Page 1*

time of high consumption for its Chinese consumers, and while Mondelez's sales to retailers were in line with expectations, the company will be watching to see if consumer sales take a hit, Van de Put said.

The Deerfield-based company, which has instituted travel restrictions within and to China for its employees, also closed two of its four factories in China at the request of the local government to reduce the risk of infection.

"We do believe that this could have a short-term impact, but long-term we continue to be very convinced for the outlook of the Chinese market for us," Van de Put said, according to a transcript of the call.

Chicago is particularly vulnerable to the effects of any interruptions to manufacturing supply chains, said Phil Levy, a global trade expert who served as a senior economist under President George W. Bush.

While the majority of Chinese products are shipped to the U.S. via ocean freight, crucial manufacturing parts and high-value products such as electronics are often sent by air, Levy said. Chicago was the top gateway for cargo flown between the U.S. and China in 2017, according to the

Chicago Department of Aviation.

All it takes is the absence of one key part to shut down a factory, said Levy, who was formerly a senior fellow at the Chicago Council on Global Affairs and now serves as chief economist at Flexport, a San Francisco-based global logistics company.

"If that was the key part that you needed to keep your assembly line moving and you don't have it, you're stuck," Levy said.

The ongoing trade war fueled by President Donald Trump's decision to impose tariffs on Chinese goods may provide some insulation for manufacturers that found safe haven suppliers in Vietnam and other countries.

Rick Woldenberg, CEO of Vernon Hills-based toymaker Learning Resources, said he stocked up on goods before the tariffs went into effect, though a handful of new items that haven't yet shipped will be delayed.

Still, it's not clear how quickly factories will be back to full strength, especially if employees who traveled home during the holidays are hesitant to return or are delayed by travel restrictions, he said.

"No one really knows how it's going to play out," he said.

If the coronavirus becomes a global pandemic, Levy said it could be a major blow to Chicago's tourism

and convention business — beyond the potential dearth of Chinese visitors this summer.

"If people are worried about something and decide not to undertake an activity, those coordinated downturns can be really problematic for an economy," Levy said. "Tourists deciding not to visit, people deciding not to go to conferences and business meetings — something Chicago does a lot of. If everybody decides this is not a good time for that, that's a problem."

During prior epidemics, like SARS, travelers have avoided the areas most affected but generally haven't curtailed flying altogether, said Khalid Usman, senior vice president with Oliver Wyman's transportation practice.

At the height of the SARS outbreak in 2003, airlines in the Asia-Pacific region lost about 8% of their annual passenger traffic, equivalent to about $6 billion in lost revenues, according to a report from the International Air Transport Association. North American airlines lost about 3.7% of international traffic, or an estimated $1 billion in lost revenues.

Travel rebounded within about nine months, suggesting any disruption would be temporary, the report said.

"As long as they can contain the longevity of the event...hopefully it only causes a short-term impact," said Usman.

But it could still be an "expensive impact, especially with China getting more relevant, and not just in aviation," he said.

U.S. carriers halted all flights to and from mainland China after the U.S. government issued a "do not travel" warning for China and imposed travel restrictions and mandatory quarantines on travelers who had been in China within two weeks of attempting to enter the U.S.

United Airlines is likely to be hardest hit of the three domestic carriers operating flights between the U.S. and China. The airline accounted for a little more than half of all flights domestic carriers operated connecting the U.S. to China

and Hong Kong last year, according to data from PlaneStats.com, Oliver Wyman's aviation data portal.

Still, most passengers flying between the U.S. and China aren't on United, American Airlines or Delta Air Lines. Foreign carriers operated nearly 65% of flights between the U.S. and China or Hong Kong last year, and some are still offering flights.

United and American both canceled flights to mainland China through late March. Delta Air Lines' suspension extends through April 30.

On Tuesday, United announced it would suspend service to Hong Kong — which already had been cut to a single daily flight from San Francisco — starting Saturday, "in response to the continued drop in demand." The airline expects to resume flights to Hong Kong on Feb. 20.

Four in five business travel managers said their company's employees would likely change travel plans to avoid flying and business travel due to the outbreak, according to a Global Business Travel Association survey about 250 travel managers conducted between Jan. 27 and 31.

In the meantime, companies are relying on video and phone conferencing. Some of Chicago-based Here Technologies' roughly 9,000 global employees are heading to an internal meeting in Europe this week, but workers in China will participate by video conference, said company spokesman Jordan Stark.

"The ability to have instantaneous communication through multiple mediums sure helps," Stark said.

Todd, at Balodana, said she's still optimistic the linen suit will arrive in time for the engagement party, so long as workers go back to work as planned.

"The big risk is if the government changes their mind and tries to push back that Feb.10 date," she said.

*Chicago Tribune reporter Mary Wisniewski contributed.*



ANTONIO PEREZ/CHICAGO TRIBUNE

Dave Pinsof, left, and Eli Halpern of Cards Against Humanity LLC, sell their popular game at Gen Con at a convention center in Indianapolis.

# Website

*Continued from Page 1*

G/O Media, gave few details Tuesday about the reasons for the sale, saying it was "a business decision."

ClickHole was launched under previous owners in 2014 as an offshoot of The Onion. Spanish language broadcaster Univision bought The Onion websites in 2016. Boston-based private equity firm Great Hill Partners bought the digital media portfolio, which had been combined with the remnants of Gawker Media, for an undisclosed price in April.

Founded through a Kickstarter campaign in 2010, Cards Against Humanity has carved out its own niche with a popular party game known for politically incorrect, cutting-edge humor.

"We wanted to purchase ClickHole because we think the team is extremely funny and we wanted them to have the same independence that we are lucky to enjoy," Max Temkin, co-founder of Cards Against Humanity, said in an email Tuesday.

Temkin said ClickHole will remain independent and be majority employee-owned in partnership with Cards Against Hu-

manity, which will supply funding and own a minority stake. ClickHole's five-person editorial staff will come over to the new corporate entity as part of the deal, Temkin said.

It is unclear if Click-Hole will be relocated to the Bucktown offices of Cards Against Humanity, but the operation will remain in Chicago, Temkin said.

ClickHole will be leaving the G/O Media fold, and The Onion's offices at 730 N. Franklin St., just as Deadspin, the irreverent sports website shut down last fall by a mass exodus of New York staffers, moves in with plans to boost its staff and relaunch.

Last month, G/O Media announced it was relocating Deadspin to Chicago after a monthslong standoff between the digital media publisher and the union representing the more than 20 writers and editors who resigned in protest over the website's direction under private equity ownership.

Jim Rich, who was named editor-in-chief of Deadspin on Jan. 23, opened the Chicago editorial office last week to begin the task of rebuilding the dormant website. There is no target date for relaunch, Goodman said.

*rchannick@chicagotribune.com*

NOTIFICATION OF DISPOSITION OF COLLATERAL

To:   Interested Members of the Public
From:   Golden Fleece Beverages, Inc. ("Secured Party")
        c/o Levenfeld Pearlstein, LLC, Attorney for the Secured Party
        Attn: Jamie L. Burns, 2 N. LaSalle Street, Suite 1300, Chicago, IL 60602, (312) 476-7601
Names of   Argo Tea, Inc., Argo Tea Franchise, LLC, Argo Tea Café Montreal, LLC, Argo Tea UDV, LLC, Argo
Debtors:   Tea Broadway, LLC, Argo Tea Marquette, LLC, Argo Tea Mall, LLC, Argo Tea Franklin, LLC,
           Argo Sea Mena, LLC
We will sell the Collateral described below to the highest qualified bidder in public as follows:
Day and Date:   Friday, February 14, 2020          Time:   10:30 a.m.
Place:   Levenfeld Pearlstein, LLC
         2 N. LaSalle Street, Suite 1300, Chicago, Illinois 60602, (312) 346-8380



**Albank: Chicago's Concierge Business Bank**

Albank offers an intelligent alternative for those that desire personal attention, quick service and access to decision makers. Our unique approach to business banking helps our clients grow. And that has made Albank one of the fastest growing business banks in Chicago.



All the Bank your Business needs

**www.albank.com**

Member FDIC

© 2020 Albany Bank & Trust Co NA



# OUR READERS VOTE TO BE PREPARED

How will national and local elections affect you? Find out by joining with our readers and following our expert analysis, in-depth explainers and live results.

Stay informed. Vote with confidence.

chicagotribune.com/2020

**Chicago Tribune**

2020 ELECTION

**Chicago Tribune**

**Publication Date: 02/05/2020**

This electronic tearsheet confirms the ad appeared in The Chicago Tribune on the date and page indicated. You may not create derivative works, or in any way exploit or repurpose any content.

Client Name:
Advertiser:
Section/Page/Zone: **BUSINESS/2002/ALL**
Description:

Ad Number:
Insertion Number:
Size:
Color Type:

# Chicago Tribune

2/12/2020

**Ad Number:** <u>6595624</u>
**Ad Description:** NOTIFICATION OF DISPOSITION OF COLLATERAL ad that published 2x in the Auction Mart Section.
**RE:** Levenfeld Pearlstein, LLC
**Number of Insertions:** ___2___
**Dates of Insertion:** _2/9/2020 & 2/12/2020_

To Whom It May Concern,

The purpose of this letter is to confirm that the Legal Notice Advertisement: NOTIFICATION OF DISPOSITION OF COLLATERAL published 1 Sunday and 1 Wednesday in the Auction Mart Section in The Chicago Tribune has successfully completed its run. The Legal Notice ran in the Auction Mart section with Full Circulation on Sunday February 9, 2020 and Wednesday February 12, 2020.

_____

Advertising Sales Representative

State: Illinois

County: __Cook__

On this _12_ day of _February 2020_, before me appeared _Leighanne Block_, the person who signed this instrument on behalf of The Chicago Tribune, who acknowledge has signed it on behalf of The Chicago Tribune.

Notary Signature: _Elizabeth Bol_

Date: _02_/_12_/_2020_

My Commission Expires: _12_/_20_/_22_

OFFICIAL SEAL
ELIZABETH BOLIN
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:12/20/2022

Client Name:
Advertiser:
Section/Page/Zone:   BUSINESS/2003/ALL
Description:

Ad Number:
Insertion Number:
Size:
Color Type:

This electronic tearsheet confirms the ad appeared in The Chicago Tribune on the date and page indicated. You may not create derivative works, or in any way exploit or repurpose any content.

Chicago Tribune

Publication Date:  02/09/2020

# Calorie count in almonds a tough nut to crack

### New studies spur Kind company to lower bars' figures

By CANDICE CHOI
Associated Press

NEW YORK — Almonds used to have about 170 calories per serving. Then researchers said it was really more like 130. A little later, they said the nuts may have even less.

Calorie counting can be a simple way to help maintain a healthy weight — don't eat and drink more than you burn. And the calorie labels on food packaging seem like an immutable guide to help you track what you eat.

But the shifting numbers for almonds show how the figures printed on nutrition labels may not be as precise as they seem.

Last month, Kind said it was lowering the calorie counts for its snack bars, even though the ingredients weren't changing. The company cited studies that indicate nuts have fewer digestible calories than previously believed.

Conducted by government researchers with



Kind snack bars are displayed at a supermarket in New York. Last month, Kind said it was lowering the calorie counts for its snack bars, citing studies that indicate nuts have fewer digestible calories than previously believed.

MARK LENNIHAN/AP 2017

funding from nut producers, the studies show the inexact method of determining calorie counts established more than a century ago. The widely used system says a gram of carbohydrates and a gram of protein each have 4 calories, while a gram of fat has around 9. Companies can also subtract some calories based on past estimates of how much of different foods are not digested.

But based on anecdotal comments, researchers suspected more of the nutri-

ents in nuts may be expelled in the bathroom than previously estimated.

"If they're not digested, then maybe the calorie content is not correct," said David Baer, a co-author of the nut studies at the U.S. Department of Agriculture, which funded the research along with nut producers like the Almond Board of California.

To test the hunch, Baer and colleagues gave 18 people meals with and without raw almonds and instructed them to return daily with

their urine and stool packed in dry ice. The contents were analyzed to calculate that a serving of almonds has about 130 digestible calories, rather than the widely used figure of 170.

A few years later, in 2016, another study by Baer and colleagues also looked at the effects of food processing. They found cooking and grinding helped break down cell walls in almonds, freeing more calories for digestion. Roasted almonds had slightly more digestible calories than raw almonds. When the nuts were ground up into almond butter, nearly all the calories were digested.

Notably, the second study also found raw almonds had even fewer digestible calories than suggested by the first study. Baer attributed the discrepancy to variations in how people digest foods and natural differences in almonds themselves.

"It's unlikely you're going to get the exact same number every time you repeat the experiment," he said.

The almond studies are among several Baer has co-authored on the digestibility of nuts. Another last year was funded by the

Global Chemical Council and found cashews had fewer calories than estimated.

Despite his findings, Baer said he thinks the calorie counts used for most other foods are fairly accurate. And even though the U.S. Food and Drug Administration lets companies use different methods to determine calorie counts, the agency says products aren't supposed to have more than 20% more calories than what's stated on labels.

That's why health experts said the calorie counts on nutrition labels are still valuable: They offer general guidance for people trying to keep their weight in check. But it's even more important to pay attention to overall diet and not get hung up on small caloric differences, experts said.

"That's not what's going to make or break someone's attempt at weight management," said Elizabeth Mayer-Davis, a University of North Carolina nutrition professor.

Mayer-Davis said the studies on the calories in nuts wouldn't affect her general advice that they can be part of a healthy diet. She said it's more important to

pay attention to how they're prepared, such as whether sweeteners are added.

Kind's founder, Daniel Lubetzky, said he hopes the studies will help overcome the reluctance some might have about eating nuts because of their relatively higher calorie counts. The studies also mean the company's most popular bar can now drop from 200 to 180 calories, which could be a marketing advantage that sways decisions at the grocery store.

"It can't hurt," Lubetzky said

Mars, which took a minority stake in Kind in 2017, said it doesn't have plans to update the calorie counts for M&M's with almonds. The Almond Board says it's not aware of other companies yet using the lower numbers.

The Associated Press Health and Science Department receives support from the Howard Hughes Medical Institute's Department of Science Education. The AP is solely responsible for all content.

Follow @ChiTribBusiness on Facebook and @ChiTrib Biz on Twitter.

## Care

Continued from Page 1

after attaining national certification.

The American Medical Association opposes legislation to allow nurse practitioners to work independently, saying in a statement they're "valuable members" of physician-led health care teams, but "not a substitute for physicians."

"Patients' best interests are optimally served when they are treated in a physician-led team-based model of care," the association said.

Nurse practitioners are taking on roles doctors have filled in the past. For example, Edward-Elmhurst Health in the western suburbs decided in November to lay off about 15 of its urgent care doctors and instead use nurse practitioners, sources said.

Edward-Elmhurst spokesman Keith Hartenberger said in a statement that any advanced practice clinicians, such as nurse practitioners, will work under a doctor's supervision. He declined to confirm the number of people affected, but said the decision to "move to a team model" was driven by "feedback from our patients that they are looking for a lower-cost alternative for walk-in care."

Most of the care provided at Edward-Elmhurst's immediate care clinics is for low-level conditions such as sore throats, earaches and urinary tract infections, Hartenberger said.

"These visits are well within the scope of an advanced practice clinician's license, and this model is being used by other centers throughout the nation," he said.

Edward-Elmhurst is working with those affected by the change to find "alternative placement," Hartenberger said.

Physicians for Patient Protection, a national group that advocates for physician-led care, has criticized Edward-Elmhurst's plans, saying they're emblematic of a bigger problem.

Health systems "see these nurse practitioners and physician assistants as a cheaper labor force and have totally disregarded patient safety in the name of saving dollars," said Dr. Amy Judice Townsend, a board member of Physicians for Patient Protection who practices in Texas. "There are a lot of things that come in that are routine, but some things ... you have to have clinical experience to recognize it's not something that's just run-of-the-mill."

A 2014 study published in the journal JAMA Internal Medicine found advanced practice clinicians ordered more medical imaging tests for patients than primary care doctors.

Dr. Amber Price, who has a Chicago practice, Willow Pediatrics and Lactation, said she's seen patients who were misdiagnosed by nurse practitioners. One child she saw early in her career had a serious problem that required hospital-

ization, but had been diagnosed with pink eye by a nurse practitioner, she said.

"Doctors make mistakes, but we don't miss obvious things," said Price, who is a member of Physicians for Patient Protection.

Doctors groups have similar concerns about physician assistants, who perform many of the same tasks as nurse practitioners but have different training and education. But there are far fewer physician assistants in Illinois than nurse practitioners, about 3,700. Physician assistants' education is modeled on medical school curriculum while nurse practitioners' education is more aligned with nursing.

Physicians for Patient Protection also worries about confusion caused by nurse practitioners who use the title "doctor" because they've earned doctorates in nursing practice. Though the title is technically correct, some physicians worry patients will assume all who use it are medical doctors.

"It's deceptive to patients," Townsend said. "Patients, when they're introduced to someone as a doctor in a clinical setting, are assuming the knowledge base is in clinical practice and that's not the case."

It's a issue that could become more prevalent now that the National Organization of Nurse Practitioner Faculties, which acts as a resource for nurse practitioner education programs, wants to see all nurse practitioner programs offer doctorates of nursing practice by 2025.

Nurse practitioners point out that the initials after their names show their credentials, such as APRN, and Illinois law requires those who use the title "doctor" to "clearly state" they're not medical doctors. The law also prohibits advanced practice registered nurses from using the titles "doctor" or "physician" in advertising.

Galloway, the Crest Hill nurse practitioner who's been treating Hug for years, said he uses the title "Dr." because, like medical doctors and many professors, he earned the highest degree in his field. If anything, he said, medical doctors should be called physicians, not doctors, to clear up any confusion.

Nurse practitioners say fears about the quality of care they provide are unfounded.

"Nurse practitioners have been providing care for over 50 years, and we've got 50 years of data that reinforces the fact that nurse practitioners are educated and trained to provide the care in these settings," said Sophia Thomas, president of the American Association of Nurse Practitioners.

When advanced practice nurses are involved in emer-

gency and critical care, patients have shorter stays, shorter waits for consultation or treatment, and improved mortality rates, satisfaction and cost savings, according to a 2017 review of 15 studies published in Human Resources for Health. A 2014 study in the journal Nursing Outlook found states that allow nurse practitioners to practice without a doctor's supervision have lower hospitalization rates and better health outcomes.

Nurse practitioners are also often the most viable option for patients because of the shortage of doctors, Thomas said. As baby boomers age, the U.S. will have a shortage of primary care doctors, with anywhere from 21,100 to 55,200 too few by 2032, according to the Association of American Medical Colleges.

There are still far more doctors in the U.S. than advanced practice registered nurses — 756,800 compared with 240,700 nurse anesthetists, nurse midwives and nurse practitioners in 2018, according to the Bureau of Labor Statistics.

But the number of advanced practice nursing jobs is expected to grow 26% between 2018 and

2028, much faster than the average growth rate of 7% for doctors, according to the bureau.

Many people decide to become nurse practitioners instead of doctors because they're already registered nurses who want to build on their educations rather than start over, because they're attracted to nursing or because going to medical school takes longer and costs more than earning a master's degree in nursing, said Susan Swart, executive director of the Illinois Society for Advanced Practice Nursing.

"Physicians understandably are concerned about this change, but I think the reality is it a supply and demand issue," said Hazel Seabrook, a managing director at consulting firm Huron, who's worked as a nurse. "There aren't going to be enough primary care physicians or physicians, period, in the coming years, so what do we do as a health care system to plug the gap?"

About 19% of consumers surveyed said they had trouble scheduling a new patient visit with a primary care physician in the last year, according to a national survey of 1,500 people con-

ducted last year by the Texas Medical Center Health Policy Institute. City dwellers had a tougher time, with 32% saying they had trouble scheduling an appointment, though that may have had to do with insurance issues rather than a shortage of doctors.

Providers who rely on nurse practitioners are also reacting to cost pressures, Swart said.

"Everybody is challenged to provide the best care they can at the best cost savings," Swart said. "If they have the ability to free up physicians to provide care for more complex patients, then utilizing an advanced practice registered nurse in those voids makes a lot of sense."

The lower cost of nurse practitioners is part of the reason Midwest Express Clinic relies heavily on them at its 17 locations in Illinois and Indiana, said Kaitlyn Steinberg, director of clinical operations at the company and a family nurse practitioner. Midwest Express has physicians at a few of its locations.

"We're able to provide more affordable prices for our patients without sacrificing the quality of care," Steinberg said.

Dr. Daniel Weissbluth, whose pediatric practice has three offices in Streeterville, the South Loop and Bucktown, has eight pediatricians and five nurse practitioners. The long had nurse practitioners, who do well-child and sick-child visits when pediatricians

are unavailable, or when parents simply prefer to see them over the doctors.

"Many patients choose to see nurse practitioners because their clinical skills and communication skills are very good, and they like that person," Weissbluth said. "If at any point they ever feel that they're unsure of the best course of action, there's always a pediatrician there who can work with them and guide them."

Most doctors expect to see fewer patients in coming years as the number of nurse practitioners grows, according to the Texas Medical Center Health Policy Institute survey. Some of the apprehension toward the spread of nurse practitioners may come from doctors who "resent people coming into their turf," said Dr. Mark Werner, a director with consulting firm the Chartis Group.

"I think they sometimes see nurse practitioners as additional competition for their patients," Werner said.

Galloway, the Crest Hill nurse practitioner, wants to see the state allow nurse practitioners even more independence. Doing so would expand patients' access to care, he said.

"I wish it wasn't such a political battle between ourselves and doctors. We really need to be working together," Galloway said. "There are enough patients to go around."

lschenecker@chicagotribune.com

## AUCTION MART

PLEASE CALL 312 222.4089
TO PLACE AD

NOTIFICATION OF DISPOSITION OF COLLATERAL

To:   Intended Members of the Public

From:   Golden Fleece Beverages, Inc. ("Secured Party")
c/o Levenfeld Pearlstein, LLC, Attorney for the Secured Party
Attn: James L. Burns, 2 N. LaSalle Street, Suite 1300,
Chicago, IL 60602, (312) 476-7601

Names of   Argo Tea, Inc., Argo Tea Nashville, LLC, Argo Tea Franklin, LLC,
Debtors:   LLC, Argo Tea UCH, LLC, Argo Tea Broadway, LLC, Argo Tea
Marquette, LLC, Argo Tea NW, LLC, Argo Tea Madison, LLC,
Argo Tea Mdse, LLC

We will sell the Collateral described below to the highest qualified bidder in public as follows:
Day and Date:   Friday, February 14, 2020   Time:   10:30 a.m.
Place:   Levenfeld Pearlstein, LLC
2 N. LaSalle Street, Suite 1300
Chicago, Illinois 60602, (312) 346-6380

Collateral: (a) All of the personal property now owned or at any time hereafter acquired by any Debtor or in which any Debtor now has or at any time in the future may acquire any right, title or interest, including all of each Debtor's Accounts, Chattel Paper, Commercial Tort Claims, Deposit Accounts, Documents, Equipment, Fixtures, General Intangibles, Health Care Insurance Receivables, Farm Products, Goods, Instruments, Intellectual Property, Inventory, Investment Property, Leases, Letter-of-Credit Rights, Money, Supporting Obligations and Identified Claims; (b) all books and records pertaining to any of the foregoing; (c) all Proceeds and products of any of the foregoing, and (d) all collateral security and guaranties given by any Person with respect to any of the foregoing.

The sale will be conducted in accordance with the provisions of the Illinois Uniform Commercial Code. The bid price must be paid in certified check or cashier's check or wire transfer payable to the order of Golden Fleece Beverages, Inc. Twenty Percent (20%) of the successful bid price will be paid at the time of sale and the balance must be paid within two (2) business days of the sale.

If the successful bidder defaults on the second balance, the Secured Party may retain the initial deposit and, at the Secured Party's option, sell to the next highest bidder. Secured Party reserves the right to bid part or all of the amount secured by the Collateral being sold without certified check or cashier's check as required for other bidders. Secured Party reserves the right to within five (5) business days of the receipt of bidding to reject all bids. The Secured Party reserves the right to adjourn the sale to another date without further publication or notice by giving notice at the time of the sale.

If the Secured Party accepts a bid, the bidder will receive a Secured Party Bill of Sale of the interest of the Secured Party in the Collateral purchased, subject to the terms hereof. The Secured Party makes no representations or warranties as to the condition of the Collateral or the right to sell it, where is and with all faults, subject to any and all taxes, liens, claims or encumbrances. There is no warranty as to title, possession, quiet enjoyment, or the like in this disposition.

The Debtors are entitled to an accounting of the unpaid indebtedness, which shall be provided free of charge.

For further information, please contact: Jamie L. Burns, Levenfeld Pearlstein, LLC, 2 N. LaSalle Street, Suite 1300, Chicago, IL 60602, Phone (312) 476-7601 counsel for Secured Party.

## Who's WHO in Local Business

SPONSORED CONTENT

placead.chicagotribune.com/whos-who

### Mazars USA Announces New Office Managing Partner for Chicago Office

Mazars USA has named Jeremy Rice the Chicago Office Managing Partner. Jeremy has over 13 years of experience providing audit and advisory services to local, national, and international organizations, including many US subsidiaries of foreign companies. He has significant expertise working with companies in manufacturing, insurance, financial services, higher education, and healthcare. Jeremy co-leads the Chicago audit practice and is a leader in the industrial and automotive practices.

Mazars USA Chairman and CEO Victor Wahba said, "We continue to grow our Chicago office and, with his track record of success for the firm, we feel that Jeremy Rice is an excellent choice to contribute in the upward trend."

Mazars USA LLP is a high-

performing accounting, tax and consulting firm with significant national presence in strategic U.S. geographies. Since 1921, our dedicated professionals have leveraged technical industry expertise to develop customized solutions for clients, create value, and Optimize their performance. We offer a broad array of industry specialists providing services to growth-oriented enterprises and individuals. For more information, visit www.mazarsusa.com.



M A Z A R S

# Exec buying former produce market site

By Ryan Ori

The owner of a Chicago construction firm plans to buy the former home of Stanley's Fresh Fruits & Vegetables, but there are no immediate plans for what will replace the popular produce market on the North Side.

John Novak, the owner of Novak Construction, confirmed he has a contract to buy the property at 1558 N. Elston Ave. for more than $8 million.

Novak said he's buying the land as a long-term investment, with plans to eventually build on it as larger developments nearby — including Sterling Bay's

$6 billion Lincoln Yards mixed-use project — take shape.

"I just know it's a good piece of property, with a lot of activity in that area with Lincoln Yards and the rest," Novak said. "It's more of a long-term play. There's nothing immediate in mind."

Novak, who founded the general contractor in 1980, said he expects to complete the purchase March 2.

That would end a lengthy process to sell the property, starting in July 2018. The produce market closed in April 2019, after 52 years in business, while the real estate remained up for sale.

The land near the Ken-

nedy Expressway is being sold by the family of Stanley's founder Stelios Panagiotaros, also known as Stanley Peters.

Last year, brokers from Chicago-based Paine Wetzel Commercial Real Estate and Champaign-based MWA Capital Advisors said the property would be sold at a Nov. 19 auction. The Stanley's property was packaged with separately owned, adjacent properties to form a combined site of almost 76,000 square feet. Bids were accepted for individual parcels or all of the land.

But the auction was non-binding, and sellers did not sign a contract with the



A sign for Stanley's Fresh Fruits & Vegetables in Chicago. The popular produce market on Chicago's North Side closed after 52 years in business.

ERIN HOOLEY/CHICAGO TRIBUNE 2019

unidentified top bidder. The brokers eventually struck a deal with Novak, who also

had made a bid, Novak said. Peter Panagiotaros, son of the Stanley's founder, con-

firmed the pending sale to Novak but otherwise declined to comment.

Novak said his deal is for about 47,000 square feet of land, which includes the closed produce store.

Novak said he envisions eventually replacing the single-story building with some combination of retail, residential and office space on the site at the high-traffic intersection of Elston and North avenues.

"I'm waiting to see how the area develops," Novak said. "It could be five to 10 years before we decide. There's a lot of options."

*rori@chicagotribune.com*
*Twitter @Ryan_Ori*

---

## Ori

Continued from Page 1

al and comes to fruition, it would bring an influx of residents to a longtime industrial corridor headed for waves of development.

The 160-acre, manmade island was formed by creating a canal in the 1800s, combining it with the North Branch of the Chicago River.

Goose Island today has a mix of manufacturers, distribution centers and loft offices. Chicago's zoning rules prohibited residential development until the city in 2017 created a new land use plan for a 3.7-mile stretch of industrial land along the river. The changes put the wheels in motion for riverfront properties such as Sterling Bay's proposed $6 billion Lincoln Yards development and the planned redevelopment of 37 acres just south of Goose Island owned by broadcast company Tribune Media.

The Greyhound site was carved out as the one Goose Island parcel where apartments are permitted.

The site is mostly at 901 N. Halsted St., with a small parcel across the street at 904 N. Halsted. Greyhound put the property up

for sale in 2017, and the company plans to move its bus repair operation to a new facility in the Canaryville neighborhood on the South Side.

Onni initially struck a deal to buy the Greyhound site for about $50 million in 2018, before it negotiated the price down because of affordable housing requirements. The land is within a pilot area of the city's Affordable Housing Requirement Ordinance, where 20% of residential units must be priced for low- and moderate-income residents.

In other parts of the city, 10% of residential units must be affordable.

Onni initially proposed building half of the affordable units on site and paying an in-lieu fee toward creating the other half within two miles. Buttner shot down that idea, saying the on-site aspect of the pilot area was non-negotiable.

That led Onni to step back from the deal before eventually negotiating the lower purchase price to offset the lower return expected on affordable units. That means if 2,500 apartments are built, 500 of them would have to be deemed affordable.

*rori@chicagotribune.com*
*Twitter @Ryan_Ori*

---

## Program

Continued from Page 1

appointments, she said. They might also have trouble finding therapists or psychiatrists covered by their health insurance plans. Putting those providers in the same space can eliminate wait times and confusion over insurance coverage, Miller said.

The program requires patients be screened for depression at least twice during pregnancy and again after birth. Not all obstetricians screen patients that often, Miller said, though Illinois law requires those providing care before and after birth to offer screenings.

Miller presented unpublished research at the Society for Maternal-Fetal Medicine's annual meeting in Texas last week showing that pregnant women who went through the program were more likely to be screened for depression, and those who screened positive were more likely to get treatment than women who saw the same obstetricians and midwives before the program launched.

Dr. Erika Werner, a board member for the society, said the Northwestern program is one of the first in the U.S. to use collaborative care to handle psychiatric disorders in pregnancy, an approach that is "sorely



Jenny Mason-Frey is part of the Compass program, which helps new moms with support and treatment for stress, depression and anxiety.

STACEY WESCOTT/CHICAGO TRIBUNE

needed."

"Being a new mom is inherently stressful, and asking moms to deal with that stress while they're also dealing with untreated psychiatric disorders is a setup for failure," Werner said.

Dr. Amanda Yeaton-Massey, assistant professor of maternal-fetal medicine at the University of California at San Francisco, said she's looked to the Northwestern program for inspiration as the health system looks to improve coordination between obstetricians and mental health professionals.

"It's a better way to care for moms, and I think a lot of services, when you put them outside the four walls of the clinic, are harder to access," Yeaton-Massey said.

The University of Pitts-

burgh departments of psychiatry and obstetrics are also working with Northwestern's Miller to develop a research proposal that would allow them to use the Compass program.

"We know that there are a lot of barriers for women to get mental health treatment," said Eydie Moses-Kolko, an associate professor of psychiatry at the Western Psychiatric Hospital of the University of Pittsburgh Medical Center. "We can offer them mental health treatment in a way that's more convenient."

Raquel Pendleton, 34, of Chatham, said the Compass program has made a big difference in her life. After Pendleton had her son in September, "I was experiencing something I never

experienced before."

She didn't want to get out of bed, eat or leave the house. "My child was the only thing I wanted to be bothered with," she said.

When those feelings lasted more than two weeks, she knew it was more than the baby blues. She contacted her doctor at Northwestern, and that same week, she met with a Northwestern therapist.

She began to feel better. Now, she's getting out of the house again with her now 4-month-old son, grocery shopping and visiting relatives.

"They've got me on a regimen that helps me get back to myself," she said.

*lschencker@chicagotribune.com*

---

## Amazon

Continued from Page 1

In January, the Tribune reported Amazon was plan-

ning a distribution center on another site formerly known for entertainment. Amazon leased a three-building, 623,000-square-foot distribution center on the former site of the May-

wood Park horse track just west of the city in Melrose Park.

The former Old Chicago site is about three times larger.

The idea of combining shops, amusement park rides and live entertainment under a single roof was innovative when Old Chicago opened in 1975. Canada-West Edmonton Mall and the Mall of America, which combine shopping with attractions like rides, mini golf, escape rooms and aquariums, wouldn't open until 1981 and 1992, respectively.

But Old Chicago was "troubled from the get-go," said Neil Stern, senior partner with Chicago-based retail consultancy McMillanDoolittle, who recalls visiting the indoor amusement park as a kid. "It was never economically viable."

The $20 million, 500,000-square-foot building cracked while under construction, leading to cost overruns. A trapeze artist fell to his death in front of hundreds of spectators. Six Flags Great America opened just one year later in Gurnee, creating competition.

Nor was its location in then-remote Bolingbrook ideal. A 1975 photo shows Old Chicago's massive dome rising above a field

and farm buildings along I-55.

While it had roughly 200 shops, they were designed to host small boutiques, not big, name-brand destination stores, and two years after opening, occupancy had fallen to 54%. Old Chicago drew 2 million visitors in its first year, but just 900,000 in 1977, the Tribune reported at the time.

Old Chicago's original owners sought bankruptcy protection roughly a year after opening. New owners invested $6 million in improvements, but it closed in 1980.

There have been only a handful of similarly massive, entertainment-driven malls since, Stern said. Three — Mall of America, West Edmonton Mall and New Jersey's American Dream Mall, which partially opened last year with attractions including an indoor skill hill — are owned by the same firm, Triple Five Group.

"You have to get everything just perfect about it — the right location, the right mix, filling a hole in the market. I think it's absolutely doable, but it's not like these have taken over the world," he said.

*rori@chicagotribune.com*
*lzumbach@chicagotribune.com*

---

## AUCTION MART

PLEASE CALL 312.222.4089
TO PLACE AD

**NOTIFICATION OF DISPOSITION OF COLLATERAL**

To:    Interested Members of the Public
From:   Golden Fleece Beverages, Inc. ("Secured Party")
        c/o Levenfeld Pearlstein, LLC, Attorney for the Secured Party
        Attn: Jamie L. Burns, 2 N. LaSalle Street, Suite 1300,
        Chicago, IL 60602, (312) 476-7601
Names of   Argo Tea, Inc., Argo Tea Rush, LLC, Argo Tea State/Randolph,
Debtors:   LLC, Argo Tea UGH, LLC, Argo Tea Broadway, LLC, Argo Tea
           Marquette, LLC, Argo Tea NM, LLC, Argo Tea Franklin, LLC,
           Argo Tea Merra, LLC

We will sell the Collateral described below to the highest qualified bidder in public as follows:

Day and Date:   Friday, February 14, 2020        Time:   10:30 a.m.
Place:          Levenfeld Pearlstein, LLC
                2 N. LaSalle Street, Suite 1300
                Chicago, Illinois 60602, (312) 346-8380

Collateral: (a) All of the personal property now owned or at any time hereafter acquired by any Debtor or in which any Debtor now has or at any time in the future may acquire any right, title or interest, including all of each Debtor's Accounts, Chattel Paper, Commercial Tort Claims, Deposit Accounts, Documents, Equipment, Fixtures, General Intangibles, Health Care Insurance Receivables, Farm Products, Goods, Instruments, Intellectual Property, Inventory, Investment Property, Leases, Letter-of-Credit Rights, Money, Supporting Obligations and Identified Claims; (b) all books and records pertaining to any of the foregoing; (c) all Proceeds and products of any of the foregoing, and (d) all collateral security and guaranties given by any Person with respect to any of the foregoing.

The sale will be conducted in accordance with the provisions of the Illinois Uniform Commercial Code. The bid price must be paid in certified check or cashier's check payable to the order of Golden Fleece Beverages, Inc. Twenty Percent (20%) of the successful bid will be paid at the time of the sale and the balance must be paid within two (2) business days of the sale.

If the successful bidder defaults on the secured balance, the Secured Party may retain the initial deposit and, at the Secured Party's option, sell to the next highest bidder. Secured Party reserves the right to bid part or all of the debt secured by the Collateral being sold without certified check or cashier's check as required for other bidders. The Secured Party reserves the right within three (3) business days of the completion of the bidding to reject all bids. The Secured Party reserves the right to adjourn the sale to another date without further authorization or other notice at the time of the sale.

If the Secured Party accepts a bid, the bidder will receive a Secured Party Bill of Sale of the interest of the Secured Party in the Collateral purchased, subject to the terms hereof. The Secured Party makes no representations or warranties as to the condition of the Collateral and the sale is "as is", where "is and "with all faults, subject to any and all claims, liens, claims or encumbrances. There is no warranty as to title, possession, quiet enjoyment, or the like in this disposition.

The Debtors are entitled to an accounting of the unpaid indebtedness, which shall be provided free of charge.

For further information please contact: Jamie L. Burns, Levenfeld Pearlstein, LLC, 2 N. LaSalle Street, Suite 1300, Chicago, IL 60602, Phone: (312) 476-7601 counsel for Secured Party.



REAL ESTATE AUCTION
**FEBRUARY 18, 2020**

DEVELOPMENT OPPORTUNITY

**HARVARD, ILLINOIS**
SEC OF RT. 14 & BRINK ST.

4.4 acres at a centrally located, heavily traveled, stoplight intersection
Zoned B3-Commercial District

Previously Valued to Over
**$1,500,000**

Suggested Opening Bid
**$125,000**

FOR INFORMATION CONTACT

Rick Levin & Associates, Inc.
**312.440.2000 • www.ricklevin.com**

IN CONJUNCTION WITH CBRE

## NOW HIRING

People are searching for part-time & freelance pros just like you!

✓ Tutors
✓ Developers
✓ Accountants
& more...

**Moonlighting**
Opportunity. Everywhere.

**SIGN UP FREE!**
gomnlt.com/chicago-tribune

Chicago Tribune

## Chicago Tribune

Ad Number:
Insertion Number:
Size:
Color Type:

Client Name:
Advertiser:
Section/Page/Zone:    BUSINESS/2002/ALL
Description:

Publication Date:    02/12/2020

This electronic tearsheet confirms the ad appeared in The Chicago Tribune on the date and page indicated. You may not create derivative works, or in any way exploit or repurpose any content.

# Exhibit B

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| 550 ST. CLAIR RETAIL ASSOCIATES, LLC, an Illinois Limited Liability Company, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.  2016 CH 02547 |
| ARGO TEA, INC., a Delaware Corporation, and, ARGO TEA ST. CLAIR, LLC, an Illinois Limited Liability Company, | ) ) ) ) | Consolidated with 2019 L 005567 (transferred to Law Division, Calendar 5, Tax and Miscellaneous |
| Defendants. | ) ) | Remedies) |
| _____ | ) | |
| BEAR CONSTRUCTION COMPANY, | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | |
| ARGO TEA, INC., and ARGO TEA ST. CLAIR, LLC, | ) ) ) | |
| Defendants. | ) ) | |

## PLAINTIFF/CREDITOR'S RESPONSE TO PETITION TO INTERVENE AND UNFREEZE ASSETS FILED BY GOLDEN FLEECE BEVERAGES, INC.

550 St. Clair Retail Associates, LLC, (herein "Plaintiff"), by its attorneys, Regas, Frezados & Dallas LLP, for its response to the Petition to Intervene and Unfreeze Assets filed by Golden Fleece Beverages, Inc. (herein "Golden Fleece"), states as follows:

### INTRODUCTION

Plaintiff previously obtained a judgment against Argo Tea St. Clair, LLC.  Subsequently, Plaintiff brought an action against Argo Tea, Inc. (herein "Argo") to pierce the corporate veil and hold Argo liable for the judgment.  During this lawsuit, Argo's Chief Financial Officer, Roy Yu, admitted that the sole purpose of Argo Tea St. Clair, LLC was to protect Argo from liability under a lease with Plaintiff.  In early fall last year, the trial court entered a judgment in favor of Plaintiff

1

piercing the veil of limited liability and holding Argo liable for the debts of Argo Tea St. Clair, which then totaled $1,662,073.01.  On May 6, 2021, Plaintiff issued citations to discover assets to Argo and served them on Argo's president, Arsen Avakian (herein "Avakian").  Avakian failed to appear as required by the citation, and this Court issued rules to show cause against him on June 15, 2021.  On May 6, 2021, Plaintiff also issued citations to discover assets to Golden Fleece and served the citations on the president of Golden Fleece, which is also Avakian.  Avakian, in his capacity as president of Golden Fleece, again failed to appear to respond to the citations and additional rules to show cause were issued against him on June 15, 2021.  No documents have been produced in response to these citations.  After being contacted by Golden Fleece's counsel regarding the subject of the Petition, Plaintiff has twice written Golden Fleece's counsel to ask when they will  produce the documents requested in the citations and when they will produce Avakian for his citation examination.  However, counsel for Golden Fleece has provided no response.

Plaintiff also served  citations to discover assets on Walgreens, who did appear in this matter.  The citations to Walgreens contained statutory restraining provisions prohibiting the transfer of assets belonging to the debtor, Argo.  Walgreens revealed that it is currently holding $394,455.06 in connection with the sale of Argo Tea beverages and indicated that it would be putting a hold on this account until this matter is resolved.  Despite its failure to provide any response to the citations served upon it nearly two months ago, Golden Fleece has now filed an Emergency Petition to Intervene and Unfreeze Assets (herein "Petition") in connection with the Argo Tea beverage sale proceeds which Walgreens is currently holding.  However, the Petition does not make any effort to demonstrate a basis for its emergency status.  In the Petition, Golden Fleece requests to intervene in this action, but such request is superfluous, Golden Fleece has been

2

served with  citations to discover assets, has failed to respond to the citations to discover assets and has been ordered by this Court to appear and show cause for its failure comply with its obligations.  Golden Fleece further requests that the Court unfreeze the funds being held, based on a small set of unsworn documents that it has selectively provided.  However, Golden Fleece, by its own admission, has assets from Argo, and the accounts Walgreens is holding are proceeds from those assets.   The Illinois statute governing post-judgment proceedings provides for the withholding of these funds until it can be determined whether they can be applied to Plaintiff's judgment, ensuring that Avakian does not dissipate these assets or transfer Argo's assets to yet another entity.

**ARGUMENT**

## I.   THERE IS NO EMERGENCY BASIS FOR THIS MOTION

Golden Fleece does not even attempt to articulate an emergency basis for its Petition; therefore, the Petition should be denied.  This Court does not maintain a standing order articulating the criteria that establish an emergency, but other courts in the Law Division and other divisions of the County Department provide the following guidance:  "True emergencies are rare and limited to a situation which could lead to irreparable injury if relief is not granted before Movant can be heard on the Court's regular motion call."  Uniform Standing Order for All Commercial Calendars (Law Division), July 6, 2020[1].  "Emergency matters are defined as sudden and unforeseen circumstances that may cause injury, loss of life, or damage to property and that requires an urgent

---

[1] http://www.cookcountycourt.org/Portals/0/Law%20Divison/Standing%20Orders/7-6-20%20Commercial_Calendar_Uniform_Order%20-%20Pandemic%20Revision%20-%203_0.pdf?ver=7yRli-NLXzMaGyyuNRik7w%3d%3d

response and remedial action." General Administrative Order No. 2021-05 (Amended) (Chancery Division).[2] Suffice to say, establishing an emergency matter is a high burden.

Golden Fleece does not attempt to meet this burden. Instead, it offers just a single sentence consisting of the rote conclusion that "This Motion is being brought on an emergency basis as Golden Fleece will suffer irreparable harm in the event its assets and right to payment from Walgreens remains frozen . . . ." Golden Fleece makes no effort to explain what harm will occur, when it will occur, how it will occur or why it is irreparable. As there is no emergency basis for the Petition, it should be denied with respect to its request to unfreeze the assets.

## II.    THE ASSETS HELD BY WALGREENS ARE SUBJECT TO THE RESTRAINING PROVISIONS OF THE CITATION TO DISCOVER ASSETS

Not only does Golden Fleece's Petition fail to set forth an emergency basis, it fails to cite any statute or caselaw establishing that the accounts should be unfrozen. Illinois statute provides for the restraint of the assets, and the caselaw interpreting it demonstrates that such a restraining provision is particularly appropriate here.

Illinois Statute provides, *inter alia*, that "A judgment creditor . . . is entitled to prosecute citations to discover assets for the purposes of examining . . . any . . . person to discover assets or income of the debtor . . . and of compelling the application of . . . assets or income discovered towards the payment of the amount due under the judgment." 735 ILCS 5/2-1402(a). "The citation may prohibit the party to whom it is directed from making or allowing any transfer or other disposition of . . . any property . . belonging to the judgment debtor or to which he or she may be entitled or which may thereafter be acquired by or become due to the judgment debtor . . . ." 735

---

[2]

http://www.cookcountycourt.org/Portals/0/Chancery%20Division/General%20Administrative%20Orders/GAO%202021-05%20COVID-19%20%20(Part%2015)%20%20General%20Chancery%20and%20Mechanics%20Lien%20Amended.pdf?ver=4bKYuLV_nHRTl41_DjBkOg%3d%3d

ILCS 5/2-1402(f)(1). The provisions of the statute are construed liberally, and where a third party has transferred assets of the corporate debtor for consideration, with full knowledge of the existence of an outstanding claim against the corporation, then the judgment creditor may properly treat the proceeds from the sale of the assets as property of the corporate debtor, which is recoverable pursuant to 735 ILCS 5/2-1402. *Kennedy v. Four Boys Labor Servs.*, 279 Ill.App.3d 361, 367 (2nd Dist. 1996). Here, Walgreens is holding the assets of Argo and/or assets to which Argo may become entitled. Golden Fleece admits that Argo's inventory and products were sold through Walgreens. Petition, ¶ 9. The frozen accounts represent the proceeds from the sale of those inventory and products, and Avakian had full knowledge of the existence of outstanding claims because he was the president of both Argo and Golden Fleece. Accordingly, under *Kennedy v. Four Boys Labors Servs.*, the frozen proceeds held by Walgreens are properly treated as property of Argo, which is then subject to the restraining provision of 735 ILCS 5/2-1402(f)(1).

Golden Fleece may dispute as much, but the statute does not provide that such dispute is grounds to lift the citation restraint. Rather, it provides that "If it appears that any property . . . discovered . . . is claimed by any person, the court shall . . . permit or require the claimant to appear and maintain his or her right." 735 ILCS 5/2-1402(g). While Golden Fleece is permitted to maintain its right, it is not permitted to ignore lawfully served process, conceal documentation regarding its purported right and use unsupported claims of emergency to obtain a determination of its purported right based on an incomplete subset of documents hand-picked in an effort to support such right. Such an outcome would undermine the purpose of the statute, which is to "provide an efficient and expeditious procedure to discover assets of a judgment debtor and to apply them to payment of the judgment, the restraining provisions of [the statute] do no more than preserve the status quo until the judgment creditor's rights can be determined and forestall a debtor

5

or third party from frustrating the supplementary proceeding before the judgment creditor can reach those assets." *Bank of Aspen v. Fox Cartage, Inc.*, 141 Ill.App.3d 369, 373 (2nd Dist. 1986).

Finally, even though Golden Fleece has hand-picked documents to support its claim while wrongfully denying Plaintiff the opportunity to do the same, the best support it can muster does more to undermine Golden Fleece's claim than support it, demonstrating the necessity of full citation proceedings and an evidentiary hearing. Golden Fleece purports to have obtained the right to the assets of Argo through a UCC sale. Illustrating the highly selective nature of the documents Golden Fleece has chosen to provide, the Petition does not even contain a document that indicates the outcome of UCC sale. Moreover, even if Golden Fleece was the successful bidder at the UCC sale, the UCC sale was plainly illegitimate. A UCC sale is subject to the requirement of commercial reasonableness, and every aspect of the sale, including the method, manner, time, place, and other terms, must be commercially reasonable. 810 ILCS 5/9-610(b). While commercial reasonableness is a question of fact, it is well established that the secured party is required to exercise due diligence to sell the collateral for the best price obtainable and to have a reasonable regard for the debtor's interest. *Voutiritsas v. Intercounty Title Co.*, 279 Ill.App.3d 170, 183 (1st Dist. 1994). Where, by failing to advertise in a manner that will engender competitive bidding, the secured party ensures an opportunity for self-dealing, a court must scrutinize the sale closely, and where no one attends a public auction except the secured creditor, improper notice of public auction may be inferred. *Id.*

On their face, the unauthenticated and inadmissible documents provided by Golden Fleece demonstrate that Golden Fleece, its president Avakian and its counsel made no effort to conduct a commercially reasonable sale. While Avakian, as president of both Argo and Golden Fleece, was undoubtedly aware of the assets that Argo possessed, the notice of disposition does not list the

property to be sold, merely stating that the sale is of "All personal property now owned or at any time hereafter acquired by any Debtor or in which any Debtor now has or at any time in the future may acquire any right, title or interest . . . ."  Petition, Exhibit G.  From this description, a disinterested third-party would have no way of knowing what, if anything, was being sold.  As is shown in Golden Fleece's petition, Argo Tea held numerous patents and copyrights, yet none of this intellectual property was listed in the notice of sale.  The notice was published in a physical newspaper three times over the course of a week, the first publication occurring just nine days before the advertised sale.  Petition, Exhibit H.  Tellingly, no other auctions are listed alongside the notice.  Exhibit H.  The only electronic forum where the notice was published is a website where every newspaper notice required by law in the State of Illinois must be placed.  Exhibit H; *see* 715 ILCS 5/2.1.  Despite advertising Argo Tea products as "available in over 15,000 stores nationwide" and at stores in six states, Golden Fleece made no efforts to advertise the sale of Argo Tea's assets outside of Illinois.  No auctioneer was hired.  The auction was held in the offices of Golden Fleece's counsel and it appears, unsurprisingly, no one attended.  Exhibit H; Petition ¶ 9.

The manifestly unreasonable sale is only the beginning of the wrongful conduct by Avakian and Golden Fleece.  Contemporaneously with this response, Plaintiff is filing a motion for leave to file a complaint against Golden Fleece and Avakian setting forth claims for fraudulent transfer, successor liability and breach of fiduciary duty (derivatively on behalf of Argo).  The foregoing authority is clear: the status quo should be preserved and the proceeds being held by Walgreens should not be released to Golden Fleece, nor otherwise transferred, until Plaintiff's right to the accounts can be determined, in order to forestall Avakian from frustrating these proceedings by dissipating these assets or transferring the assets to yet another third-party.

## CONCLUSION

For all the reasons set forth above, the Petition should be denied.

Regas, Frezados & Dallas LLP

By:    /s Steven M. Dallas
       Attorneys for Plaintiff

Steven M. Dallas      stevend@rfd-law.com
William D. Dallas     wdd@rfd-law.com
Regas, Frezados & Dallas LLP
20 N. Clark Street, Suite 1103
Chicago, IL 60602
(312) 236-4400
Atty No. 08189

# Exhibit C

### IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| 550 ST. CLAIR RETAIL ASSOCIATES, LLC, an Illinois Limited Liability Company, ) ) ) | |
| | Case No. 2016 CH 02547 |
| Plaintiff, ) ) | |
| | (Consolidated with 2019 L 02547) |
| v. ) ) | |
| | Judge Patrick J. Heneghan |
| ARGO TEA, INC., a Delaware Corporation, and, ARGO TEA ST. CLAIR, LLC, an Illinois Limited Liability Company, ) ) ) | |
| | Calendar 5 |
| Defendants. ) ) ) | |

## ORDER

This cause coming to be heard on Golden Fleece Beverages, Inc.'s Emergency Petition to Intervene and Unfreeze Assets and Novack and Macey LLP's Emergency Motion for Time to File a Petition to Intervene, due notice having been given to all parties entitled thereto and the Court being fully advised of the premises:

IT IS HEREBY ORDERED:

1.   Golden Fleece Beverages, Inc.'s Emergency Petition to Intervene and Unfreeze Assets is granted in part and denied in part.  Golden Fleece Beverages, Inc. is granted leave to intervene in this action.  The remainder of Golden Fleece Beverages, Inc.'s request—that the freeze on its account at Walgreens be released and the citation issued by Plaintiff dismissed as to any assets of Golden Fleece Beverages, Inc.—is   denied.

2.   Novack and Macey LLP's Emergency Motion for Time to File a Petition to Intervene is granted.  Novack and Macey is granted until July 26, 2021 to file a Petition to Intervene in this matter.

1

3.     This cause is continued to August 3, 2021 at 10:30 a.m. for status. Plaintiff's Petition to Enjoin Transfer of Proceeds of the Property of Judgment Debtor and Motion for Leave to File and Maintain Action Against Citation Respondents Golden Fleece Beverages, Inc. and Arsen Avakian is advanced to August 3, 2021 at 10:30 a.m. for presentment, and the original motion date of August 4, 2021 is hereby stricken.

Entered:

_____

Judge

Associate Judge Patrick J. Heneghan

JUL 2 6 2021

Circuit Court - 2155

Steven M. Dallas      stevend@rfd-law.com
Regas, Frezados & Dallas LLP
20 N. Clark Street, Suite 1103
Chicago, IL 60602
(312) 236-4400
Atty. No. 08189

2