**UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| GOLDEN FLEECE BEVERAGES, INC., | No. 21-12228 |
| Debtor. | Hon. David D. Cleary |

**DEBTOR'S SUBCHAPTER V PLAN OF REORGANIZATION**
**AND NOTICE OF FILING, CONFIRMATION HEARING,**
**VOTING DEADLINE AND OBJECTION DEADLINE**

This Subchapter V Plan of Reorganization ("Plan") sets forth the proposed restructuring of the debts of Golden Fleece Beverages, Inc. ("GFB" or the "Debtor"). The Debtor seeks your vote to accept the Plan.

You are encouraged to carefully review the full text of this document, including all exhibits and attachments hereto, before deciding how to vote on the Plan. To assist you in your review, please note that a list of definitions and a section of frequently asked questions appear towards the end of this document.

**IN ADDITION TO CASTING YOUR VOTE TO ACCEPT OR REJECT THE PLAN, YOU MAY OBJECT TO THE TERMS OF THE PLAN. IF YOU WISH TO OBJECT TO THE TERMS OF THE PLAN, ON OR BEFORE _____ AT 5:00 P.M. CT, YOU MUST FILE YOUR WRITTEN OBJECTION WITH THE COURT AND SERVE IT PURSUANT TO FED. R. BANKR. P. 3020(B)(1) ON DEBTOR'S COUNSEL, THE UNITED STATES TRUSTEE AND THE SUBCHAPTER V TRUSTEE.**

**YOUR BALLOT STATING HOW YOU ARE VOTING ON THE PLAN MUST BE MAILED SO THAT IT IS ACTUALLY RECEIVED BY DEBTOR'S COUNSEL BY _____ AT THE FOLLOWING ADDRESS: COZEN O'CONNOR, 123 N. WACKER DR., SUITE 1800, CHICAGO, IL 60606, ATTN: PETER J. ROBERTS.**

**A HEARING ON THE CONFIRMATION OF THE PLAN IS SCHEDULED FOR _____ AT 10:30 A.M. CT AND WILL BE HEARD ELECTRONICALLY USING ZOOM FOR GOVERNMENT.**[1] No personal appearance in court is necessary or permitted. To appear and be heard at the confirmation hearing, you must do the following:

---

[1] This Plan is being filed in accordance with 11 U.S.C. § 1189(b). The Debtor anticipates that it will subsequently file a motion with the Court to approve dates and deadlines for balloting, objections and a confirmation hearing on the Plan. This Plan will be amended accordingly once those dates and deadlines are established.

LEGAL\56417569\6

**To appear by video**, use this link: https://www.zoomgov.com. Then enter the meeting ID.

**To appear by telephone**, call Zoom for Government at 1-669-254-5252 or 1-646-828-7666. Then enter the meeting ID.

**Meeting ID and password**. The meeting ID for this hearing is 161 122 6457, and the passcode is Cleary 644. The meeting ID and further information can also be found on Judge Cleary's web page on the court's web site.

Your rights may be affected by this Plan. You should consider discussing this document with an attorney.

GOLDEN FLEECE BEVERAGES, INC.

Date:  March 17, 2022

By:    /s/ Peter J. Roberts
        One of its attorneys

Robert M. Fishman
Peter J. Roberts
Cozen O'Connor
123 North Wacker Drive, Suite 1800
Chicago, IL  60606
P:  (312) 382-3100
F:  (312) 382-8910
rfishman@cozen.com
proberts@cozen.com

## SUMMARY OF THE PLAN AND DISTRIBUTIONS TO CREDITORS

Following is a summary of the Plan, describing the treatment of each class of Creditors and the sources of funding for the Plan, pursuant to Local Bankruptcy Rule 3016-1(1)(a).  The various classes of Claims and the anticipated recovery for each class under the Plan are summarized as follows:

| Class | Type | Undisputed Amount Per Class | Estimated Recovery |
|-------|------|-----------------------------|--------------------|
| 1 | Miscellaneous Secured Claims | unknown | 100% |
| 2 | Priority Unsecured Claims | $2,000 | 100% |
| 3 | General Unsecured Claims | $1,470,487.28 | 20.4% |
| 4 | Equity Interests | N/A | N/A |

The Plan does not classify (i) Administrative Expenses, which consist of the expenses of administration of the Case entitled to priority under § 507(a)(2) of the Code and allowed under § 503(b) of the Code, including without limitation, any actual and necessary expenses of preserving the Debtor's bankruptcy estate (the "Estate"), or (ii) Priority Tax Claims, which consist of tax claims entitled to priority in payment under § 507(a)(8) of the Bankruptcy Code.  The Plan provides that all Allowed Administrative Expenses will be paid in full in the amount allowed by the Court upon the Effective Date of the Plan, in the ordinary course of business after the Effective Date or as soon thereafter as may be practicable, or upon such other terms agreed upon by the Debtor and the holders of Allowed Administrative Expenses.  The Debtor estimates that Allowed Administrative Expenses to be paid under the Plan will total approximately $135,000 as of the Effective Date.  Though the Plan also provides that all Allowed Priority Tax Claims will be paid in full in the ordinary course of business after the Effective Date, the Debtor believes that it is substantially up to date on its tax obligations and that Priority Tax Claims do not exceed $500.

Class 1 is comprised of all Miscellaneous Secured Claims, if any, against the Debtor.  The Plan provides that the holders of Class 1 Allowed Miscellaneous Secured Claims shall be Rendered Unimpaired by the Reorganized Debtor, except to the extent that the holder of a particular Allowed Miscellaneous Secured Claim consents to a different treatment.  The Debtor is unaware of any undisputed Claims that fit within Class 1, and it has included this Class out of an abundance of caution in the event that any such Claims are asserted and Allowed.

Class 2 is comprised of all Priority Unsecured Claims against the Debtor.  The Plan provides that all Class 2 Allowed Priority Unsecured Claims will be paid in the full amount allowed by the Court upon the Effective Date of the Plan or upon such other terms agreed upon by the Debtor and the holders of Allowed Priority Unsecured Claims.  Most of the priority claims against the Debtor as of the Petition Date were satisfied through "first day" orders entered at the beginning

of the Case.  Therefore, the Debtor estimates that Allowed Priority Unsecured Claims to be paid under the Plan will total approximately $2,000 as of the Effective Date.

Class 3 is comprised of all General Unsecured Claims against the Debtor.  Each holder of an Allowed Class 3 General Unsecured Claim shall receive Cash or its equivalent in an amount equal to the holder's pro rata share of five annual distributions following the Effective Date and totaling $300,000 in the aggregate.  Specifically, the five annual distributions shall consist of (i) a $30,000 aggregate distribution on or before December 31, 2022; (ii) a $60,000 aggregate distribution on or before December 31, 2023; (iii) a $65,000 aggregate distribution on or before December 31, 2024; (iv) a $70,000 aggregate distribution on or before December 31, 2025; and (v) a $75,000 aggregate distribution on or before December 31, 2026.  These distributions shall be backstopped by the commitment of the Lender, which is an entity that shall be created and capitalized by certain of the Debtor's board members, to lend the Reorganized Debtor such amounts as may be necessary to ensure that the distributions to Class 3 creditors are made.  On the basis of $1,470,487.28 in undisputed General Unsecured Claims against the Estate, the Debtor estimates that holders of Allowed Class 3 General Unsecured Claims will eventually receive approximately 20.4% of their Claims under the Plan.

Class 4 is comprised of all Equity Interests in the Debtor.  Each holder of an Equity Interest in the Debtor shall retain its prepetition interest in the Debtor, subject to dilution caused by any post-Effective Date capital raising that the Debtor may endeavor to pursue.

The Plan contemplates its funding from the Debtor's existing cash, its working capital assets, and its future business operations.  The Debtor contemplates that these sources, plus the cash flows generated from the Debtor's business, will be sufficient to meet all of Debtor's obligations under the Plan.  As noted above, to the extent that the Debtor's resources prove insufficient to make any contemplated distributions to Allowed Class 3 General Unsecured Claims, the Debtor shall borrow funds from the Lender to make such distributions.  The Debtor shall make all distributions to holders of Allowed Claims as required by the Plan.

All holders of Claims and Equity Interests should refer to Article 2 for information regarding the precise treatment of their Claims and Equity Interests.  Your rights may be affected. **You should read this Plan carefully and discuss it with your attorney, if you have one.  If you do not have an attorney, you may wish to consult one.**

4

# ARTICLE 1
## BACKGROUND OF THE DEBTOR

### 1.1    Filing of the Debtor's Case.

The Debtor filed the above-captioned bankruptcy case (the "Case") under subchapter V of chapter 11 of the Bankruptcy Code on October 27, 2021 (the "Petition Date"). The Debtor continues to manage its financial affairs as debtor in possession under §§ 1182 and 1184 of the Bankruptcy Code. After the Petition Date, Neema Varghese was appointed Subchapter V Trustee for the Case (the "Trustee").

### 1.2    Description and History of the Debtor's Business.

On January 15, 2020, the Debtor was formed as a Delaware corporation for the express purpose of purchasing the secured debt that Argo Tea, Inc. ("Argo") owed to Caribou Coffee Company, Inc. After raising $3.15 million in equity capital, the Debtor purchased the Argo debt from Caribou for $1.6 million.  The Argo debt was secured by substantially all of the assets of Argo and its subsidiaries.

On February 14, 2020, the Debtor conducted a public auction of the Argo collateral in accordance with Article 9 of the Uniform Commercial Code.  The Debtor was the only bidder at, and won, the Article 9 auction with a credit bid of $9 million.  On the basis of its successful bid, the Debtor took title to substantially all of the Argo companies' assets. To facilitate the transition of assets from Argo to the Debtor, the two parties entered into a transition services agreement under which Argo retained certain of its employees after the Article 9 auction and leased them to the Debtor, with the lease payments covering the salaries and benefits of the retained employees. This arrangement continued until July 21, 2021.

Following its purchase of the Argo assets, the Debtor proceeded to use the assets in growing its new business.  The Debtor's overall business strategy focused on selling consumer packaged goods to retailers with a secondary focus on working with licensee-partners who operate cafés.  With the $1.55 million of capital remaining from its initial raise, the Debtor began to build operations, produce inventory, develop new formulas for its beverages, develop a new brand image, and market to customers.  Meanwhile, the Debtor began exiting the direct ownership and operation of cafés.

Following the beginning of the COVID pandemic in March 2020, the Debtor closed all of its retail operations. All company owned café operations were transitioned to licensees, closed permanently, or sold.  As of the Petition Date, the Debtor had only six employees and contacted out all of its manufacturing.

The packaged goods side of the Debtor's business generates about 93% of its revenue, over 80% of which is earned by selling its products to Walgreens and Kwik Trip.

### 1.3    Events Leading to the Filing of the Bankruptcy Case.

The Case was filed as a result of the financial problems that the Debtor experienced from state court litigation brought by 550 St. Clair Retail Associates, LLC ("550 St. Clair"), a former landlord of one of Argo's affiliates. Following the closing of the UCC sale of Argo's assets to the Debtor, 550 St. Clair pursued collection litigation against Argo. In the course of that collection litigation, 550 St. Clair not only obtained citation liens against Argo, but it also managed to obtain state court orders freezing certain funds payable to the Debtor. Those orders and their corresponding asset freezes severely disrupted the Debtor's cash flow and business operations.

By the Petition Date, the Debtor essentially had no access to its working capital. The Debtor filed the Case in order to regain access to that working capital, address the claims of 550 St. Clair, and use the subchapter V platform to restructure its financial affairs through the formulation and confirmation of chapter 11 plan of reorganization.

**1.4    <u>Significant Events During the Bankruptcy Case.</u>**

Immediately upon filing this Case, the Debtor filed a series of motions (collectively, the "First Day Motions") to ensure that its immediate operational needs were met and that its business prospects were preserved as much as possible. Among those First Day Motions were (i) a motion for debtor in possession financing ("DIP Financing Motion"); (ii) a motion to maintain the Debtor's cash management system; (iii) a motion to satisfy prepetition employee obligations; (iv) a motion to pay prepetition taxes; and (v) a motion to maintain existing insurance policies. Shortly thereafter, the Debtor filed a motion to pay certain warehousemen obligations in order to free up its access to certain warehoused goods.

With the exception of the DIP Financing Motion, each of the First Day Motions and the warehousemen obligations motion were granted without substantive opposition. The DIP Financing Motion was contested by 550 St. Clair, who filed a written objection.

Among other actions prior to the Petition Date, 550 St. Clair had obtained and served citations to discover assets upon two of the Debtor's most important customers: Walgreens and Kwik Trip. The citations effectively froze the payment of receivables due to the Debtor from those customers in the aggregate amount of approximately $850,000 (the "Receivables"). As a result, 550 St. Clair not only asserted an interest in the Receivables on a successor liability theory, but it also opposed the Debtor's intentions to grant a senior lien on those Receivables through the DIP Financing Motion or to otherwise use the cash collateral generated from those Receivables in the Debtor's business operations.

Due to the pendency of the 550 St. Clair objection, the Court initially approved the DIP Financing Motion on an interim basis pending a final hearing on the objection and associated litigation over 550 St. Clair's asserted interest in the Receivables. However, rather than incur an inordinate expense litigating with 550 St Clair over its objection and thereby expending valuable resources that could otherwise be marshaled for its benefit of its restructuring efforts, the Debtor immediately engaged in negotiations with 550 St. Clair in an effort to resolve the objection.

The negotiations with 550 St. Clair extended over a period of several weeks. They culminated in 550 St. Clair's agreement to sell its claims and rights against Argo and the Debtor and their respective assets, including the asserted interests in the Receivables, to a consortium of

6

entities that are affiliated with three of the Debtor's board members (collectively, the "Buyers"). Unlike 550 St. Clair, the Buyers agreed to the Debtor's use of the Receivables to fund its business operations.

On December 28, 2021, the Court granted the Debtor's motion to approve certain releases that the Debtor exchanged with 550 St. Clair as a condition of the sale agreement.  The sale agreement between 550 St. Clair and the Buyers closed soon thereafter.  The Buyers then consented to the final approval of the DIP Financing Motion, which was approved by the Court on January 5, 2022.

Shortly thereafter, on January 19, 2022, the Court entered an order setting a bar date of March 10, 2022 ("General Bar Date") for the filing of proofs of claim by non-governmental entities.

On January 26, 2022, the Court granted the Debtor's motion to approve certain releases with Novack & Macey LLP ("Novack") in conjunction with Novack's sale of claims to the Buyers. Like 550 St. Clair, Novack had also asserted an interest in the Walgreens Receivables.  Since the entry of the order approving the Novack motion, the Debtor was able to obtain payment of the Receivables and has used them to fund its business operations.

## 1.5    Avoidable Transfers

The Debtor (and the Reorganized Debtor) do not intend to pursue preference, fraudulent conveyance or other avoidance actions.  Payments to creditors within the ninety days preceding the Petition Date were largely made in the ordinary course of business, and the Reorganized Debtor intends to continue to conduct business with those creditors after the Confirmation Date.  For those reasons, pursuit of these claims would not be beneficial to the Debtor or the Estate.

The Debtor (and the Reorganized Debtor) also does not intend to pursue any avoidance actions against any of the Debtor's insiders.  This is so because the payments to insiders in the year preceding the Petition Date consist of compensation earned and expenses reimbursed in the ordinary course of business of the Debtor.

## ARTICLE 2
## THE PLAN

The Debtor's Plan sets forth how Creditors will be paid. As required by the Code, the Plan places Claims and Equity Interests in various Classes and describes the treatment each Class will receive. The Plan also states whether each Class of Claims or Equity Interests is Impaired or Unimpaired. A Claim or Equity Interest can be Impaired if the Plan alters the legal, equitable or contractual rights to which the holders of such Claim or Equity Interest are otherwise entitled. If the Plan is confirmed, each Creditor's recovery is limited to the amount provided in the Plan.

Only Creditors in Classes that are Impaired may vote on whether to accept or reject the Plan, and only Creditors holding Allowed Claims may vote. A Class accepts the Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the Allowed Claims that actually vote, vote in favor of the Plan. Also, a Class of Equity Interest holders accepts the

7

Plan when at least two-thirds (2/3) in amount of the allowed Equity Interest holders that actually vote, vote in favor of the Plan.  If no holders of Allowed Claims that are eligible to vote in a particular Class vote to accept or reject the Plan, then the Debtor may seek to have the Court deem the Plan to have been accepted by such Class.  A Class that is Unimpaired is deemed to accept the Plan.

If all of the Classes accept the Plan, and the Plan meets all of the applicable requirements of § 1129(a) (except for the disposable income requirement of § 1129(a)(15)), then the Plan will be confirmed as a "Consensual Plan."  If less than all, or no Classes accept the Plan, the Debtor will still seek to have the Plan confirmed under the "cram down" provisions of § 1191(b) of the Bankruptcy Code, and the Debtor believes the Plan meets those requirements.

## 2.1    <u>Unclassified Claims.</u>

Certain types of Claims are automatically entitled to specific treatment under the Code. For example, Administrative Expenses and Priority Tax Claims are not classified. They are not considered Impaired, and holders of such Claims do not vote on the Plan. They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code. As such, the Plan does not place the following Claims in any class:

A.    Administrative Expenses

The Debtor must pay all Administrative Expenses in full, though it may do so pursuant to the terms of the Plan (i.e. over the payment period set out in the Plan), unless the Administrative Claimant agrees to other treatment. If an Administrative Expense is disputed, the Bankruptcy Court must determine the validity and amount of the Administrative Expense, or in other words, "allow" the Administrative Expense. Any Administrative Expense that is undisputed and is due and owing on the Confirmation Date must be paid in accordance with the Plan, or upon such other terms as agreed upon by the Debtor and the Administrative Claimant. If the Administrative Expense is disputed, payment will be made in accordance with the Plan after the Administrative Expense is allowed by the Bankruptcy Court.

There are several types of Administrative Expenses, including the following:

1.    Claims arising out of the ordinary course of the Debtor's business following its filing of the Case that are entitled to be paid in full for the goods or services provided to the Debtor post-Petition Date. This ordinary trade debt incurred by the Debtor after the Petition Date will typically be paid on an ongoing basis in accordance with the ordinary business practices and terms between the Debtor and their trade Creditors.

2.    Claims for the value of goods purchased in the ordinary course of the Debtor's business and received by the Debtor within the 20 days preceding the Petition Date.

3.    Claims for post-Petition Date fees and expenses allowed to professionals, including attorneys and accountants employed upon Bankruptcy Court

8

authority to render services to the Debtor during the course of the Case, under § 330(a) of the Code, and the Trustee. These fees and expenses must be noticed to Creditors and approved by the Bankruptcy Court prior to payment.

The following chart lists the Debtor's estimated Administrative Expenses as of the Confirmation Date, and their proposed treatment under the Plan:

| Type | Estimated Amount Owed | Proposed Treatment |
|---|---|---|
| Expenses arising in the ordinary course of business after the Petition Date | $0.00 | To be paid in full in the ordinary course of business or such later date when it becomes an Allowed Administrative expense. |
| Administrative Tax Claims | $0.00 | To be paid in full in the ordinary course of business or such later date when it becomes an Allowed Administrative expense. |
| The value of goods received in the ordinary course of business within 20 days before the Petition Date | $0.00 | To be paid in full on the Effective Date or such later date when it becomes an Allowed Administrative |
| Professional fees, as approved by the Bankruptcy Court | $110,000 | To be paid in full on the Effective Date or such later date when it becomes an Allowed Administrative expense. |
| Subchapter V trustee fees, as approved by the Bankruptcy Court | $25,000 | To be paid in full on the Effective Date or such later date when it becomes an Allowed Administrative |
| **TOTAL** | $135,000[2] | |

B.    Priority Tax Claims.

Priority Tax Claims are unsecured income, employment, and other taxes described by § 507(a)(8) of the Code. Unless the holder of such a § 507(a)(8) Priority Tax Claim agrees otherwise, it must receive the present value of such Claim, in regular installments paid over a period not exceeding 5 years from the order of relief.

---

[2] Assumes Effective Date of April 30, 2022.

9

Each holder of a Priority Tax Claim will be paid as set forth in the chart below:

| Name of Taxing Authority and Type of Tax | Estimated Amount Owed | Date of Assessment | Treatment |
|---|---|---|---|
| Internal Revenue Service ("IRS") | $0.00 | N/A | Allowed Priority Tax Claims of the IRS, if any, will be paid in full in the ordinary course of business after the Effective Date. |
| Illinois Department of Revenue ("IDOR") | $491.96 | N/A | Allowed Priority Tax Claims of the IDOR, if any, will be paid in full in the ordinary course of business after the Effective Date. |

**2.2    Classes of Claims and Equity Interests.**

The following are the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan:

A.    Classes of Secured Claims

Allowed Secured Claims are Claims secured by property of the Debtor's bankruptcy estate (or that are subject to setoff) to the extent allowed as secured Claims under § 506 of the Code. If the value of the collateral or setoffs securing the Creditor's Claim is less than the amount of the Creditor's Allowed Claim, the deficiency will be classified as a general unsecured Claim.

Class 1 of the Plan consists of all Miscellaneous Secured Claims, if any.

Treatment:  In full satisfaction of every Allowed Miscellaneous Secured Claim, if any, such Allowed Miscellaneous Secured Claim shall be Rendered Unimpaired by the Reorganized Debtor, except to the extent that the holder of a particular Miscellaneous Secured Claim consents to a different treatment.

Voting:  The Class 1 Claims, if any, are Unimpaired and holders of Class 1 Claims are deemed to have accepted the Plan pursuant to § 1126(f), and therefore, are not entitled to vote to accept or reject the Plan.

Estimated Recovery: The Debtor is unaware of any undisputed Claims that fit within Class 1, and it has included this Class out of an abundance of caution in the event that any such Claims are asserted and Allowed.

LEGAL\56417569\6

B.      Classes of Priority Unsecured Claims.

Certain priority Claims that are referred to in §§ 507(a)(1),(4), (5), (6), and (7) of the Code are required to be placed in classes. The Code requires that each holder of such a Claim receive cash on the Effective Date of the Plan equal to the allowed amount of such Claim. However, a class of holders of such Claims may vote to accept different treatment.

Class 2 of the Plan consists of all Priority Unsecured Claims against the Debtor.

Treatment:  In full satisfaction of every Allowed Priority Unsecured Claim, such Allowed Priority Unsecured Claim shall be paid in full amount upon the Effective Date of the Plan or upon such other terms agreed upon by the Debtor and the holder of such Allowed Priority Unsecured Claim.

Voting:  The Class 2 Claims are Unimpaired and holders of Class 2 Claims are deemed to have accepted the Plan pursuant to § 1126(f), and therefore, are not entitled to vote to accept or reject the Plan.

Estimated Recovery:  Most of the priority claims against the Debtor as of the Petition Date were satisfied through the orders that approved the First Day Motions at the beginning of the Case.  Therefore, the Debtor estimates that Allowed Priority Unsecured Claims to be paid under the Plan will total approximately $2,000 as of the Effective Date.

C.      Classes of General Unsecured Claims

General Unsecured Claims are not secured by property of the estate and are not entitled to priority under § 507(a) of the Code.

Class 3 of the Plan consists of all General Unsecured Claims against the Debtor.

Treatment:  Each holder of an Allowed General Unsecured Claim shall receive Cash or its equivalent in an amount equal to the holder's Pro Rata share of the Unsecured Claim Distributions (which total $300,000 and consist of the following five annual distributions: (i) a $30,000 aggregate distribution on or before December 31, 2022; (ii) a $60,000 aggregate distribution on or before December 31, 2023; (iii) a $65,000 aggregate distribution on or before December 31, 2024; (iv) a $70,000 aggregate distribution on or before December 31, 2025; and (v) a $75,000 aggregate distribution on or before December 31, 2026), up to a maximum of one hundred percent (100%) of the Allowed amount of the holder's General Unsecured Claim.

Voting:  The Class 3 Claims are Impaired and holders of Class 3 Claims are entitled to vote to accept or reject the Plan.

Estimated Recovery:   On the basis of $1,470,487.28 in undisputed General Unsecured Claims against the Estate, the Debtor estimates that holders of Allowed Class 3 General Unsecured Claims will eventually receive approximately 20.4% of their Claims through the Distributions.  The Distributions shall be backstopped by the commitment of

11

the Lender to lend the Reorganized Debtor such amounts as may be necessary to ensure that the Distributions are made.

D.      Classes of Equity Interest Holders.

Equity Interest holders are parties who hold an ownership interest (i.e., equity interest) in the Debtor. In a corporation, entities holding shares in the corporation are Equity Interest holders.

Class 4 of the Plan consists of all Equity Interests in the Debtor.

<u>Treatment</u>:  The holders of Equity Interests in the Debtor shall retain their Equity Interests in the Debtor.

<u>Voting</u>:  The Class 4 Equity Interests are Unimpaired and holders of Class 4 Equity Interests are deemed to have accepted the Plan pursuant to § 1126(f), and therefore, are not entitled to vote to accept or reject the Plan.

Notwithstanding the preservation of the Equity Interests as stated above, the Reorganized Debtor shall retain the ability to raise additional equity capital in accordance with applicable law. Therefore, to the extent Reorganized Debtor does raise additional equity capital, the Equity Interests shall be subject to dilution.

## 2.3    <u>Claims Objections.</u>

The Debtor (and Reorganized Debtor) may object to the amount or validity of any Claim filed before the Confirmation Date by filing an objection with the Bankruptcy Court and serving a copy of the objection on the holder of the Claim within 90 days of the Confirmation Date, unless such time period is extended by order of the Bankruptcy Court upon motion therefor. Any timely filed Claim objected to will be treated as a Disputed Claim under the Plan. If and when a Disputed Claim is finally resolved by the allowance of the Claim in whole or in part, the Debtor (or Reorganized Debtor) will pay the Allowed Claim in accordance with the Plan.

Notwithstanding any other provision of this Plan, no payment will be made on account of any Disputed Claim until such time, if any, as the Disputed Claim becomes an Allowed Claim in whole or in part, and no interest shall be payable on the allowed portion, if any, of any Disputed Claim.

## 2.4    <u>Treatment of Executory Contracts and Unexpired Leases.</u>

An "Executory Contract" is a contract under which significant performance remains for the applicable Debtor and the counterparty to the executory contract.  An unexpired lease of non-residential real property is also an executory contract ("Unexpired Lease").  The Debtor have the right to reject, assume (i.e. accept), or assume and assign Executory Contracts and Unexpired Leases to another entity, subject to the Bankruptcy Court's approval. To the extent the Debtor have not already assumed or rejected an Executory Contract or Unexpired Lease prior to the Confirmation Date, the paragraphs below set forth the Debtor's intentions regarding their

12

remaining Executory Contracts and Unexpired Leases and the impact such intentions would have on the counterparties to the same.

### A.      Assumption of Executory Contracts and Unexpired Leases.

The Executory Contracts and Unexpired Leases set forth on <u>Exhibit B</u> shall be assumed by the Debtor as of the Effective Date. Assumption means that the Debtor/Reorganized Debtor has elected to continue to perform its obligations under such Executory Contract or Unexpired Lease, and to cure defaults of the type that must be cured under the Bankruptcy Code, if any. Exhibit B also lists how the Debtor/Reorganized Debtor will cure and compensate the counterparties to such Executory Contracts or Unexpired Leases for any such defaults.

**If you object to the assumption of your Executory Contract or Unexpired Lease, the proposed cure amount for any defaults, or the adequacy of assurance of future performance, you must file and serve your objection to the proposed assumption within the deadline for objecting to the confirmation of the Plan, unless the Bankruptcy Court has set an earlier time.**

### B.      Rejection of Executory Contracts and Unexpired Leases.

The Executory Contracts and Unexpired Leases set forth on <u>Exhibit C</u> shall be rejected by the Debtor as of the Confirmation Date.

Further, as of the Confirmation Date, the Debtor will be conclusively deemed to have rejected all Executory Contracts and/or Unexpired Leases not (a) assumed or rejected prior to the Confirmation Date or (b) listed on Exhibit B hereto as of the Confirmation Date.

Rejection means that the Debtor elected not to continue to perform the obligations under such contract or lease. If the Debtor has elected to reject an Executory Contract or Unexpired Lease, the counterparty to the Executory Contract or Unexpired Lease will be treated as an Unsecured Creditor holding a Claim that arose before the bankruptcy was filed.

**The Deadline for Filing a Proof of Claim Based on a Claim Arising from the Rejection of an Executory Contract or Unexpired Lease Effectuated upon Confirmation of the Plan is 30 Days after the Confirmation Date. Any Claim based on the rejection of an Executory Contract or Unexpired Lease will be barred if the proof of claim is not timely filed, unless the Bankruptcy Court orders otherwise.**

### 2.5      <u>Means for Implementation of the Plan.</u>

In combination with the Debtor's existing cash, cash flows from the Debtor's business will be sufficient to meet all of Debtor's obligations under the Plan. Nothing in this Plan shall prohibit the Debtor, in their sole discretion, from raising additional capital on and after the Effective Date.

The Debtor's projected cash flows in the Financial Projections are conservative relative to historical experience and provide sufficient leeway for unforeseen circumstances. The Debtor's

13

confidence level in the Financial Projections is enhanced by its operating results since the Petition Date.

To the extent that the Reorganized Debtor lacks sufficient cash to make any Unsecured Claim Distribution, the Lender (which is an entity that shall be created and capitalized by certain of the Debtor's board members) shall loan such funds to the Reorganized Debtor as may be necessary for it to make such Unsecured Claim Distribution.  In exchange for making any such loan, the Lender shall be entitled to (i) be repaid by the Reorganized Debtor with interest at the prevailing prime rate existing at the time of such loan, and (ii) receive a security interest in the Reorganized Debtor's assets to secure such repayment.

On the Effective Date if the Plan is confirmed under § 1191(a) and otherwise on the date of discharge under Article 5 of this Plan, all property of the Debtor, tangible and intangible, including, without limitation, licenses, cash and cash equivalents, contracts and contract rights, furniture, fixtures and equipment, will revert, free and clear of all Claims and Equity Interests except as provided in the Plan, to the Reorganized Debtor.  The Debtor expect to have sufficient cash on hand to make the payments they have agreed to pay on the Effective Date.

The Debtor's Board of Directors immediately prior to the Effective Date shall serve as the initial Board of Directors of the Reorganized Debtor on and after the Effective Date. Each member of the Board of Directors shall serve in accordance with applicable non-bankruptcy law and the Reorganized Debtor's articles of incorporation and bylaws, as each of the same which may be amended from time to time.

Except for those restrictions expressly imposed by the Plan or by the Confirmation Order, on and after the Effective Date, the Reorganized Debtor shall operate its business and shall use, acquire, or dispose of property without supervision or approval by the Bankruptcy Court and free of any restrictions imposed under or by virtue of the Bankruptcy Code, the Bankruptcy Rules and any other applicable rules and guidelines.

Without limiting the generality of the foregoing, the Reorganized Debtor may (i) continue the Debtor's business operations; (ii) obtain credit for business operations and to fund payments to creditors if necessary (provided that any Liens granted to secure such additional credit shall be subordinate to any Liens that continue or arise under this Plan); (iii) make capital expenditures; (iv) compromise or settle any post-Effective Date liability, claim or cause of action; and (v) pay all post-Effective Date claims in its ordinary course of business, including claims of its professional representatives for services rendered and costs incurred from and after the Effective Date, without application to or approval by the Bankruptcy Court.

**2.6**     **Disbursing Agent.**

Distributions to Creditors provided for in this Plan will be made by the Reorganized Debtor.

**2.7**     **Post-Confirmation Management.**

The Post-Confirmation Officers of the Debtor, and their compensation, shall be as follows:

14

| Name | Position | Compensation |
|---|---|---|
| Candace MacLeod | President | $120,000 base salary, plus commissions and benefits |

The Post-Confirmation Board of Directors of the Debtor, and their compensation, shall be as follows:

| Name | Position | Compensation |
|---|---|---|
| Arsen Avakian | Director | None |
| Glen Tullman | Director | None |
| Greg Wasson | Director | None |

**2.8** **Post-Confirmation Professionals.** Post Effective Date, the Reorganized Debtor may continue to employ, or hire new, any professionals that they, in their business judgment, believe best serve the interests of the Reorganized Debtor, its business operations and obligations under the Plan, and compensate such professionals, without further order of the Court.

**2.9** **Tax Consequences of the Plan.**

**CREDITORS AND EQUITY INTEREST HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS OR ADVISORS.**

A detailed discussion of the federal, state and local income tax consequences of the Plan is not practicable under the circumstances of the Case, and the Debtor expresses no opinion thereon. Because the income tax consequences of the Plan may be different for different parties, each party is urged to seek advice from its own tax advisor with respect to the income tax consequences of the Plan. No rulings have been or are expected to be requested from the IRS with respect to any tax aspects of the Plan. No representations are being made regarding the particular tax consequences of the confirmation and consummation of the Plan. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

Generally, if a debt for which a debtor is personally liable is forgiven or discharged for less than the full amount owed, the debt is considered canceled for the amount it remained unpaid ("COD Income"), and must be included in such debtor's gross income. However, under certain exceptions, COD Income may be excluded from a debtor's gross income. A specific statutory exception applies to certain debtors if the discharge of indebtedness is granted in a case under the Bankruptcy Code and pursuant to a plan approved by a bankruptcy court in such case. A separate exception applies to taxpayers if the discharge occurs when the taxpayer is insolvent. Section 108 of the Tax Code requires the amount of COD Income so excluded from gross income to be applied to reduce certain tax attributes of the taxpayer. Attribute reduction is calculated only after the tax for the year of the discharge has been determined. Section 108 of the Tax Code further provides that a taxpayer does not realize COD Income from cancellation of indebtedness to the extent that payment of such indebtedness would have given rise to a deduction. Under the Plan, certain holders of Claims are expected to receive less than full payment on their Claims. The Debtor's

15

liability to the holders of such Claims in excess of the amount satisfied by distributions under the Plan will be cancelled and therefore will result in COD income to the Debtor, with an attendant reduction in the Debtor's tax attributes.

Pursuant to the Plan, each holder of an Allowed Claim will receive cash distributions in satisfaction of its Allowed Claim, and should be treated as exchanging such Claim for cash in a fully taxable exchange. The holder of an Allowed Claim should recognize gain or loss equal to the difference between (a) the amount of cash received that is not allocable to accrued interest and (b) the holder's tax basis in the Allowed Claim surrendered therefor by the holder. If the holder of an Allowed Claim held such claim as a capital asset, such gain or loss will constitute a capital gain or loss (long term if held for more than one year), otherwise, such gain or loss will be ordinary in nature. To the extent that a portion of the cash received in exchange for the Allowed Claims is allocable to accrued but untaxed interest, the holder may recognize ordinary income.

**HOLDERS OF ALLOWED CLAIMS OR EQUITY INTERESTS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF INCOME, GAIN OR LOSS FOR FEDERAL INCOME TAX PURPOSES, ON ACCOUNT OF THEIR ALLOWED CLAIMS OR EQUITY INTERESTS.**

### 2.10   Risk Factors/Mitigating Factors.

The Debtor's available cash as of the Effective Date and cash generated from business operations after the Effective Date is expected to be sufficient to fund the Debtor's operations and make all anticipated Plan payments on and after the Effective Date. However, the following specific risks exist in connection with confirmation and implementation of the Plan:

### A.   Bankruptcy Law Considerations.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtor believes that the classification of the Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtor created Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims or Equity Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

In the event that certain, or even all, Classes fail to meet the minimum Class vote requirements, the Debtor may request a cramdown of such non-accepting Classes. The Debtor believes that the Plan satisfies the cramdown requirements. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual confirmation or consummation of the Plan may result in, among other things, increased expenses relating to professional compensation. Failure to secure a cramdown or to suitably amend the Plan, if required, will in all likelihood prevent confirmation of the Plan.

If no plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of the Debtor's creditors, the Case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate assets

for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtor believes that liquidation under chapter 7 would result in smaller distributions being made to unsecured creditors than those provided for in the Plan because of (1) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than the Debtor's business being reorganized as a going concern; (2) additional administrative expenses involved in the appointment of a trustee; and (3) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, and from the rejection of leases and other executory contracts in connection with a cessation of the Debtor's operations.

### B.     Business Risks.

The beverage industry in which the Debtor operates is competitive. The Reorganized Debtor will compete with other companies that provide similar goods. There is no assurance that the Reorganized Debtor will be able to successfully compete, achieve their growth objectives or sustain or build their reputation in the Chicagoland area. Accordingly, the Debtor cannot predict with certainty what effect competitive pressures will have on the business going forward.

### C.     Argo Claims Asserted Against the Debtor.

Though the Debtor only acquired the assets of Argo and assumed none of Argo's liabilities, several Argo creditors have nevertheless asserted claims against the Debtor based upon liabilities incurred by Argo.  Based on the Debtor's review of proofs of claim filed in the Case prior to the General Bar Date, approximately $3,456,000 in unsecured claims have been asserted against the Debtor based upon debts that are owed by Argo, not the Debtor.  Though the Debtor intends to object to these claims, a risk still exists that the claims could be allowed against the Estate to some extent.  To the extent that the allowance of those claims does occur, the pro rata Distributions payable to Class 3 General Unsecured Claims will be diluted.

### D.     Risks Associated with Forward Looking Statements.

The financial information contained in this Plan has not been audited. In preparing this Plan, the Debtor relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtor has used its reasonable business judgment to ensure the accuracy of the financial information provided in the Plan, and while the Debtor believes that such financial information fairly reflects the financial condition of the Debtor, the Debtor is unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

This Plan contains projections concerning the financial results of the Reorganized Debtor's operations, including the Financial Projections, which are, by their nature, forward-looking, and which projections are necessarily based on certain assumptions and estimates. Should any or all of these assumptions or estimates ultimately prove to be incorrect, the actual future experiences of the Reorganized Debtor may turn out to be different from the Financial Projections. The Financial Projections represent the Debtor's management team's best estimate of the Debtor's future financial performance.

LEGAL\56417569\6

Specifically, the projected financial results contained in this Plan reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtor, some of which may not materialize, including, without limitation, assumptions concerning: (a) the timing of confirmation and consummation of the Plan in accordance with its terms; (b) the anticipated future performance of the Reorganized Debtor, including, without limitation, the Reorganized Debtor's ability to maintain or increase revenue and gross margins, control future operating expenses or make necessary capital expenditures; (c) general business and economic conditions; and (d) overall industry performance and trends. The Financial Projections also depend on the Debtor's ability to retain key personnel. While the Debtor believes that the Financial Projections are reasonable and conservative, there can be no assurance that they will be realized and are subject to known and unknown risks and uncertainties, many of which are beyond their control. If the Debtor does not achieve these projected financial results, (1) the value of the Equity Interests may be negatively affected, (2) the Reorganized Debtor may lack sufficient liquidity to maintain operations after the Effective Date, and (3) the Reorganized Debtor may be unable to pay post-Effective Date obligations. Moreover, the financial condition and results of operations of the Reorganized Debtor from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtor's historical financial statements.

## ARTICLE 3
## FEASIBILITY OF PLAN

As a condition to confirmation, the Bankruptcy Code generally requires that confirmation is not likely to be followed by the liquidation of the Debtor or the need for further financial reorganization.  This requirement is generally referred to as the feasibility test of § 1129(a)(11) of the Bankruptcy Code.  If applicable, as set forth under § 1191(c)(3) of the Bankruptcy Code, there must be a reasonable likelihood that the Debtor will be able to make all payments under the Plan. The Debtor submits that the Plan is feasible.

As evidenced by the Debtor's financial projections attached hereto as <u>Exhibit A</u> (the "Financial Projections"), the Debtor believe their financial condition will continue to improve under the course set out in their Plan, and enable them to meet their obligations under the Plan.  As set forth in the Financial Projections, the Debtor expects to generate sufficient cash from operations to satisfy all Allowed Claims pursuant to the Plan and to generate additional value after the Effective Date for the holders of Equity Interests. Moreover, in the event that the Reorganized Debtor lacks sufficient cash to make any of the Unsecured Claims Distributions, the Lender will loan such cash to the Reorganized Debtor in order to ensure that the Unsecured Claims Distributions are made.

**You should consult with your accountant or other financial advisor if you have any questions pertaining to the Financial Projections.**

### 3.1    <u>Remedies Applicable only if Plan is Confirmed under § 1191(b).</u>

If the Plan is confirmed under § 1191(b) of the Bankruptcy Code, the Plan provides the following remedies, subject to § 1193(c) of the Bankruptcy Code.

18

Upon an Event of Default with respect to Allowed Unsecured Claims, the Trustee or any other party interest shall be entitled to seek conversion of the Case to one under chapter 7 of the Bankruptcy Code by filing a motion with the Bankruptcy Court and providing notice to the Reorganized Debtor and their counsel, the United States Trustee, the Trustee and all other parties requesting notice in the Case. If the Bankruptcy Court grants any such motion to convert the Case, the unpaid balance of Allowed Unsecured Claims shall be accelerated and immediately due and payable.

Any and all defaults under the Plan shall constitute an "Event of Default" provided that: (i) written notice of such default is provided to the Reorganized Debtor and their counsel, the Trustee, the United States Trustee and all other parties requesting notice in the Case; and (ii) such default is not cured within ten (10) Business Days of the Reorganized Debtor's actual receipt of such default notice, unless such default relates to the lapse of requisite insurance under this Plan which shall be cured within three (3) Business Days of the Reorganized Debtor's actual receipt of such default notice.

Nothing herein shall alter the Reorganized Debtor's right to file a motion with the Bankruptcy Court seeking to (a) modify the Plan pursuant to section 1193(c), (b) continue the imposition of the automatic stay pursuant to section 362 or (c) seek other relief under the Bankruptcy Code or other applicable law with respect to any Event of Default.

## ARTICLE 4
## LIQUIDATION ANALYSIS

To confirm the Plan, the Bankruptcy Court must find that all Creditors and Equity Interest holders who do not accept the Plan will receive at least as much under the Plan as such Claimants and Equity Interest holders would receive in a Chapter 7 liquidation. A liquidation analysis is attached hereto as <u>Exhibit D</u>. As set forth therein, after taking into account the anticipated liquidation value of the Debtor's assets, as well as the costs of administration of a Chapter 7 case, it is unlikely if the Case is converted to one under Chapter 7 of the Bankruptcy Code that sufficient funds will remain for general unsecured creditors in an amount that would permit them to receive more than they would receive under this Plan. The Debtor estimates, that under a best case liquidation scenario, general unsecured creditors would not receive more than a 12.5% distribution on their Allowed Claims, as compared to a 20.4% distribution for all Creditors with Allowed Claims under the Plan.

The liquidation valuations in the Liquidation Analysis have been prepared solely for use in this Plan and do not represent values that are appropriate for any other purpose. Nothing contained in the Liquidation Analysis is intended to be or constitutes a concession by or admission of the Debtor for any purpose.

## ARTICLE 5
## DISCHARGE

<u>Discharge.</u> If the Plan is confirmed consensually under § 1191(a) of the Bankruptcy Code, then on the Effective Date of this Plan, the Debtor will be discharged from any debt that

arose before confirmation of this Plan, to the extent specified in § 1141(d)(1) of the Bankruptcy Code.

If the Plan is confirmed under § 1191(b) of the Bankruptcy Code, then as soon as practicable after the completion by the Debtor of all payments due within the first three years of the Plan, or such longer period not to exceed five years, unless the Court approves a written waiver of discharge executed by the Debtor after the entry of the order for relief in the Case, the Court shall grant the Debtor a discharge of all debts provided in § 1141(d)(1)(A) of the Bankruptcy Code, and all other debts allowed under § 503 of the Bankruptcy Code and provided for in the Plan, except any debts on which payments are due in years four and five of the Plan or of the kind specified in § 523(a) of the Bankruptcy Code.

In either instance, the automatic stay imposed under § 362(a) of the Bankruptcy Code shall remain in place until the Debtor is granted a discharge, the automatic stay is terminated by a Final Order, or the Case is otherwise closed or dismissed.  11 U.S.C. § 362(c)(2).  For the avoidance of doubt, nothing herein discharges the Debtor from obligations under Executory Contracts and Unexpired Leases that were assumed pursuant to § 365 of the Bankruptcy Code.

## ARTICLE 6
## GENERAL PROVISIONS

### 6.1    Title to Assets.

On the Effective Date, if the Plan is confirmed under § 1191(a) and otherwise on the date of discharge under Article 5 of this Plan, all property of the Debtor, tangible and intangible, including, without limitation, licenses, cash and cash equivalents, contracts and contract rights, furniture, fixtures and equipment, will revert, free and clear of all Claims and Equity Interests except as provided in the Plan and/or the Confirmation Order, to the Reorganized Debtor.

### 6.2    Binding Effect.

If the Plan is confirmed, the provisions of the Plan will bind the Debtor, the Reorganized Debtor and all Creditors and Equity Interest holders, whether or not they accept the Plan. The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of the successors or assigns of such entity.

### 6.3    Severability.

If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

### 6.4    Retention of Jurisdiction by the Bankruptcy Court.

Until the Case is closed, the Bankruptcy Court shall retain the most extensive jurisdiction permissible.  Except as otherwise provided in this Plan, the Bankruptcy Court shall retain jurisdiction to hear and determine all Claims against and Equity Interests in the Debtor, and to adjudicate and enforce all other causes of action which may exist on behalf of the Debtor (or

LEGAL\56417569\6

Reorganized Debtor). Nothing contained herein shall prevent the Debtor (or Reorganized Debtor) from taking such action as may be necessary in the enforcement of any cause of action which the Debtor has or may have and which may not have been enforced or prosecuted by the Debtor, which cause of action shall survive confirmation of this Plan and shall not be affected thereby except as specifically provided herein.

In addition to the foregoing, the Bankruptcy Court shall retain exclusive jurisdiction for the following specific purposes after the Confirmation Date.

(a)     to modify this Plan after the Confirmation Date, pursuant to the provisions of the Bankruptcy Code and the Bankruptcy Rules;

(b)     to correct any defect, cure any omission, reconcile any inconsistency, or make any other necessary changes or modifications in or to this Plan or the Confirmation Order as may be necessary to carry out the purposes and intent of this Plan;

(c)     to assure the performance by the Debtor (or Reorganized Debtor) of their obligations to make Distributions under this Plan; including, but not limited to Distributions to holders of Allowed Claims (or to the Trustee, as the case may be) pursuant to the provisions of this Plan;

(d)     to enter such orders or judgments, including, but not limited to, injunctions as may be necessary or appropriate to (i) enforce the title, rights, and powers of the Debtor (or Reorganized Debtor), and (ii) implement or consummate the provisions of this Plan and the Confirmation Order, except as otherwise provided herein;

(e)     to decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtor that may be pending on the Effective Date, or brought thereafter by the Reorganized Debtor, including the causes of action retained and preserved under this Plan, and to hear and determine any motions or contested matters involving tax, tax refunds, tax attributes, tax benefits, and similar or related matters with respect to the Debtor (or Reorganized Debtor) arising on or prior to the Effective Date, arising on account of transactions contemplated by the Plan Documents, or relating to the period of administration of the Case;

(f)     to hear and determine all applications for compensation of professionals and reimbursement of expenses under §§ 330, 331, or 503(b) of the Bankruptcy Code;

(g)     to enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated or if Distributions pursuant to this Plan are enjoined or stopped;

(h)     to determine any other matters that may arise in connection with or relate to this Plan or the Confirmation Order;

LEGAL\56417569\6

(i)    to consider and act on the compromise and settlement of any Claim against or Interest in the Debtor or its Estate, including, without limitation, any disputes relating to the General Bar Date or governmental bar date;

(j)    to hear and determine all questions and disputes regarding title to the assets of the Debtor or its Estate;

(k)    to hear and determine any other matters related hereto, including the implementation and enforcement of all orders entered by the Bankruptcy Court in the Case; and

(l)    to enter an order closing the Case.

**6.5    Exculpation/Release.  Neither the Debtor, Reorganized Debtor, nor any of their respective present or former members, officers, directors, managers, officers, employees, advisors, or professionals (collectively, the "Indemnified Persons") shall have or incur any liability to any holder of a Claim or an Equity Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, professionals, affiliates, or any of their successors or assigns, for any act or omission arising on or before the Effective Date in connection with, relating to, or arising out of, the Case, formulating, negotiating or implementing the Plan, the pursuit of confirmation of the Plan, the confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their actual fraud, gross negligence or willful misconduct, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan; provided, however, that this shall not operate to waive and release the rights of the releasing parties to enforce the Plan, any related confirmation order, any related agreements, instruments, and other documents delivered, referenced or incorporated  in connection with the Plan or assumed or reinstated pursuant to the Plan or order of the Bankruptcy Court. To the fullest extent permitted by applicable law, the Debtor and Reorganized Debtor will indemnify, hold harmless, defend and reimburse the Indemnified Persons and each of their designated representatives from and against any and all losses, claims, causes of action, damages, fees, expenses, liabilities and actions, for any act or omission in connection with, relating to, or arising out of, the Case, formulating, negotiating or implementing the Plan, the pursuit of confirmation of the Plan, the confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for actual fraud, gross negligence or willful misconduct as determined by a Final Order.  All rights of the Indemnified Persons exculpated and indemnified pursuant hereto shall survive confirmation of the Plan and the closing of the Case.**

**6.6    Captions.**

The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

**6.7    Professional Fees.**    Final applications for payment of compensation and reimbursement of expenses arising on or before the Effective Date shall be filed by any professionals required to do so under §§ 330, 331 and/or 503(b) of the Bankruptcy Code and/or

22

Court order on or before the 45th day after the Effective Date, unless such time is extended by further order of the Court.

### 6.8    Conditions to Effectiveness of Plan.

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived by the Debtor in its sole discretion:

(a) all governmental and material third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the Plan and transactions contemplated by the Plan shall be in full force and effect (which, in the case of an order of judgment of any Court, shall mean a Final Order), and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions; and

(b) all documents and agreements necessary to implement the Plan shall have (i) been tendered for delivery, and (ii) been effected or executed by all parties thereto, or will be deemed executed and delivered by virtue of the effectiveness of the Plan as expressly set forth herein, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

If the Effective Date does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Equity Interest or Class of Claims or Equity Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Equity Interests; (b) prejudice in any manner the rights of the Debtor, the Trustee, or any other party in interest; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtor, the Trustee, or any other party in interest.

### 6.9    Modification of Plan.

The Debtor or Reorganized Debtor may modify the Plan as provided in § 1193.

### 6.10    Final Decree.

Once the Estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Reorganized Debtor shall file a motion with the Bankruptcy Court to obtain a final decree to close the case. Alternatively, the Bankruptcy Court may enter such a final decree on its own motion.

### 6.11    Notices.    All notices required to be given hereunder must be in writing, and delivered to by either personal delivery or overnight courier, at the addresses set forth below, and will be deemed received upon delivery.

To the Debtor/Reorganized Debtor:

Candace McLeod
31515 Beechwood Drive
Warren, MI  48088

With a copy to:

Robert M. Fishman
Peter J. Roberts
Cozen O'Connor
123 N. Wacker Dr., Suite 1800
Chicago, IL  60606


To the Trustee:

Neema T. Varghese
NV Consulting Services
701 Potomac, Suite 100
Naperville, IL 60565

**6.12    Governing Law.**  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of Illinois shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, without giving effect to the principles of conflicts of law thereof.

## ARTICLE 7
## ATTACHMENTS

The following documents accompany this combined Plan and disclosure statement:

Debtor's Financial Projections, annexed as Exhibit A.

Executory Contracts and Unexpired Leases to be Assumed, annexed as Exhibit B.

Executory Contracts and Unexpired Leases to be Rejected, annexed as Exhibit C.

Liquidation Analysis, annexed as Exhibit D.

## ARTICLE 8
## FREQUENTLY ASKED QUESTIONS

**What Is the Debtor Attempting to Do in Subchapter V of Chapter 11?** Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Under Chapter 11, a Debtor attempts to restructure the Claims held against it. Formulation and confirmation of a plan of reorganization is the primary goal of Chapter 11. Subchapter V of Chapter 11 is a subchapter of Chapter 11 that is specifically tailored to small businesses that as of the Petition Date, have liquidated, non-

24

contingent debt in an aggregate amount of less than $7,500,000.  The Plan is the legal document which sets forth the manner and the means by which holders of Claims against a Debtor will be treated.

**How Do I Determine Which Class I Am In?** To determine the Class of your Claim or interest, you must first determine whether your Claim is secured or unsecured. Your Claim is secured if you have a validly perfected security interest or lien in collateral owned by the Debtor. If you do not have any collateral, your Claim is unsecured. The Table of Contents will direct you to the treatment provided to the Class in which you are grouped. The pertinent section of the Plan dealing with that Class will explain, among other things, who is in that Class, what is the size of the Class, what you will receive if the Plan is confirmed, and when you will receive what the Plan has provided for you if the Plan is becomes effective. Section 2.2 lists all Classes of Claims and Equity Interests.

**Why Is Confirmation of a Plan of Reorganization Important?** Confirmation of the Plan is necessary because if the Plan is confirmed, the Debtor and all of its Creditors are bound by the terms of the Plan. If the Plan is not confirmed, the Debtor may not pay Creditors as proposed in the Plan while the Debtor remains in bankruptcy.

**What Is Necessary to Confirm a Plan of Reorganization?** Confirmation of the Plan can either proceed consensually or nonconsensually.  Consensual confirmation under § 1191(a) of the Bankruptcy Code requires, among other things, that each Impaired Class of Claims and Equity Interests vote in favor of the Plan by two-thirds of that Class' total dollar amount and a majority in number of that Class' Claims actually voted.

If one or more, or even all of the Classes of Claims and Interest do not accept the Plan, then the Debtor may still confirm the Plan on a nonconsensual basis but only if certain additional elements regarding the ultimate fairness of the Plan to the creditors are shown as required under § 1191(b) of the Bankruptcy Code.

**Am I Entitled to Vote on the Plan?** Any Creditor of the Debtor whose Claim is Impaired under the Plan is entitled to vote, if either (i) the Creditor's Claim has been scheduled by the Debtor and such Claim is not scheduled as disputed, contingent, or unliquidated, or (ii) the Creditor has filed a proof of Claim on or before the last date set by the Bankruptcy Court for such filings and such Claim is not subject to a pending objection. Any Claim to which an objection has been filed (and such objection is still pending) is not entitled to vote, unless the Bankruptcy Court temporarily allows the Creditor to vote upon the Creditor's motion. Such motion must be heard and determined by the Bankruptcy Court prior to the date established by the Bankruptcy Court to confirm the Plan.

**How Do I Determine Whether I Am in an Impaired Class?** Section 2.2 of the Plan identifies the Classes of Creditors whose Claims are Impaired. If your Claim is Impaired, your vote will be considered by the Bankruptcy Court.

**When Is the Deadline by Which I Need to Return My Ballot?** The Plan is being distributed to all Claim holders for their review, consideration and approval. A ballot must be mailed so that it is actually received by Debtor's counsel by _____ at the following

address: Cozen O'Connor, 123 N. Wacker Drive, Suite 1800, Chicago, IL 60606, Attn: Peter J. Roberts.

**How Do I Determine When and How Much I Will Be Paid?** In the Summary at the beginning of the Plan and Section 2.2, the Debtor have provided both written and financial summaries of what they anticipate each Class will receive under the Plan.

## ARTICLE 9
## DEFINITIONS

The definitions and rules of construction set forth in §§ 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Code are used in this Plan. The definitions that follow that are found in the Code are for convenience of reference only, and are superseded by the definitions found in the Code:

**9.1**    **550 St. Clair**: Has the meaning ascribed to it in Article I, Section 3.

**9.2**    **Administrative Creditor**: Any person entitled to payment of an Administrative Expense.

**9.3**    **Administrative Expense**: Any cost or expense of administration of the Case entitled to priority under § 507(a)(2) of the Code and allowed under § 503(b) of the Code, including without limitation, any actual and necessary expenses of preserving the Debtor's estate, any actual and necessary expenses incurred following the filing of the bankruptcy petition by the Debtor, allowances of compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under the Bankruptcy Code, and any fees or charges assessed against the Debtor's estate under Chapter 123, Title 28, United States Code.

**9.4**    **Administrative Tax Claim**: Any tax incurred pursuant to § 503(b)(1)(B) of the Code.

**9.5**    **Allowed Administrative Expense:** Any claim against the Debtor for an Administrative Expense pursuant to § 503(b) of the Bankruptcy Code that is allowed by Final Order or otherwise agreed by the Debtor, other than any Administrative Tax Claim.

**9.6**    **Allowed or Allowed Claim**: Any claim against the Debtor pursuant to § 502 of the Code to the extent that: (a) a Proof of Claim was either timely filed or was filed late with leave of the Bankruptcy Court or without objection by the Debtor, and (b) as to which either (i) a party in interest, including the Debtor, does not timely file an objection, or (ii) is allowed by a Final Order.

**9.7**    **Allowed Priority Tax Claim**: A Priority Tax Claim to the extent that it is or has become an Allowed Claim, which in any event shall be reduced by the amount of any offsets, credits, or refunds to which the Debtor shall be entitled on the Confirmation Date.

LEGAL\56417569\6

**9.8**   **Allowed Secured Claim**:  Allowed Secured Claims are claims secured by property of the Debtor's bankruptcy estate (or that are subject to setoff) to the extent allowed as secured claims under § 506 of the Code

**9.9**   **Allowed Unsecured Claim**:  An Unsecured Claim to the extent it is, or has become, an Allowed Claim, which in any event shall be reduced by the amount of any offsets, credits, or refunds to which the Debtor shall be entitled on the Confirmation Date.

**9.10**   **Argo**:  Has the meaning ascribed to it in Article I, Section 2.

**9.11**   **Bankruptcy Code or Code**:  The Bankruptcy Reform Act of 1978, as amended and codified as Title 11, United States Code.

**9.12**   **Bankruptcy Court or Court**.  The United States Bankruptcy Court for the Northern District of Illinois.

**9.13**   **Bankruptcy Rules**:  The Federal Rules of Bankruptcy Procedure.

**9.14**   **Business Day**:  Any day except any Saturday, any Sunday, or any day which is a federal legal holiday or any day on which banking institutions are authorized or required by law or other governmental action to close.

**9.15**   **Buyers**:  Has the meaning ascribed to it in Article I, Section 4.

**9.16**   **Case**:  Has the meaning ascribed to it in Article I, Section 1.

**9.17**   **Cash**:   Cash, cash equivalents and other readily marketable securities or instruments issued by a person other than the Debtor, including, without limitation, readily marketable direct obligations of the United States of America, certificates of deposit issued by banks and commercial paper of any entity, including interest accrued or earned thereon.

**9.18**   **Claim:**  Any "right to payment from the Debtor whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, secured or unsecured; or any right to an equitable remedy for future performance if such breach gives rise to a right of payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, disputed, undisputed, secured or unsecured." 11 U.S.C. § 101(5).

**9.19**   **Class**:  A category of holders of claims or interests which are substantially similar to the other claims or interests in such class.

**9.20**   **Confirmation**:  The entry by the Bankruptcy Court of an order confirming this Plan.

**9.21**   **Confirmation Date**:  The Date upon which the Bankruptcy Court shall enter the Confirmation Order; provided however, that if on motion the Confirmation Order or consummation of the Plan is stayed pending appeal, then the Confirmation Date shall be the entry

of the Final Order vacating such stay or the date on which such stay expires and is no longer in effect.

**9.22** __Confirmation Hearing__: The hearing to be held on _____ to consider confirmation of the Plan.

**9.23** __Confirmation Order__: An order of the Bankruptcy Court or any amendment thereto confirming the Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code.

**9.24** __Creditor__: Any person who has a Claim against the Debtor that arose on or before the Petition Date.

**9.25** __Debtor or GFB__: Have the meaning ascribed to them in Article 1, Section 1 herein.

**9.26** __DIP Financing Motion__: Has the meaning ascribed to it in Article I, Section 4.

**9.27** __Disputed Claim__: Any claim against the Debtor pursuant to § 502 of the Code that the Debtor has in any way objected to, challenged or otherwise disputed.

**9.28** __Distributions__: The property required by the Plan to be distributed to the holders of Allowed Class 3 General Unsecured Claims.

**9.29** __Effective Date__: The first date on which all of the conditions precedent described in Article VI, Section 8 of the Plan have occurred or have been waived.

**9.30** __Equity Interest__: An stock ownership interest or warrant interest in the Debtor.

**9.31** __Event of Default:__ Has the meaning ascribed to it in Article III, Section 1.

**9.32** __Executory Contract__: Has the meaning ascribed to it in Article II, Section 4.

**9.33** __Estate__: Has the meaning ascribed to it in the Summary of the Plan and Distributions to Creditors.

**9.35** __Financial Projections__: The Debtor's financial projections attached hereto as Exhibit A.

**9.36** __Final Order__: An order or judgment of the Bankruptcy Court that has not been reversed, stayed, modified or amended and as to which (a) any appeal that has been taken has been finally determined or dismissed, or (b) the time for appeal has expired and no notice of appeal has been filed.

**9.37** __First Day Motions__: Has the meaning ascribed to it in Article I, Section 4.

**9.38** __General Bar Date__: March 10, 2022, the deadline set by the Court for the filing of proofs of claim by non-governmental entities.

LEGAL\56417569\6

**9.39** __General Unsecured Claim__: Any Claim that is not an Administrative Expense, an Administrative Tax Claim, a Priority Tax Claim, a Priority Unsecured Claim, or a Miscellaneous Secured Claim.

**9.40** __Impaired__: When used in reference to a Claim or Interest, means a Claim or Interest that is impaired within the meaning of § 1124.

**9.41** __IRC__: The Internal Revenue Code

**9.42** __Lender__: An entity that shall be created and capitalized by certain of the Debtor's board members to loan such funds to the Reorganized Debtor as may be necessary for it to make the Unsecured Claim Distributions.

**9.43** __Liquidation Analysis__: The Debtor's liquidation analysis attached hereto sas Exhibit D.

**9.44** __Miscellaneous Secured Claim__: Any Secured Claim against the Debtor.

**9.45** __Miscellaneous Secured Creditor__: Any creditor that holds a Miscellaneous Secured Claim.

**9.46** __Novack__: Has the meaning ascribed to it in Article I, Section 4.

**9.47** __Petition Date__: October 27, 2021, the date the Debtor filed its voluntary petition under chapter 11 of the Bankruptcy Code.

**9.48** __Plan__: This Plan, either in its present form or as it may be altered, amended, or modified from time to time.

**9.49** __Plan Proponent__: The Debtor.

**9.50** __Priority Tax Claim__: Any Claim entitled to priority in payment under § 507(a)(8) of the Bankruptcy Code.

**9.51** __Priority Unsecured Claim__: Any Claim, other than an Administrative Expense Claim or Priority Tax Claim, that is entitled to priority in payment pursuant to § 507(a).

**9.52** __Pro Rata__: With regard to a particular Allowed Claim and any distribution on account of that Allowed Claim, the ratio of the amount of such Allowed Claim to the aggregate amount of all Allowed Claims in the same Class (but not including Claims disallowed by a Final Order).

**9.53** __Receivables__: Has the meaning ascribed to it in Article I, Section 4.

**9.54** __Rendered Unpaired__: When used in reference to a Claim or Interest, a Claim or Interest that, at the option of the Reorganized Debtor, is rendered unimpaired within the meaning of either § 1124(1) or § 1124(2).

LEGAL\56417569\6

**9.55**   **Reorganized Debtor**: The Debtor after the Effective Date.

**9.56**   **Schedules**:  Schedules and Statement of Financial Affairs, as amended, filed by the Debtor with the Bankruptcy Court listing liabilities and assets.

**9.57**   **Secured Claim**:  A Claim that is secured by property of the Debtor.

**9.58**   **Subchapter V**:  Subchapter V of chapter 11 of the Bankruptcy Code.

**9.59**   **Trustee:**  Neema T. Varghese.

**9.60**   **Unexpired Lease**:  Has the meaning ascribed to it in Article II, Section 4.

**9.61**   **Unimpaired**:  When used in reference to a Claim or Interest, means a Claim or Interest that is not impaired within the meaning of § 1124.

**9.62**   **Unsecured Claim Distributions**: Five annual distributions to be made by the Reorganized Debtor to holders of Class 3 Allowed General Unsecured Claims following the Effective Date, totaling $300,000, and consisting of (i) a $30,000 aggregate distribution on or before December 31, 2022; (ii) a $60,000 aggregate distribution on or before December 31, 2023; (iii) a $65,000 aggregate distribution on or before December 31, 2024; (iv) a $70,000 aggregate distribution on or before December 31, 2025; and (v) a $75,000 aggregate distribution on or before December 31, 2026.

**9.63**   **Unsecured Creditor**: Any Creditor that holds a Claim in the Case that is not a secured Claim.

GOLDEN FLEECE BEVERAGES, INC.

By:   /s/ Peter J. Roberts
       One of its attorneys

Robert M. Fishman
Peter J. Roberts
Cozen O'Connor
123 North Wacker Drive, Suite 1800
Chicago, IL  60606
P:  (312) 382-3100
F:  (312) 382-8910
rfishman@cozen.com
proberts@cozen.com

LEGAL\56417569\6

**EXHIBIT A – Debtor's Financial Projections**

1

**Exhibit A - Financial Projections**

**Golden Fleece Beverages, Inc.**
**Statement of Cash Flows**
*$ in thousands*

| | 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|
| **Period Ended** | **May-Dec** | **Year 2** | **Year 3** | **Year 4** | **Year 5** |
| **Operating Activities:** | | | | | |
| Net Income | ($100.0) | $26.2 | $32.0 | $93.3 | $216.8 |
| | | | | | |
| Adjustments to Reconcile Net Income | | | | | |
| to Cash from Operating Activities: | | | | | |
| Depreciation & Amortization | 20.3 | 33.0 | 35.5 | 38.0 | 40.5 |
| (Increase) Decrease in Current Assets | 162.6 | 203.3 | (244.7) | (20.1) | (249.0) |
| (Increase) Decrease in Other Assets | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Increase (Decrease) in Current Liabilities | (13.4) | 120.2 | 188.1 | 93.8 | 100.9 |
| Increase (Decrease) in Long-term Liabilities | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| | | | | | |
| Cash Provided (Used) by Operating Activities | 69.5 | 382.8 | 10.8 | 205.0 | 109.1 |
| | | | | | |
| **Investing Activities:** | | | | | |
| Capital Expenditures | (24.0) | (50.0) | (50.0) | (50.0) | (50.0) |
| Sales of Fixed Assets | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| | | | | | |
| Cash Used by Investing Activities | (24.0) | (50.0) | (50.0) | (50.0) | (50.0) |
| | | | | | |
| **Financing Activities:** | | | | | |
| Borrow / (Paydown) Revolver | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Borrow / (Paydown) Notes Payable | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Borrow / (Paydown) Pre-Petition Debt | (30.0) | (60.0) | (65.0) | (70.0) | (75.0) |
| Proceeds/Redemption of Common Stock | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Proceeds/Redemption of Preferred Stock | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Borrow / (Paydown) Loans | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Proceeds/Redemption of Stock-APIC | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| | | | | | |
| Cash Provided by Financing Activities | (30.0) | (60.0) | (65.0) | (70.0) | (75.0) |
| | | | | | |
| Increase (Decrease) in Cash | 15.5 | 272.8 | (104.2) | 85.0 | (15.9) |
| Cash at Beginning of Period | 100.8 | 116.3 | 389.0 | 284.8 | 369.8 |
| **Cash at End of Period** | **$116.3** | **$389.0** | **$284.8** | **$369.8** | **$353.9** |

*Projected Consolidated Income Statement*

**Golden Fleece Beverages, Inc.**

**Income Statement**

*$ in thousands*

| | 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|
| **Period Ended** | **May-Dec** | **Year 2** | **Year 3** | **Year 4** | **Year 5** |
| Company-Owned Units Open at Period End | | 0 | 0 | 0 | 0 |
| Licensed Units Open at Period End | | 21 | 24 | 28 | 34 |
| Systemwide Units Open at Period End | | 21 | 24 | 28 | 34 |
| | | | | | |
| CPG Sales | 2,435.1 | 4,191.5 | 5,350.8 | 6,670.6 | 8,081.2 |
| eCommerce Sales | 7.1 | 11.1 | 10.7 | 10.0 | 9.4 |
| Licensing Sales | 175.5 | 349.3 | 403.2 | 465.4 | 569.2 |
| **Gross Revenue** | **2,617.7** | **4,551.9** | **5,764.7** | **7,146.0** | **8,659.9** |
| *% growth* | | *27.5%* | *26.6%* | *24.0%* | *21.2%* |
| | | | | | |
| Discounts / Allowances - CPG | (323.1) | 510.8 | 652.1 | 812.9 | 984.8 |
| | | | | | |
| **Net Revenue** | **2,294.5** | **4,041.2** | **5,112.6** | **6,333.1** | **7,675.1** |
| *% growth* | | *25.5%* | *26.5%* | *23.9%* | *21.2%* |
| | | | | | |
| Cost of Goods Sold: | | | | | |
| CPG | 1,462.6 | 2,425.0 | 3,095.8 | 3,859.3 | 4,675.5 |
| eCommerce | 6.4 | 7.4 | 7.0 | 6.5 | 6.0 |
| Licensing | 26.5 | 52.8 | 58.4 | 67.6 | 80.7 |
| Total Cost of Goods Sold | 1,495.5 | 2,485.2 | 3,161.2 | 3,933.4 | 4,762.2 |
| | | | | | |
| **Gross Profit** | **799.1** | **1,555.9** | **1,951.4** | **2,399.7** | **2,912.9** |
| *Gross Margin* | *34.5%* | *38.5%* | *38.2%* | *37.9%* | *38.0%* |
| | | | | | |
| CPG | 238.9 | 438.0 | 660.8 | 859.3 | 1,034.3 |
| eCommerce | 1.5 | 3.0 | 2.9 | 2.7 | 2.6 |
| Licensing | 89.7 | 140.3 | 152.6 | 257.5 | 375.1 |
| Total Operating Expenses | 330.2 | 581.4 | 816.3 | 1,119.6 | 1,412.0 |
| | | | | | |
| Corporate Supply Chain | | 238.6 | 272.0 | 331.6 | 401.7 |
| Corporate Payroll & Benefits | | 540.4 | 654.3 | 674.0 | 694.2 |
| Corporate Marketing | | - | - | - | - |
| Corporate Rent & Utilities | | - | - | - | - |
| Corporate G&A and Other | | 128.9 | 132.0 | 134.5 | 137.2 |
| Total Corporate Expenses | 538.6 | 908.0 | 1,058.3 | 1,140.1 | 1,233.1 |
| | | | | | |
| Total Regional & Corporate Expenses | 868.8 | 1,489.3 | 1,874.6 | 2,259.7 | 2,645.0 |
| | | | | | |
| **Company EBITDA** | **(69.7)** | **66.6** | **76.9** | **140.1** | **267.9** |
| *EBITDA Margin* | *(3.6%)* | *1.6%* | *1.5%* | *2.2%* | *3.5%* |
| | | | | | |
| New Product Development | 10.0 | 7.4 | 9.4 | 8.8 | 10.6 |
| Other Expenses | | - | - | - | - |
| Other Income | | - | - | - | - |
| Interest Expense | - | - | - | - | - |
| Depreciation & Amortization | 20.3 | 33.0 | 35.5 | 38.0 | 40.5 |
| Other Expenses/(Income) | 30.3 | 40.3 | 44.9 | 46.7 | 51.1 |
| | | | | | |
| **Income Before Taxes** | **(100.0)** | **26.2** | **32.0** | **93.3** | **216.8** |
| | | | | | |
| Provision for Taxes | | - | - | - | - |
| **Net Income** | **($100.0)** | **$26.2** | **$32.0** | **$93.3** | **$216.8** |

**Golden Fleece Beverages, Inc.**

**Income Statement**

*$ in thousands*

| Period Ended | 2022 May-Dec | 2023 Year 2 | 2024 Year 3 | 2025 Year 4 | 2026 Year 5 |
|---|---|---|---|---|---|
| Company-Owned Units Open at Period End | | 0 | 0 | 0 | 0 |
| Licensed Units Open at Period End | | 21 | 24 | 28 | 34 |
| Systemwide Units Open at Period End | | 21 | 24 | 28 | 34 |
| | | | | | |
| *Net Income Margin* | *(3.8%)* | *0.6%* | *0.6%* | *1.5%* | *2.8%* |

*Projected Consolidated Income Statement*

**Golden Fleece Beverages, Inc.**

**Income Statement**

*$ in thousands*

*Projected Consolidated Income Statement*

| | 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|
| **Period Ended** | **May-Dec** | **Year 2** | **Year 3** | **Year 4** | **Year 5** |
| Company-Owned Units Open at Period End | | 0 | 0 | 0 | 0 |
| Licensed Units Open at Period End | | 21 | 24 | 28 | 34 |
| Systemwide Units Open at Period End | | 21 | 24 | 28 | 34 |
| | | | | | |
| Revenue Mix | | | | | |
|    CPG Sales | | 92.1% | 92.8% | 93.3% | 93.3% |
|    eCommerce Sales | | 0.2% | 0.2% | 0.1% | 0.1% |
|    Licensing Sales | | 7.7% | 7.0% | 6.5% | 6.6% |
| | | | | | |
| COGS % of Respective Revenue Category | | | | | |
|    CPG | | 57.9% | 57.9% | 57.9% | 57.9% |
|    eCommerce | | 66.8% | 65.8% | 64.8% | 63.8% |
|    Licensing | | 15.1% | 14.5% | 14.5% | 14.2% |
|    Total Cost of Goods Sold | | 61.5% | 61.8% | 62.1% | 62.0% |
| | | | | | |
| Payroll & Benefits Growth | | 36.1% | 21.1% | 3.0% | 3.0% |
| Rent & Occupancy Growth | | 0.0% | 0.0% | 0.0% | 0.0% |
| General & Administrative Growth | | (60.0%) | 2.4% | 1.9% | 2.0% |
| | | | | | |
| New Product Development (% of Net Revenue) | | 0.2% | 0.2% | 0.1% | 0.1% |
| Depreciation & Amortization (% of Net Revenue) | | 0.8% | 0.7% | 0.6% | 0.5% |
| | | | | | |
| NOL Deduction | | 2,188 | 2,156 | 2,063 | 1,846 |
| Corporate Tax Rate (Federal + State) | | 44.5% | 44.5% | 44.5% | 44.5% |

**EXHIBIT B – Executory Contracts and Unexpired Leases to be Assumed**

| Counterparty | Description | Cure Amount | Cure Method |
|---|---|---|---|
| Aramark Food & Support Svcs Group | Licensing Agreement | $0 | N/A |
| Argo Tea Korea/Argo Tea Korea Co LT | Licensing Agreement | $0 | N/A |
| Compass Group USA, Inc. | Licensing Agreement | $0 | N/A |
| Dora's Naturals | Customer Agreement | $0 | N/A |
| First Logistics Management Svs. | Warehouse and Fulfillment Agreement | $0 | N/A |
| Hera Retail LLC | Licensing Agreement and Transition Services Agreement | $0 | N/A |
| KeHe | Customer Agreement | $0 | N/A |
| Kwik Trip, Inc. | Customer Agreement | $0 | N/A |
| Lipari | Customer Agreement | $0 | N/A |
| McLane | Customer Agreement | $0 | N/A |
| Ship Hero Fulfillment, LLC | Fulfillment Service Agreement | $6,479.98 | Cash Payment on Effective Date |
| Sodexo Management, Inc. | Licensing Agreement | $0 | N/A |
| United Natural Foods, Inc. | Customer Agreement | $0 | N/A |
| Univ. of Western Ontario/Hosp Svc | Licensing Agreement | $0 | N/A |
| University of MA Amherst | Licensing Agreement | $0 | N/A |
| Walgreens | Merchandise Vendor Agreement | $0 | N/A |

1

**EXHIBIT C – Executory Contracts and Unexpired Leases to be Rejected**

| Counterparty | Description |
| --- | --- |
| Load King | Customer Agreement |
| O-I Packaging Solutions | Supply Agreement |

1

**EXHIBIT D** - **Liquidation Analysis**

LEGAL\56417569\6

## Exhibit D - GFB Liquidation Analysis

| Assets | Total | Notes |
|---|---|---|
| PPE | $ - | |
| Cash | $ 30,305.00 | As of April 30th |
| Inventory | $ 22,663.54 | As of April 30th |
| Brand value | | IP rights, etc |
| AR | $ 387,300.00 | Walgreens for 60 days, All others for 30 days.  Less "Other" in AR |
| Total | $ 440,268.54 | |

| Deductions | | Notes |
|---|---|---|
| Accrued Professional Fees | $ 135,000.00 | Clark Hill, Cozen, and Sub 5 Trustee |
| Payroll | $ 23,700.00 | One full payroll for team. |
| Expense Reports | $ 4,500.00 | 30 days expenses trailing |
| Taxes | $ 2,625.00 | Franchise and Sales Tax.  No income tax. |
| Insurance | $ 17,474.00 | Payments through 120 days |
| Personnel Requirements | $ 54,164.00 | KC and CP for 60 days, then CP for an additional 60 |
| Chapter 7 Trustee Expenses | $ 13,208.06 | 3% of Assets |
| Dip Loan Repayment | | |
| AP | $ 5,000.00 | Almost all vendors on pre-pay |
| Total | $ 255,671.06 | |

| Estimated Liquidation Value | $ 184,597.48 | |
|---|---|---|